Case No. 25-4066

———————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————————

VICKI COFFEY, on behalf of herself and all others similarly situated,

*Plaintiff–Appellant,*

v.

FAST EASY OFFER LLC, GFSG LLC d/b/a KELLER WILLIAMS
REALTY PHOENIX, and KELLER WILLIAMS REALTY, INC.,

*Defendants–Appellees.*

———————————————

On Appeal from the United States District Court
for the District of Arizona (Case No. 24-cv-02725)
The Honorable Steven P. Logan

———————————————

## BRIEF FOR APPELLANT

———————————————

Adam Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Emma Freeman
 *Counsel of Record*
APOLLO LAW LLC
275 Park Avenue
Suite A
Brooklyn, NY 11205
(646) 363-6766
emma@apollo-law.com

[*additional counsel listed on inside cover*]

Alex D. Kruzyk
PARDELL, KRUZYK & GIRIBALDO, PLLC
7500 Rialto Boulevard
Suite 1-250
Austin, TX 78735

*Counsel for Appellant*

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUES .......................................................... 1

INTRODUCTION ............................................................................... 1

STATEMENT OF THE CASE ............................................................. 5

I.    LEGAL BACKGROUND ............................................................. 5

    A.    Congress Passed the TCPA to Combat the Intrusive Invasion of Privacy Caused by "Unrestricted Telemarketing" ........................................................... 5

    B.    The TCPA Authorized the FCC to Establish a Do-Not-Call Registry and Required the FCC to Promulgate Regulations Prohibiting Telephone Solicitations ................... 6

    C.    FCC Regulations Prohibit Telephone Solicitations Sent to Numbers Listed in the Do-Not-Call Registry .................... 7

    D.    The TCPA Grants Plaintiffs the Right to Sue for Telephone Solicitations that Violate FCC Regulations ......... 8

II.    FACTUAL BACKGROUND ......................................................... 9

    A.    Vicki Coffey ...................................................................... 9

    B.    Fast Easy Offer's Wholesaling Business Model Features "Hybrid" Offers to Purchase Homes ....................................... 9

    C.    Fast Easy Offer Partners with Keller Williams to Profit from Conventional Real Estate Sales .................................... 13

    D.    Fast Easy Offer Calls and Texts Coffey with the Purpose of Selling Her Real-Estate Services ......................................... 16

III.    PROCEDURAL HISTORY ........................................................ 17

SUMMARY OF THE ARGUMENT .................................................. 19

STANDARD OF REVIEW ................................................................ 21

ARGUMENT .................................................................................... 22

I.   APPELLEES CONCEDE ALL BUT ONE ELEMENT OF COFFEY'S TCPA CLAIM ............................................... 22

II.  FAST EASY OFFER REPEATEDLY SENT COFFEY PROHIBITED TELEPHONE SOLICITATIONS ......................... 22

     A.   The TCPA Must Be Interpreted in View of Its Text, Structure, and Purpose ............................................. 23

     B.   The TCPA Directs Courts to Examine the Purpose of Telephone Calls and Messages to Determine Whether They Are "Telephone Solicitations" ...................................... 24

     C.   Courts Must Look Beyond the Plain Text of Telephone Messages to Their Entire Context ......................................... 29

     D.   The Purpose of Fast Easy Offer's Text Messages and Telephone Calls Was to Sell Coffey Real-Estate Services ............................................................................... 33

          (1)  Coffey alleged that Fast Easy Offer made "hybrid" offers to encourage her to buy its suite of real-estate services and induce her to hire Keller Williams real-estate agents ........................................... 33

          (2)  The district court failed to credit Coffey's allegations about the purpose behind Fast Easy Offer's calls and messages and contravened this Court's decision in *Chesbro* ........................................... 36

          (3)  Nearly every court to consider analogous "hybrid" offers has deemed them prohibited solicitations under the TCPA ............................................................ 39

          (4)  *Jance* and *Hunsinger* did not address the "hybrid" offers at issue here ...................................... 44

CONCLUSION ....................................................................... 47

ADDENDUM ..........................................................................

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Catalina Structured Funding, Inc.*,
No. 1:21-cv-197, 2021 WL 8315006 (W.D. Mich. Dec. 21, 2021)
.................................................................................... 27, 43–44

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................ 21

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022)........................................... 21

*Bumpus v. Realogy Brokerage Grp. LLC*,
No. 3:19-cv-03309, 2022 WL 1489470 (N.D. Cal. May 11, 2022)
.................................................................................... 35, 43

*Chesbro v. Best Buy Stores, L.P.*,
705 F.3d 913 (9th Cir. 2012) ............. 4, 20, 24, 28–30, 32, 36–39, 44

*Chinitz v. Intero Real Est. Servs.*,
No. 18-cv-05623, 2021 WL 1375837 (N.D. Cal. Apr. 12, 2021) ..... 36

*Chinitz v. NRT W., Inc.*,
No. 18-cv-06100, 2019 WL 720996 (N.D. Cal. Feb. 20, 2019)
.................................................................................... 25, 31, 35, 42

*Davis v. Reliance First Cap., LLC*,
No. 7:22-cv-00018, 2023 WL 1982354 (E.D.N.C. Feb. 13, 2023) ... 31

*Eagle v. GVG Cap. LLC*,
No. 22-cv-00638, 2023 WL 1415615 (W.D. Mo. Jan. 31, 2023)
.................................................................................... 40

*Facebook v. Duguid*,
592 U.S. 395 (2021) ........................................................ 32

iv

*Golan v. Veritas Ent., LLC*,
    788 F.3d 814 (8th Cir. 2015) ................................................... 24, 30

*Helfrich v. Raven3 HomeBuyers LLC*,
    No. 22-cv-03529, 2023 WL 5956221 (S.D.N.Y. Sept. 13, 2023)
    .......................................................................................... 37, 41

*Hill v. InvestorPlace Media, LLC*,
    No. 5:23-cv-00111, 2024 WL 1056030 (W.D. N.C. Mar. 11,
    2024) ........................................................................................... 31

*Hulce v. Zipongo Inc.*,
    132 F.4th 493 (7th Cir. 2025) ......................................................... 25

*Hunsinger v. Offer LLC*,
    No. 3:21-cv-2846, 2022 WL 18143951 (N.D. Tex. Dec. 7, 2022)
    ...................................................................................... 18, 46–47

*Jance v. Homerun Offer LLC*,
    No. 20-cv-00482, 2021 WL 3270318 (D. Ariz. July 30, 2021)
    ...................................................................................... 18, 44–46d

*JW Gaming Dev., LLC v. James*,
    544 F. Supp. 3d 903 (N.D. Cal. 2021) ........................................... 43

*Knutson v. Blue Light Sec., Inc.*,
    No. 17-cv-134, 2018 WL 1172611 (S.D. Cal. Mar. 6, 2018) ..... 44, 46

*Lathus v. City of Huntington Beach*,
    56 F.4th 1238 (9th Cir. 2023) ......................................................... 21

*Leyse v. Bank of Am. Nat. Ass'n*,
    804 F.3d 316 (3d Cir. 2015) ........................................................... 23

*McLaughlin Chiropractic Assocs., Inc. v. McKesson, Inc.*,
    606 U.S. 146 (2025) ....................................................................... 23

*Mattioda v. Nelson,*
    98 F.4th 1164 (9th Cir. 2023) ........................................ 21

*McMorrow v. Core Props., LLC,*
    No. 4:23-cv-00126, 2023 WL 8697795 (E.D. Mo. Dec. 15, 2023)
    ........................................................................... 36, 42

*Moonsawmy v. JWS Acquisitions, LLC,*
    No. 1:23-cv-04198, slip op. (N.D. Ga. July 18, 2024) ..................... 41

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) ....................................... 23

*Pepper v. GVC Cap. LLC,*
    677 F. Supp. 3d 638 (S.D. Tex. 2023) ................................. 27, 35, 40

*Physicians Healthsource, Inc. v. A-S Med. Sols., LLC,*
    950 F.3d 959 (7th Cir. 2020) ......................................... 23

*Redd v. Guerrero,*
    84 F.4th 874 (9th Cir. 2023) .......................................... 22

*Rudgayzer & Gratt v. Enine, Inc.,*
    779 N.Y.S.2d 882 (Sup. Ct. N.Y., App. Term, 2004) ..................... 31

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ........................................ 38

*United States v. Gallego,*
    No. CR-18-01537-001, 2018 WL 4257967 (D. Ariz. Sept. 6, 2018)
    ............................................................................ 44

*United States v. Muckleshoot Indian Tribe,*
    235 F.3d 429 (9th Cir. 2000) ......................................... 32

*United States ex rel. Campie v. Gilead Scis., Inc.,*
    862 F.3d 890 (9th Cir. 2017) ......................................... 36–37

*Van Patten v. Vertical Fitness Grp., LLC,*
    847 F.3d 1037 (9th Cir. 2017) ..................................................... 9, 23

*Wilcox v. MarketPro S., Inc.,*
    No. 23-cv-2364, 2023 WL 8806696 (D. Md. Dec. 20, 2023)
    .................................................................................. 31, 35, 38, 42

## STATUTES

Pub. L. No. 102-243, 105 Stat. 2394 (1991) ............................................. 1

Pub. L. No. 108-10, 117 Stat. 557 (2003) ................................................. 8

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

47 U.S.C. § 227 ................................................1–9, 19, 22, 24, 26, 33, 39

## RULES AND REGULATIONS

16 C.F.R. § 310.4 ..................................................................................... 7

47 C.F.R. § 64.1200 ........................................1, 4, 8, 19, 22, 24, 26, 29, 33

## OTHER AUTHORITIES

68 Fed. Reg. 44144 (July 25, 2003) ........................................................ 26

137 Cong. Rec. S9840-02 (1991) .............................................................. 6

H.R. Rep. No. 108-8 .............................................................................. 7–8

In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of
    1991, 18 F.C.C. Rcd. 14014 (2003) ............................................... 8

*Purpose,* 12 *The Oxford English Dictionary* ........................................... 24

*Services*, 15 *The Oxford English Dictionary* ...........................................35

*Purpose, Merriam-Webster's Third New International Dictionary* (Philip Babcock Gove et al., eds., 7th prtg. 1993)................................................24

*Services, Merriam-Webster's Third New International Dictionary* (Philip Babcock Gove et al., eds., 7th prtg. 1993)................................................35

## **STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Coffey respectfully requests oral argument in this case, which presents important questions about how to determine whether telephone calls and messages constitute "telephone solicitations" under the Telephone Consumer Protection Act. Oral argument will give this Court a valuable opportunity to clarify the parties' arguments.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because this case arose under the Telephone Consumer Protection Act, 47 U.S.C. § 227, and its implementing regulations, 47 C.F.R. § 64.1200. ER-11.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court entered final judgment on June 5, 2025. ECF No. 28. Appellant filed a notice of appeal on June 27, 2025. ECF No. 29. This appeal is from a final judgment disposing of all parties' claims.

## STATEMENT OF THE ISSUES

Whether the district court erred when it granted Appellees' motion to dismiss based on the court's conclusion that Appellee Fast Easy Offer's repeated, unsolicited telephone calls and text messages to Appellant Coffey encouraging Coffey to purchase Fast Easy Offer and Keller Williams' real-estate services were not "telephone solicitations" under the Telephone Consumer Protection Act.

## INTRODUCTION

"Unrestricted telemarketing" is "an intrusive invasion of privacy." Pub. L. No. 102-243, § 2(5) (1991). Divided on a great many issues, Americans remain united in their "outrage[] over the proliferation of intrusive, nuisance calls" and text messages "from telemarketers." *Id.* § 2(6). Over the past generation, Congress has embraced this consensus by passing and repeatedly strengthening the Telephone Consumer

1

Protection Act (TCPA) and authorizing the creation of the Federal Communications Commission's (FCC) National Do-Not-Call Registry. The crown jewel of the TCPA is a provision prohibiting unsolicited telephone calls and text messages that are made "for the purpose of encouraging the purchase" of "goods" or "services." 47 U.S.C. § 227(a)(4).

This case is about a serial telemarketer that's trying to open a continent-sized loophole in the TCPA. Appellee Fast Easy Offer LLC refers to itself as a "cash homebuyer." In reality, Fast Easy Offer is a wholesaling entity that makes money the old-fashioned way—by selling services. Its business model is simple. Fast Easy Offer blasts out thousands of unsolicited calls and texts to homeowners. Those calls and messages dangle lowball "all-cash" offers to buy the recipients' houses. But they also implicitly carry an invitation to purchase the suite of brokerage-like services that Fast Easy Offer provides: repairs, title, escrow, marketing, preparation of paperwork, and closing costs, to name just a few. Despite Fast Easy Offer's initial pitch to buy recipients' houses, it doesn't typically buy anything. Instead, Fast Easy Offer provides another service: acting as a middleman broker by quickly marketing the properties at a premium to third-party investors who buy the homes. And if the initial sales pitch fails, Fast Easy Offer provides *yet another* service: encouraging listing the homeowners' properties for sale with Fast Easy Offer's business affiliate Appellee Keller Williams

Realty. Fast Easy Offer and Keller Williams share revenue from this arrangement.

The result? When homeowners accept Fast Easy Offer's "offers" on their homes, or sign up with Keller Williams, they pay Fast Easy Offer an "effective fee" and receive an array of real-estate services in return.

Now focus again on Fast Easy Offer's telemarketing campaign. Fast Easy Offer's calls and texts serve an obvious dual purpose. They are "hybrid" telephone solicitations—nominally offering to purchase a home, but also made "for the purpose of encouraging the purchase" of "services." 47 U.S.C. § 227(a)(4).

Appellant Vicki Coffey is one of the homeowners Fast Easy Offer targeted. Coffey put her telephone number on the Do-Not-Call Registry more than twenty years ago. She never listed her home for sale. Yet she was repeatedly bombarded with Fast Easy Offer's calls and texts from an ever-changing series of phone numbers. Each call and text asked Coffey if she wanted to sell her home. But when the calls and texts directed Coffey to Fast Easy Offer's website, the messages' true purpose became clear: Fast Easy Offer wanted to encourage Coffey to buy its bundle of real-estate services. And if Coffey didn't bite on the wholesaling pitch, Fast Easy Offer and Keller Williams stood ready to monetize the lead through a traditional real-estate listing. One way or another, Fast Easy Offer's messages to Coffey sought to sell her its services.

3

The sole question in this appeal is whether Fast Easy Offer's calls and text messages to Coffey constituted "telephone solicitations" within the meaning of the TCPA. The answer to that question is yes. Congress defined a "telephone solicitation" as any "call or message" made "for the purpose of encouraging the purchase" of "services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). The plain language of this statutory provision is clear: What matters is the *underlying purpose* of the communication— not the lawyerly framing of the message itself, not the sender's characterization of the message, and not the impact on the listener. Pointing to the TCPA's text, the FCC has urged courts to look past wordsmithing to the real aim of a telephone message. This Court has likewise held that the character of a telephone communication turns on common-sense context and intent, not whether the sender used or avoided certain magic language in its message. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). In short, if a call or text is made with the aim of marketing services, it is a prohibited solicitation—no matter how artfully disguised.

Despite all this, the district court granted the motion to dismiss Coffey's TCPA claim, holding that Fast Easy Offer's messages weren't "telephone solicitations" under the TCPA because, on the surface, they did no more than offer to purchase Coffey's home.

That conclusion was seriously misplaced. It disregarded Coffey's allegations, which explained in detail that the purpose behind Fast Easy

4

Offer's texts and calls was to encourage the purchase of real-estate services. It ignored the growing consensus reached by district courts across the country analyzing similar telephone messages and business models. And it placed a judicial imprimatur on a perverse scheme that would allow a flood of telemarketers to circumvent the TCPA—and the will of Congress and the American people—by labeling their sales pitch as nothing more than an "offer to buy."

The district court's form-over-substance reasoning is inconsistent with the plain text of the TCPA, the FCC's regulations and guidance, and Ninth Circuit precedent. This Court should reverse.

## STATEMENT OF THE CASE

## I.  LEGAL BACKGROUND.

This case revolves around the meaning of the phrase "telephone solicitation" in the TCPA. Pub. L. No. 102–243, § 2, ¶ 5, 105 Stat. 2394 (1991) (codified as amended at 47 U.S.C. § 227). Some background relating to the statutory scheme and the reasons Congress chose to prohibit unwanted telephone solicitations supplies important context.

### A.  Congress Passed the TCPA to Combat the Intrusive Invasion of Privacy Caused by "Unrestricted Telemarketing."

Congress passed the TCPA in 1991 to address the "intrusive invasion of privacy" posed by "[u]nrestricted telemarketing." Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243, § 2, ¶ 5, 105 Stat. 2394 (1991) (codified as amended at 47 U.S.C. § 227). Congress found

5

that "[m]any consumers [we]re outraged over the proliferation of intrusive, nuisance [telemarketing] calls to their homes…regardless of the content or the initiator of the message." *Id*. ¶¶ 6, 10. Introducing the bill, Senator Hollings captured the prevailing sentiment. He described telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. S9840-02, S9874 (1991). "They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." *Id*.

### B. The TCPA Authorized the FCC to Establish a Do-Not-Call Registry and Required the FCC to Promulgate Regulations Prohibiting Telephone Solicitations.

Through the TCPA, Congress moved to prohibit unwanted telephone solicitations. It did so in two steps.

First, Congress defined "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase…of…services." 47 U.S.C. § 227(a)(4).

Second, Congress authorized the FCC to create a national do-not-call registry and required the agency to prohibit telephone solicitations to anyone on that list. The TCPA directs the FCC to issue regulations "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id*. at § 227(c)(1)–(c)(2). It authorizes the FCC to create and administer a national do-not-call registry. *Id*. at § 227(c)(3). And it requires the FCC to issue

6

regulations "prohibit[ing] any person from making or transmitting a telephone solicitation to the telephone number of any subscriber" listed in the registry. *Id*. at § 227(c)(3)(F).

### C. FCC Regulations Prohibit Telephone Solicitations Sent to Numbers Listed in the Do-Not-Call Registry.

By 2003, the FCC had issued regulations prohibiting telephone solicitations to anyone on the Do-Not-Call Registry.

The FCC considered setting up a national do-not-call registry almost immediately after the TCPA was passed, but determined that the registry would be "too costly and burdensome at that time." H.R. Rep. No. 108-8, at 4 (2003). The problem of telemarketing, meanwhile, only got worse. Within ten years, consumer complaints "regarding unwanted telemarketing calls" had "increased over one-thousand percent." H.R. Rep. No. 108-8, at 2 (2003).

As these developments prompted the FCC to reconsider establishing a do-not-call registry, the Federal Trade Commission (FTC) took action in its place. *See* H.R. Rep. No. 108-8 at 4. After a period of notice and comment, the FTC observed that "consumers continue to be angered by and frustrated with the pattern of unsolicited telemarketing calls they receive from the multitude of sellers and telemarketers." Telemarketing Sales Rule, 68 Fed. Reg. 4580, 4631 (2003) (codified at 16 C.F.R. § 310.4). The FTC similarly reported that "[c]onsumer and privacy advocates, as well as individual consumers, overwhelmingly

7

supported the creation of…a [national do-not-call] registry." *Id*. at 4628. The FTC created the National Do-Not-Call Registry in 2003 to address these concerns. H.R. Rep. No. 108-8 at 3.

With the National Do-Not-Call Registry now in place, Congress in 2003 directed the FCC to issue its own rules to "maximize consistency with" the FTC's registry. *See* Pub. L. No. 108-10, § 3, 117 Stat. 557 (2003). The FCC issued regulations later that year. H.R. Rep. No. 108-8 at 3; *see* In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014 (2003) [hereinafter "2003 FCC Order"].

Those regulations completed the regulatory scheme contemplated by the TCPA. The FCC regulations prohibit any "telephone solicitation" sent to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." 47 C.F.R. § 64.1200(c)(2). The FCC regulations define "telephone solicitation" and "telemarketing" to match the TCPA's statutory definition exactly: "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." *Compare* 47 U.S.C. § 227(a)(4) *with* 47 C.F.R. § 64.1200(f)(13), (15).

### D. The TCPA Grants Plaintiffs the Right to Sue for Telephone Solicitations that Violate FCC Regulations.

When it passed the TCPA, Congress empowered individuals to combat privacy violations by granting them "the substantive right to be free from certain types of phone calls and texts absent [their] consent."

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017). Congress created a private right of action for any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations" promulgated under the statute. 47 U.S.C. § 227(c)(5). TCPA plaintiffs can "recover for actual monetary loss" or "up to $500 in damages for each…violation," whichever is greater. 47 U.S.C. § 227(c)(5)(b).

## II.   FACTUAL BACKGROUND.

### A.   Vicki Coffey.

Appellant Vicki Coffey is a resident of Gilbert, Arizona. She is the sole user of her personal cellular telephone, which she also uses as her residential line. Wanting to avoid telemarketing calls, Coffey registered her phone number on the National Do-Not-Call Registry in 2004. ER-12. Coffey's number has remained there ever since. ER-12.

### B.   Fast Easy Offer's Wholesaling Business Model Features "Hybrid" Offers to Purchase Homes.

Appellee Fast Easy Offer is a Mesa, Arizona-based real estate company that advertises itself as "a local real estate solutions company" that can "help[] homeowners like you find solutions to any problem." ER-15.

Here's how Fast Easy Offer's business model works. First, Fast Easy Offer solicits homeowners to sell their houses to Fast Easy Offer at steep discounts, far below fair-market value. ER-15. Fast Easy Offer

9

accomplishes this step through a mass-telemarketing scheme that requires its employees to make and send upward of a thousand unsolicited calls and texts each day. ER-15. These calls and texts ask homeowners whether they are interested in selling their property. ER-15, ER-17. Fast Easy Offer's agents tell homeowners that the company will "buy your house with a fair all cash offer" while claiming that Fast Easy Offer will "handle all the necessary details on your behalf" to complete the sale. ER-16. Once a homeowner takes the bait—but before the home purchase is complete—Fast Easy Offer typically assigns the sale contract to a third-party investor at a much higher price, with Fast Easy Offer pocketing the difference in price. ER-15–16. In other cases, Fast Easy Offer buys the property itself but quickly resells it to a third-party purchaser. ER-16.

FEO spells out its wholesaling formula for customers this way: "[Your Offer] = [After Repair Value] – [Repair Costs] – [Our Selling Costs] – [Our Minimum Profit]." ER-17. This means that Fast Easy Offer calculates each cash offer by (1) assessing what a home would be worth once renovated, then (2) subtracting costs stemming from the services it provides, together with repair costs and an amount for Fast Easy Offer's profit. ER-16.

The crucial aspect of Fast Easy Offer's wholesaling scheme is that the company doesn't just passively ask whether a homeowner wants to sell her property—full stop. Rather, inherent in each of Fast Easy Offer's

inquiries is the offer to provide a bundle of brokerage-like *services*—for example, home repair, agent fees, closing costs, taxes, preparing paperwork, holding costs, title, escrow, and marketing. ER-15–17. The value of these services is significant: Fast Easy Offer estimates that it amounts to "10%...of the selling price." ER-16.

Fast Easy Offer's own promotional materials discuss these services explicitly. For example, Fast Easy Offer touts its service to homeowners in appraising property: "Before our meeting at your property," Fast Easy Offer explains, "we do a comprehensive market analysis (CMA) on your home to determine what the market value of the property will be once it is completely renovated and brought up to today's HGTV standards." ER-16. Fast Easy Offer similarly highlights its service to homeowners in handling closings. The company's website explains: "If you agree to the offer, we'll arrange a closing with a reputable attorney, and your home will be sold." ER-16. These are just two examples among many. Fast Easy Offer sums up its service-oriented approach this way: "We'll work according to your timeline and handle all the necessary details on your behalf." ER-16.

Every homeowner who sells real estate using Fast Easy Offer pays for these services. According to its website, Fast Easy Offer's home purchases are "100% FREE"—"No agent fees, no repairs." Fast Easy Offer, *We Buy Homes For Cash!*, https://www.fasteasyoffer.com (last visited Oct. 9, 2025). But how does Fast Easy Offer actually make money

11

from the real estate services it offers? The answer is that those services are anything but free. Fast Easy Offer profits by baking an "effective fee" into every home-purchase transaction: It offers homeowners cash prices well below fair-market value, deducting from that number all the costs of valuation, repairs, title, escrow, closings, and its own minimum profit based on the assignment of the purchase contract to the third-party investor who ultimately buys the property. ER-15, ER-17. By doing so, Fast Easy Offer bundles its suite of brokerage-adjacent services into its purchase offers and charges for them indirectly—not through an invoice, but through a reduced offer price. ER-16–17. The supposed "free" model is simply clever marketing; homeowners still pay for Fast Easy Offer's services, but they pay by receiving less cash for their property than they'd otherwise get from a sale. ER-17. This hidden effective fee— obtained through a "hybrid" offer to purchase that includes an implicit solicitation to buy services—lies at the heart of Fast Easy Offer's business model. Indeed, Fast Easy Offer openly acknowledges as much by publicizing its wholesaling formula. ER-17.

It's easy to see why Fast Easy Offer takes this approach. In the traditional sales model, if a buyer's real-estate agent calls about an off-market home, the homeowner typically hires her own agent. The homeowner's agent provides pricing advice, markets the property, negotiates offers, and manages the escrow and closing process. The homeowner pays for those services through a commission. And in return,

the homeowner gets the chance to attract competing bids and sell at or above fair-market value.

But Fast Easy Offer's business model works differently. It markets itself as a one-stop shop that removes the hassle of repairs, open houses, and uncertain timelines. ER-16. On its website, Fast Easy Offer contrasts the "contractor nightmare" and "complete uncertainty" of the conventional process with what it calls "a better home-selling experience," promising to "handle the entire process from start to finish." Fast Easy Offer, *How We Buy Houses*, https://www.fasteasyoffer.com/how-we-buy-houses/ (last visited Oct. 9, 2025). But the convenience comes at a price. Homeowners only get the advertised convenience if they accept a sharply reduced, below-market offer. ER-17. That discount is how Fast Easy Offer makes money, and it means homeowners give up a significant share of their equity in exchange for services that are advertised as "free."

### C. Fast Easy Offer Partners with Keller Williams to Profit from Conventional Real-Estate Sales.

Fast Easy Offer promotes a second category of services through its affiliation with the well-known real-estate agency Keller Williams. When homeowners aren't interested in accepting a below-market sale, Fast Easy Offer promotes Keller Williams' traditional sales model and shares in the revenue from any sales.

13

The collaboration works like this: Whenever Fast Easy Offer cannot wholesale a property because a homeowner isn't interested in a reduced all-cash offer, Fast Easy Offer funnels the lead to Keller Williams agents for a listing. ER-18, ER-20. Homeowners based in Arizona are sent to Appellee GFSG LLC, Keller Williams' local affiliate doing business as Keller Williams Realty Phoenix ("Keller Williams Phoenix"). ER-18. Homeowners based elsewhere are referred to Appellee Keller Williams Realty ("Keller Williams National"), Keller Williams' national group. ER-18. When homeowners sent to Keller Williams by Fast Easy Offer sell their homes through this referral arrangement, Keller Williams and Fast Easy Offer share the revenues from the sale. ER-20.

This arrangement between Fast Easy Offer and Keller Williams is the product of deep business ties between the companies. Brett Tanner is an owner of Fast Easy Offer. ER-11. Tanner is also a licensed Arizona real estate broker affiliated with Keller Williams Phoenix. ER-12, ER-20. In promotional videos hosted by Keller Williams National, Tanner explained that while "nine out of ten" of Fast Easy Offer's consumer leads do not result in wholesale purchases, these leads are "perfect" for his Keller Williams team, which then lists the properties through conventional brokerage services. ER-17–18. Revenues are shared between Fast Easy Offer and Keller Williams Phoenix, with Keller Williams National receiving a percentage from each transaction. ER-20.

14

The connection between Fast Easy Offer and Keller Williams runs deeper still. Keller Williams National actively propagates Fast Easy Offer's business model through its "KW Wealth" program—led by Tanner himself. That program trains Keller Williams agents nationwide to replicate Fast Easy Offer's hybrid wholesaling approach: use aggressive solicitation to acquire homes cheaply when possible, and otherwise flip the lead into a conventional listing. ER-21–24. Keller Williams National lends its name, infrastructure, and technology to the program, charges monthly subscription fees for access, and collects fees from the resulting transactions. ER-22, ER-25. Most of Fast Easy Offer's disclosed employees and managers are themselves Keller Williams Phoenix agents. ER-22. Fast Easy Offer and Keller Williams Realty Phoenix share employees and office space, and even feature the same agents in promotional materials. ER-20.

In short, Fast Easy Offer is no rogue operator. It is a cog in the nationwide Keller Williams machine, designed to ensure that every consumer targeted by its telemarketing campaign becomes a source of profit—whether through a wholesaled home or a listed property.

To summarize, Every Fast Easy Offer cold call or text message to homeowners promotes two distinct categories of services: first, to wholesale the home and profit from the difference between the below-market cash offer and the ultimate value of the renovated property; or, alternatively, to refer the recipient to a Keller Williams real estate agent

for a traditional home sale. ER-18. One way or another, Fast Easy Offer pitches its (and Keller Williams') services to homeowners.

### D. Fast Easy Offer Calls and Texts Coffey With the Purpose of Selling Her Real-Estate Services.

Beginning in early 2024, Coffey received repeated calls and text messages from a rotating set of numbers. ER-12–14. One characteristic text message read: "Have you given up on selling your property?" ER-14. Coffey received at least six calls and two text messages from one number alone. ER-14.

Coffey never consented to receive these calls or texts. ER-25. She didn't solicit them. ER-25. And her telephone number was on the Do-Not-Call Registry when each call and text was received. ER-12. In any event, Coffey wasn't selling her home and had no interest in doing so. ER-14.

Coffey ultimately learned that *all* of the rotating numbers were linked to Fast Easy Offer. ER-14. After Coffey answered one call to figure out who was responsible for violating her do-not-call status on the Registry, the caller identified himself as "Yannick" and directed Coffey to Fast Easy Offer's website. ER-14.

Coffey's experience with Fast Easy Offer was typical of other homeowners that Fast Easy Offer targeted through its mass telemarketing efforts. One homeowner left a public consumer review of Fast Easy Offer that called its employees "[c]old call spammers" who

16

were "[s]uper rude." ER-19. Another homeowner said that "when you sign paperwork [Fast Easy Offer] will try to wholesale you[r] house behind your back" and "[l]et[] people view your house with a key you trusted [] them to use." ER-19. Yet another complained that Fast Easy Offer "made [an] offer[,] signed contract and then pulled out at the last minute" because the "contract is written so that they can cancel [it] at any time for any reason." ER-19.

And, as it did with Coffey, Fast Easy Offer called other consumers from multiple rotating telephone numbers, making it near-impossible for homeowners on the Do-Not-Call Registry to prevent undesired telephone communications. ER-19. "They keep calling," wrote one homeowner in 2022. ER-19. He continued: "I block one number and they call from another number. So far, blocked 8 numbers." ER-19.

## III. PROCEDURAL BACKGROUND.

Coffey filed a class-action complaint under the TCPA against Fast Easy Offer, Keller Williams Realty Phoenix, and Keller Williams National in 2024 (jointly, "Appellees"). ECF No. 1. Appellees moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that Fast Easy Offer's calls and text messages to Coffey were not "telephone solicitations" under the TCPA and, separately, that Keller Williams National should be dismissed from the case because it was neither directly nor vicariously liable for Fast Easy Offer's communications. ECF No. 18 at

17

1–2. The parties agreed to permit Coffey to file an amended complaint, and the district court denied the motion as moot. *See* ECF Nos. 16–17.

Coffey filed her amended complaint. ECF No. 19. Appellees again moved to dismiss, raising the same two arguments they had made the first time. ECF No. 24.

The district court granted this motion in its entirety. ER-10–32. The district court held that Fast Easy Offer's calls and texts to Coffey were not "telephone solicitations" under the TCPA. ER-8. Although the district court acknowledged that the statute defines "telephone solicitation" by reference to the "purpose" of a call or text, the court nevertheless concluded that Coffey had not plausibly alleged such a purpose because, the court reasoned, Fast Easy Offer's calls and messages offered only to buy her home. ER-3. Disregarding Coffey's out-of-circuit authority and relying exclusively on *Jance v. Homerun Offer LLC*, No. 20-cv-00482, 2021 WL 3270318 (D. Ariz. July 30, 2021) and *Hunsinger v. Offer LLC*, No. 3:21-cv-2846, 2022 WL 18143951 (N.D. Tex. Dec. 7, 2022), *report and recommendation adopted*, No. 3:21-cv-2846, 2023 WL 122649 (N.D. Tex. Jan. 6, 2023), the district court held that the TCPA does not prohibit a call or message that (1) offers to purchase property but (2) doesn't expressly ask a homeowner to *buy* anything. ER-5–7.

Based on this conclusion, the district court declined to reach the alternate argument that Keller Williams National was not liable for Fast Easy Offer's calls and text messages. ER-8.

This appeal followed.

## SUMMARY OF THE ARGUMENT

Fast Easy Offer's repeated, unsolicited calls and texts to Coffey were "telephone solicitations" under the TCPA because they were sent with the purpose of encouraging Coffey to purchase Fast Easy Offer and Keller Williams' suite of real-estate services.

Congress defined a "telephone solicitation" as any call or message made "for the purpose of encouraging the purchase…of…services." 47 U.S.C. § 227(a)(4); *see also* 47 C.F.R. § 64.1200(f)(15). The statute's plain text requires courts to focus on the underlying intent of telephone communications when determining if they meet this definition. The FCC has said as much, too. A call or text message can be a "telephone solicitation" even if it never mentions a service, so long as its purpose is to encourage the recipient to purchase one.

That was exactly the purpose behind Fast Easy Offer's telephone calls and text messages to Coffey: to encourage her to purchase real estate services. Fast Easy Offer sent messages and made phone calls hoping to induce Coffey to pay the company an "effective fee" to arrange home repairs, pay closing costs, handle title and escrow logistics, and more. Fast Easy Offer similarly sought to convince Coffey to use the

company as a middleman broker that would facilitate the sale of her home to third-party buyers. And failing that, Fast Easy Offer aimed to persuade Coffey to hire affiliated Keller Williams real estate agents to facilitate a traditional home sale. Because Fast Easy Offer contacted Coffey hoping to entice her to buy these services, its calls and text messages violated the TCPA's core prohibition against "telephone solicitations."

By focusing myopically on the text of Fast Easy Offer's messages to Coffey rather than on their *purpose*, the district court violated the TCPA's mandate. The proper analysis doesn't confine itself to reading the four corners of a text message or the script used for a robocall. Instead, courts must look beyond the literal words of a telephone message to its entire context. In *Chesbro*, 705 F.3d 913, this Court held that common sense—not clever drafting—controls. Any other approach would allow telemarketers to evade the TCPA by disguising their pitch as a mere "offer to buy." Rather than credit Coffey's allegations about the purpose behind Fast Easy Offer's messages, the district court made factual findings untethered to the complaint and claimed to divine Fast Easy Offer's purpose by looking only to the specific words Fast Easy Offer used in its calls and texts.

The district court's decision also ran counter to the weight of federal court authority. At least seven different district courts have confronted nearly identical "hybrid" offers from real estate wholesalers

20

just like Fast Easy Offer. Each court held that the calls and messages conveying these offers were "telephone solicitations" under the TCPA because they sought to encourage the purchase of services, not just induce the recipient to sell her home. The district court brushed aside the growing consensus among courts and instead relied on two unpublished cases filed by pro se plaintiffs—*Jance* and *Hunsinger*—that did not ever address "hybrid" offers like Fast Easy Offer's. But those cases say only that a telephone message whose purpose is *solely* to offer to purchase the recipient's home is not a "telephone solicitation" under the TCPA. *Jance* and *Hunsinger* have nothing to say about the type of messages Fast Easy Offer sent.

This Court should reverse and remand.

## STANDARD OF REVIEW

This Court reviews the grant of a motion to dismiss under Rule 12(b)(6) de novo. *Mattioda v. Nelson*, 98 F.4th 1164, 1173 (9th Cir. 2023). At this stage, the Court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Lathus v. City of Huntington Beach*, 56 F.4th 1238, 1240 (9th Cir. 2023). The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Boquist v. Courtney*, 32 F.4th 764, 773 (9th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The question is not whether the plaintiff will "ultimately prevail," but rather whether her "complaint was sufficient to cross the

21

federal court's threshold." *Redd v. Guerrero*, 84 F.4th 874, 892 (9th Cir. 2023) (citation modified).

## ARGUMENT

### I. APPELLEES CONCEDE ALL BUT ONE ELEMENT OF COFFEY'S TCPA CLAIM.

At the threshold, Appellees contest just one element of Coffey's TCPA claim: whether Fast Easy Offer's calls and text messages constitute "telephone solicitation" within the meaning of the statute. *See* 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). Appellees concede that Coffey adequately alleged that she (1) received at least two telephone communications within a 12-month period; (2) used her cellular telephone as her residential telephone; (3) registered her cellular telephone number on the Do-Not-Call Registry; and (4) did not provide prior express written consent for Fast Easy Offer to send telephone communications to her. *Compare* ER-12–14, ER-25 *with* ECF No. 24.

With these elements established, the only question before this Court is whether the district court erred in concluding that Fast Easy Offer's communications to Coffey did not constitute "telephone solicitations" under the TCPA.

### II. FAST EASY OFFER REPEATEDLY SENT COFFEY PROHIBITED TELEPHONE SOLICITATIONS.

The district court erred in granting Appellees' motion to dismiss and holding that Fast Easy Offer's calls and texts were not "telephone solicitations" under the TCPA. The court failed to credit Coffey's

22

allegations, disregarded the TCPA's mandate to evaluate the purpose of telephone messages, and wrongly constrained what little analysis it did conduct to the specific words Fast Easy Offer used in its calls and texts. The plain language of the statute and Ninth Circuit authority compel reversal.

### A. The TCPA Must Be Interpreted in View of Its Text, Structure, and Purpose.

Courts must "interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation" of the statute. *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). "As with any question of statutory interpretation," this Court must "begin[] with the plain language of the" TCPA, informed by "the whole statutory text, considering the [statute's] purpose and context." *Newsom v. Trump*, 141 F.4th 1032, 1046 (9th Cir. 2025).

"Because the TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls and messages, it should be construed in accordance with that purpose." *Van Patten*, 847 F.3d at 1047; *see Physicians Healthsource, Inc. v. A-S Med. Sols., LLC*, 950 F.3d 959 (7th Cir. 2020) (same). At the very least, if two "proposed interpretations of the Act [a]re equally plausible…the scales…tip in [the consumer]'s favor." *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 327 (3d Cir. 2015).

**B. The TCPA Directs Courts to Examine the Purpose of Telephone Calls and Messages to Determine Whether They Are "Telephone Solicitations."**

Begin with the text. Congress defined "telephone solicitation" as "the initiation of a telephone call or message for the purpose of encouraging the purchase…of…services." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). The plain meaning of this definition is unambiguous: When assessing whether a particular telephone communication violates the TCPA, courts must examine a caller's *intentions*—the "purpose of his message"—not the content of his messages, their effect or impact on the recipient, or "the caller's characterization of the call." *Chesbro*, 705 F.3d at 918; *see* 12 *The Oxford English Dictionary* at 878 (defining "purpose" as "result or effect intended or sought"); *Merriam-Webster's Third New International Dictionary* (Philip Babcock Gove et al., eds., 7th prtg. 1993) at 1847 ("an object to be attained: an end or aim"). Put another way, the caller's subjective intention, not the specific words of his message, is what matters.

The statute's focus on purpose makes sense. "Even when the intended content of a message is not conveyed, the intrusion into the home and the 'seizure' of the phone line is the same." *Golan v. Veritas Ent., LLC*, 788 F.3d 814, 820 (8th Cir. 2015) (quoting TCPA of 1991, § 2(5)); *see also* FCC 2003 Order, 68 Fed. Reg. 44144, 44147 & n.1 (July 25, 2003) (noting that even calls about "surveys, market research, [and]

24

political or religious speech…may be prohibited if they serve as a *pretext* to an otherwise prohibited advertisement or a means of establishing a business relationship").

And there's no serious dispute that the caller's "purpose" is the TCPA's north star. Appellees implicitly concede as much. The district court did the same. ER-3 (recognizing that "[w]hether a call constitutes a solicitation turns on the purpose of the message") (citation modified). The bottom line: Under the TCPA, "the caller's purpose and perspective"—not that of the call's recipient—"is of primary concern" when interpreting the phrase "telephone solicitation." *Hulce v. Zipongo Inc.*, 132 F.4th 493, 500 (7th Cir. 2025); *see also, e.g.*, *Chinitz v. NRT W., Inc.*, No. 18-cv-06100, 2019 WL 720996, at *3 (N.D. Cal. Feb. 20, 2019) (denying motion to dismiss TCPA claim against real estate brokerage because brokerage's robocalls, made "for the purpose of encouraging the purchase of [the] brokerage services," constituted "telemarketing" under TCPA).

Despite paying lip service to the significance of Fast Easy Offer's purpose, the district court didn't actually assess the purpose behind Fast Easy Offer's text communications when it held that those communications were not prohibited "telephone solicitations." Instead, the district court focused its analysis on the possible *impact* of Fast Easy Offer's messages. It first looked improperly to whether the "ultimate result" of Fast Easy Offer's messages would "*ever require [Coffey] to*

25

*purchase, rent, or invest* in property, goods, or services." ER-6–7. And, because of this initial error, the district court wrongly concluded that Fast Easy Offer's "calls and texts…cannot constitute 'solicitations'" because, even if Coffey accepted Fast Easy Offer's cash offer, she "would still be *making* money—and not spending a cent on purchasing any goods or services from Defendants." ER-8.

These points find no support in the plain text of the TCPA, which says nothing at all about the impact of any given telephone call or message, how much money a recipient ultimately spends, or whether a message "requires" any particular purchase by the recipient. ER-6. For one thing, had Congress wanted TCPA liability to hinge on the *impact* of a telephone communication rather than its *purpose*, it would have said so explicitly. Congress could have defined a prohibited telephone solicitation as—for instance—any "call or message…encouraging" the purchase of goods or services—regardless of the message's purpose. 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15). But that is not the language Congress chose. Instead, it unequivocally directed courts to assess the *purpose* for which a message was initiated—not the *impact* it ultimately had, or what the recipient of the message did after she received it. A TCPA plaintiff need not show that a telephone message would "require" her to do anything in particular to state a claim. ER-6. The TCPA and its implementing regulations say merely that a telephone solicitation must "*encourage*" the purchase of services. It would be

utterly inconsistent with the TCPA's text—and its purpose—if a telemarketer's cold-call only qualified as solicitation if a consumer actually transacted with that telemarketer.

Besides, the district court's focus on whether Coffey "would still be *making* money" if she accepted Fast Easy Offer's offer misunderstands the nature of the "effective fee" Fast Easy Offer charges homeowners. ER-8. "[Coffey] would pay [Fast Easy Offer's] fee whether she made the payment directly or indirectly, by discounting the sale price." *Pepper v. GVC Cap. LLC*, 677 F. Supp. 3d 638, 642 (S.D. Tex. 2023) (holding that the difference between an "effective fee" and an "actual fee" is "a distinction without a difference"). In other words, "just because the fees may be taken out of the [cash] payment to the [homeowner] rather than itemized does not mean that no fees were charged in connection with the transaction." *Anderson v. Catalina Structured Funding, Inc.*, No. 1:21-cv-197, 2021 WL 8315006, at *5 (W.D. Mich. Dec. 21, 2021).

The district court's "making money" analysis was misguided for two additional reasons. First, conventional real-estate representations create precisely the same "allocation from sales proceeds" payment model that Fast Easy Offer uses. When a real-estate agent calls a homeowner to market his services—for which he'd receive a commission once the hoped-for sale is complete—the homeowner would, through the district court's lens, "not spend[] a cent on purchasing any goods or service." ER-8. That's because the consumer does not "spend a cent" on

27

the agent's representation; he instead allocates a portion of the sales proceeds as a commission to the agent. But no one would claim that a realtor provides no services. And there's no dispute that a realtor promoting her business over the telephone is engaged in "telephone solicitations." *See infra* at II.D.1. The same is true here.

Second, myriad other transactions similarly contemplate indirect payment for services. The calls in *Chesbro* encouraged listeners to redeem "points"—in lieu of money—to make purchases at Best Buy. 705 F.3d at 918. This Court reasoned that "points" redemptions ultimately had the purpose of encouraging purchases, *even if no cash ever left the consumer's hands. See generally id.* Even if a consumer redeemed her Best Buy "points" in sufficient volume to purchase a product "for free," the robocalls encouraging redemption *still* had the purpose of encouraging the purchase of goods. The district court's analysis, which mandates a pitch for some form of direct payment, runs counter to these commonsense conclusions—and risks opening the door to a flood of unrestricted mass telemarketing calls from real-estate agencies.

This Court should reject the district court's improper focus on the impact of Fast Easy Offer's messages rather than Fast Easy Offer's purpose in sending them.

28

### C. Courts Must Look Beyond the Plain Text of Telephone Messages to Their Entire Context.

The district court erred in a second, related way: by analyzing the sender's purpose solely by reference to the words in the solicitations. That approach missed the mark. Courts must look beyond the specific words in a call or text to their full context to ascertain their purpose. *Chesbro*, 705 F.3d at 918.

As discussed above, this Court's decision in *Chesbro* involved robocalls from Best Buy reminding customers that their Best Buy rewards "points" were going to expire. *Id.* at 916–17. The calls "urged the listener to 'redeem' his points, directed him to a website where he could further engage with the [points], and thanked him for 'shopping at Best Buy.'" *Id.* The scripts of these calls "did not explicitly reference any…goods, or services." *Id.* at 918. Nevertheless, this Court held that the robocalls constituted "telemarketing"[1] under the TCPA because (1) the calls urged the listener to redeem "points" at Best Buy, and (2) "[t]here was no other use for the…points" besides purchasing Best Buy products." *Id.* at 918. As this Court explained, "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear *from the context*." *Id.* (emphasis added).

---

[1] Although this Court was interpreting the definition of "telemarketing" rather than "telephone solicitation" in the FCC's regulations, the relevant portions of the definitions are identical. *Compare* 47 C.F.R. § 64.1200(f)(13) *with* 64.1200(f)(15).

Had this Court limited itself to the precise words used in the robocalls, it would have reached the opposite conclusion, since nothing in those calls explicitly encouraged listeners to buy anything at all. Only by examining all of the available information about the calls could this Court ascertain their true goal: inducing points-holders to make Best Buy purchases.

In line with *Chesbro*, courts across the country agree that context is key. First consider the Eighth Circuit's comprehensive decision in *Golan*, which held that a series of unsolicited voicemails constituted "telemarketing" even when the content of the messages themselves gave no hints as to the caller's ultimate goal. 788 F.3d at 814. In *Golan*, the plaintiffs received two voicemails, each with the same cryptic message: "Liberty. This is a public survey call. We may call back later." *Id.* at 816. The plaintiffs discovered that many others had received similar calls, and that those who picked up were treated to a pre-recorded message from former-Governor Mike Huckabee promoting a movie on the eve of its release in theaters. *Id.* The defendants argued that the court "should consider only the content of the calls" the Golans received, which made no overt reference to the Huckabee promotion. *Id.* at 820. The Eighth Circuit flatly "refuse[d] to do so." *Id.* Instead, it invoked *Chesbro* for the proposition that the TCPA governs messages whose "improper purpose is 'clear from the context.'" *Id.* (quoting *Chesbro*, 705 F.3d at 918). Because "the calls were initiated and transmitted to the Golans *in order*

*to* promote" the movie, they were forbidden "telephone solicitations" "even though the messages never referenced the film." *Id*. (emphasis added).

Other decisions follow the same analytical path. *See, e.g.*, *Wilcox v. MarketPro S., Inc.*, No. 23-cv-2364, 2023 WL 8806696, at *3 (D. Md. Dec. 20, 2023) ("[T]his Court does not see a basis in the TCPA, its regulations, or otherwise to limit its 'intent' or 'purpose' inquiry to the plain language of [defendant's] text messages."). These courts broadly agree that "factors such as who the sender is, as well as his motives, purposes and intentions for sending the [message], are all relevant." *Rudgayzer & Gratt v. Enine, Inc.*, 779 N.Y.S.2d 882, 886 (Sup. Ct. N.Y., App. Term, 2d and 11th Judicial Districts 2004) (declining to "limit our scrutiny to the four corners of the fax" in TCPA analysis); *see also Hill v. InvestorPlace Media, LLC*, No. 5:23-cv-00111, 2024 WL 1056030, at *3 (W.D. N.C. Mar. 11, 2024) (declining to limit TCPA analysis to plain text of telephone messages and "examin[ing] both the plain meaning and other facts of the case"); *Chinitz v. NRT W.*, 2019 WL 720996, at *3 (declining to "limit its purpose-of-the-call analysis to the call itself" and looking instead to "the entire context"); *Davis v. Reliance First Cap., LLC*, No. 7:22-cv-00018, 2023 WL 1982354, at *4 (E.D.N.C. Feb. 13, 2023) ("In evaluating whether or not a call is a 'solicitation,' the Court examines the content and context of the message while using a measure of common sense.") (citation modified).

31

Even setting aside its failure to credit Coffey's allegations about purpose, *see infra* Part II.D.2, the district court went astray when it myopically focused on the specific words used in Fast Easy Offer's messages. *See, e.g.*, ER-7 (noting that the messages "never encouraged Plaintiff to engage in future purchasing activity at all—only to engage in future selling activity") (citation modified). The court's approach appeared to flow from a misapprehension about the nature of textualism. The district court invoked the Supreme Court's decision in *Facebook v. Duguid*, which "cautioned against reaching past the plain text of the TCPA." ER-5 (quoting 592 U.S. 395, 409 (2021)). But interpreting the TCPA through a textualist lens does not require interpreting *telephone messages* through that same lens. Textualism is an interpretive canon that applies to *statutes*, not all written material that comes before a federal court. *See United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 433 (9th Cir. 2000) (noting that textualism, while "at the very center of statutory interpretation," does not apply to the interpretation of judicial opinions). Here, a *textualist* reading of the *TCPA* actually requires a *purposivist* approach to interpreting *telephone communications*. In ignoring what was "clear from the *context*" of Fast Easy Offer's telephone messages, *Chesbro*, 705 F.3d at 918 (emphasis added), the district court erred.

### D. The Purpose of Fast Easy Offer's Text Messages and Telephone Calls Was to Sell Coffey Real-Estate Services.

When Fast Easy Offer sent text messages to Coffey asking if she was interested in selling her home, it sought to "encourage[e] the purchase…of…services," 47 U.S.C. § 227(a)(4), in one of two ways: first, by encouraging Coffey to buy Fast Easy Offer's suite of real-estate services by accepting a lowball cash offer for her home, and second, by inducing her to hire conventional brokers affiliated with Fast Easy Offer and Keller Williams. Either purpose fits the TCPA's definition of "telephone solicitation" like a glove, as virtually every court to address this precise issue has held.

### (1) Coffey alleged that Fast Easy Offer made "hybrid" offers to encourage her to buy its suite of real-estate services and induce her to hire Keller Williams real-estate agents.

Coffey's amended complaint admits no ambiguity about Fast Easy Offer's purpose. Coffey alleged that "[t]he purpose of the calls and text messages at issue was to advertise and to market Defendants' business or services," ER-25—a purpose that perfectly matches the TCPA's definition of "telephone solicitations." *See* 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(15) (solicitations are telephone communications sent with the "purpose of encouraging the purchase…of…services").

Coffey's allegations outlined in detail the two types of services Fast Easy Offer sought to encourage her to purchase: First, a bundle of real-estate services associated with the sale of her home; and, second,

conventional real-estate representation through Keller Williams brokers who were themselves also Fast Easy Offer employees.

Start with the suite of sale-adjacent services that Fast Easy Offer provides. Fast Easy Offer's calls and text messages to Coffey were sent with the purpose of encouraging her to pay Fast Easy Offer to arrange title and escrow services; prepare paperwork and closing documents; pay agent fees, closing costs, and holding costs; and handle tax requirements—"all [the] ancillary services associated with the purchase or sale of a home." ER-14–17. As part of this proposed wholesaling package deal, Fast Easy Offer's communications with Coffey also sought to connect her with a third-party buyer through an assignment contract—in other words, to act like a traditional real-estate broker and receive payment through the arbitrage between the prices paid by the seller and buyer. ER-15, ER-17, ER-25. These are quintessential "services" under the TCPA.

Now turn to Fast Easy Offer's efforts to induce Coffey to hire Keller Williams agents to provide conventional real-estate representation. ER-17–18, ER-20–21. Fast Easy Offer's messages to Coffey were also sent with the purpose of encouraging her hire a Keller Williams broker—a quintessential real-estate service. ER-18, ER-25. The head of Fast Easy Offer and the KW Wealth program, Brett Tanner, admitted that he routes "nine out of ten" wholesaling leads to agents for conventional seller-side real estate representation. ER-18. Indeed, as Coffey further

alleged, Tanner and most of Fast Easy Offer's team members are themselves Keller Williams agents who could provide just such representation on commission. ER-20, ER-22.

Fast Easy Offer's "bundle" of home-selling perks constitutes "services" within the meaning of the TCPA. *See* 15 *Oxford English Dictionary* 26 (defining "services" as "the action of serving, helping, or benefiting"); *Merriam-Webster* 2075 (defining "services" as "the performance of work…paid for by another"). Handling "title and escrow," facilitating a "purchase contract," and performing other "legal aspects of the home sale" are all "services" under the TCPA. *Pepper v. GVC Cap. LLC*, 677 F. Supp. 3d 638, 642 (S.D. Tex. 2023); *Wilcox v. Marketpro S., Inc.*, 2023 WL 8806696 (D. Md. 2023) (same).

The same is true of the traditional real-estate representation encouraged by Fast Easy Offer's texts and calls. The reason why is simple: Real-estate agents provide a paradigmatic service by helping people sell their homes. *See Chinitz v. NRT W.,* 2019 WL 720996, at *3 (denying motion to dismiss in relevant part involving real estate telemarketing messages); *accord Chinitz v. Intero Real Est. Servs.*, No. 18-cv-05623, 2021 WL 1375837, at *7 (N.D. Cal. Apr. 12, 2021) (denying summary judgment to both parties on question of whether specific real estate calls qualified as solicitations); *Bumpus v. Realogy Brokerage Grp. LLC*, No. 3:19-cv-03309, 2022 WL 1489470, at *1 (N.D. Cal. May 11, 2022) (same). The FCC takes the same position. *See* In the Matter of

Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991, 20 F.C.C. Rcd. 3788, 3789, 3793 (2005) [hereinafter 2005 FCC Order]. As the FCC has explained, "calls by real estate agents to property owners for the purpose of offering their services" constitute prohibited solicitations under the TCPA. *Id.*; *see also McMorrow v. Core Props., LLC*, No. 4:23-cv-00126, 2023 WL 8697795, at *12 (E.D. Mo. Dec. 15, 2023) (services just like Fast Easy Offer's "are similar enough to services offered by real estate agents…that the 2005 FCC Guidance is instructive").

Coffey's allegations, which detail how Fast Easy Offer's texts and calls were designed to encourage her to purchase one of two types of real-estate services, are more than enough to state a claim under the TCPA.

> **(2)  The district court failed to credit Coffey's allegations about the purpose behind Fast Easy Offer's calls and messages and contravened this Court's decision in *Chesbro.***

With these allegations in mind, the district court made two related errors in analyzing the purpose of Fast Easy Offer's calls and messages to Coffey.

First, the court ignored its bedrock obligation to take Coffey's allegations as true and to draw all possible inferences in her favor. Those allegations should have ended the district court's inquiry. "The issues raised by [Fast Easy Offer below] are matters of proof, not legal grounds to dismiss [Coffey's] complaint." *United States ex rel. Campie v. Gilead*

*Scis., Inc.*, 862 F.3d 890, 907 (9th Cir. 2017). Yet the district court approached Fast Easy Offer's motion as if it were one for summary judgment or even a bench trial, effectively making factual findings about the "true" purpose of the texts—even when those "findings" contradicted Coffey's allegations.

For example, despite recognizing Coffey's allegation that Fast Easy Offer's "offer to purchase her home contains within it an implied offer of services," ER-5—whether through wholesaling or conventional representation—the district court nevertheless held that the messages were merely "an offer for *Defendants* to make a future purchase from *Plaintiff*," and nothing more, ER-6. That "fact-based [conclusion]…is untethered to the Complaint." *Helfrich v. Raven3 HomeBuyers LLC*, No. 22-cv-03529, 2023 WL 5956221, at *3 (S.D.N.Y. Sept. 13, 2023). It deprived Coffey of the benefit of her allegations. And it could only have resulted from the district court's mistaken belief that the TCPA's purpose inquiry is constrained to the plain text of telephone communications. Making matters worse, the district court did not even acknowledge—much less credit—Coffey's allegations that Fast Easy Offer sought to encourage her to hire Keller Williams brokers to represent her in a conventional real-estate sale. *See generally* ER-1–9.

In short, "[w]hether [Coffey] can ultimately prove [her] case" depends on "the precise structure of [Fast Easy Offer's] business and the connection between its home purchases and its 'sale' or provision of any

associated services." *Wilcox*, 2023 WL 8806696 at *3. These were not appropriate questions to resolve through a motion to dismiss. *See Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6).").

Second, the district court veered further off-course when it tried to sidestep *Chesbro*. In that case, this Court made clear that whether a communication constitutes a "telephone solicitation" turns on its purpose, not the labels used by the caller. The district court first wrote that the messages in *Chesbro* "were always *ultimately* intended to induce the recipients to purchase something. That is not the case here." ER-7. But that view ignores Coffey's allegations, the reasoning of *Chesbro*, and the reality of Fast Easy Offer's business model. Coffey alleged that Fast Easy Offer's communications were exactly like the robocalls in *Chesbro*—"always *ultimately* intended" to encourage homebuyers to purchase Fast Easy Offer's real-estate services by accepting reduced cash offers. Like *Chesbro*'s robocalls, Fast Easy Offer's messages were superficially dressed in neutral language, but in substance designed to encourage the purchase of services. The distinction the district court attempted to draw between this case and *Chesbro* does not exist.

Finally, to the extent the district court granted the motion to dismiss because of its view that Fast Easy Offer's messages "only"

encouraged Coffey to sell her home and not buy anything, ER-7, this conclusion ignored *Chesbro*'s recognition of "dual purpose" messages under the TCPA. 705 F.3d at 917–18. Citing the FCC's 2003 Order, this Court recognized that purportedly informational messages might be "motivated in part by the desire to ultimately sell additional goods or services." *Id.* at 917 (quoting 2003 FCC Order, 18 FCC Rcd. 14014, 14095 ¶ 142 (F.C.C. July 3, 2003)).[2] Coffey alleged that Fast Easy Offer's messages, at least in part, sought to encourage her to buy its services. That the messages may have *also* intended to induce her to sell her house does not mean they were not "telephone solicitations" under the TCPA.

> **(3) Nearly every court to consider analogous "hybrid" offers has deemed them prohibited "telephone solicitations" under the TCPA.**

Virtually every court to consider calls, text messages, and business models like the ones in this case agree: Such messages constitute "telephone solicitations" that violate the TCPA. These courts have denied motions to dismiss—and even granted motions for summary judgment in favor of the plaintiff—predicated on the argument that

---

[2] While this discussion explicitly concerned prohibited advertising rather than telephone solicitation under the TCPA, the principle applies even more strongly where the definition of telephone solicitation, but not advertisement, includes the word "purpose." *See* 47 U.S.C. § 227(a)(5).

messages just like Fast Easy Offer's violate the TCPA. The district court erred in rejecting courts' consensus position.

Start with *Eagle v. GVG Capital LLC*, which involved a real estate wholesaling business whose business model is virtually identical to Fast Easy Offer's. *See* No. 22-cv-00638, 2023 WL 1415615, at *1 (W.D. Mo. Jan. 31, 2023). GVG sent numerous text messages "ask[ing] Plaintiff whether she was interested in selling her home." *Id.* Even though these messages did not explicitly offer any of GVG's services to the plaintiff, the court denied GVG's motion to dismiss, concluding—based on information from GVG's website about how it makes money—that GVG's text messages were sent "for the purpose of offering its 'home selling services' to [plaintiff]." *Id.* at *3.

Next consider *Pepper*. The district court there refused to dismiss a case just like this one. *Pepper*, 677 F. Supp. 3d at 642. The court wrote: "Pepper's allegations that GVG Capital provides the necessary services associated with a real estate transaction, and that the seller effectively pays for those services through GVG Capital's payment of a discounted purchase price, are sufficient to state a claim." *Id.*

*Eagle* and *Pepper* are both squarely on point. GVG and Fast Easy Offer both send text messages that offer to purchase houses but do not explicitly mention any real estate services. But GVG and Fast Easy Offer both rely on business models that "bundle" solicitations to purchase real estate services into their home-buying offers. Like the allegations in

40

*Pepper*, Coffey's allegations that "[t]he purpose of the calls and text messages at issue was to advertise and to market [Fast Easy Offer's] business or services" are more than enough to make out a TCPA claim. ER-25.

*Helfrich v. Raven3 HomeBuyers* reached an identical conclusion about another real estate wholesaler. "[G]iven the nature of its business," the court wrote, the defendants' "calls and pre-recorded voice messages advertise the commercial availability of its house-buying service and constitute advertisements within the meaning of the TCPA." 2023 WL 5956221, at *3. Very much like Fast Easy Offer, Raven23 "refers to itself in its website as a 'house-buying business' that 'makes the selling process easy' and 'works with the seller to find a solution that works.'" *Id.* (citation modified). Based on the allegations in the complaint and the information on Raven3's website, the court denied Raven3's motion to dismiss.

Still more courts denied analogous motions to dismiss in the *Moonswamy* and *Wilcox* cases. Just like Coffey, the plaintiff in *Moonsawmy* alleged that the wholesaling business "sought to purchase [her] home at a reduced fee, provide [her] related real estate services, then sell the home at an inflated price." *Moonsawmy v. JWS Acquisitions, LLC*, No. 1:23-cv-04198, slip op. at 6 (N.D. Ga. July 18, 2024). And just like Fast Easy Offer, the defendant, JWS, argued that its texts were not "telephone solicitations" because they "did not

41

explicitly encourage Plaintiff to purchase anything." The court denied JWS's motion to dismiss, noting that "the majority of district courts to face [this question] have rejected [JWS'] reasoning." *Id.* at 4. And in *Wilcox*, the court held that the plaintiff's allegations that "MarketPro's actual purpose was to encourage a surreptitious sale of its various real-estate related services, couched as a straightforward home-buying offer," stated a claim under the TCPA claim. 2023 WL 8806696 at *3. Emphasizing "the low bar applicable at the motion to dismiss phase," the court rejected MarketPro's argument that "discovery into its true intent will complicate the litigation," explaining that "factual complexity is not a basis to avoid discovery into a properly pled claim." *Id.*

In at least one case, discovery revealed proof supporting summary judgment in the plaintiff's favor. That's what happened in *McMorrow v. Core Properties*, which involved another wholesaler whose business model mirrors Fast Easy Offer's. *See* 2023 WL 8697795, at *11. After considering the entire record—including information from the wholesaler's website, *id.* at *13—the court held that the wholesaler's "text messages were sent for the purpose of encouraging Plaintiff to purchase Growth Development's services related to selling Plaintiff's home," *id.* at *12.

Courts have similarly concluded that communications urging homeowners to seek representation by real-estate brokers are prohibited solicitations. *See Chinitz v. NRT W.,* 2019 WL 720996, at *3 (citing 2005

42

FCC order and denying motion to dismiss in relevant part involving real estate telemarketing messages); *Chinitz v. Intero Real Est. Servs.*, 2021 WL 1375837, at *7 (denying summary judgment to both parties on question of whether specific real estate calls qualified as solicitations); *Bumpus*, 2022 WL 1489470, at *1 (same).

Across all these cases, the bottom line is the same: Text messages and calls from wholesaling and real-estate representation businesses "may be offering to make a purchase" on their face, "but [they are] also marketing a service. To suggest [they are] not is too clever by half." *Anderson*, 2021 WL 8315006 at *6.

The district court did not mention any of these cases by name, much less recognize their startlingly similar facts or discuss why they should not at least influence the court's analysis. Instead, the district court noted merely that Coffey "cites numerous out-of-Circuit cases to support" her position. ER-4. The fact that *Eagle*, *Pepper*, *Helfrich*, *Moonsawmy*, *Wilcox*, *McMorrow*, and *Anderson* arose outside the Ninth Circuit does not excuse the district court's failure to engage even superficially with their analysis. "It should go without saying that courts may rely on persuasive but nonbinding authority so long as it is in line with the rules that do bind them." *JW Gaming Dev., LLC v. James*, 544 F. Supp. 3d 903, 926 n.13 (N.D. Cal. 2021). These "carefully reasoned" cases merited close consideration: they are not only directly on point (far more so than *Jance* and *Hunsinger*, as discussed *infra* at Part II.D.4),

*United States v. Gallego*, No. CR-18-01537-001, 2018 WL 4257967, at *3 (D. Ariz. Sept. 6, 2018), but also consistent with this Court's admonition in *Chesbro* to interpret the TCPA with "a measure of common sense," 705 F.3d at 918. This Court should join the emerging consensus that seven different district courts have already reached.

### (4) *Jance* and *Hunsinger* did not address the "hybrid" offers at issue here.

In concluding that Fast Easy Offer's text messages and calls were not "telephone solicitations," the district court disregarded the long list of cases discussed above and relied exclusively on two unpublished cases brought by pro se plaintiffs that didn't address "hybrid" offers: *Jance* and *Hunsinger*. Neither case supports Fast Easy Offer's position.

*Jance* involved an entity called Homerun Offer that called homeowners to ask if they were interested in selling their property. *Jance v. Homerun Offer LLC*, 2021 WL 3270318, at *4. *Jance* devoted a mere four sentences to analyzing whether those telephone calls constituted "telephone solicitations" under the TCPA. *Id.*; *see Anderson*, 2021 WL 0315006 at *5 ("The *Jance* court's analysis is cursory."). These sentences boil down to two points: first, Jance alleged that the purpose of Homerun Offer's calls was to purchase his home, "not to induce [him] to make a purchase from the caller"; and, second, the TCPA governs only "calls that directly advertise." *Id.* (quoting *Knutson v. Blue Light Sec., Inc.*, No. 17-cv-134, 2018 WL 1172611, at *4 (S.D. Cal. Mar. 6, 2018)).

44

Consider each point in turn. No one disputes that telephone communications whose *sole* purpose is to offer to purchase property are not "telephone solicitations" under the TCPA. And that is all that Jance—a pro se plaintiff—alleged. The district court framed Coffey's arguments as inconsistent with *Jance*, *see* ER-5–6, but that analysis missed the mark. Unlike Coffey and the plaintiffs in the cases she cites, Jance neither pleaded nor argued that Homerun's calls constituted *both* an offer to purchase property *and* a solicitation to buy real estate services. He merely urged the court to apply the TCPA to Homerun's calls because "solicitations to buy [his] property are still solicitations." Response to Defendants' Motion to Dismiss the Complaint at 8, ECF No. 22, *Jance*, 2021 WL 3270318 (Jan. 12, 2021). In short, the court in *Jance* did not reach the distinct question of hybrid communications because Jance's bare-bones complaint did not allege that Homerun's calls fell into that category. *See generally* No. 4:20-cv-00482, ECF No. 1–3. Given all this, it's no surprise that the *Jance* court held that the definition of "telephone solicitation" does not "encompass a scenario in which the caller offers to buy something from the recipient of the call." *Id.* (citation modified). The concept of a call that *both* "offers to buy something," *id.*, *and* offers to sell services was not before the court at all. Here, in sharp contrast, Coffey explicitly pleaded that Fast Easy Offer's calls and messages had a dual purpose.

45

The *Jance* court's "direct advertisement" point just repackages the same idea: Calls or messages whose only purpose is to offer to *buy* something (and not *sell* something) fall outside the TCPA. *Jance* borrowed this language from another case, *Knutson*, that is factually distinguishable in exactly the same way. Like Jance, Knutson alleged a telephone call in which the caller "offered him a $200 gift card for the contact information" of the people who had recently purchased his home so she could "market a security system to them." 2018 WL 1172611 at *3. Like Jance, Knutson did not allege that the call was intended to sell *him* anything. While the defendant "may have been a telemarketer for purposes of other calls" to the buyers of Knutson's house, the court held, "the call Knutson describes in the complaint did not include advertising or constitute telemarketing" with respect to him. *Id.* at *4. *Knutson* is factually far afield from this case, and because *Jance* merely imported *Knutson*'s analysis, it's equally inapposite.

The district court's reliance on *Hunsinger v. Offer LLC* was misplaced for all the same reasons. In *Hunsinger*, the court concluded that a message asking if the plaintiff was "interested in selling [his] house" did not constitute a solicitation because it "did not encourage Plaintiff to purchase, rent, or invest in anything." 2022 WL 18143951, at *3. As in *Jance*, the district court emphasized that Hunsinger—a pro se litigant who had filed over fifty TCPA lawsuits, *see Hunsinger*, No. 3:21-cv-1598, ECF No. 29 (filed July 5, 2022)—"does not allege that

Defendants sought to sell or rent any service or product to him." 2022 WL 18143951 at *6. As in *Jance*, *Hunsinger* simply did not confront the "hybrid" offers at issue here. And, as in *Jance*, the *Hunsinger* allegations were paper-thin. *See generally* No. 3:21-cv-2846, ECF No. 3.

In short, both *Jance* and *Hunsinger* hold only that the TCPA does not forbid a telephone communication whose sole purpose is to induce the recipient to sell her property. By applying *Hunsinger* and *Jance* to a factual scenario those cases didn't purport to address, the district court ignored the critical distinction between allegations about a simple purchase inquiry versus a hybrid scheme to sell real-estate services. Doing so created a conflict not only with the text of the TCPA, but also with the FCC's implementing regulations and this Court's emphasis on context and purpose in *Chesbro*.

## CONCLUSION

This Court should reverse the district court's judgment and remand for further proceedings.

Date: October 10, 2025          Respectfully submitted,

> s/Emma L. Freeman
> Emma L. Freeman
>   *Counsel of Record*
> APOLLO LAW LLC
> 275 Park Avenue
> Suite A
> Brooklyn, NY 11205
> (646) 363-6766
> emma@apollo-law.com

Adam Hansen
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401

Alex D. Kruzyk
Pardell, Kruzyk & Giribaldo, PLLC
7500 Rialto Boulevard
Suite 1-250
Austin, TX 78735

*Counsel for Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 25-4066

I am the attorney or self-represented party.

**This brief contains** | 10,928 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Emma Lerner Freeman | **Date** | 10/10/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# **ADDENDUM**

| | |
|---|---|
| Restrictions on use of telephone equipment, 47 U.S.C. § 227 | Add. 1–20 |
| Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (Dec. 20, 1991) | Add. 21–27 |
| Delivery restrictions, 47 C.F.R. § 64.1200 | Add. 28–49 |
| In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC Rcd. 14014 (2003) | Add. 50–190 |
| House Report No. 108-8, Do-Not-Call Implementation Act | Add. 191–98 |

🚩 KeyCite Red Flag

Unconstitutional or Preempted  Held Unconstitutional by  Barr v. American Association of Political Consultants, Inc.,  U.S.,  July 06, 2020

🚩 KeyCite Yellow Flag

Proposed Legislation

United States Code Annotated
   Title 47. Telecommunications (Refs & Annos)
      Chapter 5. Wire or Radio Communication (Refs & Annos)
         Subchapter II. Common Carriers (Refs & Annos)
            Part I. Common Carrier Regulation

47 U.S.C.A. § 227

§ 227. Restrictions on use of telephone equipment

Currentness

**(a) Definitions**

As used in this section--

**(1)** The term "automatic telephone dialing system" means equipment which has the capacity--

**(A)** to store or produce telephone numbers to be called, using a random or sequential number generator; and

**(B)** to dial such numbers.

**(2)** The term "established business relationship", for purposes only of subsection (b)(1)(C)(i), shall have the meaning given the term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003, except that--

**(A)** such term shall include a relationship between a person or entity and a business subscriber subject to the same terms applicable under such section to a relationship between a person or entity and a residential subscriber; and

**(B)** an established business relationship shall be subject to any time limitation established pursuant to paragraph (2)(G)). [1]

**(3)** The term "telephone facsimile machine" means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

**(4)** The term "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does

Add. 1

not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

**(5)** The term "unsolicited advertisement" means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

**(b) Restrictions on use of automated telephone equipment**

**(1) Prohibitions**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--

**(A)** to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--

**(i)** to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

**(ii)** to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

**(iii)** to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

**(B)** to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B);

**(C)** to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless--

**(i)** the unsolicited advertisement is from a sender with an established business relationship with the recipient;

**(ii)** the sender obtained the number of the telephone facsimile machine through--

**(I)** the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

**(II)** a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and

**(iii)** the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E); or

**(D)** to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

**(2) Regulations; exemptions and other provisions**

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission--

**(A)** shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

**(B)** may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe--

**(i)** calls that are not made for a commercial purpose; and

**(ii)** such classes or categories of calls made for commercial purposes as the Commission determines--

**(I)** will not adversely affect the privacy rights that this section is intended to protect; and

**(II)** do not include the transmission of any unsolicited advertisement;

**(C)** may, by rule or order, exempt from the requirements of paragraph (1)(A)(iii) of this subsection calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to such conditions as the Commission may prescribe as necessary in the interest of the privacy rights this section is intended to protect;

**(D)** shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if--

**(i)** the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

**(ii)** the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

**(iii)** the notice sets forth the requirements for a request under subparagraph (E);

**(iv)** the notice includes--

**(I)** a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

**(II)** a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

**(v)** the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual or business to make such a request at any time on any day of the week; and

**(vi)** the notice complies with the requirements of subsection (d);

**(E)** shall provide, by rule, that a request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if--

**(i)** the request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

**(ii)** the request is made to the telephone or facsimile number of the sender of such an unsolicited advertisement provided pursuant to subparagraph (D)(iv) or by any other method of communication as determined by the Commission; and

**(iii)** the person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine;

**(F)** may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, allow professional or trade associations that are tax-exempt nonprofit organizations to send unsolicited advertisements to their members in furtherance of the association's tax-exempt purpose that do not contain the notice required by paragraph (1) (C)(iii), except that the Commission may take action under this subparagraph only--

**(i)** by regulation issued after public notice and opportunity for public comment; and

**(ii)** if the Commission determines that such notice required by paragraph (1)(C)(iii) is not necessary to protect the ability of the members of such associations to stop such associations from sending any future unsolicited advertisements;

**(G)(i)** may, consistent with clause (ii), limit the duration of the existence of an established business relationship, however, before establishing any such limits, the Commission shall--

**(I)** determine whether the existence of the exception under paragraph (1)(C) relating to an established business relationship has resulted in a significant number of complaints to the Commission regarding the sending of unsolicited advertisements to telephone facsimile machines;

**(II)** determine whether a significant number of any such complaints involve unsolicited advertisements that were sent on the basis of an established business relationship that was longer in duration than the Commission believes is consistent with the reasonable expectations of consumers;

**(III)** evaluate the costs to senders of demonstrating the existence of an established business relationship within a specified period of time and the benefits to recipients of establishing a limitation on such established business relationship; and

**(IV)** determine whether with respect to small businesses, the costs would not be unduly burdensome; and

**(ii)** may not commence a proceeding to determine whether to limit the duration of the existence of an established business relationship before the expiration of the 3-month period that begins on July 9, 2005;

**(H)** may restrict or limit the number and duration of calls made to a telephone number assigned to a cellular telephone service to collect a debt owed to or guaranteed by the United States; and

**(I)** shall ensure that any exemption under subparagraph (B) or (C) contains requirements for calls made in reliance on the exemption with respect to--

**(i)** the classes of parties that may make such calls;

**(ii)** the classes of parties that may be called; and

**(iii)** the number of such calls that a calling party may make to a particular called party.

**(3) Private right of action**

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State--

**(A)** an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**(4) Civil forfeiture**

**(A) In general**

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title.

**(B) Violation with intent**

Any person that is determined by the Commission, in accordance with paragraph (3) or (4) of section 503(b) of this title, to have violated this subsection with the intent to cause such violation shall be liable to the United States for a forfeiture penalty pursuant to section 503(b)(1) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection. A forfeiture penalty under this subparagraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this subparagraph shall be equal to an amount determined in accordance with subparagraphs (A) through (F) of section 503(b)(2) of this title plus an additional penalty not to exceed $10,000.

**(C) Recovery**

Any forfeiture penalty determined under subparagraph (A) or (B) shall be recoverable under section 504(a) of this title.

**(D) Procedure**

No forfeiture liability shall be determined under subparagraph (A) or (B) against any person unless such person receives the notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

**(E) Statute of limitations**

Notwithstanding paragraph (6) of section 503(b) of this title, no forfeiture penalty shall be determined or imposed against any person--

**(i)** under subparagraph (A) if the violation charged occurred more than 1 year prior to the date of issuance of the required notice or notice of apparent liability; or

**(ii)** under subparagraph (B) if the violation charged occurred more than 4 years prior to the date of issuance of the required notice or notice of apparent liability.

**(F) Rule of construction**

Notwithstanding any law to the contrary, the Commission may not determine or impose a forfeiture penalty on a person under both subparagraphs (A) and (B) based on the same conduct.

**(c) Protection of subscriber privacy rights**

**(1) Rulemaking proceeding required**

Within 120 days after December 20, 1991, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall--

**(A)** compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

**(B)** evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

**(C)** consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

Add. 7

**(D)** consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

**(E)** develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

**(2) Regulations**

Not later than 9 months after December 20, 1991, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

**(3) Use of database permitted**

The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall--

**(A)** specify a method by which the Commission will select an entity to administer such database;

**(B)** require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

**(C)** specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

**(D)** specify the methods by which such objections shall be collected and added to the database;

**(E)** prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

**(F)** prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

**(G)** specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

**(H)** specify the methods for recovering, from persons accessing such database, the costs involved in identifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

**(I)** specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with the regulations prescribed under this subsection;

**(J)** be designed to enable States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

**(K)** prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

**(L)** require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

**(4) Considerations required for use of database method**

If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall--

**(A)** in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

**(B)** develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and--

**(i)** reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

**(ii)** reflect the relative costs of providing such lists on paper or electronic media; and

**(iii)** not place an unreasonable financial burden on small businesses; and

**(C)** consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

**(5) Private right of action**

A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State--

**(A)** an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

**(B)** an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

**(C)** both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**(6) Relation to subsection (b)**

The provisions of this subsection shall not be construed to permit a communication prohibited by subsection (b).

**(d) Technical and procedural standards**

**(1) Prohibition**

It shall be unlawful for any person within the United States--

**(A)** to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system, that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

**(B)** to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

**(2) Telephone facsimile machines**

Add. 10

The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after December 20, 1991, clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual.

**(3) Artificial or prerecorded voice systems**

The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that--

**(A)** all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

**(B)** any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

**(e) Prohibition on provision of misleading or inaccurate caller identification information**

**(1) In general**

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States, in connection with any voice service or text messaging service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value, unless such transmission is exempted pursuant to paragraph (3)(B).

**(2) Protection for blocking caller identification information**

Nothing in this subsection may be construed to prevent or restrict any person from blocking the capability of any caller identification service to transmit caller identification information.

**(3) Regulations**

**(A) In general**

The Commission shall prescribe regulations to implement this subsection.

**(B) Content of regulations**

**(i) In general**

Add. 11

The regulations required under subparagraph (A) shall include such exemptions from the prohibition under paragraph (1) as the Commission determines is appropriate.

**(ii) Specific exemption for law enforcement agencies or court orders**

The regulations required under subparagraph (A) shall exempt from the prohibition under paragraph (1) transmissions in connection with--

**(I)** any authorized activity of a law enforcement agency; or

**(II)** a court order that specifically authorizes the use of caller identification manipulation.

**(4) Repealed.** Pub.L. 115-141, Div. P, Title IV, § 402(i)(3), Mar. 23, 2018, 132 Stat. 1089

**(5) Penalties**

**(A) Civil forfeiture**

**(i) In general**

Any person that is determined by the Commission, in accordance with paragraphs (3) and (4) of section 503(b) of this title, to have violated this subsection shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this paragraph shall be in addition to any other penalty provided for by this chapter. The amount of the forfeiture penalty determined under this paragraph shall not exceed $10,000 for each violation, or 3 times that amount for each day of a continuing violation, except that the amount assessed for any continuing violation shall not exceed a total of $1,000,000 for any single act or failure to act.

**(ii) Recovery**

Any forfeiture penalty determined under clause (i) shall be recoverable pursuant to section 504(a) of this title. Paragraph (5) of section 503(b) of this title shall not apply in the case of a violation of this subsection.

**(iii) Procedure**

No forfeiture liability shall be determined under clause (i) against any person unless such person receives the notice required by section 503(b)(3) of this title or section 503(b)(4) of this title.

**(iv) 4-year statute of limitations**

No forfeiture penalty shall be determined or imposed against any person under clause (i) if the violation charged occurred more than 4 years prior to the date of issuance of the required notice or notice or apparent liability.

**(B) Criminal fine**

Any person who willfully and knowingly violates this subsection shall upon conviction thereof be fined not more than $10,000 for each violation, or 3 times that amount for each day of a continuing violation, in lieu of the fine provided by section 501 of this title for such a violation. This subparagraph does not supersede the provisions of section 501 of this title relating to imprisonment or the imposition of a penalty of both fine and imprisonment.

**(6) Enforcement by States**

**(A) In general**

The chief legal officer of a State, or any other State officer authorized by law to bring actions on behalf of the residents of a State, may bring a civil action, as parens patriae, on behalf of the residents of that State in an appropriate district court of the United States to enforce this subsection or to impose the civil penalties for violation of this subsection, whenever the chief legal officer or other State officer has reason to believe that the interests of the residents of the State have been or are being threatened or adversely affected by a violation of this subsection or a regulation under this subsection.

**(B) Notice**

The chief legal officer or other State officer shall serve written notice on the Commission of any civil action under subparagraph (A) prior to initiating such civil action. The notice shall include a copy of the complaint to be filed to initiate such civil action, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such civil action.

**(C) Authority to intervene**

Upon receiving the notice required by subparagraph (B), the Commission shall have the right--

   **(i)** to intervene in the action;

   **(ii)** upon so intervening, to be heard on all matters arising therein; and

   **(iii)** to file petitions for appeal.

**(D) Construction**

For purposes of bringing any civil action under subparagraph (A), nothing in this paragraph shall prevent the chief legal officer or other State officer from exercising the powers conferred on that officer by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(E) Venue; service or process**

**(i) Venue**

An action brought under subparagraph (A) shall be brought in a district court of the United States that meets applicable requirements relating to venue under section 1391 of Title 28.

**(ii) Service of process**

In an action brought under subparagraph (A)--

**(I)** process may be served without regard to the territorial limits of the district or of the State in which the action is instituted; and

**(II)** a person who participated in an alleged violation that is being litigated in the civil action may be joined in the civil action without regard to the residence of the person.

**(7) Effect on other laws**

This subsection does not prohibit any lawfully authorized investigative, protective, or intelligence activity of a law enforcement agency of the United States, a State, or a political subdivision of a State, or of an intelligence agency of the United States.

**(8) Definitions**

For purposes of this subsection:

**(A) Caller identification information**

The term "caller identification information" means information provided by a caller identification service regarding the telephone number of, or other information regarding the origination of, a call made using a voice service or a text message sent using a text messaging service.

**(B) Caller identification service**

The term "caller identification service" means any service or device designed to provide the user of the service or device with the telephone number of, or other information regarding the origination of, a call made using a voice service or a text message sent using a text messaging service. Such term includes automatic number identification services.

**(C) Text message**

The term "text message"--

**(i)** means a message consisting of text, images, sounds, or other information that is transmitted to or from a device that is identified as the receiving or transmitting device by means of a 10-digit telephone number or N11 service code;

**(ii)** includes a short message service (commonly referred to as "SMS") message and a multimedia message service (commonly referred to as "MMS") message; and

**(iii)** does not include--

   **(I)** a real-time, two-way voice or video communication; or

   **(II)** a message sent over an IP-enabled messaging service to another user of the same messaging service, except a message described in clause (ii).

**(D) Text messaging service**

The term "text messaging service" means a service that enables the transmission or receipt of a text message, including a service provided as part of or in connection with a voice service.

**(E) Voice service**

The term "voice service"--

   **(i)** means any service that is interconnected with the public switched telephone network and that furnishes voice communications to an end user using resources from the North American Numbering Plan or any successor to the North American Numbering Plan adopted by the Commission under section 251(e)(1) of this title; and

   **(ii)** includes transmissions from a telephone facsimile machine, computer, or other device to a telephone facsimile machine.

**(9) Limitation**

Notwithstanding any other provision of this section, subsection (f) shall not apply to this subsection or to the regulations under this subsection.

**(f) Effect on State law**

**(1) State law not preempted**

Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits--

**(A)** the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

**(B)** the use of automatic telephone dialing systems;

**(C)** the use of artificial or prerecorded voice messages; or

**(D)** the making of telephone solicitations.

**(2) State use of databases**

If, pursuant to subsection (c)(3), the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a State or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of such single national database that relates to such State.

**(g) Actions by States**

**(1) Authority of States**

Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

**(2) Exclusive jurisdiction of Federal courts**

The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

**(3) Rights of Commission**

The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

**(4) Venue; service of process**

Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or where the defendant may be found.

**(5) Investigatory powers**

For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State, or an official or agency designated by a State, from exercising the powers conferred on the attorney general or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(6) Effect on State court proceedings**

Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

**(7) Limitation**

Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendency of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

**(8) "Attorney general" defined**

As used in this subsection, the term "attorney general" means the chief legal officer of a State.

**(h) Annual report to Congress on robocalls and transmission of misleading or inaccurate caller identification information**

**(1) Report required**

Not later than 1 year after December 30, 2019, and annually thereafter, the Commission, after consultation with the Federal Trade Commission, shall submit to Congress a report regarding enforcement by the Commission of subsections (b), (c), (d), and (e) during the preceding calendar year.

**(2) Matters for inclusion**

Each report required by paragraph (1) shall include the following:

**(A)** The number of complaints received by the Commission during each of the preceding 5 calendar years, for each of the following categories:

**(i)** Complaints alleging that a consumer received a call in violation of subsection (b) or (c).

**(ii)** Complaints alleging that a consumer received a call in violation of the standards prescribed under subsection (d).

**(iii)** Complaints alleging that a consumer received a call in connection with which misleading or inaccurate caller identification information was transmitted in violation of subsection (e).

**(B)** The number of citations issued by the Commission pursuant to section 503(b) of this title during the preceding calendar year to enforce subsection (d), and details of each such citation.

**(C)** The number of notices of apparent liability issued by the Commission pursuant to section 503(b) of this title during the preceding calendar year to enforce subsections (b), (c), (d), and (e), and details of each such notice including any proposed forfeiture amount.

**(D)** The number of final orders imposing forfeiture penalties issued pursuant to section 503(b) of this title during the preceding calendar year to enforce such subsections, and details of each such order including the forfeiture imposed.

**(E)** The amount of forfeiture penalties or criminal fines collected, during the preceding calendar year, by the Commission or the Attorney General for violations of such subsections, and details of each case in which such a forfeiture penalty or criminal fine was collected.

**(F)** Proposals for reducing the number of calls made in violation of such subsections.

**(G)** An analysis of the contribution by providers of interconnected VoIP service and non-interconnected VoIP service that discount high-volume, unlawful, short-duration calls to the total number of calls made in violation of such subsections, and recommendations on how to address such contribution in order to decrease the total number of calls made in violation of such subsections.

**(3) No additional reporting required**

The Commission shall prepare the report required by paragraph (1) without requiring the provision of additional information from providers of telecommunications service or voice service (as defined in section 227b(a) of this title).

**(i) Information sharing**

**(1) In general**

Not later than 18 months after December 30, 2019, the Commission shall prescribe regulations to establish a process that streamlines the ways in which a private entity may voluntarily share with the Commission information relating to--

**(A)** a call made or a text message sent in violation of subsection (b); or

**(B)** a call or text message for which misleading or inaccurate caller identification information was caused to be transmitted in violation of subsection (e).

**(2) Text message defined**

In this subsection, the term "text message" has the meaning given such term in subsection (e)(8).

**(j) Robocall blocking service**

**(1) In general**

Not later than 1 year after December 30, 2019, the Commission shall take a final agency action to ensure the robocall blocking services provided on an opt-out or opt-in basis pursuant to the Declaratory Ruling of the Commission in the matter of Advanced Methods to Target and Eliminate Unlawful Robocalls (CG Docket No. 17-59; FCC 19-51; adopted on June 6, 2019)--

**(A)** are provided with transparency and effective redress options for both--

**(i)** consumers; and

**(ii)** callers; and [2]

**(B)** are provided with no additional line item charge to consumers and no additional charge to callers for resolving complaints related to erroneously blocked calls; and

**(C)** make all reasonable efforts to avoid blocking emergency public safety calls.

**(2) Text message defined**

In this subsection, the term "text message" has the meaning given such term in subsection (e)(8).

**CREDIT(S)**

(June 19, 1934, c. 652, Title II, § 227, as added Pub.L. 102-243, § 3(a), Dec. 20, 1991, 105 Stat. 2395; amended Pub.L. 102-556, Title IV, § 402, Oct. 28, 1992, 106 Stat. 4194; Pub.L. 103-414, Title III, § 303(a)(11), (12), Oct. 25, 1994, 108 Stat. 4294; Pub.L. 108-187, § 12, Dec. 16, 2003, 117 Stat. 2717; Pub.L. 109-21, §§ 2(a) to (g), 3, July 9, 2005, 119 Stat. 359, 362; Pub.L. 111-331, § 2, Dec. 22, 2010, 124 Stat. 3572; Pub.L. 114-74, Title III, § 301(a), Nov. 2, 2015, 129 Stat. 588; Pub.L. 115-141, Div. P, Title IV, § 402(i)(3), Title V, § 503(a)(1) to (4)(A), Mar. 23, 2018, 132 Stat. 1089, 1091; Pub.L. 116-105, §§ 3(a), 8(a), 10(a), (b), Dec. 30, 2019, 133 Stat. 3274, 3283, 3284.)

### VALIDITY

<The government-debt exception to the Telephone Consumer Protection Act's (TCPA) restriction on "robocalls" to cell phones (47 U.S.C. § 227(b)(1)(A)(iii)), was held by the United States Supreme Court to impermissibly favor debt-collection speech over political and other speech in violation of the First Amendment. Barr v. American Association of Political Consultants, Inc., U.S. 2020, 140 S.Ct. 2335, 591 U.S. 610, 207 L.Ed.2d. 784.>

Notes of Decisions (1152)

---

### Footnotes

1    So in original. The second closing parenthesis probably should not appear.

2    So in original. The word "and" probably should not appear.

47 U.S.C.A. § 227, 47 USCA § 227
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 20

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 81 of 258

TELEPHONE CONSUMER PROTECTION ACT OF 1991, PL 102–243, December 20,...

PL 102–243, December 20, 1991, 105 Stat 2394

UNITED STATES PUBLIC LAWS

102nd Congress - First Session

Convening January 3, 1991

Additions and Deletions are not identified in this document.
8848

PL 102–243 (S 1462)

December 20, 1991

TELEPHONE CONSUMER PROTECTION ACT OF 1991

An Act to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

<< 47 USCA §§ 227 nt, 609 NOTE >>

SECTION 1. SHORT TITLE.

This Act may be cited as the "Telephone Consumer Protection Act of 1991".

<< 47 USCA § 227 NOTE >>

SEC. 2. FINDINGS.

The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

(9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

(10) Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

(11) Technologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer.

Add. 21

(12) Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

(13) While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14) Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.

(15) The Federal Communications Commission should consider adopting reasonable restrictions on automated or prerecorded calls to businesses as well as to the home, consistent with the constitutional protections of free speech.

SEC. 3. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT.

<< 47 USCA § 227 >>

(a) AMENDMENT.—Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

"SEC. 227. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT.

"(a) DEFINITIONS.—As used in this section—

"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

"(3) The term 'telephone solicitation' means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization.

"(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.—

"(1) PROHIBITIONS.—It shall be unlawful for any person within the United States—

"(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

"(i) to any emergency telephone line (including any '911' line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

"(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

"(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

"(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

"(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or

"(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 83 of 258

TELEPHONE CONSUMER PROTECTION ACT OF 1991, PL 102–243, December 20,...

"(2) REGULATIONS; EXEMPTIONS AND OTHER PROVISIONS.—The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

"(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent; and

"(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

"(i) calls that are not made for a commercial purpose; and

"(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

"(I) will not adversely affect the privacy rights that this section is intended to protect; and

"(II) do not include the transmission of any unsolicited advertisement.

"(3) PRIVATE RIGHT OF ACTION.—A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

"(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

"(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

"(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

"(c) PROTECTION OF SUBSCRIBER PRIVACY RIGHTS.—

"(1) RULEMAKING PROCEEDING REQUIRED.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. The proceeding shall—

"(A) compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages;

"(B) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

"(C) consider whether different methods and procedures may apply for local telephone solicitations, such as local telephone solicitations of small businesses or holders of second class mail permits;

"(D) consider whether there is a need for additional Commission authority to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, propose specific restrictions to the Congress; and

"(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

"(2) REGULATIONS.—Not later than 9 months after the date of enactment of this section, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

"(3) USE OF DATABASE PERMITTED.—The regulations required by paragraph (2) may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase. If the Commission determines to require such a database, such regulations shall—

"(A) specify a method by which the Commission will select an entity to administer such database;

"(B) require each common carrier providing telephone exchange service, in accordance with regulations prescribed by the Commission, to inform subscribers for telephone exchange service of the opportunity to provide notification, in accordance with regulations established under this paragraph, that such subscriber objects to receiving telephone solicitations;

"(C) specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

"(D) specify the methods by which such objections shall be collected and added to the database;

"(E) prohibit any residential subscriber from being charged for giving or revoking such notification or for being included in a database compiled under this section;

"(F) prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database;

"(G) specify (i) the methods by which any person desiring to make or transmit telephone solicitations will obtain access to the database, by area code or local exchange prefix, as required to avoid calling the telephone numbers of subscribers included in such database; and (ii) the costs to be recovered from such persons;

"(H) specify the methods for recovering, from persons accessing such database, the costs involved in identifying, collecting, updating, disseminating, and selling, and other activities relating to, the operations of the database that are incurred by the entities carrying out those activities;

"(I) specify the frequency with which such database will be updated and specify the method by which such updating will take effect for purposes of compliance with the regulations prescribed under this subsection;

"(J) be designed to enable States to use the database mechanism selected by the Commission for purposes of administering or enforcing State law;

"(K) prohibit the use of such database for any purpose other than compliance with the requirements of this section and any such State law and specify methods for protection of the privacy rights of persons whose numbers are included in such database; and

"(L) require each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of this section and the regulations thereunder.

"(4) CONSIDERATIONS REQUIRED FOR USE OF DATABASE METHOD.—If the Commission determines to require the database mechanism described in paragraph (3), the Commission shall—

"(A) in developing procedures for gaining access to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level;

"(B) develop a fee schedule or price structure for recouping the cost of such database that recognizes such differences and—

"(i) reflect the relative costs of providing a national, regional, State, or local list of phone numbers of subscribers who object to receiving telephone solicitations;

"(ii) reflect the relative costs of providing such lists on paper or electronic media; and

"(iii) not place an unreasonable financial burden on small businesses; and

"(C) consider (i) whether the needs of telemarketers operating on a local basis could be met through special markings of area white pages directories, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix.

"(5) PRIVATE RIGHT OF ACTION.—A person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—

"(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,

"(B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or

"(C) both such actions.

It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

**TELEPHONE CONSUMER PROTECTION ACT OF 1991, PL 102–243, December 20,...**

"(6) RELATION TO SUBSECTION (B).—The provisions of this subsection shall not be construed to permit a communication prohibited by subsection (b).

"(d) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) PROHIBITION.—It shall be unlawful for any person within the United States—

"(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system, that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

"(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

"(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which is manufactured after one year after the date of enactment of this section clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual.

"(3) ARTIFICIAL OR PRERECORDED VOICE SYSTEMS.—The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

"(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

"(B) any such system will automatically release the called party's line within 5 seconds of the time notification is transmitted to the system that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

"(e) EFFECT ON STATE LAW.—

"(1) STATE LAW NOT PREEMPTED.—Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

"(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

"(B) the use of automatic telephone dialing systems;

"(C) the use of artificial or prerecorded voice messages; or

"(D) the making of telephone solicitations.

"(2) STATE USE OF DATABASES.—If, pursuant to subsection (c)(3), the Commission requires the establishment of a single national database of telephone numbers of subscribers who object to receiving telephone solicitations, a State or local authority may not, in its regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of such single national datebase that relates to such State.

"(f) ACTIONS BY STATES.—

"(1) AUTHORITY OF STATES.—Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

"(2) EXCLUSIVE JURISDICTION OF FEDERAL COURTS.—The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section

or regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of such violation. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

"(3) RIGHTS OF COMMISSION.—The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

"(4) VENUE; SERVICE OF PROCESS.—Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or where the defendant may be found.

"(5) INVESTIGATORY POWERS.—For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State, or an official or agency designated by a State, from exercising the powers conferred on the attorney general or such official by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

"(6) EFFECT ON STATE COURT PROCEEDINGS.—Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

"(7) LIMITATION.—Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendency of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

"(8) DEFINITION.—As used in this subsection, the term 'attorney general' means the chief legal officer of a State.".

<< 47 USCA § 152 >>

(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "Except as provided" and all that follows through "and subject to the provisions" and inserting "Except as provided in sections 223 through 227, inclusive, and subject to the provisions".

<< 47 USCA § 227 NOTE >>

(c) DEADLINE FOR REGULATIONS; EFFECTIVE DATE.—

(1) REGULATIONS.—The Federal Communications Commission shall prescribe regulations to implement the amendments made by this section not later than 9 months after the date of enactment of this Act.

(2) EFFECTIVE DATE.—The requirements of section 228 of the Communications Act of 1934 (as added by this section), other than the authority to prescribe regulations, shall take effect one year after the date of enactment of this Act.

<< 47 USCA § 331 >>

SEC. 4. AM RADIO SERVICE.

Section 331 of the Communications Act of 1934 is amended—

(1) in the heading of such section, by inserting "AND AM RADIO STATIONS" after "TELEVISION STATIONS";

(2) by inserting "(a) VERY HIGH FREQUENCY STATIONS.—" after "SEC. 331."; and

(3) by adding at the end the following new subsection:

"(b) AM RADIO STATIONS.—It shall be the policy of the Commission, in any case in which the licensee of an existing AM daytime-only station located in a community with a population of more than 100,000 persons that lacks a local full-time aural station licensed to that community and that is located within a Class I station primary service area notifies the Commission that such licensee seeks to provide full-time service, to ensure that such a licensee is able to place a principal community contour signal over its entire community of license 24 hours a day, if technically feasible. The Commission shall report to the appropriate committees of Congress within 30 days after the date of enactment of this Act on how it intends to meet this policy goal.".

Approved December 20, 1991

PL 102–243, 1991 S 1462

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag

Unconstitutional or Preempted   Prior Version Held Invalid   *Insurance Marketing Coalition Limited v. Federal Communications Commission,*   11th Cir.,   Jan. 24, 2025

Code of Federal Regulations
  Title 47. Telecommunication
    Chapter I. Federal Communications Commission (Refs & Annos)
      Subchapter B. Common Carrier Services
        Part 64. Miscellaneous Rules Relating to Common Carriers (Refs & Annos)
          Subpart L. Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising (Refs & Annos)

47 C.F.R. § 64.1200

§ 64.1200 Delivery restrictions.

Currentness

<Text of section effective until Dec. 15, 2025.>

<"For statute affecting validity of par. (f)(9) of this section, see: 47 U.S.C.A. §§ 227(b)(1)(A, B), 227(b)(2)."\>

(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

(iv) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service, provided the number is not already on the national do-not-call registry or caller's company-specific do-not-call list. A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when making calls exempted by paragraph (a)(9) of this section.

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message that includes or introduces an advertisement or constitutes telemarketing without the prior express written consent of the called party, or that exceeds the applicable numerical limitation on calls identified in paragraphs (a)(3)(ii) through (v) of this section without the prior express consent of the called party. A telephone call to any residential line using an artificial or prerecorded voice to deliver a message requires no consent if the call:

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization and the caller makes no more than three calls within any consecutive 30–day period to the residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103, and the caller makes no more than one call per day to each patient's residential line, up to a maximum of three calls combined per week to each patient's residential line and honors the called party's request to opt out of future calls as required in paragraphs (b) and (d) of this section.

(4) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine, unless—

(i) The unsolicited advertisement is from a sender with an established business relationship, as defined in paragraph (f) (6) of this section, with the recipient; and

(ii) The sender obtained the number of the telephone facsimile machine through—

(A) The voluntary communication of such number by the recipient directly to the sender, within the context of such established business relationship; or

(B) A directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution. If a sender obtains the facsimile number from the recipient's own directory, advertisement, or Internet site, it will be presumed that the number was voluntarily made available for public distribution, unless such materials explicitly note that unsolicited advertisements are not accepted at the specified facsimile number. If a sender obtains the facsimile number from other sources, the sender must take reasonable steps to verify that the recipient agreed to make the number available for public distribution.

(C) This clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005 if the sender also possessed the facsimile machine number of the recipient before July 9, 2005. There shall be a rebuttable presumption that if a valid established business relationship was formed prior to July 9, 2005, the sender possessed the facsimile number prior to such date as well; and

(iii) The advertisement contains a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements. A notice contained in an advertisement complies with the requirements under this paragraph only if—

(A) The notice is clear and conspicuous and on the first page of the advertisement;

(B) The notice states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The notice sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

(D) The notice includes—

(1) A domestic contact telephone number and facsimile machine number for the recipient to transmit such a request to the sender; and

(2) If neither the required telephone number nor facsimile machine number is a toll-free number, a separate cost-free mechanism including a Web site address or email address, for a recipient to transmit a request pursuant to such notice to the sender of the advertisement. A local telephone number also shall constitute a cost-free mechanism so long as recipients are local and will not incur any long distance or other separate charges for calls made to such number; and

(E) The telephone and facsimile numbers and cost-free mechanism identified in the notice must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week.

(iv) A request not to send future unsolicited advertisements to a telephone facsimile machine complies with the requirements under this subparagraph only if—

(A) The request identifies the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;

(B) The request is made to the telephone number, facsimile number, Web site address or email address identified in the sender's facsimile advertisement; and

(C) The person making the request has not, subsequent to such request, provided express invitation or permission to the sender, in writing or otherwise, to send such advertisements to such person at such telephone facsimile machine.

(v) A sender that receives a request not to send future unsolicited advertisements that complies with paragraph (a)(4)(v) of this section must honor that request within the shortest reasonable time from the date of such request, not to exceed 30 days, and is prohibited from sending unsolicited advertisements to the recipient unless the recipient subsequently provides prior express invitation or permission to the sender. The recipient's opt-out request terminates the established business relationship exemption for purposes of sending future unsolicited advertisements. If such requests are recorded or maintained by a party other than the sender on whose behalf the unsolicited advertisement is sent, the sender will be liable for any failures to honor the opt-out request.

(vi) A facsimile broadcaster will be liable for violations of paragraph (a)(4) of this section, including the inclusion of opt-out notices on unsolicited advertisements, if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(5) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

(6) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(7) Abandon more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30–day period for a single calling campaign. If a single calling campaign exceeds a 30–day period, the abandonment rate shall be calculated separately for each successive 30–day period or portion thereof that such calling campaign continues. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

(i) Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed greeting, the telemarketer or the seller must provide:

(A) A prerecorded identification and opt-out message that is limited to disclosing that the call was for "telemarketing purposes" and states the name of the business, entity, or individual on whose behalf the call was placed, and a telephone number for such business, entity, or individual that permits the called person to make a do-not-call request during

regular business hours for the duration of the telemarketing campaign; provided, that, such telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges, and

(B) An automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make a do-not-call request prior to terminating the call, including brief explanatory instructions on how to use such mechanism. When the called person elects to opt-out using such mechanism, the mechanism must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call.

(ii) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line or to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section after the subscriber to such line has granted prior express written consent for the call to be made shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(iii) The seller or telemarketer must maintain records establishing compliance with paragraph (a)(7) of this section.

(iv) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by this paragraph (a)(7).

(8) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

(9) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section for making any call exempted in this paragraph (a)(9), provided that the call is not charged to the called person or counted against the called person's plan limits on minutes or texts. As used in this paragraph (a)(9), the term "call" includes a text message, including a short message service (SMS) call.

(i) Calls made by a package delivery company to notify a consumer about a package delivery, provided that all of the following conditions are met:

(A) The notification must be sent only to the telephone number for the package recipient;

(B) The notification must identify the name of the package delivery company and include contact information for the package delivery company;

(C) The notification must not include any telemarketing, solicitation, or advertising content;

(D) The voice call or text message notification must be concise, generally one minute or less in length for voice calls or 160 characters or less in length for text messages;

(E) The package delivery company shall send only one notification (whether by voice call or text message) per package, except that one additional notification may be sent for each attempt to deliver the package, up to two attempts,

if the recipient's signature is required for the package and the recipient was not available to sign for the package on the previous delivery attempt;

<Text of subsection (a)(9)(i)(F) effective until (date pending).>

(F) The package delivery company must offer package recipients the ability to opt out of receiving future delivery notification calls and messages and must honor an opt-out request within a reasonable time from the date such request is made, not to exceed 30 days; and,

<Text of subsection (a)(9)(i)(F) delayed until announcement of effective date in the Federal Register. See 89 FR 15757.>

(F) The package delivery company must offer package recipients the ability to opt out of receiving future delivery notification calls and messages and must honor an opt-out request within a reasonable time from the date such request is made, not to exceed six business days; and,

(G) Each notification must include information on how to opt out of future delivery notifications; voice call notifications that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make an opt-out request prior to terminating the call; voice call notifications that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future package delivery notifications; text notifications must include the ability for the recipient to opt out by replying "STOP."

(ii) Calls made by an inmate collect call service provider following an unsuccessful collect call to establish a billing arrangement with the called party to enable future collect calls, provided that all of the following conditions are met:

(A) Notifications must identify the name of the inmate collect call service provider and include contact information;

(B) Notifications must not include any telemarketing, solicitation, debt collection, or advertising content;

(C) Notifications must be clear and concise, generally one minute or less;

(D) Inmate collect call service providers shall send no more than three notifications following each inmate collect call that is unsuccessful due to the lack of an established billing arrangement, and shall not retain the called party's number after call completion or, in the alternative, after the third notification attempt; and

(E) Each notification call must include information on how to opt out of future calls; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the called person to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future notification calls; and,

(F) The inmate collect call service provider must honor opt-out requests immediately.

(iii) Calls made by any financial institution as defined in section 4(k) of the Bank Holding Company Act of 1956, 15 U.S.C. 6809(3)(A), provided that all of the following conditions are met:

(A) Voice calls and text messages must be sent only to the wireless telephone number provided by the customer of the financial institution;

(B) Voice calls and text messages must state the name and contact information of the financial institution (for voice calls, these disclosures must be made at the beginning of the call);

(C) Voice calls and text messages are strictly limited to those for the following purposes: transactions and events that suggest a risk of fraud or identity theft; possible breaches of the security of customers' personal information; steps consumers can take to prevent or remedy harm caused by data security breaches; and actions needed to arrange for receipt of pending money transfers;

(D) Voice calls and text messages must not include any telemarketing, cross-marketing, solicitation, debt collection, or advertising content;

(E) Voice calls and text messages must be concise, generally one minute or less in length for voice calls (unless more time is needed to obtain customer responses or answer customer questions) or 160 characters or less in length for text messages;

(F) A financial institution may initiate no more than three messages (whether by voice call or text message) per event over a three-day period for an affected account;

(G) A financial institution must offer recipients within each message an easy means to opt out of future such messages; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future calls; text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

(H) A financial institution must honor opt-out requests immediately.

(iv) Calls made by, or on behalf of, healthcare providers, which include hospitals, emergency care centers, medical physician or service offices, poison control centers, and other healthcare professionals, provided that all of the following conditions are met:

(A) Voice calls and text messages must be sent only to the wireless telephone number provided by the patient;

(B) Voice calls and text messages must state the name and contact information of the healthcare provider (for voice calls, these disclosures would need to be made at the beginning of the call);

(C) Voice calls and text messages are strictly limited to those for the following purposes: appointment and exam confirmations and reminders, wellness checkups, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up intended to prevent readmission, prescription notifications, and home healthcare instructions;

(D) Voice calls and text messages must not include any telemarketing, solicitation, or advertising; may not include accounting, billing, debt-collection, or other financial content; and must comply with HIPAA privacy rules, 45 CFR 160.103;

(E) Voice calls and text messages must be concise, generally one minute or less in length for voice calls or 160 characters or less in length for text messages;

(F) A healthcare provider may initiate only one message (whether by voice call or text message) per day to each patient, up to a maximum of three voice calls or text messages combined per week to each patient;

(G) A healthcare provider must offer recipients within each message an easy means to opt out of future such messages; voice calls that could be answered by a live person must include an automated, interactive voice- and/or key press-activated opt-out mechanism that enables the call recipient to make an opt-out request prior to terminating the call; voice calls that could be answered by an answering machine or voice mail service must include a toll-free number that the consumer can call to opt out of future healthcare calls; text messages must inform recipients of the ability to opt out by replying "STOP," which will be the exclusive means by which consumers may opt out of such messages; and,

(H) A healthcare provider must honor opt-out requests immediately.

(10) A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) and (c)(2) of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender. Any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a call; using the words "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe" sent in reply to an incoming text message; or pursuant to a website or telephone number designated by the caller to process opt-out requests constitutes a reasonable means per se to revoke consent. If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and robotexts. If a reply to an incoming text message uses words other than "stop," "quit," "end," "revoke," "opt out," "cancel," or "unsubscribe," the caller must treat that reply text as a valid revocation request if a reasonable person would understand those words to have conveyed a request to revoke consent. Should the text initiator choose to use a texting protocol that does not allow reply texts, it must provide a clear and conspicuous disclosure on each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol, and clearly and conspicuously provide on each text reasonable alternative ways to revoke consent. All requests to revoke prior express consent or prior express written consent made in any reasonable manner must be honored within a reasonable time not to exceed ten business days from receipt of such request. Callers or senders of text messages covered by paragraphs (a)(1) through (3) and (c)(2) of this section may not designate an exclusive means to request revocation of consent.

Add. 35

(11) The use of any other means to revoke consent not listed in paragraph (a)(10) of this section, such as a voicemail or email to any telephone number or email address intended to reach the caller, creates a rebuttable presumption that the consumer has revoked consent when the called party satisfies their obligation to produce evidence that such a request has been made, absent evidence to the contrary. In those circumstances, a totality of circumstances analysis will determine whether the caller can demonstrate that a request to revoke consent has not been conveyed in a reasonable manner.

(12) A one-time text message confirming a request to revoke consent from receiving any further calls or text messages does not violate paragraphs (a)(1) and (2) of this section as long as the confirmation text merely confirms the text recipient's revocation request and does not include any marketing or promotional information, and is the only additional message sent to the called party after receipt of the revocation request. If the confirmation text is sent within five minutes of receipt, it will be presumed to fall within the consumer's prior express consent. If it takes longer, however, the sender will have to make a showing that such delay was reasonable. To the extent that the text recipient has consented to several categories of text messages from the text sender, the confirmation message may request clarification as to whether the revocation request was meant to encompass all such messages; the sender must cease all further texts for which consent is required absent further clarification that the recipient wishes to continue to receive certain text messages.

(b) All artificial or prerecorded voice telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated;

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages and messages made pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours; and

(3) In every case where the artificial or prerecorded-voice telephone message is made pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism must automatically record the called person's number to the caller's do-not-call list and immediately terminate the call. When the artificial or prerecorded-voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the caller's do-not-call list.

(c) No person or entity shall initiate any telephone solicitation to:

(1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

(B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

Note to paragraph (c)(2)(i)(D): The requirement in paragraph 64.1200(c)(2)(i)(D) for persons or entities to employ a version of the national do-not-call registry obtained from the administrator no more than 31 days prior to the date any call is made is effective January 1, 2005. Until January 1, 2005, persons or entities must continue to employ a version of the registry obtained from the administrator of the registry no more than three months prior to the date any call is made.

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

(d) No person or entity shall initiate any artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) Written policy. Persons or entities making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel. Personnel engaged in making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

<Text of subsection (d)(3) effective until (date pending).>

(3) Recording, disclosure of do-not-call requests. If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed 30 days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

<Text of subsection (d)(3) delayed until announcement of effective date in the Federal Register. See 89 FR 15757.>

(3) Recording, disclosure of do-not-call requests. If a person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed ten (10) business days from the receipt of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the call is made, the person or entity on whose behalf the call is made will be liable for any failures to honor the do-not-call request. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) or any call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a call is made or an affiliated entity.

(4) Identification of callers and telemarketers. A person or entity making an artificial or prerecorded-voice telephone call pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must

provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

(5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and (for telemarketing calls) the product being advertised.

(6) Maintenance of do-not-call lists. A person or entity making artificial or prerecorded-voice telephone calls pursuant to an exemption under paragraphs (a)(3)(ii) through (v) of this section or any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02–278, FCC 03–153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

(f) As used in this section:

(1) The term advertisement means any material advertising the commercial availability or quality of any property, goods, or services.

(2) The terms automatic telephone dialing system and autodialer mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(3) The term clear and conspicuous means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures. With respect to facsimiles and for purposes of paragraph (a)(4)(iii)(A) of this section, the notice must be placed at either the top or bottom of the facsimile.

(4) The term emergency purposes means calls made necessary in any situation affecting the health and safety of consumers.

(5) The term established business relationship for purposes of telephone solicitations means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

(i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

(ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(6) The term established business relationship for purposes of paragraph (a)(4) of this section on the sending of facsimile advertisements means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

(7) The term facsimile broadcaster means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

(8) The term one-ring scam means a scam in which a caller makes a call and allows the call to ring the called party for a short duration, in order to prompt the called party to return the call, thereby subjecting the called party to charges.

(9) The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

(i) The written agreement shall include a clear and conspicuous disclosure informing the person signing that:

(A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and

(B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

(ii) The term "signature" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law.

(10) The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(11) The term sender for purposes of paragraph (a)(4) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.

(12) The term telemarketer means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(13) The term telemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(14) The term telephone facsimile machine means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

(15) The term telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

(i) To any person with that person's prior express invitation or permission;

(ii) To any person with whom the caller has an established business relationship; or

(iii) By or on behalf of a tax-exempt nonprofit organization.

(16) The term unsolicited advertisement means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.

(17) The term personal relationship means any family member, friend, or acquaintance of the telemarketer making the call.

(18) The term effectively mitigate means identifying the source of the traffic and preventing that source from continuing to originate traffic of the same or similar nature.

(19) The term gateway provider means a U.S.-based intermediate provider that receives a call directly from a foreign originating provider or foreign intermediate provider at its U.S.-based facilities before transmitting the call downstream to another U.S.-based provider. For purposes of this paragraph (f)(19):

(i) U.S.-based means that the provider has facilities located in the United States, including a point of presence capable of processing the call; and

(ii) Receives a call directly from a provider means the foreign provider directly upstream of the gateway provider in the call path sent the call to the gateway provider, with no providers in-between.

(g) Beginning January 1, 2004, common carriers shall:

(1) When providing local exchange service, provide an annual notice, via an insert in the subscriber's bill, of the right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national do-not-call database maintained by the federal government and the methods by which such rights may be exercised by the subscriber. The notice must be clear and conspicuous and include, at a minimum, the Internet address and toll-free number that residential telephone subscribers may use to register on the national database.

(2) When providing service to any person or entity for the purpose of making telephone solicitations, make a one-time notification to such person or entity of the national do-not-call requirements, including, at a minimum, citation to 47 CFR 64.1200 and 16 CFR 310. Failure to receive such notification will not serve as a defense to any person or entity making telephone solicitations from violations of this section.

(h) The administrator of the national do-not-call registry that is maintained by the federal government shall make the telephone numbers in the database available to the States so that a State may use the telephone numbers that relate to such State as part of any database, list or listing system maintained by such State for the regulation of telephone solicitations.

(i) [Reserved]

(j) [Reserved]

(k) Voice service providers may block calls so that they do not reach a called party as follows:

(1) A provider may block a voice call when the subscriber to which the originating number is assigned has requested that calls purporting to originate from that number be blocked because the number is used for inbound calls only.

(2) A provider may block a voice call purporting to originate from any of the following:

(i) A North American Numbering Plan number that is not valid;

(ii) A valid North American Numbering Plan number that is not allocated to a provider by the North American Numbering Plan Administrator or the Pooling Administrator; and

(iii) A valid North American Numbering Plan number that is allocated to a provider by the North American Numbering Plan Administrator or Pooling Administrator, but is unused, so long as the provider blocking the calls is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of the blocking.

(iv) A telephone number that the provider identifies, based on reasonable analytics, as highly likely to be associated with a one-ring scam.

(3) A terminating provider may block a voice call without liability under the Communications Act or the Commission's rules where:

(i) Calls are blocked based on the use of reasonable analytics designed to identify unwanted calls;

(ii) Those analytics include consideration of caller ID authentication information where available;

(iii) A consumer may opt out of blocking and is provided with sufficient information to make an informed decision;

(iv) All analytics are applied in a non-discriminatory, competitively neutral manner;

(v) Blocking services are provided with no additional line-item charge to consumers; and

(vi) The terminating provider provides, without charge to the caller, the redress requirements set forth in paragraph (k)(8) of this section.

(4) A provider may block voice calls or cease to accept traffic from an originating or intermediate provider without liability under the Communications Act or the Commission's rules where the originating or intermediate provider, when notified by the Commission, fails to effectively mitigate illegal traffic within 48 hours or fails to implement effective measures to prevent new and renewing customers from using its network to originate illegal calls. Prior to initiating blocking, the provider shall provide the Commission with notice and a brief summary of the basis for its determination that the originating or intermediate provider meets one or more of these two conditions for blocking.

(5) A provider may not block a voice call under paragraphs (k)(1) through (4), paragraph (k)(11), paragraphs (n)(2) and (3), paragraph (n)(5), or paragraph (o) of this section if the call is an emergency call placed to 911.

(6) When blocking consistent with paragraphs (k)(1) through (4), paragraph (k)(11), paragraphs (n)(2) and (3), paragraph (n)(5), or paragraph (o) of this section, a provider must make all reasonable efforts to ensure that calls from public safety answering points and government emergency numbers are not blocked.

(7) For purposes of this section, a provider may rely on Caller ID information to determine the purported originating number without regard to whether the call, in fact originated from that number.

(8) Each terminating provider that blocks calls pursuant to this section or utilizes caller ID authentication information in determining how to deliver calls must provide a single point of contact, readily available on the terminating provider's public-facing website, for receiving call blocking error complaints and verifying the authenticity of the calls of a calling party that is adversely affected by information provided by caller ID authentication. The terminating provider must resolve disputes pertaining to caller ID authentication information within a reasonable time and, at a minimum, provide a status update within 24 hours. When a caller makes a credible claim of erroneous blocking and the terminating provider determines that the calls should not have been blocked, or the call delivery decision is not appropriate, the terminating

provider must promptly cease the call treatment for that number unless circumstances change. The terminating provider may not impose any charge on callers for reporting, investigating, or resolving either category of complaints, so long as the complaint is made in good faith.

(9) Any terminating provider that blocks calls based on any analytics program, either itself or through a third-party blocking service, must immediately return, and all voice service providers in the call path must transmit, an appropriate response code to the origination point of the call. For purposes of this rule, an appropriate response code is:

(i) In the case of a call terminating on an IP network, the use of Session Initiation Protocol (SIP) code 603, 607, or 608;

(ii) In the case of a call terminating on a non–IP network, the use of ISDN User Part (ISUP) code 21 with the cause location "user";

(iii) In the case of a code transmitting from an IP network to a non–IP network, SIP codes 607 and 608 must map to ISUP code 21; and

(iv) In the case of a code transmitting from a non–IP network to an IP network, ISUP code 21 must map to SIP code 603, 607, or 608 where the cause location is "user."

(10) Any terminating provider that blocks calls pursuant to an opt-out or opt-in analytics program, either itself or through a third-party blocking service, must provide, at the request of the subscriber to a number, at no additional charge and within 3 business days of such a request, a list of calls to that number, including the date and time of the call and the calling number, that the terminating provider or its designee blocked pursuant to such analytics program within the 28 days prior to the request.

(11) A terminating provider may block calls without liability under the Communications Act and the Commission's rules, without giving consumers the opportunity to opt out of such blocking, so long as:

(i) The provider reasonably determines, based on reasonable analytics that include consideration of caller ID authentication information where available, that calls are part of a particular call pattern that is highly likely to be illegal;

(ii) The provider manages its network-based blocking with human oversight and network monitoring sufficient to ensure that it blocks only calls that are highly likely to be illegal, which must include a process that reasonably determines that the particular call pattern is highly likely to be illegal before initiating blocking of calls that are part of that pattern;

(iii) The provider ceases blocking calls that are part of the call pattern as soon as the provider has actual knowledge that the blocked calls are likely lawful;

(iv) The provider discloses to consumers that it is engaging in such blocking;

(v) All analytics are applied in a non-discriminatory, competitively neutral manner;

(vi) Blocking services are provided with no additional line-item charge to consumers; and

(vii) The terminating provider provides, without line item charge to the caller, the redress requirements set forth in subparagraphs 8 and 9.

(l) A reporting carrier subject to § 52.15(f) of this title shall:

(1) Maintain records of the most recent date each North American Numbering Plan (NANP) telephone number allocated or ported to the reporting carrier was permanently disconnected.

(2) Beginning on the 15th day of the month after the Consumer and Governmental Affairs Bureau announces that the Administrator is ready to begin accepting these reports and on the 15th day of each month thereafter, report to the Administrator the most recent date each NANP telephone number allocated to or ported to it was permanently disconnected.

(3) For purposes of this paragraph (l), a NANP telephone number has been permanently disconnected when a subscriber permanently has relinquished the number, or the provider permanently has reversed its assignment of the number to the subscriber such that the number has been disassociated with the subscriber. A NANP telephone number that is ported to another provider is not permanently disconnected.

(4) Reporting carriers serving 100,000 or fewer domestic retail subscriber lines as reported on their most recent Forms 477, aggregated over all the providers' affiliates, must begin keeping the records required by paragraph (l)(1) of this section six months after the effective date for large providers and must begin filing the reports required by paragraph (l)(2) of this section no later than the 15th day of the month that is six months after the date announced by the Consumer and Governmental Affairs Bureau pursuant to paragraph (l)(2).

(m) A person will not be liable for violating the prohibitions in paragraph (a)(1), (2), or (3) of this section by making a call to a number for which the person previously had obtained prior express consent of the called party as required in paragraph (a)(1), (2), or (3) but at the time of the call, the number is not assigned to the subscriber to whom it was assigned at the time such prior express consent was obtained if the person, bearing the burden of proof and persuasion, demonstrates that:

(1) The person, based upon the most recent numbering information reported to the Administrator pursuant to paragraph (l) of this section, by querying the database operated by the Administrator and receiving a response of "no", has verified that the number has not been permanently disconnected since the date prior express consent was obtained as required in paragraph (a)(1), (2), or (3) of this section; and

(2) The person's call to the number was the result of the database erroneously returning a response of "no" to the person's query consisting of the number for which prior express consent was obtained as required in paragraph (a)(1), (2), or (3) of this section and the date on which such prior express consent was obtained.

(n) A voice service provider must:

(1) Upon receipt of a traceback request from the Commission, civil law enforcement, criminal law enforcement, or the industry traceback consortium, the provider must fully respond to the traceback request within 24 hours of receipt of the request. The 24–hour clock does not start outside of business hours, and requests received during that time are deemed received at 8 a.m. on the next business day. If the 24–hour response period would end on a non-business day, either a weekend or a Federal legal holiday, the 24–hour clock does not run for the weekend or holiday in question, and restarts at 12:01 a.m. on the next business day following when the request would otherwise be due. For example, a request received at 3 p.m. on a Friday will be due at 3 p.m. on the following Monday, assuming that Monday is not a Federal legal holiday. For purposes of this paragraph (n)(1), business day is defined as Monday through Friday, excluding Federal legal holidays, and business hours is defined as 8 a.m. to 5:30 p.m. on a business day. For purposes of this paragraph (n)(1), all times are local time for the office that is required to respond to the request.

(2) Upon receipt of a Notice of Suspected Illegal Traffic from the Commission through its Enforcement Bureau, take the applicable actions with respect to the identified traffic described in paragraphs (n)(2)(i) through (iii) of this section. The provider will not be held liable under the Communications Act or the Commission's rules in this chapter for providers that inadvertently block lawful traffic as part of the requirement to block substantially similar traffic so long as it is blocking consistent with the requirements of paragraphs (n)(2)(i) through (iii). For purposes of this paragraph (n)(2), identified traffic means the illegal traffic identified in the Notification of Suspected Illegal Traffic issued by the Enforcement Bureau. The following procedures shall apply:

(i)(A) The Enforcement Bureau will issue a Notification of Suspected Illegal Traffic that identifies with as much particularity as possible the suspected illegal traffic; provides the basis for the Enforcement Bureau's reasonable belief that the identified traffic is unlawful; cites the statutory or regulatory provisions the identified traffic appears to violate; and directs the provider receiving the notice that it must comply with this section. The Enforcement Bureau's Notification of Suspected Illegal Traffic shall give the identified provider a minimum of 14 days to comply with the notice. Each notified provider must promptly investigate the identified traffic and report the results of that investigation to the Enforcement Bureau within the timeframe specified in the Notification of Suspected Illegal Traffic. If the provider's investigation determines that it served as the gateway or originating provider for the identified traffic, it must block or cease accepting the identified traffic and substantially similar traffic on an ongoing basis within the timeframe specified in the Notification of Suspected Illegal Traffic. The provider must include in its report to the Enforcement Bureau:

(1) A certification that it is blocking the identified traffic and will continue to do so; and

(2) A description of its plan to identify and block or cease accepting substantially similar traffic on an ongoing basis.

(B) If the provider's investigation determines that the identified traffic is not illegal, it shall provide an explanation as to why the provider reasonably concluded that the identified traffic is not illegal and what steps it took to reach that conclusion. Absent such a showing, or if the Enforcement Bureau determines based on the evidence that the traffic is illegal despite the provider's assertions, the identified traffic will be deemed illegal. If the notified provider determines during this investigation that it did not serve as the gateway provider or originating provider for any of the identified traffic, it shall provide an explanation as to how it reached that conclusion and, if it is a non-gateway intermediate or terminating provider for the identified traffic, it must identify the upstream provider(s) from which it received the identified traffic and, if possible, take lawful steps to mitigate this traffic. If the Enforcement Bureau finds that an approved plan is not blocking substantially similar traffic, the identified provider shall modify its plan to block such

traffic. If the Enforcement Bureau finds that the identified provider continues to allow suspected illegal traffic onto the U.S. network, it may proceed under paragraph (n)(2)(ii) or (iii) of this section, as appropriate.

(ii) If the provider fails to respond to the Notification of Suspected Illegal Traffic, the Enforcement Bureau determines that the response is insufficient, the Enforcement Bureau determines that the provider is continuing to originate substantially similar traffic or allow substantially similar traffic onto the U.S. network after the timeframe specified in the Notification of Suspected Illegal Traffic, or the Enforcement Bureau determines based on the evidence that the traffic is illegal despite the provider's assertions, the Enforcement Bureau shall issue an Initial Determination Order to the provider stating the Bureau's initial determination that the provider is not in compliance with this section. The Initial Determination Order shall include the Enforcement Bureau's reasoning for its determination and give the provider a minimum of 14 days to provide a final response prior to the Enforcement Bureau making a final determination on whether the provider is in compliance with this section.

(iii) If the provider does not provide an adequate response to the Initial Determination Order within the timeframe permitted in that Order or continues to originate substantially similar traffic onto the U.S. network, the Enforcement Bureau shall issue a Final Determination Order finding that the provider is not in compliance with this section. The Final Determination Orders shall be published in EB Docket No. 22–174 at https://www.fcc.gov/ecfs/search/search-filings. A Final Determination Order may be issued up to one year after the release date of the Initial Determination Order, and may be based on either an immediate failure to comply with this section or a determination that the provider has failed to meet its ongoing obligation under this section to block substantially similar traffic.

(3) When notified by the Commission through its Enforcement Bureau that a Final Determination Order has been issued finding that an upstream provider has failed to comply with paragraph (n)(2) of this section, block and cease accepting all traffic received directly from the upstream provider beginning 30 days after the release date of the Final Determination Order. This paragraph (n)(3) applies to any provider immediately downstream from the upstream provider. The Enforcement Bureau shall provide notification by publishing the Final Determination Order in EB Docket No. 22–174 at https://www.fcc.gov/ecfs/search/search-filings. Providers must monitor EB Docket No. 22–174 and initiate blocking no later than 30 days from the release date of the Final Determination Order. A provider that chooses to initiate blocking sooner than 30 days from the release date may do so consistent with paragraph (k)(4) of this section.

(4) Take affirmative, effective measures to prevent new and renewing customers from using its network to originate illegal calls, including knowing its customers and exercising due diligence in ensuring that its services are not used to originate illegal traffic.

(5) Take reasonable and effective steps to ensure that any originating provider or intermediate provider, foreign or domestic, from which it directly receives traffic is not using the provider to carry or process a high volume of illegal traffic onto the U.S. network.

(o) A provider that serves as a gateway provider for particular calls must, with respect to those calls, block any calls purporting to originate from a number on a reasonable do-not-originate list. A list so limited in scope that it leaves out obvious numbers that could be included with little effort may be deemed unreasonable. The do-not-originate list may include only:

(1) Numbers for which the subscriber to which the number is assigned has requested that calls purporting to originate from that number be blocked because the number is used for inbound calls only;

Add. 47

(2) North American Numbering Plan numbers that are not valid;

(3) Valid North American Numbering Plan Numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and

(4) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the calls is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

(p) A mobile wireless provider must block a text message purporting to originate from a North American Numbering Plan number on a reasonable do-not-originate list. A list so limited in scope that it leaves out obvious North American Numbering Plan numbers that could be included with little effort may be deemed unreasonable. The do-not-originate list may include only:

(1) North American Numbering Plan Numbers for which the subscriber to the number has requested that texts purporting to originate from that number be blocked;

(2) North American Numbering Plan numbers that are not valid;

(3) Valid North American Numbering Plan numbers that are not allocated to a provider by the North American Numbering Plan Administrator; and

(4) Valid North American Numbering Plan numbers that are allocated to a provider by the North American Numbering Plan Administrator, but are unused, so long as the provider blocking the message is the allocatee of the number and confirms that the number is unused or has obtained verification from the allocatee that the number is unused at the time of blocking.

(q) [Reserved by 89 FR 15062]

(r) A mobile wireless provider must provide a point of contact or ensure its aggregator partners or blocking contractors that block text messages on its network provide a point of contact to resolve complaints about erroneous blocking from message senders that can document that their messages have been blocked. Such point of contact may be the same point of contact for voice call blocking error complaints.

(s) A terminating mobile wireless provider must, upon receipt of a Notification of Illegal Texts from the Commission through its Enforcement Bureau, take the actions described in this paragraph (s), including, when required, blocking all texts from the identified number or numbers. The Enforcement Bureau will issue a Notification of Illegal Texts that identifies the number(s) used and the date(s) the texts were sent or received; provides the basis for the Enforcement Bureau's determination that the identified texts are unlawful; cites the statutory or regulatory provisions the identified texts violate; directs the provider receiving the notice that it must comply with this section; and provide a point of contact to be used by a subscriber to a listed number to dispute blocking. The Enforcement Bureau's Notification of Illegal Texts shall give the identified provider a reasonable amount of time to comply with the notice. The Enforcement Bureau shall make the Notification of Illegal Texts available in EB Docket

Add. 48

No. 23–418 at https://www.fcc.gov/ecfs/search/search-filings. The provider must include a certification that it is blocking all texts from the number or numbers and will continue to do so unless the provider learns that the number has been reassigned, in which case the provider shall promptly notify the Enforcement Bureau of this fact and include any information it has obtained that demonstrates that the number has been reassigned. If, at any time in the future, the provider determines that the number has been reassigned, it shall notify the Enforcement Bureau and cease blocking. The provider is not required to monitor for number reassignments.

**Credits**

[57 FR 53293, Nov. 9, 1992; 60 FR 42069, Aug. 15, 1995; 68 FR 44177, July 25, 2003; 68 FR 50978, Aug. 25, 2003; 68 FR 56764, Oct. 1, 2003, as amended at 68 FR 59131, Oct. 14, 2003; 69 FR 60316, Oct. 8, 2004; 69 FR 62816, Oct. 28, 2004; 69 FR 78339, Dec. 30, 2004; 70 FR 19337, April 13, 2005; 70 FR 37705, June 30, 2005; 70 FR 75070, Dec. 19, 2005; 71 FR 25977, May 3, 2006; 71 FR 42297, July 26, 2006; 71 FR 56893, Sept. 28, 2006; 71 FR 75122, Dec. 14, 2006; 73 FR 40185, July 14, 2008; 73 FR 67419, Nov. 14, 2008; 77 FR 34246, June 11, 2012; 77 FR 63240, Oct. 16, 2012; 77 FR 66935, Nov. 8, 2012; 83 FR 1577, Jan. 12, 2018; 84 FR 10267, March 20, 2019; 84 FR 11232, March 26, 2019; 85 FR 38334, June 26, 2020; 85 FR 56534, Sept. 14, 2020; 86 FR 2563, Jan. 13, 2021; 86 FR 8559, Feb. 8, 2021; 86 FR 11447, 11448, Feb. 25, 2021; 86 FR 17734, 17735, April 6, 2021; 86 FR 74375, Dec. 30, 2021; 87 FR 7044, Feb. 8, 2022; 87 FR 42944, July 18, 2022; 87 FR 51921, Aug. 24, 2022; 87 FR 69207, Nov. 18, 2022; 88 FR 3668, 3677, Jan. 20, 2023; 88 FR 21500, April 11, 2023; 88 FR 43458, July 10, 2023; 89 FR 5104, 5105, Jan. 26, 2024; 89 FR 15061, 15062, March 1, 2024; 89 FR 15762, March 5, 2024; 89 FR 17762, March 12, 2024; 89 FR 82518, Oct. 11, 2024; 89 FR 87983, Nov. 6, 2024; 90 FR 13425, March 24, 2025; 90 FR 42138, Aug. 29, 2025]

SOURCE: 56 FR 18523, April 23, 1991; 56 FR 25372, June 4, 1991; 56 FR 36731, Aug. 1, 1991; 57 FR 4740, Feb. 7, 1992; 57 FR 21040, May 18, 1992; 57 FR 48335, Oct. 23, 1992; 57 FR 48355, Oct. 23, 1992; 57 FR 54331, Nov. 18, 1992; 58 FR 44773, Aug. 25, 1993; 61 FR 24903, May 17, 1996; 61 FR 50246, Sept. 25, 1996; 61 FR 52323, Oct. 7, 1996; 61 FR 59366, Nov. 22, 1996; 62 FR 39779, July 24, 1997; 62 FR 45588, Aug. 28, 1997; 62 FR 47237, Sept. 8, 1997; 62 FR 64758, Dec. 9, 1997; 63 FR 20338, April 24, 1998; 63 FR 43041, Aug. 11, 1998; 64 FR 51469, Sept. 23, 1999; 64 FR 51718, Sept. 24, 1999; 65 FR 38435, June 21, 2000; 65 FR 48396, Aug. 8, 2000; 65 FR 54804, Sept. 11, 2000; 67 FR 9616, March 4, 2002; 67 FR 22007, May 2, 2002; 68 FR 6355, Feb. 7, 2003; 68 FR 44177, July 25, 2003; 69 FR 62816, Oct. 28, 2004; 71 FR 25977, May 3, 2006; 76 FR 24400, May 2, 2011; 76 FR 26647, May 9, 2011; 76 FR 43205, July 20, 2011; 76 FR 65969, Oct. 25, 2011; 76 FR 67073, Oct. 31, 2011; 76 FR 73882, Nov. 28, 2011; 77 FR 30919, May 24, 2012; 77 FR 34246, June 11, 2012; 77 FR 71137, Nov. 29, 2012; 81 FR 62825, Sept. 13, 2016; 81 FR 87343, Dec. 2, 2016; 82 FR 7707, Jan. 23, 2017; 82 FR 19325, April 27, 2017; 82 FR 44119, Sept. 21, 2017; 83 FR 1577, Jan. 12, 2018; 83 FR 21737, May 10, 2018; 83 FR 33143, July 17, 2018; 83 FR 47308, Sept. 19, 2018; 83 FR 48963, Sept. 28, 2018; 84 FR 8461, March 8, 2019; 84 FR 45678, Aug. 30, 2019; 85 FR 22043, April 21, 2020; 85 FR 67461, Oct. 23, 2020; 86 FR 40731, July 28, 2021; 87 FR 75513, Dec. 9, 2022; 88 FR 84448, Dec. 5, 2023; 89 FR 5104, Jan. 26, 2024; 89 FR 77361, Sept. 20, 2024, unless otherwise noted.

AUTHORITY: 47 U.S.C. 151, 152, 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 227b, 228, 251(a), 251(e), 254(k), 255, 262, 276, 403(b)(2)(B), (c), 616, 620, 716, 1401–1473, unless otherwise noted; Pub.L. 115–141, Div. P, sec. 503, 132 Stat. 348, 1091.

Notes of Decisions (309)

Current through October 1, 2025, 90 FR 47239. Some sections may be more current. See credits for details.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 110 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

 KeyCite Yellow Flag

Order Clarified by  IN THE MATTER OF WESTFAX, INC. PETITION FOR CONSIDERATION AND CLARIFICATION,  F.C.C.,  August 28, 2015

**18 FCC Rcd. 14014 (F.C.C.), 18 F.C.C.R. 14014, 29 Communications Reg. (P&F) 830, 2003 WL 21517853**

Federal Communications Commission (F.C.C.)

Report and Order

IN THE MATTER OF RULES AND REGULATIONS IMPLEMENTING
THE TELEPHONE CONSUMER PROTECTION ACT OF 1991

CG Docket No. 02-278

FCC 03-153

Adopted: June 26, 2003

Released: July 3, 2003

**\*\*1  \*14014**  By the Commission: Chairman Powell, Commissioners Abernathy, Copps and Adelstein issuing separate statements.

### \*14017  I. INTRODUCTION

1. In this Order, we revise the current Telephone Consumer Protection Act (TCPA) [1] rules and adopt new rules to provide consumers with several options for avoiding unwanted telephone solicitations. Specifically, we establish with the Federal Trade Commission (FTC) a national do-not-call registry for consumers who wish to avoid unwanted telemarketing calls. The national do-not-call registry will supplement the current company-specific do-not-call rules for those consumers who wish to continue requesting that particular companies not call them. To address the more prevalent use of predictive dialers, we have determined that a telemarketer may abandon no more than three percent of calls answered by a person and must deliver a prerecorded identification message when abandoning a call. The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information. The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited fax, and we have clarified when fax broadcasters are liable for the transmission of unlawful facsimile advertisements. We believe the rules the Commission adopts here strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers.

2. It has now been over ten years since the Commission adopted a broad set of rules that respond to Congress's directives in the TCPA. Over the last decade, the telemarketing industry has undergone significant changes in the technologies and methods used to contact consumers. The Commission has carefully reviewed the record developed in this rulemaking proceeding. The record confirms that these marketplace changes warrant modifications to our existing rules, and adoption of new rules if consumers are to continue to receive the protections that Congress intended to provide when it enacted the TCPA. The number of telemarketing calls has risen steadily; the use of predictive dialers has proliferated; and consumer frustration with unsolicited telemarketing calls continues despite the efforts of the states, the Direct Marketing Association (DMA), [2] and the company-specific approach to the problem. Consumers often feel frightened, threatened, and harassed by telemarketing calls. They are angered by hang-ups and "dead air" calls, by do-not-call requests that are not honored, and by unsolicited fax advertisements. Many consumers who commented in this proceeding "want something done" about unwanted solicitation calls, and the vast majority of them support the establishment of a national do-not-call registry. Congress, too, has responded by enacting the Do-Not-Call Implementation Act (Do-Not-Call Act), [3] authorizing the establishment of a national do-not-call registry, and directing this Commission to issue final rules in its second major TCPA proceeding that maximize consistency with those of the FIC.

**Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 111 of 258**

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*2  \*14018**  3. The Commission recognizes that telemarketing is a legitimate method of selling goods and services, and that many consumers value the savings and convenience it provides. Thus, the national do-not-call registry that we adopt here will only apply to outbound telemarketing calls and will only include the telephone numbers of consumers who indicate that they wish to avoid such calls. Consumers who want to receive such calls may instead continue to rely on the company-specific do-not-call lists to manage telemarketing calls into their homes. Based on Congress's directives in the TCPA and the Do-Not-Call Act, the substantial record developed in this proceeding, and on the Commission's own enforcement experience, we adopt these amended rules, as described in detail below.

## II. BACKGROUND

### A. Telephone Consumer Protection Act of 1991

4. On December 20, 1991, Congress enacted the TCPA in an effort to address a growing number of telephone marketing calls and certain telemarketing practices thought to be an invasion of consumer privacy and even a risk to public safety. [4] The statute restricts the use of automatic telephone dialing systems, artificial and prerecorded messages, and telephone facsimile machines to send unsolicited advertisements. Specifically, the TCPA provides that:
It shall be unlawful for any person within the United States–

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice–

(i) to any emergency telephone line (including any "911" line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency);

(ii) to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the Commission under paragraph (2)(B);

(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine; or

**\*14019**  (D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously. [5]

Under the TCPA, those sending fax messages or transmitting artificial or prerecorded voice messages are subject to certain identification requirements. [6] The statute also provides consumers with several options to enforce the restrictions on unsolicited telemarketing, including a private right of action. [7]

Add. 51

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 112 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*3**  5. The TCPA requires the Commission to prescribe regulations to implement the statute's restrictions on the use of autodialers, artificial or prerecorded messages and unsolicited facsimile advertisements.[8] The TCPA also requires the Commission to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights" and to consider several methods to accommodate telephone subscribers who do not wish to receive unsolicited advertisements, including live voice solicitations.[9] Specifically, section 227(c)(1) requires the Commission to "compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting such privacy rights, and in terms of their cost and other advantages and disadvantages."[10] The TCPA specifically authorizes the Commission to "require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone  **\*14020** solicitations."[11]

### B. TCPA Rules

6. In 1992, the Commission adopted rules implementing the TCPA, including the requirement that entities making telephone solicitations institute procedures for maintaining do-not-call lists.[12] Pursuant to the Commission's rules, a person or entity engaged in telemarketing is required to maintain a record of a called party's request not to receive future solicitations for a period of ten years.[13] Telemarketers must develop and maintain written policies for maintaining their lists,[14] and they are required to inform their employees of the list's existence and train them to use the list.[15] Commission rules prohibit telemarketers from calling residential telephone subscribers before 8 a.m. or after 9 p.m.[16] and require telemarketers to identify themselves to called parties.[17] As mandated by the TCPA, the Commission's rules also establish general prohibitions against autodialed calls being made without prior express consent to certain locations, including emergency lines or health care facilities,[18] the use of prerecorded or artificial voice message calls to residences,[19] line seizure by prerecorded messages,[20] and the transmission of unsolicited advertisements by facsimile machines.[21] The TCPA rules provide that facsimile and prerecorded voice transmissions, as well as telephone facsimile machines, must meet specific identification requirements.[22]

7. In 1995 and 1997, the Commission released orders addressing petitions for reconsideration of the *1992 TCPA Order*. In a Memorandum Opinion and Order released on  **\*14021** August 7, 1995, the Commission exempted from its TCPA rules calls made on behalf of tax-exempt nonprofit organizations, clarified treatment of debt collection calls, and required telemarketers to honor a do-not-call request for a period of ten years.[23] The Commission also extended its TCPA rules to respond to technical advances in computer-based facsimile modems that enable solicitors to become "fax broadcasters."[24] On April 10, 1997, the Commission issued an Order on Further Reconsideration requiring that all facsimile transmissions contain the identifying information of the business, other entity, or individual creating or originating the facsimile message, rather than the entity that transmits the message.[25]

### C. Marketplace Changes Since 1992

**\*\*4**  8. The marketplace for telemarketing has changed significantly in the last decade. When the TCPA was enacted in 1991, Congress determined that 300,000 solicitors were used to telemarket goods and services to more than 18 million Americans every day.[26] Congress also found that in 1990 sales generated through telemarketing amounted to $435 billion dollars.[27] Some estimate that today telemarketers may attempt as many as 104 million calls to consumers and businesses every day,[28] and that telemarketing calls generate over $600 billion in sales each year.[29] The telemarketing industry is considered the single largest direct marketing system in the  **\*14022** country, representing 34.6% of the total U.S. sales attributed to direct marketing.[30]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 113 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

The number of telemarketing calls, along with the increased use of various technologies to contact consumers, has heightened public concern about unwanted telemarketing calls and control over the telephone network. Autodialers can deliver prerecorded messages to thousands of potential customers every day. Predictive dialers, [31] which initiate phone calls while telemarketers are talking to other consumers, frequently abandon calls before a telemarketer is free to take the next call. [32] Using predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on. Despite a general ban on faxing unsolicited advertisements, [33] and aggressive enforcement by the Commission, [34] faxed advertisements also have proliferated, as facsimile service providers (or "fax broadcasters") enable sellers to send advertisements to multiple destinations at relatively little cost. These unsolicited faxes impose costs on consumers, result in substantial inconvenience and disruption, and also may have serious implications for public safety. [35]

#### *14023  D. FTC National Do-Not-Call Registry and Telemarketing Rules

9. In response to these changes in the marketplace, the FTC recently amended its own rules to better protect consumers from deceptive and abusive telemarketing practices, including those that may be abusive of consumers' interest in protecting their privacy. On December 18, 2002, the FTC released an order adopting a national do-not-call registry to be maintained by the federal government to help consumers avoid unwanted telemarketing calls. In that order, the FTC Also adopted other changes to its Telemarketing Sales Rule (TSR), which are based on its authority under the 1994 Telemarketing Consumer Fraud and Abuse Prevention Act. [36] The FTC's amended TSR supplements its current company-specific do-not-call rules with a provision allowing consumers to stop unwanted telemarketing calls by registering their telephone numbers with a national do-not-call registry at no cost. Telemarketers will be required to pay fees to access the database and to "scrub" their calling lists of the telephone numbers in the database. [37] The FTC's list will not cover those entities over which it has no jurisdiction, including common carriers, banks, credit unions, savings and loans, companies engaged in the business of insurance, and airlines. [38] It also will not apply to intrastate telemarketing calls. In addition, the FTC concluded that nonprofit organizations are not subject to the national do-not-call list; however, they must, when using for-profit telemarketers, comply with the company-specific do-not-call rules. [39]

**5  10. The FTC indicated in its order that it does not intend the national do-not-call registry to preempt state do-not-call laws. Instead, it will allow all states, and the DMA if it so desires, to download into the national registry the telephone numbers of consumers on their lists. The FTC anticipates a relatively short transition period leading to one harmonized registry, and *14024  said that it will work with the states to coordinate implementation, minimize duplication, and maximize efficiency for consumers. [40] The FTC has also announced that online registration for the do-not-call registry will be available nationwide on or around July 1, 2003. Telephone registration will be open on the same date for consumers in states west of the Mississippi River and open to the entire country on July 8, 2003. On October 1, 2003, the FTC and the States will begin enforcing the national do-not-call provisions of the amended TSR. [41]

11. The FTC also adopted new rules on the use of predictive dialers and the transmission of caller ID information. The amended TSR prohibits telemarketers from abandoning any outbound telephone call, and provides in a safe harbor provision, that to avoid liability, a telemarketer must, among several other requirements, abandon no more than three percent of all calls answered by a person. [42] Telemarketers will also be required to transmit the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service. [43]

#### E. State Do-Not-Call Lists

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 114 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

12. A growing number of states have also adopted or are considering legislation to establish statewide do-not-call lists. To date, 36 states have passed "do-not-call" statutes, [44] and numerous others have considered similar bills. [45] Consumers remain enthusiastic about do-not-call lists, as they continue to register their telephone numbers with state lists. [46] State do-not-call **14025** lists vary in the methods used for collecting data, the fees charged, and the types of entities required to comply with their restrictions. Some state statutes provide for state-managed do-not-call lists, while others require telemarketers to use the Direct Marketing Association's Telephone Preference Service. [47] In some states, residents can register for the do-not-call lists at no charge. [48] In others, telephone subscribers must pay a fee. For example, Georgia requires its residents to pay $5 to place their phone numbers on the do-not-call list for a period of two years. [49] To register with the Texas do-not-call list, residents must pay $2.25 for three years. [50] In most states, telemarketers must pay to access the state do-not-call list if they wish to call residents in that state; however, such access fees vary from state to state. In Oregon, telemarketers must pay $120 per year to obtain the state do-not-call list; [51] in Missouri, the fee is $600 per year, although telemarketers can pay less if they want only numbers from certain area codes. [52] The state "do-not-call" statutes provide varying exceptions to their requirements.

**6** 13. As state legislatures continue to consider their own do-not-call laws, others have, in anticipation of the national do-not-call registry, begun the process of harmonizing their lists with the national list. The Illinois legislature, for example, passed a bill to reconcile differences between the state and federal no-call laws. The measure would make the FTC's national no-call list the official state list for Illinois and would direct the Illinois Commerce Commission to work with local exchange providers on how to inform consumers about the existence of the list. [53] California's Attorney General's office is allowing residents to pre-register for the national registry on the internet, and says it will deliver the pre-registered California telephone numbers to the FTC as soon as it is ready to receive them. [54] The FTC indicated in its order that it will take some time to harmonize the various state do-not-call registries with the national registry. [55] While **14026** some states will be able to transfer their state "do-not-call" registration information by the time telemarketers first gain access to the national registry, other states may need from 12 to 18 months to achieve those results. [56]

### F. Notice of Proposed Rulemaking

14. On September 18, 2002, the Commission released a Memorandum Opinion and Order and Notice of Proposed Rulemaking seeking comment on whether the Commission's rules need to be revised in order to carry out more effectively Congress's directives in the TCPA. [57] Specifically, we sought comment on whether to revise or clarify our rules governing unwanted telephone solicitations [58] and the use of automatic telephone dialing systems, [59] prerecorded or artificial voice messages, [60] and telephone facsimile machines. [61] We also sought comment on the effectiveness of company-specific do-not-call lists. [62] In addition, we sought comment on whether to revisit the option of establishing a national do-not-call list [63] and, if so, how such action might be taken in conjunction with the FTC's proposal to adopt a national do-not-call list and with various state do-not-call lists. [64] Lastly, we sought comment on the effect proposed policies and rules would have on small business entities, including *inter alia* those that engage in telemarketing activities and those that rely on telemarketing as a method to solicit new business. [65] Following the FTC's announcement that it had amended its TSR, the Commission extended the reply comment period in this proceeding to ensure that all interested parties had ample opportunity to comment on possible Commission action in light of the FTC's new rules. [66]

### *14027 G. Do-Not-Call Implementation Act

15. On March 11, 2003, the Do-Not-Call Act was signed into law, authorizing the FTC to collect fees from telemarketers for the implementation and enforcement of a do-not-call registry. The Do-Not-Call Act also requires the FCC to issue a final rule

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 115 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

in its ongoing TCPA proceeding within 180 days of enactment, and to consult and coordinate with the FTC to "maximize consistency" with the rule promulgated by the FTC. Congress recognized that because the FCC is bound by the TCPA, it would not be possible for the FCC to adopt rules that are identical to those of the FTC in every instance. [67] In those instances where such inconsistencies exist, Congress stated that either the FTC or FCC must address them administratively or Congress must address them legislatively. [68] The FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement. The FCC's jurisdiction over telemarketing practices, however, is significantly broader than the FTC's. The FCC staff intends to negotiate a Memorandum of Understanding between the respective agencies to achieve an efficient and effective enforcement strategy that will promote compliance with federal regulations. The FCC is required to report to Congress within 45 days after the issuance of final rules in this proceeding, and annually thereafter. [69] The Commission released a Further Notice of Proposed Rulemaking on March 25, 2003, seeking comment on the Do-Not-Call Act's requirements. [70] By this Order, we are complying with Congress's directives to issue final rules in our TPCA proceeding within 180 days of the Do-Not-Call Act's enactment. Furthermore, we have consulted and coordinated with the FTC to adopt a national do-not-call list and other telemarketing rules that maximize consistency with the FTC's amended Telemarketing Sales Rule. [71] Pursuant to the requirements of the Do-Not-Call Act, the Commission will note the remaining inconsistencies between the FCC and FTC rules in the report to Congress. The Commission will also continue to work, within the framework of the TCPA, to maximize consistency with the FTC's rules.

### *14028  III. NATIONAL DO-NOT-CALL LIST

#### A. Background

**\*\*7**  16.  _Section 227._ The TCPA requires the Commission to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object. [72] In so doing, section 227(c)(1) directs the Commission to "compare and evaluate alternative methods and procedures" including the use of electronic databases and other alternatives in protecting such privacy rights. [73] Pursuant to section 227(c)(3), the Commission "may require the establishment and operation of a single national database to compile a list of telephone numbers of residential subscribers who object to receiving telephone solicitations, and to make that compiled list and parts thereof available for purchase." [74] If the Commission determines that adoption of a national database is warranted, section 227(c)(3) enumerates a number of specific statutory requirements that must be satisfied. [75] Additionally, section 227(c)(4) requires the Commission to consider the different needs of telemarketers operating on a local or regional basis and small businesses. [76] In addition to our general authority over interstate communications, section 2(b) of the Communications Act specifically provides the Commission with the authority to apply section 227 to intrastate communications. [77]

17. _TCPA Order and 2002 Notice._ The Commission initially considered the possibility of adopting a national do-not-call database in the 1992 _TCPA Order_. At that time, the Commission declined to adopt a national do-not-call registry citing concerns that such a database would be costly and difficult to establish and maintain in a reasonably accurate form. [78] The Commission noted that frequent updates would be required, regional telemarketers would be forced to purchase a national database, costs might be passed on to consumers, and the information compiled could present problems in protecting consumer privacy. The Commission opted instead to implement an alternative approach requiring commercial telemarketers to maintain their own company-specific lists of consumers who do not wish to be called. [79]

18. In the _2002 Notice_, the Commission sought comment on whether to revisit its  **\*14029**  1992 determination not to adopt a national do-not-call list. [80] As evidenced by the persistent consumer complaints regarding unwanted telephone solicitations, the Commission concluded that the time was ripe to revisit this issue as part of its overall review of the TCPA rules. [81] In so

Add. 55

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 116 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

doing, the Commission noted that the increasing number of telemarketing calls over the last decade, along with the increased use of various technologies, such as predictive dialers, to contact consumers, has heightened public concern about unwanted telemarketing calls and control over the telephone network.[82] The Commission also noted that technological innovations may make the creation and maintenance of a national do-not-call database more viable than in the past. Therefore, the Commission sought comment on whether a national do-not-call list should be adopted and, if so, how such a list could be implemented in the most efficient and effective manner for consumers, businesses, and regulators. The Commission noted that a national list would provide consumers with a one-step method for preventing unwanted telemarketing calls. This option could be less burdensome for consumers than repeating requests on a case-by-case basis, particularly in light of the number of entities that conduct telemarketing today. In particular, the Commission sought comment on: (1) whether the cost, accuracy, and privacy concerns noted in 1992 remain relevant today; (2) the effectiveness of the company-specific list in protecting consumer privacy rights; (3) changes in the technology or the marketplace that might influence this analysis; (4) the constitutionality of a national database; (5) satisfying the statutory requirements of section 227(c); and (6) the potential relationship of a national database with the FTC's proposed rules and various state-adopted do-not-call registries.[83]

**8 19. The issues relating to the adoption and implementation of a national do-not-call registry generated extensive comment from consumers, businesses, and state governments. Individual consumers and consumer interest groups overwhelmingly support the adoption of a national do-not-call list.[84] In fact, several commenters support more restrictive alternatives such as adopting an "opt-in" list for those consumers that wish to receive telephone solicitations.[85] *14030 Commenters supporting a national do-not-call list cite the numerous and increasing receipt of unwanted telephone solicitation calls; inadequacies of the company-specific approach due to the failure of many telemarketers to honor do-not-call requests or, the impossibility of relaying such requests in the case of "dead air" or hang-up calls initiated by predictive dialers; the burdens of making do-not-call requests for every such call, particularly on the elderly and individuals with disabilities; and the costs imposed on consumers in acquiring technologies to reduce the number of unwanted calls.[86] Many such commenters argue that unwanted telephone solicitations have reached the point of harassment that constitutes an invasion of privacy within their homes.[87] Others indicate that consumers are often frightened by dead-air and hang-up calls generated by predictive dialers believing they are being stalked.[88] Several consumers indicate that they no longer answer their telephones or they disconnect the phone during the day to avoid telemarketing calls. These commenters support the adoption of a one-step option for those consumers that desire to reduce the number of unwanted solicitation calls that they receive each day.

20. Many consumers indicate that their state lists have reduced the number of unwanted calls that they receive and express concern that any federal do-not-call registry not undermine the protections afforded by the state do-not-call laws.[89] Assuming that a national do-not-call database is adopted, commenters encourage the Commission to work closely with the FTC to adopt a single national registry that operates as consistently and efficiently as possible for all interested parties.[90] State regulators generally support a national database provided that it does not preempt state do-not-call rules or preclude the states from enforcing these laws.[91]

21. Industry representatives generally oppose the adoption of a national do-not-call database, but some support this approach provided the Commission adopts an established business relationship exemption and preempts state lists.[92] These commenters contend that the *14031 concerns noted by the Commission in 1992, including the costs, accuracy, and privacy issues involved in creating and maintaining such a database remain valid today.[93] In addition, industry commenters argue that a national do-not-call database is not necessary because the current rules are sufficient to protect consumer privacy rights.[94] Several note the economic importance of telemarketing and indicate that a national registry would have severe economic consequences for their industry.[95] Several industry representatives request specific exemptions from the national do-not-call requirements for newspapers, magazines, insurance companies and small businesses.[96] These commenters contend that they provide valuable goods or services to the public and that telemarketing is the most cost-effective means to promote those

Add. 56

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 117 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

services. [97] Representatives of various non-profit organizations oppose any extension of the national do-not-call rules to their organizations. [98] Several commenters argue that a national registry would impose an unconstitutional restriction on commercial speech. [99] They urge more stringent enforcement of the Commission's current rules.

**\*9** 22. _FTC Order_. On December 18, 2002, the FTC released an order establishing a national do-not call registry. [100] The FTC cited an extensive record that revealed that the current rules on telemarketing were not sufficient to protect consumer privacy. The FTC's do-not-call rules provide several options for consumers to manage telemarketing calls - one of which is to allow consumers who do not want to receive telephone solicitation calls to register their telephone number with a national do-not-call database. [101] The FTC indicates that consumers may do so at no cost by two methods: either through a toll-free call from the phone number that they **\*14032** wish to register or over the Internet. [102] Consumer registrations will remain valid for a period of five years, with the registry purged on a monthly basis of numbers that have been disconnected or reassigned. Each seller engaged in telemarketing or on whose behalf telemarketing is conducted will be required to pay an annual fee for access to the database based on the number of area codes of data that the company wishes to access. [103] The only consumer information that telemarketers will receive from the national registry is the registrants' telephone numbers. The FTC's rules prohibit the sale, purchase, rental, lease, or use of the national registry for any purpose other than compliance with the do-not-call provision. [104]

23. The FTC's national do-not-call rules will not apply to those entities over which it has no jurisdiction, including common carriers, banks, insurance companies, and airlines. The FTC rules also will not apply to intrastate telemarketing calls. In addition, the FTC exempts certain types of calls from the national do-not-call provisions. Specifically, the FTC has established exemptions for calls made by or on behalf of charitable organizations, [105] calls to consumers with whom the seller has an "established business relationship" [106] (as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list), and calls to businesses. The FTC also decided to retain the provision of its rules that allows sellers to obtain the express agreement of consumers who wish to receive calls from that seller. The FTC requires that such express agreement be evidenced by a signed, written agreement. As a result, consumers registered on the national do-not-call list may continue to receive calls from those sellers that have acquired their express agreement. The FTC also adopted a "safe harbor" from liability under its do-not-call provisions concluding that sellers or telemarketers that have made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights **\*14033** should not be liable for violations that result from an error. [107] The FTC clarified that because wireless subscribers are often charged for the calls they receive, they will be allowed to register their wireless telephone numbers on the national do-not-call database.

**\*\*10** 24. The FTC concluded that it does not intend its rules establishing a national do-not-call registry to preempt state do-not-call laws. The FTC indicated its desire to work with those states that have enacted such laws, as well as this Commission, to articulate requirements and procedures during what it anticipates will be a relatively short transition period leading to one harmonized registry system. The FTC has articulated a goal whereby consumers, in a single transaction, can register their requests not to receive calls to solicit sales of goods or services, and sellers and telemarketers can obtain a single list to ensure that they do not contravene consumer requests not to be called. [108]

### B. Discussion

25. As discussed in greater detail below, we conclude that the record compiled in this proceeding supports the establishment of a single national database of telephone numbers of residential subscribers who object to receiving telephone solicitations. Consistent with the mandate of Congress in the Do-Not-Call Act, the national do-not-call rules that we establish in this order "maximize consistency" with those of the FTC. [109] The record clearly demonstrates widespread consumer dissatisfaction with the effectiveness of the current rules and network technologies available to protect consumers from unwanted telephone solicitations. [110] Indeed, many consumers believe that with the advent of such technologies as predictive dialers that the vices of

Add. 57

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 118 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

telemarketing have become inherent, while its virtues remain accidental. We have compared and evaluated alternative methods to a national do-not-call list for protecting consumer privacy rights and conclude that these alternatives are costly and/or ineffective for both telemarketers and consumers. [111]

26. A national do-not-call registry that is supplemented by the amendments made to our existing rules will provide consumers with a variety of options for managing telemarketing calls. Consumers may now: (1) place their number on the national do-not-call list; (2) continue to make do-not-call requests of individual companies on a case-by-case basis; and/or (3) register on the national list, but provide specific companies with express permission to call them. **\*14034** Telemarketers may continue to call individuals who do not place their numbers on a do-not-call list and consumers with whom they have an established business relationship. We believe this result is consistent with Congress' directive in the TCPA that "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices." [112]

27. We agree with Congress that consistency in the underlying regulations and administration of the national do-not-call registry is essential to avoid consumer confusion and regulatory uncertainty in the telemarketing industry. In so doing, we emphasize that there will be one centralized national do-not-call database of telephone numbers. The FTC has set up and will maintain the national database, while both agencies will coordinate enforcement efforts pursuant to a forthcoming Memorandum of Understanding. [113] The states will also play an important role in the enforcement of the do-not-call rules. The FTC has received funding approval from Congress to begin implementation of the national do-not-call registry. Because the FTC lacks jurisdiction over certain entities, including common carriers, banks, insurance companies, and airlines, those entities would be allowed to continue calling individuals on the FTC's list absent FCC action exercising our broad authority given by Congress over telemarketers. In addition, the FTC's jurisdiction does not extend to intrastate activities. Action by this Commission to adopt a national do-not-call list, as permitted by the TCPA, requires all commercial telemarketers to comply with the national do-not-call requirements, thereby providing more comprehensive protections to consumers and consistent treatment of telemarketers.

### 1. National Do-Not-Call Registry

**\*\*11** 28. Pursuant to our authority under section 227(c), we adopt a national do-not-call registry that will provide residential consumers with a one-step option to prohibit unwanted telephone solicitations. This registry will be maintained by the FTC. Consistent with the FTC's determination, the national registry will become effective on October 1, 2003. [114] Subject to the exemptions discussed below, telemarketers will be prohibited from contacting those consumers that register their telephone numbers on the national list. In reaching this conclusion, we agree with the vast majority of consumers in this proceeding and the FTC that a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations. In response to the widespread consumer dissatisfaction with telemarketing practices, Congress has recently affirmed its support of a national do-not-call registry in approving funding for the FTC's national database. [115] In so doing, Congress has **\*14035** indicated that this Commission should adopt rules that "maximize consistency" with those of the FTC. [116] The record in this proceeding is replete with examples of consumers that receive numerous unwanted calls on a daily basis. [117] The increase in the number of telemarketing calls over the last decade combined with the widespread use of such technologies as predictive dialers has encroached significantly on the privacy rights of consumers. [118] For example, the effectiveness of the protections afforded by the company-specific do-not-call rules have been reduced significantly by dead air and hang-up calls that result from predictive dialers. In these situations, consumers have no opportunity to invoke their do-not-call rights and the Commission cannot pursue enforcement actions. As detailed previously, such intrusions have led many consumers to disconnect their phones during portions of the day or avoid answering their telephones altogether. The adoption of a national do-call-list will be an important tool for consumers that wish to exercise control over the increasing number of unwanted telephone solicitation calls.

Add. 58

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 119 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

29. Although some industry commenters attempt to characterize unwanted solicitation calls as petty annoyances and suggest that consumers purchase certain technologies to block unwanted calls, the evidence in this record leads us to believe the cumulative effect of these disruptions in the lives of millions of Americans each day is significant. As a result, we conclude that adoption of a national do-not-call list is now warranted. We believe that consumers should, at a minimum, be given the opportunity to determine for themselves whether or not they wish to receive telephone solicitation calls in their homes. The national do-not-call list will serve as an option for those consumers who have found the company-specific list and other network technologies ineffective. The telephone network is the primary means for many consumers to remain in contact with public safety organizations and family members during times of illness or emergency. Consumer frustration with telemarketing practices has reached a point in which many consumers no longer answer their telephones while others disconnect their phones during some hours of the day to maintain their privacy. We agree with consumers that incessant telephone solicitations are especially burdensome for the elderly, disabled, and those that work non-traditional hours. [119] Persons with disabilities are often unable to register do-not-call requests on many company-specific lists because many telemarketers lack the equipment necessary to

**\*14036** receive that request. [120] Given the record evidence, along with Congress's recent affirmative support for a national do-not-call registry, we adopt a national do-not-call registry. [121] As discussed more fully below, however, we are mindful of the need to balance the privacy concerns of consumers with the interests of legitimate telemarketing practices. Therefore, we have provided for certain exemptions to the national do-not-call registry.

**\*\*12** 30. While we agree that concerns regarding the cost, accuracy, and privacy of a national do-not-call database remain relevant, we believe that circumstances have changed significantly since the Commission first reviewed this issue over a decade ago such that they no longer impose a substantial obstacle to the implementation of a national registry. As several commenters in this proceeding note, advances in computer technology and software now make the compilation and maintenance of a national database a more reasonable proposition. [122] In addition, considerable experience has been gained through the implementation of many state do-not-call lists. In 1992, it was estimated by some commenters that the cost of establishing such a list in the first year could be as high as $80 million. As noted above, Congress has recently reviewed and approved the FTC's request for $18.1 million to fund the national do-not-call list. [123] We believe that the advent of more efficient technologies and the experience acquired in dealing with similar databases at the state level is responsible for this substantial reduction in cost.

31. Similarly, we believe that technology has become more proficient in ensuring the accuracy of a national database. The FTC indicates that to guard against the possibility of including disconnected or reassigned telephone numbers, technology will be employed on a monthly basis to check all registered telephone numbers against national databases, and remove those numbers that have been disconnected or reassigned. [124] The length of time that registrations remain valid also directly affects the accuracy of the registry as telephone numbers change hands over time. As discussed more fully below, we conclude that the retention period for both the national and company-specific do-not-call requests will be five years. [125] This is consistent with the FTC's determination and our own record that reveals that the current ten-year retention **\*14037** period for company-specific requests is too long given changes in telephone numbers. Consumers must also register their do-not-call requests from either the telephone number of the phone that they wish to register or via the Internet. The FTC will confirm the accuracy of such registrations through the use of automatic number identification (ANI) [126] and other technologies. We believe that a five-year registration period coupled with a monthly purging of disconnected telephone numbers adequately balances the need to maintain accuracy in the national registry with any burden imposed on consumers to re-register periodically their telephone numbers.

32. We conclude that appropriate action has been taken to ensure the privacy of those registering on the national list. Specifically, the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. [127] This is the minimum amount of information that can be provided to implement the national registry. We note that the majority of telephone numbers are publicly available through telephone directories. To the extent that consumers have an unlisted number, the consumer will have to make a choice as to whether they prefer to register on a national do-not-call list or maintain complete anonymity. We reiterate, however, that the only information that will be provided to the telemarketer is the telephone number of the consumer. [128] No corresponding name or address information will be provided. We believe that this

Add. 59

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 120 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

approach reduces the privacy concerns of such consumers to the greatest extent possible. As an additional safeguard, we find that restrictions should be imposed on the use of the national list. Consistent with the FTC's determination and section 227(c)(3) (K), we conclude that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list. [129] We conclude that these safeguards adequately protect the privacy rights of those consumers who choose to register on the national do-not-call list.

**13** 33. We conclude that the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act. In so doing, we agree with the FTC and several commenters that wireless subscribers should not be excluded from the protections of the TCPA, particularly the option to register on a national-do-not-call list. [130] Congress has indicated its intent to provide **14038** significant protections under the TCPA to wireless users. [131] Allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations for which they are charged.

34. Nextel argues, however, that, because the "TCPA only authorizes the Commission to regulate solicitations to 'residential telephone subscribers,'" wireless subscribers may not participate in the do-not-call list. [132] Nextel states we should define "residential subscribers" to mean "telephone service used primarily for communications in the subscriber's residence." [133] However, Nextel's application would result in "[a]t most, the Commission [having the] authority to regulate solicitations to wireless subscribers in those circumstances where wireless service actually has displaced a residential land line, and functions as a consumer's primary residential telephone service." [134]

35. Nextel's definition of "residential subscribers" is far too restrictive and inconsistent with the intent of section 227. Specifically, there is nothing in section 227 to suggest that only a customer's "primary residential telephone service" was all that Congress sought to protect through the TCPA. In addition, had Congress intended to exclude wireless subscribers from the benefits of the TCPA, it knew how to address wireless services or consumers explicitly. For example, in section 227(b)(1), Congress specifically prohibited calls using automatic telephone dialing systems or artificial or prerecorded voice to telephone numbers assigned to "paging service [or] cellular telephone service ...." Moreover, under Nextel's definition, even consumers who use their wireless telephone service in their homes to supplement their residential wireline service, such as by using their wireless telephone service to make long distance phone calls to avoid wireline toll charges, would be excluded from the protections of the TCPA. Such an interpretation is at odds even with Nextel's own reasoning for its definition - that the TCPA's goal is "to curb the 'pervasive' use of telemarketing 'to market goods and services to the home'." [135] As described, it is well-established that wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones. [136] **14039** Indeed, as even Nextel recognizes, there is a growing number of consumers who no longer maintain wireline phone service, and rely only on their wireless telephone service. Thus, we are not persuaded by Nextel's arguments.

**14** 36. Moreover, we believe it is more consistent with the overall intent of the TCPA to allow wireless subscribers to benefit from the full range of TCPA protections. As indicated above, Congress afforded wireless subscribers particular protections in the context of autodialers and prerecorded calls. [137] In addition, although Congress expressed concern with residential privacy, it also was concerned with the nuisance, expense and burden that telephone solicitations place on consumers. [138] Therefore, we conclude that wireless subscribers may participate in the national do-not-call list. As a practical matter, since determining whether any particular wireless subscriber is a "residential subscriber" may be more fact-intensive than making the same determination for a wireline subscriber, we will presume wireless subscribers who ask to be put on the national do-not-call list to be "residential subscribers." [139] Such a presumption, however, may require a complaining wireless subscriber to provide further proof of the validity of that presumption should we need to take enforcement action.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 121 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

37. We emphasize that it is not our intent in adopting a national do-not-call list to prohibit legitimate telemarketing practices. We believe that industry commenters present a false choice between the continued viability of the telemarketing industry and the adoption of a national do-not-call list. We are not persuaded that the adoption of a national do-not-call list will unduly interfere with the ability of telemarketers to contact consumers. Many consumers will undoubtedly take advantage of the opportunity to register on the national list. Several industry commenters suggest, however, that consumers derive substantial benefits from telephone solicitations. If so, many such consumers will choose not to register on the national do-not-call list and will opt instead to make do-not-call requests on a case-by-case basis or give express permission to be contacted by specific companies. [140] In addition, as discussed further below, we have provided for certain exemptions to the do-not-call registry in recognition of legitimate telemarketing business practices. For example, sellers of goods or services via telemarketing may continue to contact consumers on the national list with whom they have an established business relationship. We also note that calls that do not fall within the definition of "telephone **14040** solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list. These may include surveys, market research, political or religious speech calls. [141] The national do-not-call rules will also not prohibit calls to businesses and persons with whom the marketer has a personal relationship. Telemarketers may continue to contact all of these consumers despite the adoption of a national do-not-call list. Furthermore, we decline to adopt more restrictive do-not-call requirements on telemarketers as suggested by several commenters. For example, we decline to adopt an "opt-in" approach that would ban telemarketing to any consumer who has not expressly agreed to receive telephone solicitations. We believe that establishing such an approach would be overly restrictive on the telemarketing industry. As discussed more fully below, we also decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations or entities that telemarket on behalf of nonprofit organizations.

**15** 38. We agree with the FTC that a safe harbor should be established for telemarketers that have made a good faith effort to comply with the national do-not call rules. [142] A seller or telemarketer acting on behalf of the seller that has made a good faith effort to provide consumers with an opportunity to exercise their do-not-call rights should not be liable for violations that result from an error. Consistent with the FTC, we conclude that a seller or the entity telemarketing on behalf of the seller will not be liable for violating the national do-not-call rules if it can demonstrate that, as part of the seller's or telemarketer's routine business practice: (i) it has established and implemented written procedures to comply with the do-not-call rules; (ii) it has trained its personnel, and any entity assisting in its compliance, in the procedures established pursuant to the do-not-call rules; (iii) the seller, or telemarketer acting on behalf of the seller, has maintained and recorded a list of telephone numbers the seller may not contact; (iv) the seller or telemarketer uses a process to prevent telemarketing to any telephone number on any list established pursuant to the do-not-call rules employing a version of the do-not-call registry obtained from the administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and (v) any subsequent call otherwise violating the do-not-call rules is the result of error. [143] We acknowledge that the three-month safe harbor period for telemarketers may prove to be too long to benefit some consumers. The national do-not-call list has the capability to process new registrants virtually instantaneously and telemarketers will have the capability to download the list at any time at no extra cost. The Commission intends to carefully monitor the impact of this requirement pursuant to its annual report to Congress and may consider a shorter time frame in the future.

**14041** 39. As required by section 227(c)(1)(A), we have compared and evaluated the advantages and disadvantages of certain alternative methods to protect consumer privacy including the use of network technologies, special directory markings, and company-specific lists in adopting a national do-not-call database. [144] As noted below, the effectiveness of the company-specific approach has significantly eroded as a result of hang-up and "dead air" calls from predictive dialers. Consumers in these circumstances have no opportunity to assert their do-not-call rights. As discussed more fully below, we believe that, as a stand-alone option, the company-specific approach no longer provides consumers with sufficient privacy protections. We also conclude that the availability of certain network technologies to reduce telephone solicitations is often ineffective and costly for consumers. Although technology has improved to assist consumers in blocking unwanted calls, it has also evolved in such a way as to assist telemarketers in making greater numbers of calls and even circumventing such blocking technologies. [145] Millions of consumers continue to register on state do-not-call lists despite the availability of such technologies. Several commenters note that they continue to receive unwanted calls despite paying for technologies to reduce telephone solicitations. [146] Several

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 122 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

commenters also note that telemarketers routinely block transmission of caller ID. In particular, we are concerned that the cost of technologies such as caller ID, call blocking, and other such tools in an effort to reduce telemarketing calls fall entirely on the consumer. We believe that reliance on a solution that places the cost of reducing the number of unwanted solicitation calls entirely on the consumer is inconsistent with Congress' intent in the TCPA. [147] For the reasons outlined in the *1992 TCPA Order*, we also decline to adopt special area codes or prefixes for telemarketers. [148] We believe this option is costly for telemarketers that would be required to change their telephone numbers and administratively burdensome to implement. We also decline to adopt special directory markings of area white page directories because it would require telemarketers to purchase and review thousands of local telephone directories, at great cost to the telemarketers. [149] We also note that telemarketers often compile solicitation lists from many sources other than local telephone directories. In addition, such directories do not include unlisted or unregistered telephone numbers and are often updated infrequently. We also note that the record in this proceeding provides little support for this option.

**16   *14042   40. We now review the other requirements of section 227(c)(1). As required by section 227(c)(1)(B), we have evaluated AT&T Government Solutions, the entity selected by the FTC to administer the national database, and conclude that it has the capacity to establish and administer the national database. [150] Congress has reviewed and approved funding for the implementation of that database. We believe that it is unnecessary to evaluate any other such entities at this time. As discussed in greater detail below, we have considered whether different methods and procedures should apply for local telephone solicitations and small businesses as required by section 227(c)(1)(C). [151] For the reasons outlined below, we conclude that the national do-not-call database takes into consideration the costs of those conducting telemarketing on a local or regional basis, including many small businesses. In particular, we note that the national do-not-call database will permit access to five or fewer area codes at no cost to the seller. Pursuant to section 227(c)(1)(D), we have considered whether there is a need for additional authority to further restrict telephone solicitations. We conclude that no such authority is required at this time. [152] Pursuant to the Do-Not-Call Act, the Commission must report to Congress on an annual basis the effectiveness of the do-not-call registry. Should the Commission determine that additional authority is required over telephone solicitations as part of that analysis; the Commission will propose specific restrictions pursuant to that report. As required by section 227(c)(1)(E), we have developed regulations to implement the national do-not-call database in the most effective and efficient manner to protect consumer privacy needs while balancing legitimate telemarketing interests.

41. As noted above, the FTC's decision to adopt a national do-not-call list is currently under review in federal district court. [153] Because Congress has approved funding for the administration of the national list only for the FTC, this Commission would be forced to stay implementation of any national list should the plaintiffs prevail in one of those proceedings.

### 2. Exemptions

42. *Established Business Relationship*. We agree with the majority of industry commenters that an exemption to the national do-not-call list should be created for calls to consumers with whom the seller has an established business relationship. [154] We note that section 227(a)(3) excludes from the definition of telephone solicitation calls made to any person with *14043 whom the caller has an established business relationship. [155] We believe the ability of sellers to contact existing customers is an important aspect of their business plan and often provides consumers with valuable information regarding products or services that they may have purchased from the company. For example, magazines and newspapers may want to contact customers whose subscriptions have or soon will expire and offer new subscriptions. This conclusion is consistent with that of the FTC and the majority of states that have adopted do-not-call requirements and considered this issue. As discussed in further detail below, we revise the definition of an established business relationship so that it is limited in duration to eighteen (18) months from any purchase or transaction and 3 months from any inquiry or application. [156]

Add. 62

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 123 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*17**  43. To the extent that some consumers oppose this exemption, we find that once a consumer has asked to be placed on the seller's company-specific do-not-call list, the seller may not call the consumer again regardless of whether the consumer continues to do business with the seller. We believe this determination constitutes a reasonable balance between the interests of consumers that may object to such calls with the interests of sellers in contacting their customers. This conclusion is also consistent with that of the FTC.

44. _Prior Express Permission_. In addition to the established business relationship exemption, we conclude that sellers may contact consumers registered on a national do-not-call list if they have obtained the prior express permission of those consumers. We note that section 227(a)(3) excludes from the definition of telephone solicitation calls to any person with "that person's prior express invitation or permission." [157] Consistent with the FTC's determination, we conclude that for purposes of the national do-not-call list such express permission must be evidenced only by a signed, written agreement between the consumer and the seller which states that the consumer agrees to be contacted by this seller, including the telephone number to which the calls may be placed. [158] Consumers registered on the national list may wish to have the option to be contacted by particular entities. Therefore, we conclude that sellers may obtain the express written agreement to call such consumers. The express agreement between the parties shall remain in effect as long as the consumer has not asked to be placed on the seller's company-specific do-not-call list. If the consumer subsequently requests not to be called, the seller must cease calling the consumer regardless of whether the consumer continues to do business with the seller. We also note that telemarketers may not call consumers on the national do-not-call list to request their written permission to be called unless they fall within some other exemption. We believe that to allow such calls would circumvent the purpose of this exemption. Prior express **\*14044** permission must be obtained by some other means such as direct mailing.

45. _Tax-Exempt Nonprofit Organizations_. We agree with those commenters that contend that the national do-not-call requirements should not be extended to tax-exempt nonprofit organizations or calls made by independent telemarketers on behalf of tax-exempt nonprofit organizations. [159] We note that section 227(a)(3) specifically excludes calls made by tax-exempt nonprofit organizations from the definition of telephone solicitation. [160] In so doing, we believe Congress clearly intended to exclude tax-exempt nonprofit organizations from prohibitions on telephone solicitations under the TCPA. The legislative history indicates that commercial calls constitute the bulk of all telemarketing calls. [161] A number of commenters and the FTC agree with Congress' conclusion as it relates to a national do-not-call list. [162] For this reason, we decline to extend the national do-not-call requirements to tax-exempt nonprofit organizations. A few commenters seek clarification that requests for blood donations will be exempt from the national do-not-call list. [163] When such requests are made by tax-exempt nonprofit organizations, they will fall within the exemption for tax-exempt nonprofit organizations.

**\*\*18**  46. _Others_. We decline to create specific exemptions to the national do-not-call requirements for entities such as newspapers, magazines, regional telemarketers, or small businesses. [164] For the reasons discussed above, we find unpersuasive arguments that application of the national do-not-call database adopted herein will result in severe economic consequences for these entities. In particular, we note the exemptions adopted for calls made to consumers with whom the seller has an established business relationship and those that have provided express agreement to be called. As noted, many consumers may also determine not to register on the national database. Telemarketers may continue to contact all of these consumers. We believe these exemptions provide telemarketers with a reasonable opportunity to conduct their business while balancing consumer privacy interests. Although we agree that newspapers and **\*14045** other entities may often provide useful information and services to the public, given our conclusion that adoption of the national do-not-call list will not unduly interfere with the ability of telemarketers to reach consumers, we do not find this to be a compelling basis to exempt these entities.

47. We find that the national do-not-call rules adopted today do not apply to calls made to persons with whom the marketer has a personal relationship. As discussed herein, a "personal relationship" refers to an individual personally known to the telemarketer making the call. In such cases, we believe that calls to family members, friends and acquaintances of the caller will be both expected by the recipient and limited in number. [165] Therefore, the two most common sources of consumer frustration associated

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 124 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

with telephone solicitations - high volume and unexpected solicitations - are not likely present when such calls are limited to persons with whom the marketer has a personal relationship. [166] Accordingly, we find that these calls do not represent the type of "telephone solicitations to which [telephone subscribers] object" discussed in section 227(c)(1). Moreover, we conclude that the Commission also has authority to recognize this limited carve-out pursuant to section 227(c)(1)(E). This subsection provides the Commission with discretion in implementing rules to protect consumer privacy to "develop proposed regulations to implement the methods and procedures that the Commission determines are the most effective and efficient to accomplish the purpose of this section." [167] To the extent that any consumer objects to such calls, the consumer may request to be placed on the telemarketer's company's company-specific do-not-call list. We intend to monitor the rules we adopt today and caution that any individual or entity relying on personal relationships abusing this exemption may be subject to enforcement action.

48. In addition, we decline to extend this approach beyond persons that have a personal relationship with the marketer. For example, Vector urges the Commission to adopt an exemption that covers "face-to-face" appointment calls to anyone known personally to the "referring source." [168] We note that such relationships become increasingly tenuous as they extend to individuals not personally known to the marketer and thus such calls are more likely to be unexpected to the recipient and more voluminous. Accordingly, referrals to persons that do **\*14046** not have a personal relationship with the marketer will not fall within the category of calls discussed above.

**\*\*19** 49. We also decline to establish an exemption for calls made to set "face-to-face" appointments per se. [169] We conclude that such calls are made for the purpose of encouraging the purchase of goods and services and therefore fall within the statutory definition of telephone solicitation. We find no reason to conclude that such calls are somehow less intrusive to consumers than other commercial telephone solicitations. The FTC has reviewed this issue and reached the same conclusion. [170] In addition, we decline to exempt entities that make a "*de minimis*" number of commercial telemarketing calls. [171] In contrast to Congress' rationale for exempting nonprofit organizations, we believe that such commercial calls continue to be unexpected to consumers even if made in low numbers. As defined by one commenter, a *de minimis* number of calls would not be based on the total number of calls originating from one organization, but would be based on the number of calls placed by individual employees of the company. [172] Thus, the telemarketing entity could circumvent the do-not-call regulations by hiring any number of individual marketers, so long as they each did not make more than 20 calls per day. We believe that such an exemption, extrapolated to the entire direct marketing industry, would result in a significant number of unwanted telephone solicitations. This would undoubtedly result in consumer confusion and frustration regarding the application of the national do-not-call rules. In addition, we believe that it would be difficult, if not impossible, to monitor and enforce such a requirement. For the reasons discussed below, we do not believe the costs to access the national database is unreasonable for any small business or entity making a "*de minimis*" number of calls.

50. In response to the *Further Notice*, a few commenters contend that any new rules the Commission adopts would not apply to entities engaged in the business of insurance, because such rules would conflict with the McCarran-Ferguson Act. [173] The McCarran-Ferguson Act provides that "[t]he business of insurance ... shall be subject to the laws of the ... States which relate to the regulation ... of such business." [174] The McCarran-Ferguson Act further provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically **\*14047** relates to the business of insurance." [175] American Council of Life Insurers (ACLI) explains that insurers' marketing activities are extensively regulated at the state level. The Commission's proposal, ACLI argues, "intrudes upon the insurance regulatory framework established by the states" and, therefore, should not be applicable to insurers under McCarran-Ferguson. [176]

51. The McCarran-Ferguson Act does not operate to exempt insurance companies wholesale from liability under the TCPA. It applies only when their activities constitute the "business of insurance," the state has enacted laws "for the purpose of regulating" the business of insurance, and the TCPA would "impair, invalidate, or supersede" such state laws. [177] In the one case cited by

Add. 64

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 125 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

commenters as addressing the interplay between McCarran-Ferguson and the TCPA, a federal district court dismissed a claim brought against two insurance companies under the TCPA for sending unsolicited facsimile advertisements. [178] The *Chair King* court found that the TCPA conflicted with a Texas law that prohibited untrue, deceptive, or misleading advertising by insurers and their agents. In its analysis, the court determined that insurance advertising was part of the "business of insurance," [179] and that the Texas law in question was enacted for the purpose of regulating the business of insurance. [180] The court then concluded that because the TCPA "prohibits unsolicited insurance advertising by facsimile while the Texas [laws] permit [such] advertising ... so long as the advertisements are truthful and not misleading," the TCPA conflicts with the Texas law and is preempted under McCarran-Ferguson. [181]

 **20** 52. To the extent that any state law regulates the "business of insurance" [182] and the TCPA is found to "invalidate, impair, or supersede" such state law, it is possible that a particular activity involving the business of insurance would not fall within the reach of the TCPA. Any determination about the applicability of McCarran-Ferguson, however, requires an analysis of the particular activity and State law regulating it. In addition, McCarran-Ferguson applies only to federal statutes that "invalidate, impair, or supersede" state insurance regulation. Courts have **\*14048** held that duplication of state law prohibitions by a federal statute do not " invalidate, impair, or supersede" state laws regulating the business of insurance. [183] Nor is the mere presence of a regulatory scheme enough to show that a state statute is "invalidated, impaired or superseded." [184]

53. We believe that the TCPA, which was enacted to protect consumer privacy interests, is compatible with states' regulatory interests. [185] In fact, the TCPA permits States to enforce the provisions of the TCPA on behalf of residents of their State. [186] In addition, we believe that uniform application of the national do-not-call registry to all entities that use the telephone to advertise best serves the goals of the TCPA. To exempt the insurance industry from liability under the TCPA would likely confuse consumers and interfere with the protections provided by Congress through the TCPA. Therefore, to the extent that the operation of McCarran-Ferguson on the TCPA is unclear, we will raise this issue in our Report to Congress as required by the Do-Not-Call Act.

54. We conclude that the national do-not-call mechanism established by the FTC and this Commission adequately takes into consideration the needs of small businesses and entities that telemarket on a local or regional basis in gaining access to the national database. As required by section 227(c)(1)(C), we have considered whether different procedures should apply for local solicitations and small businesses. We decline, however, to exempt such entities from the national do-not-call requirements. Given the large number of entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-rules in protecting consumer privacy and create consumer confusion and frustration. In so doing, we conclude that the approach adopted herein satisfies section 227(c)(4)'s requirement that the Commission, in developing procedures for gaining *access* to the database, consider the different needs of telemarketers conducting business on a national, regional, State, or local level and develop a fee schedule for recouping the cost of such database that recognizes such differences. [187] The national database will be available for purchase by sellers on an area-code-by-area-code basis. The cost to access the database will vary depending on the number of area codes requested. Sellers need only purchase those area codes in which the seller intends to telemarket. In fact, sellers that request access to five or fewer area codes will be granted access to those area codes at no cost. We note that thirty-three states currently have five or fewer area codes. Thus, **\*14049** telemarketers or sellers operating on a "local" or "regional" basis within one of these thirty-three states will have access to all of that states' national do-not-call registrants at no cost. In addition, the national database will provide a single number lookup feature whereby a small number of telephone numbers can be entered on a web page to determine whether any of those numbers are included on the national registry. We believe this fee structure adequately reflects the needs of regional telemarketers, small business and those marketing on a *de minimis* level. For these reasons, we conclude that this approach will not place any unreasonable costs on small businesses. [188]

### 3. Section 227(c)(3) Requirements

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 126 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*21**  55. We conclude that the national do-not-call database adopted jointly by this Commission and the FTC satisfies each of the statutory requirements outlined in section 227(c)(3)(A)-(L). We now discuss each such requirement. Section 227(c)(3)(A) requires the Commission to specify the method by which an entity to administer the national database will be selected. On August 2, 2002, the FTC issued a Request for Quotes (RFQ) to selected vendors on GSA schedules seeking proposals to develop, implement, and operate the national registry. After evaluating those proposals, the FTC selected a competitive range of vendors and issued an amended RFQ to those vendors on November 25, 2002. After further evaluation, the FTC selected AT&T Government Solutions as the successful vendor for the national do-not-call database on March 1, 2003. [189] As noted above, Congress has approved the necessary funding for implementation of the national database.

56. Pursuant to sections 227(c)(3)(B)-(C), we require each common carrier providing telephone exchange service to inform subscribers for telephone exchange service of the opportunity to provide notification that such subscriber objects to receiving telephone solicitations. Each telephone subscriber shall be informed, by the common carrier that provides local exchange service to that subscriber, of (i) the subscriber's right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national database and (ii) the methods by which such rights may be exercised by the subscriber. Pursuant to section 227(c)(3)(C), we conclude that, beginning on January 1, 2004, such common carriers shall provide an annual notice, via an insert in the customer's bill, to inform their subscribers of the opportunity to register or revoke registrations on the national do-not-call database. Although we do not specify the exact description or form that such notification should take, such notification must be clear and conspicuous. At a minimum, it must include the toll-free telephone number and internet address established by the FTC to register or revoke registrations on the national do-not-call database.

57. Section 227(c)(3)(D) requires the Commission to specify the methods by which registrations shall be collected and added to the database. As discussed above, consumers will be able to add their telephone numbers to the national do-not-call registry either through a toll-free  **\*14050**  telephone call or over the Internet. [190]  Consumers who choose to register by phone will have to call the registration number from the telephone line that they wish to register. Their calls will be answered by an Interactive Voice Response (IVR) system. The consumers will be asked to enter on their telephone keypad the telephone number from which the consumer is calling. This number will be checked against the ANI that is transmitted with the call. If the number entered matches the ANI, then the consumer will be informed that the number has been registered. Consumers who choose to register over the Internet will go to a website dedicated to the registration process where they will be asked to enter the telephone number they wish to register. [191]  We encourage the FTC to notify consumers in the IVR message that the national registry will prevent most, but not all, telemarketing calls. Specifically, we believe consumers should be informed that the do-not-call registry does not apply to tax-exempt nonprofit organizations and companies with whom consumers have an established business relationship. The effectiveness and value of the national registry depends largely on an informed public. Therefore, we also intend to emphasize in our educational materials and on our website the purpose and scope of the new rules.

**\*\*22**  58. Section 227(c)(3)(E) prohibits any residential subscriber from being charged for giving or revoking notification to be included on the national do-not-call database. As discussed above, consumers may register or revoke do-not-call requests either by a toll-free telephone call or over the Internet. No charge will be imposed on the consumer. Section 227(c)(3)(F) prohibits any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included on the national database. Subject to the exemptions discussed above, we adopt rules herein that will prohibit telephone solicitations to those consumers that have registered on the national database. [192]

59. Section 227(c)(3)(G) requires the Commission to specify (i) the methods by which any person deciding to make telephone solicitations will obtain access to the database, by area code or local exchange prefix, and (ii) the costs to be recovered from such persons. Section 227(c)(3)(H) requires the Commission to specify the methods for recovering, from the persons accessing the database, the costs involved in the operations of the database. To comply with the national do-not-call rules, telemarketers must gain access to the telephone numbers in the national database. Telemarketers will have access to the national database by means of a fully-automated, secure website dedicated to providing information to these entities. [193]  The first time a telemarketer

Add. 66

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 127 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

accesses the system, the company will be asked to provide certain limited identifying information, such as name and address, contact person, and contact person's telephone number and address. If a telemarketer is accessing the registry on behalf of a client seller, the telemarketer will also need to identify that client. [194] When a telemarketer first submits **14051** an application to access registry information, the company will be asked to specify the area codes they want to access. An annual fee will be assessed based upon the number of area codes requested. [195] Each entity on whose behalf the telephone solicitation is being made must pay this fee via credit card or electronic funds transfer. After payment is processed, the telemarketer will be given an account number and permitted to access the appropriate portions of the registry. [196] Telemarketers will be permitted to access the registry as often as they wish for no additional cost, once the annual fee is paid.

60. Section 227(c)(3)(I) requires the Commission to specify the frequency with which the national database will be updated and specify the method by which such updates will take effect for purposes of compliance with the do-not-call regulations. Because the registration process will be completely automated, updates will occur continuously. Consumer registrations will be added to the registry at the same time they register - or at least within a few hours after they register. As discussed above, the safe harbor provision requires telemarketers to employ a version of the registry obtained not more than three months before any call is made. Thus, telemarketers will be required to update their lists at least quarterly. Instead of marking the list available on specific dates, the registry will be available for downloading on a constant basis so that telemarketers can access the registry at any time. [197] As a result, each telemarketer's three-month period may begin on different dates. [198] In addition, the administrator will check all telephone numbers in the do-not-call registry each month against national databases, and those numbers that have been disconnected or reassigned will be removed from the registry. [199] We encourage parties that may have specific recommendations on ways to improve the overall accuracy of the database in removing disconnected and reassigned telephone numbers to submit such proposals to our attention and to the FTC directly.

**23** 61. Section 227(c)(3)(J) requires that the Commission's regulations be designed to enable states to use the database for purposes of administering or enforcing state law. [200] Section 227(c)(3)(K) prohibits the use of the database for any purpose other than compliance with the do-not-call rules and any such state law and requires the Commission to specify methods for protection of the privacy rights of persons whose numbers are included in such database. Consistent with the determination of the FTC, we conclude that any law enforcement agency that **14052** has responsibility to enforce federal or state do-not-call rules or regulations will be permitted to access the appropriate information in the national registry. [201] This information will be obtained through a secure Internet website. Such law enforcement access to data in the national registry is critical to enable state Attorneys General, public utility commissions or an official or agency designated by a state, and other appropriate law enforcement officials to gather evidence to support enforcement of the do-not-call rules under the state and federal law. In addition, as discussed above, we have imposed restrictions on the use of the national list. [202] Consistent with the FTC's determination, we have concluded that no person or entity may sell, rent, lease, purchase, or use the national do-not-call database for any purpose except compliance with section 227 and any such state or federal law to prevent telephone solicitations to telephone numbers on such list. We specifically prohibit any entity from purchasing this list from any entity other than the national do-not-call administrator or dispensing the list to any entity that has not paid the required fee to the administrator. The only information that will be made available to telemarketers is the telephone number of consumers registered on the list. Given the restrictions imposed on the use of the national database and the limited amount of information provided, we believe that adequate privacy protections have been established for consumers.

62. Section 227(c)(3)(L) requires each common carrier providing services to any person for the purpose of making telephone solicitations to notify such person of the requirements of the national do-not-call rules and the regulations thereunder. We therefore require common carriers, beginning January 1, 2004, to make a one-time notification to any person or entity making telephone solicitations that is served by that carrier of the national do-not-call requirements. We do not specify the exact description or form that such notification should take. At a minimum, it must include a citation to the relevant federal do-not-call rules as set forth in 47 C.F.R. § 64.1200 and 16 C.F.R. Part 310, respectively. Although we recognize that carriers may not be capable of identifying every person or entity engaged in telephone solicitations served by that carrier, we require carriers to

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 128 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

make reasonable efforts to comply with this requirement. We note that failure to give such notice by the common carrier to a telemarketer served by that carrier will not excuse the telemarketer from violations of the Commission's rules.

### 4. Constitutionality

**\*\*24**  63. We conclude that a national do-not-call registry is consistent with the First Amendment. As discussed in more detail below, we believe, like the FTC, that our regulations satisfy the criteria set forth in *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, in which the Supreme Court established the applicable analytical framework for determining the constitutionality of a regulation of commercial speech. [203]  Our conclusion is also consistent with **\*14053** every Court of Appeals decision that has considered First Amendment challenges to the TCPA. [204]

64. Under the framework established in *Central Hudson*, a regulation of commercial speech will be found compatible with the First Amendment if (1) there is a substantial government interest; (2) the regulation directly advances the substantial government interest; and (3) the proposed regulations are not more extensive than necessary to serve that interest. [205]  Under the first prong, we find that there is a substantial governmental interest in protecting residential privacy. The Supreme Court has "repeatedly held that individuals are not required to welcome unwanted speech into their homes and that the government may protect this freedom." [206]

65. In particular, the government has an interest in upholding the right of *residents* to bar unwanted speech from their homes. In *Rowan v. United States Post Office*, the Supreme Court upheld a statute that permitted a person to require that a mailer remove his name from its mailing lists and stop all future mailings to the resident:

> The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property. In this case the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings from that mailer.... In effect, Congress has erected a wall - or more accurately permits a citizen to erect a wall - that no advertiser may penetrate without **\*14054** his acquiescence. [207]

66. Here, the record supports that the government has a substantial interest in regulating telemarketing calls. In 1991, Congress held numerous hearings on telemarketing, finding, among other things, that "[m]ore than 300,000 solicitors call more than 18,000,000 Americans every day" and "[u]nrestricted telemarketing can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety. [208]  Our record, like the FTC's, demonstrates that telemarketing calls are even more of an invasion of privacy than they were in 1991. The number of daily calls has increased five fold (to an estimated 104 million), due in part to the use of new technologies, such as predictive dialers. [209]  An overwhelming number of consumers in the approximately 6,500 commenters in this proceeding support the adoption and implementation of a national do-not-call registry. In addition to citing concerns about the numerous and ever-increasing number of calls, they complain about the inadequacies of the company-specific approach, the burdens of such calls on the elderly and people with disabilities, and the costs of acquiring technologies to reduce the number of unwanted calls. [210]  Accordingly, we believe that the record demonstrates that telemarketing calls are a substantial invasion of residential privacy, and regulations that address this problem serve a substantial government interest.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 129 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*25**  67. Under *Central Hudson's* second prong, we find that the Commission's regulations directly advance the substantial government interest. Under this prong, the government must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." [211] It may justify the restrictions on speech "based solely on history, consensus, and 'simple common sense.'" [212] Creating and implementing a national do-not-call registry will directly advance the government's interest in protecting residential privacy from unwanted telephone solicitations. Congress, consumers, state governments and the FTC have reached the same conclusion. The history of state administered do-not-call lists demonstrates that such do-not-call programs have a positive impact on the ability of many consumers to protect their privacy by reducing the number of unwanted telephone solicitations that they receive each day. [213] As noted above, Congress has reviewed the FTC's decision to establish a **\*14055** national do-not-call list and concluded that the do-not-call initiative will provide significant benefits to consumers throughout the United States. [214] We reject the arguments that because our do-not-call registry provisions do not apply to tax-exempt nonprofit organizations, our regulations do not directly and materially advance the government interest of protecting residential privacy. [215] "Government [need not] make progress on every front before it can make progress on any front." [216]

68. We believe that the facts here are easily distinguishable from those in *Rubin v. Coors Brewing Company*, 514 U.S. 476 (1995) and *City of Cincinnati v. Discovery Network*, 507 U.S. 410 (1993). In *Coors*, the Court struck down a prohibition against disclosure of alcoholic content on labels or in advertising that applied to beer but not to wine or distilled spirits, finding that "the irrationality of this unique and puzzling regulatory framework ensures that the labeling ban will fail to achieve [the Government's interest in combating strength wars.]" In *Discovery Network*, the Court struck down an ordinance which banned 62 newsracks containing commercial publications but did not ban 1,500-2,000 newsracks containing newspapers, finding that "the distinction bears no relationship *whatsoever* to the particular [aesthetic] interests that the city has asserted." Here, Congress' decision to exclude tax-exempt nonprofit organizations from the definition of telemarketing in the TCPA was both rational and related to its interest in protecting residential privacy. The House Report finds that "the record suggests that most unwanted telephone solicitations are commercial in nature....[T]he Committee also reached the conclusion, based on the evidence, that ... calls [from tax-exempt nonprofit organizations] are less intrusive to consumers because they are more expected. Consequently, the two main sources of consumer problems - high volume of solicitations and unexpected solicitations - are not present in solicitations by nonprofit organizations." [217]

**\*\*26**  69. Commenters in our record also express the concern that subjecting tax-exempt nonprofit organizations to the national do-not-call requirements may sweep too broadly because it would prompt some consumers to accept blocking of non-commercial, charitable calls to which they might not otherwise object as an undesired effect of registering on the national database to stop unwanted commercial solicitation calls. Both the Eighth and the Ninth Circuits found that the provisions of the TCPA, which bans unsolicited commercial faxes but not non-commercial faxes, directly advance a substantial government interest, [218] and we believe that the same **\*14056** distinction may be applied to the national do-not-call registry. [219]

70. We find under the third prong of the *Central Hudson* test that our proposed regulations are not more extensive than necessary to protect residential privacy. The Supreme Court has made clear that with respect to this prong, "the differences between commercial speech and noncommercial speech are manifest." [220] The Court held that:

> [T]he least restrictive means test has no role in the commercial speech context. What our decisions require, instead, is a fit between the legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served .... [T]he existence of numerous and obvious less-burdensome

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 130 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

alternatives to the restriction on commercial speech is certainly a relevant consideration in determining whether the fit between the ends and means is reasonable.[221]

In *Florida Bar*, the Supreme Court found that a prohibition against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident was not more extensive than necessary to "protect... the privacy and tranquility of personal injury victims and their loved ones against intrusive, unsolicited contact by lawyers."[222] Similarly, the Ninth Circuit has found that the TCPA's ban on prerecorded telemarketing calls constitutes a "reasonable fit" with the government's legitimate interest in protecting residential privacy.[223]

**\*14057** 71. Here, we find that our regulations meet the requirements of *Central Hudson's* third prong. Pursuant to our regulations, we adopt a single, national do-not-call database that we will enforce jointly with the FTC. Our rules mandate that common carriers providing telephone exchange service shall inform their subscribers of their right to register on the database either through a toll-free telephone call or over the Internet. Furthermore, telemarketers and sellers must gain access to telephone numbers in the national database and will be able to do so by means of a fully automated, secure website dedicated to providing information to these entities. In addition, sellers will be assessed an annual fee based upon the number of area codes they want to assess, with the maximum annual fee capped at $7,250. Our rules also provide that the national database will be updated continuously, and telemarketers must update their lists quarterly. We find that our regulations are a reasonable fit between the ends and means and are not as restrictive as the bans upheld in the cases cited above. In *Florida Bar*, the Supreme Court upheld an *absolute* ban against lawyers using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident. Similarly, the Ninth Circuit has upheld the TCPA's *absolute* ban on prerecorded telemarketing calls, and both the Eighth and Ninth Circuit have upheld the TCPA's *absolute* ban on unsolicited faxes. Here, our regulations do not absolutely ban telemarketing calls. Rather, they provide a mechanism by which individual consumers may choose not to receive telemarketing calls. We also note that there are many other ways available to market products to consumers, such as newspapers, television, radio advertising and direct mail.[224] In addition, there simply are not "numerous and obvious less-burdensome alternatives" to the national do-not-call registry. The record clearly demonstrates widespread consumer dissatisfaction both with the effectiveness of the current company-specific rules that are currently in place[225] and the effectiveness and expense of certain technological alternatives to reduce telephone solicitations.[226] We also note that many of the "burdens" of the national do-not-call registry - issues concerning its costs, accuracy, and privacy - have been addressed by advances in computer technology and software over the last ten years.[227] Thus, we find that our regulations implementing the national do-not-call registry are consistent with the First Amendment and the framework established in *Central Hudson*.

**\*\*27 \*14058** 72. Furthermore, we reject the arguments that the *Central Hudson* framework is not appropriate and that strict scrutiny is required because the regulations implementing the national do-not-call list are content-based, due to the TCPA's exemptions for non-profit organizations and established business relationships.[228] For support, commenters cite to *Discovery Network*, 507 U.S. 410, in which the Court struck down Cincinnati's ordinance which banned newsracks containing commercial publications but did not ban newsracks containing newspapers. The Court found that the regulation could neither be justified as a restriction on commercial speech under *Central Hudson*, nor could it be upheld as a valid time, place, or manner restriction on protected speech.[229] The Court explained that "the government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech'."[230] In this case, the Court held that the City's ban which covered commercial publications but not newspapers was content-based.[231] "It is the absence of a neutral justification for its selective ban on newsracks that prevents the city from defending its newsrack policy as content neutral."[232]

Add. 70

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 131 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

73. Here, however, there was a neutral justification for Congress' decision to exclude non-profit organizations. As we noted *supra*, Congress found that "the two sources of consumer problems - high volume of solicitations and unexpected solicitations - are not present in solicitations by nonprofit organizations."[233] Congress also made a similar finding with respect to **\*14059** solicitations based on established business relationships.[234] Consumers are more likely to anticipate contacts from companies with whom they have an existing relationship and the volume of such calls will most likely be lower. Furthermore, as the Eighth Circuit noted when it distinguished the *Discovery Network* case in upholding the TCPA's ban on unsolicited faxes that applies to commercial speech but not to noncommercial speech, "the government may regulate one aspect of a problem without regulating all others."[235] Thus, we believe it is clear that our do-not-call registry regulations may apply to commercial solicitations without applying to tax-exempt nonprofit solicitations, and that such regulations are not subject to a higher level of scrutiny. Indeed, we agree with the FTC that regulation of non-profit solicitations are subject to a higher level of scrutiny than solicitations of commercial speech,[236] and "greater care must be given [both] to ensuring that the governmental interest is actually advanced by the regulatory remedy, and [to] tailoring the regulation narrowly so as to minimize its impact on First Amendment rights."[237]

### 5. Consistency with State and FTC Do-Not-Call Rules

**\*\*28** 74. We conclude that harmonization of the various state and federal do-not-call programs to the greatest extent possible will reduce the potential for consumer confusion and regulatory burdens on the telemarketing industry.[238] An underlying concern expressed by many commenters in this proceeding is the potential for duplication of effort and/or inconsistency in the rules relating to the state and federal do-not-call programs. Congress has indicated a similar **\*14060** concern in requiring the Commission to "maximize consistency" with the FTC's rules.[239] As discussed below, we find that the use of a single national database of do-not-call registrants will ultimately prove the most efficient and economical means for consumer registrations and access for compliance purposes by telemarketing entities and regulators.

75. The states have a long history of regulating telemarketing practices, and we believe that it is critical to combine the resources and expertise of the state and federal governments to ensure compliance with the national do-not-call rules. In fact, the TCPA specifically outlines a role for the states in this process.[240] In an effort to reconcile the state and federal roles, we have conducted several meetings with the states and FTC.[241] We expect such coordination to be ongoing in an effort to promote the continued effectiveness of the national do-not-call program. We clarify below the respective governmental roles in this process under the TCPA. As noted above, we intend to develop a Memorandum of Understanding with the FTC in the near future outlining the respective federal responsibilities under the national do-not-call rules. We note that a few commenters have expressed concern that the FTC and this Commission may adopt separate national do-not-call lists.[242] We reiterate here that there will be only one national database.

76. *Use of a Single Database.* We conclude that the use of a single national do-not-call database, administered by the vendor selected by the FTC, will ultimately prove the most efficient and economical means for consumer registrations and access by telemarketers and regulators. The establishment of a single database of registrants will allow consumers to register their requests not to be called in a single transaction with one governmental agency. In addition, telemarketers may access consumer registrations for purposes of compliance with the do-not-call rules through one visit to a national database. This will substantially alleviate the potential for consumer confusion and administrative burden on telemarketers that would exist if required to access multiple databases. In addition, we note that section 227(e)(2) prohibits states, in regulating telephone solicitations, from using any database, list, or list system that does not include the part of such single national database that relates to that state.[243] Thus, pursuant to this requirement, any individual state do-not-call database must include all of the registrants on the national database for that state. We determine that the administrator of the national database shall make the numbers in the database available to the states as required by the TCPA.[244]

Add. 71

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 132 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*29  \*14061**  77. We believe the most efficient way to create a single national database will be to download the existing state registrations into the national database. The FTC has indicated that the national database is designed to allow the states to download into the national registry - at no cost - the telephone numbers of consumers that have registered with their state do-not-call lists. [245] As noted above, we believe that consumers, telemarketers, and regulators will benefit from the efficiencies derived from the creation of a single do-not-call database. We encourage states to work diligently toward this goal. We recognize that a reasonable transition period may be required to incorporate the state registrations in a few states into the national database. [246] We therefore adopt an 18-month transition period for states to download their state lists into the national database. Having an 18-month transition period will allow states that do not have full-time legislatures to complete a legislative cycle and create laws that would authorize the use of a national list. In addition, this transition period is consistent with the amount of time that the FTC anticipates it would take to incorporate the states' lists into the national database. Although we do not preempt or require states to discontinue the use of their own databases at this time, once the national do-not-call registry goes into effect, states may not, in their "regulation of telephone solicitations, require the use of any database, list, or listing system that does not include the part of [the national do-not-call registry] that relates to [each] State." [247] As noted above, we believe that there are significant advantages and efficiencies to be derived from the creation and use of a single database for all parties, including states, and we strongly encourage states to assist in this effort. The Commission intends to work diligently with the states and FTC in an effort to establish a single do-not-call database.

78. _Interplay of State and Federal Do-Not-Call Regulations_. In the _2002 Notice_, we generally raised the issue of the interplay of state and federal do-not-call statutes and regulations. [248] In response, several parties argued that state regulations must or should be preempted in whole, [249] or at least in part, [250] and several other parties argued that the Commission **\*14062** cannot or should not preempt. [251] For example, several industry commenters contend that the TCPA provides the Commission with the authority to preempt state do-not-call regulations. [252] These commenters contend that Congress intended the TCPA to occupy the field or, at the very least, intended to preempt state regulation of interstate telemarketing. Many state and consumer commenters note, however, that the TCPA contemplates a role for the states in regulating telemarketing and specifically prohibits preemption of state law in certain instances. [253] States and consumers note that state do-not-call regulations have been a successful initiative in protecting consumer privacy rights. In addition, several commenters note the importance of federal and state cooperation in enforcing the national do-not-call regulations. [254] The record also indicates that states have historically enforced their own state statutes within, as well as across state lines. [255] The statute also contains a savings clause for state proceedings to enforce civil or criminal statutes, [256] and at least one federal court has found that the TCPA does not preempt state regulation of autodialers that are not in actual conflict with the TCPA. [257]

**\*\*30**  79. The main area of difference between the state and federal do-not-call programs relates to the exemptions created from the respective do-not-call regulations. Some state regulations are less restrictive by adopting exemptions that are not recognized under federal law. For example, some states have adopted exemptions for insurance agents, newspapers, or small businesses. [258] In addition, a few states have enacted laws that are more restrictive than the federal regulations by not recognizing federal exemptions such as the established business relationship. [259] Most states, however, exempt nonprofit organizations and companies with whom **\*14063** the consumer has an established business relationship in some manner consistent with federal regulations. [260]

80. At the outset, we note that many states have not adopted any do-not-call rules. The national do-not-call rules will govern exclusively in these states for both intrastate and interstate telephone solicitations. [261] Pursuant to section 227(f)(1), all states have the ability to enforce violations of the TCPA, including do-not-call violations, in federal district court. [262] Thus, we conclude that there is no basis for conflict regarding the application of do-not-call rules in those states that have not adopted do-not-call regulations.

Add. 72

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 133 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

81. For those states that have adopted do-not-call regulations, we make the following determinations. First, we conclude that, by operation of general conflict preemption law, the federal rules constitute a floor, and therefore would supersede all less restrictive state do-not-call rules. [263] We believe that any such rules would frustrate Congress' purposes and objectives in promulgating the TCPA. Specifically, application of less restrictive state exemptions directly conflicts with the federal objectives in protecting consumer privacy rights under the TCPA. Thus, telemarketers must comply with the federal do-not-call rules even if the state in which they are telemarketing has adopted an otherwise applicable exemption. Because the TCPA applies to both intrastate and interstate communications, the minimum requirements for compliance are therefore uniform throughout the nation. We believe this resolves any potential confusion for industry and consumers regarding the application of less restrictive state do-not-call rules.

82. Second, pursuant to section 227(e)(1), we recognize that states may adopt more restrictive do-not-call laws governing intrastate telemarketing. [264] With limited exceptions, the TCPA specifically prohibits the preemption of any state law that imposes more restrictive intrastate requirements or regulations. Section 227(e)(1) further limits the Commission's ability to preempt any state law that prohibits certain telemarketing activities, including the making of telephone solicitations. This provision is ambiguous, however, as to whether this prohibition applies both to intrastate and interstate calls, [265] and is silent on the issue of whether state law that  **\*14064**  imposes more restrictive regulations on interstate telemarketing calls may be preempted. As set forth below, however, we caution that more restrictive state efforts to regulate interstate calling would almost certainly conflict with our rules.

 **\*\*31**  83. We recognize that states traditionally have had jurisdiction over only intrastate calls, while the Commission has had jurisdiction over interstate calls. [266] Here, Congress enacted section 227 and amended section 2(b) to give the Commission jurisdiction over both interstate and intrastate telemarketing calls. Congress did so based upon the concern that states lack jurisdiction over interstate calls. [267] Although section 227(e) gives states authority to impose more restrictive intrastate regulations, we believe that it was the clear intent of Congress generally to promote a uniform regulatory scheme under which telemarketers would not be subject to multiple, conflicting regulations. [268] We conclude that inconsistent interstate rules frustrate the federal objective of creating uniform national rules, to avoid burdensome compliance costs for telemarketers and potential consumer confusion. The record in this proceeding supports the finding that application of inconsistent rules for those that telemarket on a nationwide or multi-state basis creates a substantial compliance burden for those entities. [269]

84. We therefore believe that any state regulation of interstate telemarketing calls that differs from our rules almost certainly would conflict with and frustrate the federal scheme and almost certainly would be preempted. We will consider any alleged conflicts between state and federal requirements and the need for preemption on a case-by-case basis. Accordingly, any  **\*14065**  party that believes a state law is inconsistent with section 227 or our rules may seek a declaratory ruling from the Commission. We reiterate the interest in uniformity - as recognized by Congress - and encourage states to avoid subjecting telemarketers to inconsistent rules.

85. NAAG contends that states have historically enforced telemarketing laws, including do-not-call rules, within, as well as across, state lines pursuant to "long-arm" statutes. [270] According to NAAG, these state actions have been met with no successful challenges from telemarketers. We note that such "long-arm" statutes may be protected under section 227(f)(6) which provides that "nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such state." [271] Nothing that we do in this order prohibits states from enforcing state regulations that are consistent with the TCPA and the rules established under this order in state court.

## IV. COMPANY SPECIFIC DO-NOT-CALL LISTS

Add. 73

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 134 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**A. Background**

86. In the *1992 TCPA Order*, the Commission adopted a "company-specific do-not-call" approach to protect residential telephone subscriber privacy by requiring telemarketers to place consumers on a do-not-call list if the consumer requests not to receive future solicitations. [272] In the *2002 Notice*, the Commission sought comment on whether the company-specific approach has proven effective in providing consumers with a means to curb unwanted telephone solicitations. [273] The Commission noted that under the company-specific approach, consumers must repeat their request not to be called on a case-by-case basis. Given the apparent increase in telemarketing calls, the Commission requested comment on whether this approach continues to balance adequately the interests of consumers with those of legitimate telemarketers. In particular, the Commission sought comment on whether changes in the marketplace now make this approach unreasonably burdensome for consumers, including elderly and disabled consumers. [274] In addition, the Commission sought comment on whether the company-specific **14066** approach should be retained if the FTC, either acting alone or in conjunction with this Commission, adopts a national do-not-call list. Finally, the Commission sought comment on whether to consider any additional modifications to the company-specific list such as requiring companies to provide a toll-free number or website to register such requests. [275]

**\*\*32** 87. In response to the *2002 Notice*, the Commission received a number of comments relating to the company-specific do-not-call rules. The majority of individual consumers addressing these issues contend that the current company-specific approach is inadequate to prevent unwanted telephone solicitations. [276] In general, they argue that the company-specific approach is extremely burdensome to consumers who must repeat their request to every telemarketer that calls; such requests are often ignored or, in the case of abandoned calls, there is no opportunity to make such a request; and that consumers have no way to verify whether they have been placed on such lists. [277] In addition, many consumers contend that telemarketers often fail to identify themselves or provide written copies of their do-not-call policies as required by the Commission's rules. [278] Some consumers note that these limitations make it difficult to pursue any private right of action against telemarketers. [279] Commenters also indicate that telemarketers frequently inform them that it will take as long as two months to process their do-not-call requests. [280] An organization representing persons with disabilities contends that such consumers often cannot communicate requests not to be called to telemarketers. [281]

88. Many industry commenters contend that the company-specific approach has been effective and that a national do-not-call list is therefore unnecessary. These commenters argue that the advantages of the company-specific approach, as identified by the Commission in 1992, remain valid today. Specifically, these commenters contend that companies already maintain such lists, the company-specific approach allows consumers to halt calls selectively, businesses gain useful information about consumer preferences, consumer confidentiality is protected, and the costs remain on the telemarketer. A number of industry commenters request that the retention period for those consumers requesting not to be called be reduced from ten years. [282] In general, industry commenters oppose any requirement to establish a toll-free number or website **14067** for consumers to register and/or verify their do-not-call requests. [283] These commenters contend that any such requirement would be costly and unnecessary given their compliance with the existing rules.

89. The FTC concluded that its company-specific do-not-call rules should be retained despite the adoption of a national registry. [284] Although the FTC found that the company-specific list was often ineffective in protecting consumers, the FTC concluded it will work in a complementary fashion with a national do-not-call list to effectuate the appropriate balance between consumer privacy and enabling sellers to have access to customers. While the FTC has decided to exempt telemarketing calls on behalf of charitable organizations from the national registry, it concluded that calls by for-profit telemarketers on behalf of charitable organizations will now be subject to the company-specific rules. [285]

Add. 74

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 135 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

## B. Discussion

### 1. Efficacy of the Company-Specific Rules

**\*\*33** 90. We conclude that retention of the company-specific do-not-call rules will complement the national do-not-call registry by providing consumers with an additional option for managing telemarketing calls. We believe that providing consumers with the ability to tailor their requests not to be called, either on a case-by-case basis under the company do-not-call approach or more broadly under the national registry, will best balance individual privacy rights and legitimate telemarketing practices. As a result, those consumers that wish to prohibit telephone solicitations from only certain marketers will continue to have the option to do so. In addition, consumers registered on the national do-not-call registry will have the opportunity to request that they not be called by entities that would otherwise fall within the established business relationship exemption by using the option to be placed on the company-specific lists. This finding is consistent with that of the FTC.

91. As discussed above, we agree with those commenters that contend that the company-specific do-not-call approach has not proven ideal as a stand-alone method to protect consumer privacy. In particular, the increase in telemarketing calls over the last decade now places an extraordinary burden on consumers that do not wish to receive telephone solicitations. These consumers must respond on a case-by-case basis to request that they not be called. The record in this proceeding is replete with examples of consumers that receive numerous unwanted telemarketing calls each day.[286] In addition, the widespread use of predictive dialers now results in many "dead air" or hang-up calls in which consumers do not even have the opportunity to **\*14068** make a do-not-call request. Such calls are particularly burdensome for the elderly and disabled consumers. We believe, however, that the measures adopted elsewhere in this order will enhance the effectiveness of the company-specific list. For example, the adoption of a national do-not-call registry alleviates the concerns of those consumers, including elderly and disabled consumers that may find a case-by-case do-not-call option particularly burdensome. In addition, restrictions on abandoned calls will reduce the number of "dead air" calls. Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers. We also note that although many commenters question the effectiveness of the company-specific approach, there is little support in the record to eliminate those rules based on the adoption of the national do-not-call list.[287] For the reasons stated above, we retain the option for consumers to request on a case-by-case basis whether they desire to receive telephone solicitations.

### 2. Amendments to the Company-Specific Rules

92. We agree with several industry commenters that the retention period for records of those consumers requesting not to be called should be reduced from the current ten-year requirement to five years.[288] As many commenters note, telephone numbers change hands over time and a shorter retention period will help ensure that only those consumers who have requested not to be called are retained on the list.[289] Both telemarketers and consumers will benefit from a list that more accurately reflects those consumers who have requested not to be called. The FTC has concluded and several commenters in this proceeding agree that five years is a more reasonable period to retain consumer do-not-call requests.[290] We believe a five-year retention period reasonably balances any administrative burden imposed on consumers in requesting not to be called with the interests of telemarketers in contacting consumers. As noted, a shorter retention period increases the accuracy of the database while the national do-not-call option mitigates the burden on those consumers who may believe more frequent company-specific do-not-call requests are overly burdensome. We believe any shorter retention period, as suggested by a few industry commenters, would unduly increase the burdens on consumers who would be forced to make more frequent renewals of their company-specific do-not-call requests without substantially improving the accuracy of the database. We therefore amend our rules to require that a do-not-call request be honored for five years from the time the request is made.[291]

Add. 75

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 136 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*34** 93. We decline at this time to require telemarketers to make available a toll-free number or website that would allow consumers to register company-specific do-not-call requests **\*14069** or verify that such a request was made with the marketer. We also decline to require telemarketers to provide a means of confirmation so that consumers may verify their requests have been processed at a later date. Telemarketers should, however, confirm that any such request will be recorded at the time the request is made by the consumer. In addition, consumers calling to register do-not-call requests in response to prerecorded messages should be processed in a timely manner without being placed on hold for unreasonable periods of time. Although we believe the additional measures discussed above would improve the ability of consumers, including consumers with disabilities, to register do-not-call requests, we agree with those commenters that contend that such requirements would be unduly costly to businesses. [292] In particular, we are concerned with the costs imposed on small businesses. The Commission will, however, continue to monitor compliance with our company-specific do-not-call rules and take further action as necessary.

94. We conclude that telemarketers must honor a company-specific do-not-call request within a reasonable time of such request. We disagree, however, with commenters that suggest that periods of up to 90 days are a reasonable time required to process do-not-call requests. [293] Although some administrative time may be necessary to process such requests, this process is now largely automated. [294] As a result, such requests can often be honored within a few days or weeks. Taking into consideration both the large databases of such requests maintained by some entities and the limitations on certain small businesses, we conclude that a reasonable time to honor such requests must not exceed thirty days from the date such a request is made. [295] We note that the Commission's rules require that entities must record company-specific do-not-call requests and place the subscriber's telephone number on the do-not-call list at the time the request is made. [296] Therefore, telemarketers with the capability to honor such company-specific do-not-call requests in less than thirty days must do so. [297] We believe this determination adequately balances the privacy interests of those consumers that have requested not to be called with the interests of the telemarketing industry. Consumers expect their requests not to be called to be honored in a timely manner, and thirty days should be the maximum administrative time **\*14070** necessary for telemarketers to process that request.

95. In addition, we decline to extend the company-specific do-not-call rules to entities that solicit contributions on behalf of tax-exempt nonprofit organizations. The TCPA excludes calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation. [298] The Commission has clarified that telemarketers who solicit on behalf of tax-exempt nonprofit organizations are not subject to the rules governing telephone solicitations. [299] In the *2002 Notice*, the Commission declined to seek further comment on this issue. [300] We acknowledge that this determination creates an inconsistency with the FTC's conclusion to extend its company-specific requirements to entities that solicit contributions on behalf of tax-exempt nonprofit organizations. The Commission, however, derives its authority to regulate telemarketing from the TCPA. As noted above, that statute excludes tax-exempt nonprofit organizations from the definition of telephone solicitation. We therefore decline to extend the company-specific requirements to entities that solicit on behalf of tax-exempt nonprofit organizations. We note that some tax-exempt nonprofit organizations have determined to honor voluntarily specific do-not-call requests. Other organizations may find it advantageous to follow this example.

**\*\*35** 96. Finally, to make clear our determination that a company must cease making telemarketing calls to a customer with whom it has an established business relationship when that customer makes a do-not-call request, we amend the company-specific do-not-call rules to apply to any call for telemarketing purposes. [301] We also adopt a provision stating that a consumer's do-not-call request terminates the established business relationship for purposes of telemarketing calls even if the consumer continues to do business with the seller. [302]

### V. INTERPLAY OF SECTIONS 222 AND 227

### A. Background

Add. 76

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 137 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

97. In the *2002 Notice*, the Commission sought comment generally on the interplay **\*14071** between sections 222 and 227.[303] Section 222, entitled "Privacy of Consumer Information," obligates telecommunications carriers to protect the confidentiality of certain information and to protect the customer proprietary network information (CPNI) created by the customer-carrier relationship.[304] Under the CPNI rules, a customer may allow her carrier to use her CPNI for marketing purposes. Depending on the uses the carrier intends to make of the customer's CPNI, the carrier must provide the customer notice of her CPNI rights and a means to effectuate her CPNI choice - either "opt-in" or "opt-out" consent.[305] The TCPA, on the other hand, governs a particular method - telemarketing - by which carriers (and other companies) market to their customers, and those customers' rights to choose whether or not they wish to receive such telemarketing calls. Accordingly, a consumer's decision to allow her carrier to use her CPNI reflects whether she is willing to have her carrier look at her personal usage information in order to tailor its marketing[306] based on her usage patterns. A consumer's decision to enroll on the national do-not-call list reflects her decision about whether she wishes to receive telemarketing calls.

98. In the *2002 Notice*, the Commission tentatively concluded that a customer's request to be placed on a telecommunications carrier's do-not-call list limits that carrier's ability to market to that consumer via telephone.[307] The Commission reasoned that "[h]onoring a do not **\*14072** call request under section 227 does not render a consent under section 222 a spatity, but instead merely limits the manner of contact (i.e., marketing over the telephone) consistent with the express request of the customer under section 227."[308] Numerous commenters generally supported the Commission's tentative determination that a customer's section 222 approval to use his or her CPNI should not override that customer's request to be placed on a do-not-call list.[309] However, some commenters urged the Commission to draw distinctions based on: (1) the type of CPNI consent received (opt-in versus opt-out); and/or (2) national and state do-not-call lists versus company-specific do-not-call lists.

99. In particular, some commenters argued that a customer's CPNI approval should be deemed to override her request to be included on a national (or other general) do-not-call list, but should not override a request to be placed on a company-specific do-not-call list.[310] Additionally, some commenters supported an approach where a customer's CPNI approval, if obtained through an opt-out mechanism, would not overcome the customer's request to be placed on a do-not-call list; however, opt-in CPNI approval would be deemed to overcome a customer's inclusion on a do-not-call list.[311] A few commenters argued that any CPNI approval should be deemed to overcome a customer's inclusion on a do-not-call registry.[312] Finally, one commenter suggested that the question of the interplay between a customer's opt-in consent to use her CPNI and request to be on a do-not-call list should be judged on a customer-by-customer basis, based on which request was made most recently.[313]

### B. Discussion

**\*\*36** 100. We first note that the fact that a telecommunications carrier has current CPNI about a particular consumer indicates that the consumer is a customer of that carrier. In that situation, there exists an established business relationship between the customer and the carrier.[314] The established business relationship is an exception to the national do-not-call registry.[315] However, based on the evidence in the record and as supported by numerous **\*14073** commenters,[316] we confirm our tentative conclusion that if a customer places her name on a carrier's do-not-call list, that request must be honored even though the customer may also have provided consent to use her CPNI under section 222.[317] By doing so, we maximize the protections and choices available to consumers, while giving maximum effect to the language of both statutes. At the outset, the average consumer seems rather unlikely to appreciate the interrelationship of the Commission's CPNI and do-not-call rules. Allowing CPNI consent to trump a do-not-call request would, therefore, thwart most consumers' reasonable expectations about how a company-specific do-not-call list functions. Equally important, permitting a consumer's CPNI consent to supercede a consumer's express do-not call request might undermine the carrier's do-not-call database as the first source of information about the consumer's telemarketing preferences.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 138 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

101. As discussed *infra*, because we retain the exemption for calls and messages to customers with whom the carrier has an established business relationship,[318] the determination that a customer's CPNI approval does not trump her inclusion on a do-not-call list should have no impact on carriers' ability to communicate with their customers via telemarketing.[319] Carriers will be able to contact customers with whom they have an established business relationship via the telephone, unless the customer has placed her name on the company's do-not-call list; whether the customer has consented to the use of her CPNI does not impact the carrier's ability to contact the customer via telemarketing.[320]

**\*14074** 102. We are not persuaded by the arguments of those commenters who urge the Commission to find that CPNI consent should trump a customer's request to be placed on a do-not-call list or similarly, that CPNI consent equates to permission to market "without restriction."[321] We note that the Concerned Telephone Companies assert that CPNI consent equates to "consent to market *without restriction* based on [customers'] CPNI."[322] The Commission finds no support for this assertion in any Commission order or statutory provision and, as we discuss herein, we specifically determine that CPNI approval does not equate to unlimited consent to market without restriction.

103. Similarly, a number of commenters argue that a customer's CPNI authorization "covers a number of forms of marketing, including telemarketing."[323] However, such assertions ignore the plain fact that CPNI approval deals specifically with a carrier's use of a customer's personal information, and only indirectly pertains to or arguably "authorizes" marketing to the customer. Do-not-call lists, on the other hand, speak directly to customers' preferences regarding telemarketing contacts.[324] Accordingly, we are convinced that a customer's do-not-call request demonstrates more directly her willingness (or lack thereof) to receive telemarketing calls, as opposed to any indirect inference that can be drawn from her CPNI approval.

**\*\*37** 104. Additionally, we disagree with those commenters who claim that allowing CPNI approval to trump a consumer's request to be on a national or state do-not-call list gives consumers greater flexibility.[325] As stated above, a carrier's established business relationship with a customer exempts the carrier from honoring the customer's national do-not-call request. However, as stated above, CPNI consent is not deemed to trump a carrier-specific do-not-call list request. For similar reasons, we decline to make a distinction based on what type of CPNI consent (opt-in versus opt-out) received, as some commenters urge.[326]

105. We do not allow carriers to combine the express written consent to allow them to contact customers on a do-not-call list with the CPNI notice in the manner that AT&T Wireless describes. However, we do allow carriers to combine in the same document CPNI notice with a request for express written consent to call customers on a do-not-call list, provided that such notices and opportunities for consumer consent are separate and distinct. That is, consumers **\*14075** must have distinct choices regarding both whether to allow use of their CPNI and whether to allow calls after registering a do-not-call request, but carriers may combine those requests for approval in the same notice document. Finally, we find a distinction based on the type of CPNI consent unnecessary here, as carriers can avail themselves of the established business relationship exception to contact their existing customers, irrespective of the type of CPNI consent obtained.

106. Similarly, we agree with those commenters[327] who advise against using a time element to determine whether a customer's do-not-call request takes precedence over the customer's opt-in approval to use her CPNI,[328] because adding a time element would unnecessarily complicate carrier compliance and allow carriers to game the system. In particular, the New York State Consumer Protection Board argues that "enrollment on a national do-not-call list should take precedence over the prior implied consent through the 'opt-out' procedure, but that the latest in time should prevail regarding 'opt-in' consents."[329] Because we determine that carriers can contact consumers with whom they have established business relationships, irrespective of those consumers' CPNI preferences, we find this proposed methodology unnecessary in determining whether a customer's CPNI consent should trump her do-not-call request. Additionally, we note that this proposal could be manipulated by carriers to

Add. 78

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 139 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

overcome consumers' do-not-call preferences, by allowing carriers to send CPNI notices to customers that are intentionally timed to "overcome" previously expressed do-not-call requests.

107. Finally, although it was not directly raised in the *2002 Notice*, some commenters raised the issue of whether any type of do-not-call request revokes or limits a carrier's ability to use CPNI in a manner other than telemarketing.[330] To the degree such affirmation is necessary, we agree with those commenters who maintain that a carrier's ability to use CPNI is not impacted by a customer's inclusion on a do-not-call list, except as noted above.

 **38** 108. _Constitutional Implications_. We disagree with those commenters who argue that our decision that a customer's CPNI approval does not trump her request to be on a do-not-call list violates the First Amendment rights of carriers and customers.[331] Commenters cite no authority to support their arguments, and we do not believe the fact that customers have given their approval for carriers to use their CPNI implicates any additional First Amendment issues beyond those discussed in Section III.B.4., *supra*. Accordingly, we find our rules implementing the do-not-call registry are consistent with the First Amendment as applied to any consumer, including those who have previously given their approval to carriers to use their CPNI, pursuant to section 222. Furthermore, we believe that the exception which allows carriers to call consumers with whom they necessarily have an established business relationship renders **\*14076** commenters' arguments moot, as carriers necessarily have an established business relationship with any customer from whom they solicit CPNI approval.

## VI. ESTABLISHED BUSINESS RELATIONSHIP

### A. Background

109. The TCPA provides that the term "telephone solicitation" does not include a call or message to any person with whom the caller has an established business relationship (or EBR).[332] The Commission determined during its initial TCPA rulemaking that, based on the record and legislative history, the TCPA also permits an "established business relationship" exemption from the restrictions on artificial or prerecorded message calls to residences.[333] In the *2002 Notice*, we sought comment on the exemption generally, and more specifically, on the definition of "established business relationship," and whether any circumstances have developed that would justify revisiting these conclusions.[334] The current rules define the term "established business relationship" to mean:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.[335]

110. Industry commenters overwhelmingly support retaining the exemption for calls to customers with whom companies have an established business relationship,[336] and many urge the Commission not to narrow the scope of the exemption.[337] Many industry members are also opposed to any time limitation on the exemption,[338] or any modification of the rules that would **\*14077** interfere with a company's ability to market different services and products.[339] Most consumer groups and state organizations support the exemption, provided the scope of the definition is narrowed.[340] A few consumers advocated

Add. 79

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 140 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

eliminating the exemption for prerecorded messages. [341] Some consumer advocates disagreed with the assumption that consumers want to hear from companies with whom they have an existing relationship. One commenter stated that because a consumer might have established a relationship with a company does not necessarily mean that he or she wishes to receive telemarketing calls from that company. [342] Many consumers' groups argued that the relationship should be ongoing, [343] should require a completed transaction, such as a purchase or payment, [344] and should be limited in duration. [345] Of commenters who advocated a specific time limit on the EBR, there was less consensus about how long the relationship should last following a transaction between the seller and consumer. [346]

 **39** 111. The FTC decided to provide an exemption for "established business relationships" from the national "do-not-call" registry, as long as the consumer has not asked to be placed on the seller's company-specific "do-not-call" list. The FTC's amended Rule limits the "established business relationship" exemption to relationships formed by the consumer's purchase, rental or *14078 lease of goods or services from, or financial transaction with, the seller within eighteen (18) months of the telephone call or, in the case of inquiries or applications, to three (3) months from the inquiry or application. [347] The FTC explained that this time frame is consistent with most state laws that include a time limit, [348] and is more in keeping with consumer expectations than an open-ended exemption. [349] The FTC also determined that affiliates will fall within the exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or services offered and the identity of the affiliate. [350]

### B. Discussion

112. We conclude that, based on the record, an established business relationship exemption is necessary to allow companies to communicate with their existing customers. [351] Companies maintain that the exemption allows them to make new offers to existing customers, such as mortgage refinancing, insurance updates, and subscription renewals. [352] They suggest that customers benefit from calls that inform them in a timely manner of new products, services and pricing plans. American Express contends that its financial advisors have a fiduciary duty to their customers, requiring them to contact customers with time-sensitive information. [353] We are persuaded that eliminating this EBR exemption would possibly interfere with these types of business relationships. Moreover, the exemption focuses on the relationship between the sender of the message and the consumer, rather than on the content of the message. It appears that consumers have come to expect calls from companies with whom they have such a relationship, and that, under certain circumstances, they may be willing to accept these calls. [354] Finally, we believe that while consumers may find prerecorded voice messages intrusive, such messages do not necessarily impose the same costs on the recipients as, for example, unsolicited facsimile messages. [355] Therefore, we retain the exemption for established business relationship calls from *14079 the ban on prerecorded messages. Telemarketers that claim their prerecorded messages are delivered pursuant to an established business relationship must be prepared to provide clear and convincing evidence of the existence of such a relationship.

### 1. Definition of Established Business Relationship

113. We conclude that the Commission's current definition of "established business relationship" should be revised. We are convinced that consumers are confused and even frustrated more often when they receive calls from companies they have not contacted or done business with for many years. The legislative history suggests that it was Congress's view that the relationship giving a company a right to call becomes more tenuous over time. [356] In addition, we believe that this is an area where consistency between the FCC rules and FTC rules is critical for both consumers and telemarketers. We conclude that, based on the range of suggested time periods that would meet the needs of industry, along with consumers' reasonable expectations of

Add. 80

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 141 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

who may call them and when, eighteen (18) months strikes an appropriate balance between industry practices and consumers' privacy interests. Therefore, the Commission has modified the definition of established business relationship to mean:

> **40** a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three (3) months immediately preceding the date of the call, which relationship has not been previously terminated by either party. [357]

The 18-month time period runs from the date of the last payment or transaction with the company, making it more likely that a consumer would expect a call from a company with which they have recently conducted business. The amended definition permits the relationship, once begun, to exist for eighteen (18) months in the case of purchases or transactions and three (3) months in the case of inquiries or applications, unless the consumer or the company "terminates" it. We emphasize here that the termination of an established business relationship is significant **14080** only in the context of solicitation calls. [358] Therefore, consistent with the language in the definition, a company's prior relationship with a consumer entitles the company to call that consumer for eighteen (18) months from the date of the last payment or financial transaction, even if the company does not currently provide service to that customer. [359] For example, a consumer who once had telephone service with a particular carrier or a subscription with a particular newspaper could expect to receive a call from those entities in an effort to " winback" or "renew" that consumer's business within eighteen (18) months. In the context of telemarketing calls, a consumer's "prior or existing relationship" continues for eighteen (18) months (3 months in the case of inquiries and applications) or until the customer asks to be placed on that company's do-not-call list. [360]

114. _Inquiries_. The Commission asked whether we should clarify the type of consumer _inquiry_ that would create an "established business relationship" for purposes of the exemption. Some consumers and consumer groups maintain that a consumer who merely inquires about a product should not be subjected to subsequent telemarketing calls. [361] Industry commenters, on the other hand, believe that companies should be permitted to call consumers who have made inquiries about their products and services, and that consumers have come to expect such calls. [362] The legislative history suggests that Congress contemplated that an inquiry by a consumer could be the basis of an established business relationship, [363] but that such an inquiry should occur within a reasonable period of time. [364] While we do not believe any communication would amount to an established business relationship for purposes of telemarketing calls, we do not think the definition should be narrowed to only include situations where a purchase or transaction is completed. [365] The nature of any inquiry must, however, be such to create an expectation on the **14081** part of the consumer that a particular company will call them. As confirmed by several industry commenters, an inquiry regarding a business's hours or location would not establish the necessary relationship as defined in Commission rules. [366] By making an inquiry or submitting an application regarding a company's products or services, a consumer might reasonably expect a prompt follow-up telephone call regarding the initial inquiry or application, not one after an extended period of time. Consistent with the FTC's conclusion, the Commission believes three months should be a reasonable time in which to respond to a consumer's inquiry or application. [367] Thus, we amend the definition of "established business relationship" to permit telemarketing calls within three (3) months of an inquiry or application regarding a product or service offered by the company.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 142 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*41** 115. We emphasize here that the definition of "established business relationship" requires a voluntary two-way communication between a person or entity and a residential subscriber regarding a purchase or transaction made within eighteen (18) months of the date of the telemarketing call or regarding an inquiry or application within three (3) months of the date of the call. Any seller or telemarketer using the EBR as the basis for a telemarketing call must be able to demonstrate, with clear and convincing evidence, that they have an EBR with the called party.

116. _Different Products and Services_. The Commission also invited comment on whether to consider modifying the definition of "established business relationship" so that a company that has a relationship with a customer based on one type of product or service may not call consumers on the do-not-call list to advertise a different service or product. [368] Industry commenters believe an EBR with a consumer should not be restricted by product or service, but rather, should permit them to offer the full range of their services and products. [369] Consumer advocates who commented on the issue maintain that a company that has a relationship based on one service or product should not be allowed to use that relationship to market a different service **\*14082** or product. [370] The Commission agrees with the majority of industry commenters that the EBR should not be limited by product or service. In today's market, many companies offer a wide variety of services and products. Restricting the EBR by product or service could interfere with companies' abilities to market them efficiently. Many telecommunications and cable companies, for example, market products and services in packages. [371] As long as the company identifies itself adequately, [372] a consumer should not be surprised to receive a telemarketing call from that company, regardless of the product being offered. If the consumer does not want any further calls from that company, he or she may request placement on its do-not-call list.

117. _Affiliated Entities_. In the _1992 TCPA Order_, the Commission found that a consumer's established business relationship with one company may also extend to the company's affiliates and subsidiaries. [373] Consumer advocates maintain that the EBR exemption should not automatically extend to affiliates of the company with whom a consumer has a business relationship. [374] Industry members argue that it should apply to affiliates that provide reasonably-related products or services. [375] The Commission finds that, consistent with the FTC's amended Rule, affiliates fall within the established business relationship exemption only if the consumer would reasonably expect them to be included given the nature and type of goods or **\*14083** services offered and the identity of the affiliate. [376] This definition offers flexibility to companies whose subsidiaries or affiliates also make telephone solicitations, but it is based on consumers' reasonable expectations of which companies will call them. [377] As the ATA and other commenters explain, consumers often welcome calls from businesses they know. A call from a company with which a consumer has not formed a business relationship directly, or does not recognize by name, would likely be a surprise and possibly an annoyance. This determination is also consistent with current Commission rules on the applicability of do-not-call requests made to affiliated persons or entities. Under those rules, a residential subscriber's do-not-call request will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product advertised. [378]

**\*\*42** 118. _Other Issues_. The Commission clarifies that the established business relationship exemption does not permit companies to make calls based on referrals from existing customers and clients, [379] as the person referred presumably does not have the required business relationship with the company that received the referral. An EBR is similarly not formed when a wireless subscriber happens to use another carrier's services through roaming. [380] In such a situation, the consumer has not made the necessary purchase or inquiry that would constitute an EBR or provided prior express consent to receive telemarketing calls from that company. We recognize that companies often hire third party telemarketers to market their services and products. In general, those telemarketers may rely on the seller's EBR to call an individual consumer to market the seller's services and products. [381] However, we disagree with Nextel that a consumer's EBR with a third party telemarketer, including a retail store or independent dealer, extends to a seller simply because the seller has a contractual relationship with that telemarketer. The seller would only be entitled to call a consumer under the EBR exemption based on its own EBR with a consumer. [382] We also disagree with WorldCom that the EBR should extend to marketing **\*14084** partners for purposes of telemarketing joint offers, to the extent the "partner" companies have no EBR with the consumer. [383]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 143 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

### 2. Telecommunications Common Carriers

119. In the *2002 Notice*, we asked what effect the established business relationship exemption might have on the telecommunications industry, if a national do-not-call list is established. According to WorldCom, telephone solicitations are the primary mechanism for, and the means by which consumers are accustomed to, purchasing competitive telecommunications services.[384] WorldCom argues that with the advent of competition in the formerly monopolized local telephone markets, and the entry of the Regional Bell Operating Companies into the long distance market, carriers need to be able to market effectively their new services.[385] WorldCom argues that a national do-not-call list that exempts calls to persons with whom a company has established business relationships will favor incumbent providers.[386] According to WorldCom, incumbent local exchange carriers maintain most of the local customer base, and therefore would be able to telemarket new services to all those customers, regardless of whether they were on the national do-not-call registry, because of the established business relationship exemption. New competitors, on the other hand, would be restricted from calling those same consumers.

120. One approach would be to narrow the "established business relationship" for telecommunications carriers, so that a carrier doing business with customers based on one type of service may not call those customers registered with the national do-not-call list to advertise a different service.[387] We find, however, that the record does not support such an approach in the context of telemarketing calls. Along with the majority of industry commenters in this proceeding, WorldCom maintains that companies "must have flexibility in communicating with their customers not only about their current services, but also to discuss available alternative **14085** services or products...."[388] Limiting a common carrier's "established business relationship" by product or service might harm competitors' efforts to market new goods or services to existing customers, and would not be in the public interest.

**43** 121. WorldCom proposes instead that the Commission revise the definition of established business relationship so that all providers of a telecommunications service–incumbents and new entrants alike–are deemed to have an established business relationship with all consumers.[389] Alternatively, WorldCom suggests that the definition of an established business relationship be revised to exclude a company whose relationship with a consumer is based solely on a service for which the company has been a dominant or monopoly provider of the service, until such time as competitors for that service have sufficiently penetrated the market.[390]

122. Although we take seriously WorldCom's concerns about the potential effects of a national do-not-call list on competition in the telecommunications marketplace, we decline to expand the definition of "established business relationship" so that common carriers are deemed to have relationships with all consumers for purposes of making telemarketing calls. Broadening the scope of the established business relationship in such a way would be inconsistent with Congress's mandate "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."[391] To permit common carriers to call consumers with whom they have no existing relationships and who have expressed a desire not to be called by registering with the national do-not-call list, would likely confuse consumers and interfere with their ability to manage and monitor the telemarketing calls they receive.[392]

123. We further note that with the establishment of a national do-not-call registry, carriers will still be permitted to contact competitors' customers who have not placed their numbers on the national list. In addition, carriers will be able to call their prior and existing customers for 18 months to market new products and services, such as long distance, local, or DSL services, as long as those customers have not placed themselves on that carrier's company- **14086** specific do-not-call list.[393] For the remaining consumers with whom common carriers have no established business relationship and who are registered with the do-not-call list, carriers may market to them using different advertising methods, such as direct mail. Therefore, we find that

Add. 83

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 144 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

treating common carriers like other entities that use the telephone to advertise, best furthers the goals of the TCPA to protect consumer privacy interests and to avoid interfering with existing business relationships.

### 3. Interplay Between Established Business Relationship and Do-Not-Call Request

124. In the *2002 Notice*, we sought comment on the effect of a do-not-call request on an established business relationship.[394] We noted the legislative history on this issue, which suggests that despite an established business relationship, a company that has been asked by a consumer not to call again, must honor that request and avoid further calls to that consumer.[395] Consumer advocates who discussed the interplay between the established business relationship and a do-not-call request maintained that a do-not-call request should "trump" an established business relationship,[396] and that consumers should not be required to terminate business relationships in order to stop unwanted telemarketing calls.[397] The majority of industry commenters also supported the notion that companies should honor requests from individual consumers not to be called, regardless of whether there is a business relationship.[398] As discussed earlier, companies will be permitted to call consumers with whom they have an established business relationship for a period of 18 months from the last payment or transaction, even when those consumers are registered on the national do-not-call list, as long as a consumer has not asked to be placed on the company's do-not-call list. Once the consumer asks to be placed on the company-specific do-not-call list, the company may not call the consumer again regardless of **\*14087** whether the consumer continues to do business with the company. This will apply to all services and products offered by that company.[399] If the consumer continues to do business with the telemarketer after asking not to be called (by, for example, continuing to hold a credit card, subscribing to a newspaper, or making a subsequent purchase), the consumer cannot be deemed to have waived his or her company-specific do-not-call request.[400] As described above, we amend the company-specific do-not-call rules to apply to " any call for telemarketing purposes" to make clear that a company must cease making telemarketing calls to any customer who has made a do-not-call request, regardless of whether they have an EBR with that customer.[401] We also adopt a provision stating that a consumer's do-not-call request terminates the EBR for purposes of telemarketing calls even if the consumer continues to do business with the seller.[402]

### VII. TAX-EXEMPT NONPROFIT ORGANIZATION EXEMPTION

#### A. Background

**\*\*44** 125. The term "telephone solicitation," as defined in the TCPA, does not include a call or message "by a tax-exempt nonprofit organization."[403] The Commission concluded, as part of its *1995 Reconsideration Order*, that calls placed by an agent of the telemarketer are treated as if the telemarketer itself placed the call.[404] Therefore, calls made by independent telemarketers on behalf of tax-exempt nonprofits also are not subject to the rules governing telephone solicitations.[405]

126. Over the years, the Commission has received inquiries about calls made jointly by nonprofit and for-profit organizations. In the *2002 Notice*, we described a scenario in which a tax-exempt nonprofit organization calls consumers to sell another company's magazines and receives a portion of the proceeds. We then asked whether such calls should be exempt from the restrictions on telephone solicitations and prerecorded messages as calls made by a tax-exempt **\*14088** nonprofit organization.[406]

127. Tax-exempt nonprofit organizations explained that they rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns. Therefore, they support the continued exemption for professional fundraisers that call on behalf of nonprofit organizations.[407] Many commenters, while supportive of the exemption for calls by nonprofits, were concerned that it frequently has been used to veil what is in reality a commercial venture.[408] Some commenters

Add. 84

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 145 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

emphasized that "the TCPA nonprofit exemption should not function as an artifice for an inherently commercial enterprise." [409] NAAG, for example, maintained that calls that serve to benefit for-profit companies (in whole or in part) are not calls by or on behalf of nonprofits and should remain subject to the TCPA's restrictions. [410] The Association of Fundraising Professionals similarly asserted that this type of nonprofit/for-profit initiative does not represent a "pure" charitable appeal; that the primary purpose of such a transaction is receipt of a product or service by the consumer, not the charitable transfer of funds. [411] One commenter suggested that the test for whether a call is made on behalf of a nonprofit organization should be whether payment is made to the tax-exempt nonprofit organization. [412] DialAmerica, on the other hand, urged the Commission to confirm that the exemption also applies when for-profits call, conduct a commercial transaction, and donate a percentage of the proceeds to nonprofit charitable organizations. [413]

### *14089  B. Discussion

128. We reaffirm the determination that calls made by a for-profit telemarketer hired to solicit the purchase of goods or services or donations on behalf of a tax-exempt nonprofit organization are exempted from the rules on telephone solicitation. [414] In crafting the TCPA, Congress sought primarily to protect telephone subscribers from unrestricted commercial telemarketing activities, finding that most unwanted telephone solicitations are commercial in nature. [415] In light of the record before us, the Commission believes that there has been no change in circumstances that warrant distinguishing those calls made by a professional telemarketer on behalf of a tax-exempt nonprofit organization from those made by the tax-exempt nonprofit itself. The Commission recognizes that charitable and other nonprofit entities with limited expertise, resources and infrastructure, might find it advantageous to contract out its fundraising efforts. [416] Consistent with section 227, a tax-exempt nonprofit organization that conducts its own fundraising campaign or hires a professional fundraiser to do it, will not be subject to the restrictions on telephone solicitations. [417] If, however, a for-profit organization is delivering its own commercial message as part of a telemarketing campaign (*i.e.*, encouraging the purchase or rental of, or investment in, property, goods, or services), [418] even if accompanied by a donation to a charitable organization or referral to a tax-exempt nonprofit organization, [419] that call is not *by or on behalf of a tax-exempt nonprofit organization*. [420] Such calls, whether made by a live telemarketer or using a prerecorded message, would not be entitled to exempt treatment under the TCPA. We emphasize here, as we did in the *2002 Notice*, that the statute and our rules clearly apply already to messages that are predominantly commercial in nature, and that we will not hesitate to consider enforcement action should the provider of an otherwise commercial message seek to immunize itself by simply inserting purportedly "non-commercial" content into that message. A call to sell debt consolidation services, for example, is a commercial call regardless of whether the consumer is also referred to a tax-exempt nonprofit organization for counseling  *14090  services. [421] Similarly, a seller that calls to advertise a product and states that a portion of the proceeds will go to a charitable cause or to help find missing children must still comply with the TCPA rules on commercial calls.

### VIII. AUTOMATED TELEPHONE DIALING EQUIPMENT

#### A. Background

**45  129. The TCPA and Commission's rules prohibit calls using an automatic telephone dialing system (or "autodialer") to emergency telephone lines, to the telephone line of a guest room of a health care facility, to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call. [422] Section 227 defines automatic telephone dialing system as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." [423] In the *2002 Notice*, the Commission explained that more sophisticated dialing systems, such as predictive dialers

Add. 85

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 146 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

and answering machine detection software, are now widely used by telemarketers to increase productivity. We invited comment on these and other technologies and asked whether they fall within the restrictions on "automatic telephone dialing systems." [424]

130. Most industry members that commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of "automatic telephone dialing system," primarily because, they contend, predictive dialers do not dial numbers "randomly or sequentially." [425] Rather, they state that predictive dialers store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers. [426] Most consumers and consumer groups maintain that predictive dialers are autodialers; that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference. [427] **\*14091** They argue that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers. [428] A few commenters contend that even when a database of numbers is used, the numbers can be dialed in sequence. [429] In addition, LCC urges the Commission to clarify that modems used for non-telemarketing purposes are excluded from the definition of "automatic telephone dialing system." [430]

### B. Discussion

### 1. Predictive Dialers

131. _Automated Telephone Dialing Equipment_. The record demonstrates that a predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. [431] The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. [432] As commenters point out, in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call. [433] The principal feature of predictive dialing software is a timing function, not number storage or generation. Household Financial Services states that these machines are not conceptually different from dialing machines without the predictive computer program attached. [434]

**\*\*46** 132. The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." [435] The statutory definition **\*14092** contemplates autodialing equipment that either stores or produces numbers. It also provides that, in order to be considered an "automatic telephone dialing system," the equipment need only have the "_capacity_ to store or produce telephone numbers (emphasis added)...." It is clear from the statutory language and the legislative history that Congress anticipated that the FCC, under its TCPA rulemaking authority, might need to consider changes in technologies. [436] In the past, telemarketers may have used dialing equipment to create and dial 10-digit telephone numbers arbitrarily. As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. [437] The basic function of such equipment, however, has not changed–the _capacity_ to dial numbers without human intervention. We fully expect automated dialing technology to continue to develop.

133. The legislative history also suggests that through the TCPA, Congress was attempting to alleviate a particular problem– an increasing number of automated and prerecorded calls to certain categories of numbers. [438] The TCPA does not ban the use of technologies to dial telephone numbers. It merely prohibits such technologies from dialing emergency numbers, health care facilities, telephone numbers assigned to wireless services, and any other numbers for which the consumer is charged for the call. [439] Such practices were determined to threaten public safety and inappropriately shift marketing costs from sellers to consumers. [440] Coupled with the fact that autodialers can dial thousands of numbers in a short period of time, calls to these

Add. 86

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 147 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

specified categories of numbers are particularly troublesome. Therefore, to exclude from these restrictions equipment that use predictive dialing software from the definition of "automated telephone dialing equipment" simply because it relies on a given set of numbers would lead to an unintended result. Calls to emergency numbers, health care facilities, and wireless numbers would be permissible when the dialing equipment is paired with predictive dialing software and a database of numbers, but prohibited when the equipment operates independently of such lists and software packages. We believe the purpose of the **\*14093** requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented.[441] Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of " automatic telephone dialing equipment" and the intent of Congress.[442]

**\*\*47** 134. _Predictive Dialers as Customer Premises Equipment_. A few commenters maintain that predictive dialers are Customer Premises Equipment (CPE)[443] over which the Communications Act gives the FCC exclusive jurisdiction.[444] The ATA and DMA urge the Commission to assert exclusive authority over CPE and, in the process, preempt state laws governing predictive dialers. They contend that, in the absence of a single national policy on predictive dialer use, telemarketers will be subject to the possibility of conflicting state standards.[445] In the past, CPE was regulated as a common carrier service based on the Commission's jurisdiction and statutory responsibilities over _carrier-provided_ equipment.[446] The Commission long ago deregulated CPE, finding that the CPE market was becoming increasingly competitive, and that in order to increase further the options that consumers had in obtaining equipment, it would require common carriers to separate the provision of CPE from the provision of telecommunications services.[447] As part of its review of CPE regulations, the Commission pointed out that it had never regarded the provision of terminal equipment in **\*14094** isolation as an activity subject to Title II regulation.[448] While the Commission recognized that such equipment is within the FCC's authority over wire and radio communications,[449] it found that the equipment, by itself, is not a "communication" service, and therefore there was no mandate that it be regulated.[450] None of the commenters who argue this point describe a change in circumstances that would warrant reevaluating the Commission's earlier determination and risk disturbing the competitive balance the Commission deemed appropriate in 1980.[451] In addition, it is not the equipment itself that states are considering regulating; it is the use of such equipment that has caught the attention of some state legislatures.[452] We believe it is preferable at this time to regulate the use of predictive dialers under the TCPA's specific authority to regulate telemarketing practices. Therefore, we decline to preempt state laws governing the use of predictive dialers and abandoned calls or to regulate predictive dialers as CPE.

### 2. "War Dialing"

135. In the _2002 Notice_, the Commission sought comment on the practice of using autodialers to dial large blocks of telephone numbers in order to identify lines that belong to telephone facsimile machines. Of those commenters who weighed in on "war dialing,"[453] there was unanimous support for a ban on the practice.[454] Commenters explained that ringing a **\*14095** telephone for the purpose of determining whether the number is associated with a fax or voice line is an invasion of consumers' privacy interests and should be prohibited. Moreover, they asserted there is no free speech issue when the caller has no intention of speaking with the called party.[455] The TCPA prohibits the transmission of unsolicited facsimile advertisements absent the consent of the recipient. The Commission agrees that because the purpose of "war dialing" is to identify those numbers associated with facsimile machines, the practice serves few, if any, legitimate business interests and is an intrusive invasion of consumers' privacy. Therefore, the Commission today adopts a rule that prohibits the practice of using any technology to dial any telephone number for the purpose of determining whether the line is a fax or voice line.[456]

### IX. ARTIFICIAL OR PRERECORDED VOICE MESSAGES

#### A. Background

Add. 87

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 148 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*48**  136. As described above, the TCPA and Commission rules prohibit telephone calls to residences using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is specifically exempted. [457]  The TCPA permits the Commission to exempt from this provision calls which are non-commercial and commercial calls which do not adversely affect the privacy rights of the called party and which do not transmit an unsolicited advertisement. [458]  In its 1992 proceeding, the Commission determined to exempt calls that are non-commercial and commercial calls that do not contain an unsolicited advertisement, noting that messages that do not seek to sell a product or service do not tread heavily upon the consumer interests implicated by section 227. [459]  The Commission also concluded that a solicitation to someone with whom a prior business relationship exists does not adversely affect subscriber privacy interests, and adopted an exemption for prerecorded messages delivered to consumers with whom a company has an established business relationship. [460]  Finally, the Commission concluded that tax-exempt nonprofit organizations should be exempt from the prohibition on prerecorded message calls to residences as non-commercial calls. [461]  In the *2002 Notice,* the Commission sought comment on  **\*14096**  artificial or prerecorded messages containing offers for free goods or services and messages purporting to provide "information only" about products or services. We also invited comment on calls seeking people to help sell or market a business' products. We asked whether such messages should be viewed as advertisements under the rules.

137. The record reveals that the practice of sending prerecorded messages to residential telephone lines is widespread. [462] Consumers are frustrated by such messages, which often fill up the tapes of their answering machines, [463]  fail to identify adequately the company delivering the message, and provide no option for requesting that the company not call again. [464] When consumers attempt to place their numbers on a do-not-call list in response to a prerecorded message, they often reach busy signals, [465]  additional prerecorded messages, or are told that do-not-call requests are not processed at that number. [466] Consumers also indicate that they have been told by telemarketers that "free" offers and informational messages are not subject to the prerecorded message prohibition, as they do not ask the called party to purchase any product or service. [467]

138. The majority of consumers and consumer groups contend that messages offering "free" goods or services or those that claim to provide information-only are designed with the ultimate goal of soliciting consumers to buy products and services and are therefore prohibited without the prior express consent of the called party. [468]  These messages, they argue, are intended to generate future sales, and the fact that no sale occurs during the call is irrelevant to their intrusiveness. [469]  Industry members provided very few examples of prerecorded messages used to  **\*14097**  deliver advertisements. Instead, they described the benefits of communicating with existing customers through prerecorded messages. Commenters specifically cautioned the Commission against restricting "dual purpose" calls which, they contend, provide both a convenient customer service and cost effective marketing tool. [470]  One company explained that it uses prerecorded messages to notify its customers about delinquent bills or changes in service, and to simultaneously inform them of alternative services and products. [471]  Another commenter described messages sent by a mortgage broker alerting homeowners to lower interest rates and offering refinancing options. [472]

### B. Discussion

### 1. Offers for Free Goods or Services; Information-Only Messages

 **\*\*49**  139. Congress found that "residential telephone subscribers consider automated or prerecorded telephone calls ... to be a nuisance and an invasion of privacy." [473]  It also found that "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." [474]  Congress determined that such prerecorded messages cause greater harm to consumers' privacy than

Add. 88

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 149 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

telephone solicitations by live telemarketers. The record reveals that consumers feel powerless to stop prerecorded messages largely because they are often delivered to answering machines and because they do not always provide a means to request placement on a do-not-call list.

140. Additionally, the term "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." [475] The TCPA's definition does not require a sale to be made during the call in order for the message to be considered an advertisement. Offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute "advertising the commercial availability or quality of any property, goods, or services." [476] Therefore, the Commission finds **14098** that prerecorded messages containing free offers and information about goods and services that are commercially available are prohibited to residential telephone subscribers, if not otherwise exempted. [477]

141. In addition, we amend the prerecorded message rule at 47 C.F.R. § 64.1200(c)(2) so that the prohibition expressly applies to messages that constitute "telephone solicitations," as well as to those that include or introduce an "unsolicited advertisement." [478] We agree with those commenters who suggest that application of the prerecorded message rule should turn, not on the caller's characterization of the call, but on the purpose of the message. [479] Amending the rule to apply to messages that constitute "telephone solicitations," is consistent with the goals of the TCPA [480] and addresses the concerns raised by commenters about purported "free offers." [481] In addition, we believe the amended rule will afford consumers a greater measure of protection from unlawful prerecorded messages and better inform the business community about the general prohibition on such messages. [482]

142. The so-called "dual purpose" calls described in the record–calls from mortgage brokers to their clients notifying them of lower interest rates, calls from phone companies to customers regarding new calling plans, or calls from credit card companies offering overdraft protection to existing customers–would, in most instances, constitute "unsolicited advertisements," regardless of the customer service element to the call. [483] The Commission explained in the *2002 Notice* that such messages may inquire about a customer's satisfaction with a product already purchased, but are motivated in part by the desire to ultimately sell additional goods or services. If the call is intended to offer property, goods, or services for sale either during the call, or in the future (such as in response to a message that provides a toll-free number), that call is an advertisement. Similarly, a message that seeks people to help sell or **14099** market a business' products, constitutes an advertisement if the individuals called are encouraged to purchase, rent, or invest in property, goods, or services, during or after the call. However, the Commission points out that, if the message is delivered by a company that has an established business relationship with the recipient, it would be permitted under our rules. We also note that absent an established business relationship, the telemarketer must first obtain the prior express consent of the called party in order to lawfully initiate the call. Purporting to obtain consent during the call, such as requesting that a consumer "press 1" to receive further information, does not constitute the *prior* consent necessary to deliver the message in the first place, as the request to "press 1" is part of the telemarketing call.

### 2. Identification Requirements

**\*\*50** 143. The TCPA rules require that all artificial or prerecorded messages delivered by an automatic telephone dialing system identify the business, individual, or other entity initiating the call, and the telephone number or address of such business, individual or other entity. [484] Additionally, the Commission's rules contain identification requirements that apply without limitation to "any telephone solicitation to a residential telephone subscriber." [485] The term "telephone solicitation" is defined to mean "the initiation of a telephone call or *message* for the purpose of encouraging the purchase or rental of ... property, goods, or services ..." (emphasis added). [486] We sought comment, however, on whether we should modify our rules to state

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 150 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

expressly that the identification requirements apply to otherwise lawful artificial or prerecorded messages, as well as to live solicitation calls. [487]

144. The vast majority of consumer and industry commenters support modifying the rules to provide expressly that telemarketers must comply with the identification requirements when delivering prerecorded messages. [488] Some consumers urge the Commission to require specifically that companies provide the name of the company under which it is registered to do business. [489] They explain that a company will often use a "d/b/a" ("doing business as") or "alias" in the text of the prerecorded message, making it difficult to identify the company calling. The Commission recognizes that adequate identification information is vital so that consumers can determine the purpose of the call, possibly make a do-not-call request, and monitor compliance with the TCPA rules. [490] Therefore, we are amending our rules to expressly require **\*14100** that all prerecorded messages, whether delivered by automated dialing equipment or not, identify the name of the business, individual or other entity that is responsible for initiating the call, along with the telephone number of such business, other entity, or individual. [491] With respect to the caller's name, the prerecorded message must contain, at a minimum, the legal name under which the business, individual or entity calling is registered to operate. The Commission recognizes that some businesses use " d/b/as" or aliases for marketing purposes. The rule does not prohibit the use of such additional information, provided the legal name of the business is also stated. The rule also requires that the telephone number stated in the message be one that a consumer can use during normal business hours to ask not to be called again. [492] If the number provided in the message is that of a telemarketer hired to deliver the message, the company on whose behalf the message is sent is nevertheless liable for failing to honor any do-not-call request. This is consistent with the rules on live solicitation calls by telemarketers. [493] If a consumer asks not to be called again, the telemarketer must record the do-not-call request, and the company on whose behalf the call was made must honor that request.

### 3. Radio Station and Television Broadcaster Calls

**\*\*51** 145. The TCPA prohibits the delivery of prerecorded messages to residential telephone lines without the prior express consent of the called party. [494] Commission rules exempt from the prohibition calls that are made for a commercial purpose but do not include any unsolicited advertisement. [495] The Commission sought comment on prerecorded messages sent by radio stations or television broadcasters that encourage telephone subscribers to tune in at a particular time for a chance to win a prize or similar opportunity. [496] We asked whether the Commission should specifically address these kinds of calls, and if so, how. The record reveals that such calls by radio stations and television broadcasters do not at this time warrant the adoption of new rules. Few commenters in this proceeding described either receiving such messages or that they **\*14101** were particularly problematic. [497] The few commenters who addressed the issue were split on whether such messages fall within the TCPA's definition of "unsolicited advertisement" and are thus subject to the restrictions on their delivery. [498] We conclude that if the purpose of the message is merely to invite a consumer to listen to or view a broadcast, such message is permitted under the current rules as a commercial call that "does not include the transmission of any unsolicited advertisement" and under the amended rules as "a commercial call that does not include or introduce an unsolicited advertisement or constitute a telephone solicitation." [499] The Commission reiterates, however, that messages that are part of an overall marketing campaign to encourage the purchase of goods or services or that describe the commercial availability or quality of any goods or services, are "advertisements" as defined by the TCPA. Messages need not contain a solicitation of a sale during the call to constitute an advertisement.

### X. ABANDONED CALLS

### A. Background

Add. 90

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 151 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

146. In the *2002 Notice,* the Commission noted that various technologies are widely used by telemarketers to contact greater numbers of consumers more efficiently.[500] We explained that the use of one such technology–predictive dialing software–may result in a significant number of abandoned calls.[501] Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call. In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead **\*14102** air."[502] Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call. Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate.[503] The higher the abandonment rate, the higher the number of hang-up calls. The Commission asked what approaches we might take to minimize the harm that results from the use of predictive dialers.[504] We invited comment specifically on the possibility of setting a maximum rate on the number of abandoned calls.[505]

 **\*\*52** 147. The record shows that the use of predictive dialers has, in fact, become more prevalent in the telemarketing industry.[506] The record also reveals that predictive dialers are responsible for the vast majority of abandoned telemarketing calls–both hang-ups and "dead air" calls. Individual consumers report receiving between three and ten hang-up calls each day.[507] Consumers often feel harassed or aggravated by "dead air" calls.[508] Many describe the burdens these calls impose on individuals with disabilities, who often struggle to answer the telephone.[509] Hang-ups and "dead air" calls also can be frightening for the elderly.[510] Consumers complain that they do not have an opportunity to request placement on a company's do-not-call list when predictive dialers disconnect calls.[511] Abandoned calls can also interfere with Internet usage or simply tie-up telephone lines for people telecommuting or operating businesses out of the **\*14103** home.[512] Many consumer groups contend that the only way to effectively alleviate these harms is to implement a zero abandonment rate on calls delivered by predictive dialers, or one as close to zero as possible.[513] Other consumer advocates support a ban on predictive dialers altogether.[514]

148. Telemarketers acknowledge that use of predictive dialers results in a certain percentage of dropped calls.[515] But they contend that predictive dialers are a valuable tool for increasing productivity and lowering costs for telemarketers and, ultimately, for consumers.[516] Some industry members oppose restrictions on the use of predictive dialers, maintaining that the industry has "natural incentives" to keep abandonment rates low to avoid alienating consumers.[517] Others contend that a set rate would not account for the needs of various telemarketing campaigns.[518] While many telemarketers maintain that a maximum abandonment rate would eliminate the benefits that result from the use of predictive dialers,[519] most would nevertheless support a call abandonment rate of 5 percent.[520] A few commenters, including the DMA, would not oppose a 3 percent maximum rate.[521] One industry commenter, who supported a set abandonment rate on predictive dialers, stated that if non-telemarketing entities continue to dial without restriction, consumers will be encouraged to join do-not-call lists.[522]

149. In its telemarketing proceeding, the FTC determined that a total ban on abandoned calls would amount to a ban on predictive dialers, and would not strike the proper balance between addressing an abusive practice and allowing for a technology that reduces costs for **\*14104** telemarketers.[523] The FTC's amended Rule prohibits abandoned calls,[524] but provides in a "safe harbor" that a seller or telemarketer will not be deemed to have violated the TSR if the seller or telemarketer can show that its conduct conforms to certain specified standards, including a call abandonment rate of no more than three (3) percent, measured on a per day per campaign basis.[525]

**B. Discussion**

Add. 91

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 152 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*53**  150. Given the arguments raised on both sides of this issue as well as the FTC's approach to the problem, the Commission has determined to adopt a rule to reduce the number of abandoned calls consumers receive.[526] Under the new rules, telemarketers must ensure that any technology used to dial telephone numbers abandons no more than three (3) percent of calls answered by a person, measured over a 30-day period. A call will be considered abandoned if it is not transferred to a live sales agent within two (2) seconds of the recipient's completed greeting. When a call is abandoned within the three (3) percent maximum allowed, a telemarketer must deliver a prerecorded identification message containing only the telemarketer's name, telephone number, and notification that the call is for "telemarketing purposes." To allow time for a consumer to answer the phone, the telemarketer must allow the phone to ring for **\*14105** fifteen seconds or four rings before disconnecting any unanswered call. Finally, telemarketers using predictive dialers must maintain records that provide clear and convincing evidence that the dialers used comply with the three (3) percent call abandonment rate, "ring time" and two-second-transfer rule.

### 1. Maximum Rate on Abandoned Calls

151. The Commission believes that establishing a maximum call abandonment rate is the best option to reduce effectively the number of hang-ups and "dead air" calls consumers experience. We recognize that industry generally advocates a five percent abandonment rate, claiming that a rate lower than five percent would reduce efficiencies the technology provides.[527] However, the Commission is not convinced that a five percent rate will lead to a reasonable reduction in the number of abandoned calls. The DMA's current guideline, cited by many commenters, calls for an abandonment rate of no higher than five percent.[528] And several telemarketers maintain that they now utilize an abandonment rate of five percent or lower in their calling campaigns.[529] Consumers nevertheless report receiving as many as 20 dropped calls per day that interrupt dinners, interfere with home business operations, and sometimes frighten the elderly and parents with young children.[530] A rule that is consistent with the FTC's will effectively create a national standard with which telemarketers must comply and should lead to fewer abandoned calls, while permitting telemarketers to continue to benefit from such technology. It is also responsive to Congress' mandate in the Do-Not-Call Act to maximize consistency with the FTC's rules.

152. The three percent abandonment rate will be measured over a 30-day period, a standard supported by several industry commenters.[531] Industry members maintain that measuring the abandonment rate on a per day basis would severely curtail the efficiencies gained from the use of predictive dialers, and may be overly burdensome to smaller telemarketers. A per day measurement, they argue, would not account for short-term fluctuations in marketing campaigns.[532] They further argue that the impact of abandoned calls on consumers depends more **\*14106** on the aggregate number of contacts made by a telemarketer over time and not on the number in any given day.[533] The Commission believes that a three (3) percent abandonment rate measured over a 30-day period will ensure that consumers consistently receive fewer disconnected calls, and that telemarketers are permitted to manage their calling campaigns effectively under the new rules on abandoned calls. Although we recognize that this rate of measurement differs from the FTC's rule, we believe a rate measured over a longer period of time will allow for variations in telemarketing campaigns such as calling times, number of operators available, number of telephone lines used by the call centers, and other similar factors.[534] The record also suggests that an abandonment rate measured over a 30-day period will allow telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers.[535]

### 2. Two-Second-Transfer Rule

**\*\*54**  153. The record confirms that many consumers are angered by the "dead air" they often face when answering the telephone. Running to the telephone only to be met by silence can be frustrating and even frightening, if the caller cannot be identified.[536] To address the problem of "dead air" produced by dialing technologies, the Commission has determined that a

Add. 92

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 153 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

call will be considered abandoned if the telemarketer fails to connect the call to a sales representative within two (2) seconds of the person's completed greeting. [537] Calls disconnected because they were never answered (within the required 15 seconds or 4 rings) or because they received busy signals will not be considered abandoned. [538] This requirement is consistent with the FTC's rule. [539]

154. _Answering Machine Detection_. Opposition from industry to the two-second-transfer requirement appears to be based largely on its implications for use of Answering Machine Detection (AMD). [540] Some industry members explain that AMD is used by telemarketers to detect answering machines, and thereby avoid leaving messages on them. [541] The **\*14107** ATA and DMA maintain that if telemarketers are required to connect to a sales agent or message within 1-2 seconds, a large percentage of calls reaching answering machines will be transferred to sales agents, thereby reducing the efficiencies gained from AMD. [542] According to these commenters, 1-2 seconds is often insufficient for AMD to determine accurately if the call has reached an answering machine. [543] Other commenters explain that AMD is used instead by telemarketers to transmit prerecorded messages to answering machines; in such circumstances, calls that reach live persons are disconnected. [544] It is unclear from the record how prevalent the use of AMD is in the telemarketing industry. One commenter stated that the elimination of AMD would put "consumer-oriented" telemarketing firms out of business. [545] However, other industry members acknowledge that AMD contributes significantly to the amount of "dead air" consumers experience, [546] and one large telemarketing firm maintains that AMD should be banned completely. [547] The Commission believes that the record does not warrant a ban on the use of AMD. Instead, if the AMD technology is deployed in such a way that the delay in transfer time to a sales agent is limited to two seconds, then its continued use should not adversely affect consumers' privacy interests. [548]

### \*14108  3. Prerecorded Message for Identification

155. As noted above, the FTC's "safe harbor" provisions require that, when a sales agent is unavailable to speak to a person answering the phone, marketers deliver a prerecorded message that states the name and telephone number of the seller on whose behalf the call was made. [549] The Commission has similarly determined that when a telemarketer abandons a call under the three (3) percent rate allowed, the telemarketer must deliver a prerecorded message containing the name of the business, individual or other entity initiating the call, as well as the telephone number of such business, individual or other entity. The message must also state that the call is for "telemarketing purposes." [550] We recognize that many consumers are frustrated with prerecorded messages. [551] However, the record also reveals that consumers are frightened and angered by "dead air" calls and repeated hang-ups. A prerecorded message, limited to identification information only, should mitigate the harms that result from "dead air," as consumers will know who is calling them. [552] And, they will more easily be able to make a do-not-call request of a company by calling the number provided in the message. We note that such messages sent in excess of the three (3) percent allowed under the call abandonment rate, will be considered abandoned calls, unless otherwise permitted by our rules. The content of the message must be limited to name and telephone number, along with a notice to the called party that the call is for "telemarketing purposes." The message may not be used to deliver an unsolicited advertisement. [553] We caution that additional information in the prerecorded message constituting an unsolicited advertisement would be a violation of our rules, if not otherwise permitted under 47 C.F.R. § 64.1200(a)(2). [554]

### 4. Established Business Relationship

**\*\*55** 156. While the TCPA prohibits telephone calls to residential phone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, the Commission determined that the TCPA permits an exemption for established business **\*14109** relationship calls from the restriction on artificial or prerecorded message calls to

Add. 93

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 154 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

residences. [555] As discussed in detail above, the record reveals that an established business relationship exemption is necessary to allow companies to contact their existing customers. [556] Companies currently use prerecorded messages, for example, to notify their customers about new calling plans, new mortgage rates, and seasonal services such as chimney sweeping and lawn care. [557] Therefore, prerecorded messages sent by companies to customers with whom they have an established business relationship will not be considered " abandoned" under the revised rules, if they are delivered within two (2) seconds of the person's completed greeting. Similarly, any messages initiated with the called party's prior express consent and delivered within two (2) seconds of the called person's completed greeting are not "abandoned" calls under the new rules. [558] Such messages must identify the business, individual or entity making the call and contain a telephone number that a consumer may call to request placement on a do-not-call list. We recognize that the established business relationship exception to the prohibition on prerecorded messages conflicts with the FTC's amended rule. [559] However, for the reasons described above, we believe the current exception is necessary to avoid interfering with ongoing business relationships.

### 5. Ring Duration

157. The Commission also adopts a requirement that telemarketers allow the phone to ring for 15 seconds or four (4) rings before disconnecting any unanswered call. This standard is consistent with that of the FTC, similar to current DMA guidelines, [560] and used by some telemarketers already. [561] One industry commenter asserted that telemarketers often set the predictive dialers to ring for a very short period of time before disconnecting the call; in such cases, the predictive dialer does not record the call as having been abandoned. [562] The practice of ringing and then disconnecting the call before the consumer has an opportunity to answer the phone is intrusive of consumer privacy and serves only to increase efficiencies for telemarketers. Moreover, in discussing the interplay between the FTC's rules with the Commission's rules, **\*14110** very few commenters opposed the "ring time" requirement adopted by the FTC, [563] or raised any particular concerns about how it might work in the TCPA framework. Therefore, given the substantial interest in protecting consumers' privacy interests, as well as Congress's direction to maximize consistency with the FTC's rules, we have determined to adopt the 15 second or four (4) ring requirement.

**\*\*56** 158. Finally, consistent with the FTC's rules, the Commission has determined that telemarketers must maintain records establishing that the technology used to dial numbers complies with the three (3) percent call abandonment rate, "ring time," and two-second rule on connecting to a live sales agent. Telemarketers must provide such records in order to demonstrate compliance with the call abandonment rules. Only by adopting a recordkeeping requirement will the Commission be able to adequately enforce the rules on the use of predictive dialers.

159. The TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls, and therefore exempts calls or messages by tax-exempt nonprofit organizations from the definition of telephone solicitation. [564] Therefore, the Commission has determined not to extend the call abandonment rules to tax-exempt nonprofit organizations in the absence of further guidance from Congress. [565] However, the call abandonment rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and consumer will not be an exception to these rules. For these entities, the call abandonment rules will become effective on October 1, 2003. We decline to establish an effective date beyond October 1, 2003, which is consistent with the date that telemarketers must comply with the FTC's call abandonment rules. [566] This should permit telemarketers to make any modifications to their autodialing equipment or purchase any new software to enable them to comply with the three (3) percent call abandonment rate, the prerecorded message requirement and the two-second-transfer rule.

### XI. WIRELESS TELEPHONE NUMBERS

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 155 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

### A. Background

160. In the *2002 Notice*, the Commission noted that the TCPA permits the Commission to exempt from the restrictions on autodialer or prerecorded message calls, "calls to a telephone number assigned to a cellular telephone service that are not charged to the called party, subject to **\*14111** such conditions as the Commission may prescribe as necessary in the interest of the privacy rights [the TCPA] is intended to protect." [567] In the *1992 TCPA Order*, the Commission concluded that calls made by *cellular carriers* to their subscribers for which the subscribers were not charged do not fall within the prohibitions on autodialers or prerecorded messages. [568] We sought comment on the extent to which telemarketing to wireless consumers exists today and if so, the nature and frequency of such solicitations. [569] We asked whether there are other types of calls to wireless telephone numbers that are not charged to the called party, and whether such calls also should not fall within the prohibitions on autodialers or prerecorded messages. [570] We also sought comment on any developments anticipated in the near future that may affect telemarketing to wireless phone numbers. Specifically, we asked how telemarketers will identify wireless numbers in order to comply with the TCPA when consumers are able to port numbers from their wireline phones to wireless phones, [571] or receive numbers from a thousands-block [572] that was part of a central office code previously assigned to a wireline carrier. [573] The Commission further sought comment on whether the Commission's rules should be modified to facilitate telemarketers' efforts to comply with the TCPA.

**\*\*57** 161. *Local Number Portability and Pooling.* The Commission's local number portability (LNP) decisions date back to 1996, with the Commission granting a number of extensions to the effective date for wireless carriers, providing the industry and other interested parties with extensive advance notice of the impending implementation of wireless LNP. The Commission determined in the *Number Portability First Report and Order* that LECs and certain CMRS providers operating in the 100 largest MSAs must offer local number portability, according to a phased deployment schedule. [574] This requirement was subsequently limited by the *Number Portability First Order on Reconsideration*, in which the Commission concluded that LECs and covered CMRS providers were required only to deploy LNP within switches for which **\*14112** another carrier has made a specific request for the provision of LNP. [575] CMRS carriers are required to implement LNP on November 24, 2003, for switches in the top 100 MSAs requested by February 24, 2003. [576] After November 24, 2003, CMRS carriers have 30 to 180 days from the request date to implement number portability for switches in the top 100 MSAs not previously requested and for switches outside the top 100 MSAs. [577]

162. In the *Numbering Resource Optimization First Report and Order*, the Commission established national thousands-block number pooling (pooling) as an LNP-based numbering resource optimization measure designed to help slow the pace of area code and North American Numbering Plan (NANP) exhaust. [578] This measure involves breaking up the 10,000 numbers in an NXX into ten sequential blocks of 1,000 numbers each, and allocating each thousands-block to a different service provider, and possibly a different switch, within the same rate center. The Commission mandated participation in national pooling by all carriers that are required to be LNP-capable, because it believed that LNP capability was required before a carrier could participate in thousands-block number pooling. [579] In the *Numbering Resource Optimization Fourth Report and Order*, the Commission determined that thousands-block number pooling need not be linked to a carrier's ability to provide LNP because a carrier can participate in pooling once it deploys the location routing number architecture. [580] The Commission, therefore, concluded that all carriers, except those specifically exempted, are required to participate in thousands-block number pooling in accordance with the national rollout schedule, [581] regardless of whether they are required to provide LNP, including covered CMRS **\*14113** providers. [582]

163. *Telemarketing to Wireless Numbers.* The record suggests that while consumers receive telemarketing calls on their wireless phones, it is not a widespread practice at this time. [583] However, some industry members believe that telemarketing calls to

Add. 95

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 156 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

wireless numbers are likely to increase, [584] particularly as growing numbers of consumers use wireless phones as their primary phones. [585] One commenter pointed out that the record in this proceeding demonstrates that telemarketers would like to solicit consumers on their wireless phones. [586] Although the record does not reflect the full panoply of methods telemarketers currently use to avoid calling wireless telephone numbers, the record provides a sampling of such methods. [587] For example, the Direct Marketing Association's (DMA) Telephone Preference Service allows consumers to opt-out of national telemarketing lists, allowing consumers to register their wireless phone numbers in order to ensure that they do not receive telemarketing calls on their wireless phones. [588] Additionally, the DMA has created the "Wireless Telephone Suppression Service." [589] A number of commenters contended that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful. [590] Commenters also state that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers. [591]

**58   *14114   164. Most consumer groups maintain that all telemarketing calls to wireless numbers should be prohibited, regardless of whether they are made using an autodialer, prerecorded message, or live sales agent. [592] The vast majority of consumer advocates contend that telemarketing calls to cell phones are as intrusive of consumers' privacy interests as calls to landline phones. [593] Some believe they are more so, as consumers carry their cell phones on their persons, to work, and while driving. [594] Some also contend the prohibition should apply whether the consumer incurs a per-minute charge or a reduction from a "bucket" of minutes purchased at a fixed rate. [595] A few industry commenters agree that wireless subscribers should be protected from telemarketing calls to their wireless numbers. [596] Other industry members contend that wireless phones should be treated like wireline phones, in part because of the difficulty in distinguishing between wireline and wireless numbers. [597] American General Finance argues that the incremental cost of receiving a cell phone call is not significantly different from the cost of receiving a non-cellular call. [598] Some commenters suggest permitting calls to wireless numbers when there is an established business relationship, [599] when the calls are made for survey research purposes, [600] or when consumers have provided their cell phone numbers to the calling entity. [601] The ATA urges the Commission to find that calls to cellular telephones are not "charged to the called party" as contemplated by the TCPA's restriction on autodialed calls. [602]

### *14115   B. Discussion

### 1. Telemarketing Calls to Wireless Numbers

165. We affirm that under the TCPA, it is unlawful to make *any call* using an automatic telephone dialing system or an artificial or prerecorded message to any wireless telephone number. [603] Both the statute and our rules [604] prohibit these calls, with limited exceptions, "to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other common carrier service, or any service for which the called party is charged." [605] This encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls, provided the call is made to a telephone number assigned to such service. [606] Congress found that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls. [607] Moreover, such calls can be costly and inconvenient. [608] The Commission has long recognized, and the record in this proceeding supports the same conclusion, that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used. [609] Wireless subscribers who purchase a large "bucket" of minutes at a fixed rate nevertheless are charged for those minutes, and for any minutes that exceed the "bucket" allowance. This "bucket" could be exceeded more quickly if consumers receive numerous unwanted telemarketing calls. [610] Moreover, as several commenters point out, telemarketers have no way to determine how consumers are charged for their wireless service.

Add. 96

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 157 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*59** **\*14116** 166. Although the same economic and safety concerns apply to all telephone solicitation calls received by wireless subscribers, the Commission has determined not to prohibit all live telephone solicitations to wireless numbers. [611] The national do-not-call database will allow for the registration of wireless telephone numbers for those subscribers who wish to avoid live telemarketing calls to their wireless phones. Wireless subscribers thus have a simple means of preventing most live telemarketing calls if they so desire. [612] Moreover, relying on the do-not-call database to control live telephone solicitations recognizes that prohibiting such calls to wireless numbers may unduly restrict telemarketers' ability to contact those consumers who do not object to receiving telemarketing calls [613] and use their wireless phones as either their primary or only phone. [614]

167. The Commission's rules provide that companies making telephone solicitations to residential telephone subscribers must comply with time of day restrictions and must institute procedures for maintaining do-not-call lists. [615] For the reasons described above, [616] we conclude that these rules apply to calls made to wireless telephone numbers. We believe that wireless subscribers should be afforded the same protections as wireline subscribers. [617]

### 2. Wireless Number Portability and Pooling

168. Based on the evidence in the record, we find that it is not necessary to add rules to implement the TCPA as a result of the introduction of wireless LNP and thousands-block number pooling. The TCPA rules prohibiting telemarketers from placing autodialed and prerecorded message calls to wireless numbers have been in place for twelve years. [618] Further, the Commission's pooling requirements have been in place for several years and the porting requirements have been in place for over five years. Accordingly, telemarketers have received sufficient notice of these requirements in order to develop business practices that will allow them to continue to comply with the TCPA.

**\*14117** 169. Additionally, telemarketers have taken measures in the past to identify wireless numbers, and there is no indication that these measures would not continue to be effective for identifying wireless numbers affected by pooling and porting. As noted above, the industry currently makes use of a variety of tools to enable it to avoid making prohibited calls. As discussed in detail *supra*, [619] the record provides a sampling of methods, including the DMA's "Wireless Telephone Suppression Service," that telemarketers use to avoid making prohibited calls to wireless numbers. [620]

170. LNP and pooling do not make it impossible for telemarketers to comply with the TCPA. The record demonstrates that information is available from a variety of sources to assist telemarketers in determining which numbers are assigned to wireless carriers. For example, NeuStar as the North American Numbering Plan Administrator, the National Pooling Administrator, and the LNP Administrator makes information available that can assist telemarketers in identifying numbers assigned to wireless carriers. Also, other commercial enterprises such as Telcordia, the owner-operator of the Local Exchange Routing Guide (LERG) maintain information that can assist telemarketers in identifying numbers assigned to wireless carriers. We acknowledge that beginning November 24, 2003, numbers previously used for wireline service could be ported to wireless service providers and that telemarketers will need to take the steps necessary to identify these numbers. We also note that there are various solutions that will enable telemarketers to identify wireless numbers in a pooling and number portability environment. We decline to mandate a specific solution, but rather rely on the telemarketing industry to select solutions that best fit telemarketers' needs. The record demonstrates that telemarketers have found adequate methods in the past to comply with the TCPA's prohibition on telephone calls using an autodialer or an artificial or prerecorded voice message to any telephone number assigned to a cellular telephone service, a paging service, or any service for which the called party is charged for the call. We expect telemarketers to continue to make use of the tools available in the marketplace in order to ensure continued compliance with the TCPA. [621]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 158 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**60** 171. Moreover, the record indicates that telemarketing to wireless phones is not a significant problem, indicating that the industries' voluntary efforts have been successful. [622] Commenters further declare that the wireless and telemarketing industries have been actively working together to ensure that telemarketing does not become a problem for wireless customers.

172. Finally, we reject proposals to create a good faith exception for inadvertent autodialed or prerecorded calls to wireless numbers and proposals to create implied consent because we find that there are adequate solutions in the marketplace to enable telemarketers to **14118** identify wireless numbers. [623]

## XII. CALLER IDENTIFICATION

### A. Background

173. In the *1992 TCPA Order*, the Commission considered whether to require telemarketers to use a special area code or telephone number prefix that would allow consumers to block unwanted telephone solicitations using a caller identification (caller ID) service. Based on cost and the "technological uncertainties associated with implementation," the Commission declined to adopt any type of network technologies to accomplish the objectives of the TCPA. [624]

174. In the *2002 Notice*, the Commission sought comment on whether network technologies have been developed over the last decade that may allow consumers to avoid receiving unwanted telephone solicitations. The Commission sought comment specifically on whether to require telemarketers to transmit the name and telephone number of the calling party, when possible, or prohibit them from blocking or altering the transmission of such information. [625] Comments filed by consumers, state utility commissions, and wireless service providers generally support a requirement that telemarketers transmit caller identification information. [626] Consumers are frustrated by the failure of many telemarketers to transmit caller ID information, which, under certain circumstances, makes it difficult for consumers to enforce the TCPA. [627] Commenters also noted that the increased use of predictive dialers has led to a corresponding increase in the number of hang-ups. Caller ID information would allow consumers, they contend, to identify those telemarketers responsible for hang-up calls. [628] Some commenters stated that the inability to identify callers has led them to purchase other tools, such **14119** as the " telezapper," to try to stop unwanted solicitation calls. [629] Most commenters that addressed these issues support a prohibition against the blocking of caller ID information. [630] Several parties stated that the Commission should prohibit blocking independent of any caller ID mandate. [631] It was also suggested that the Commission could prohibit tampering with data or providing false data. [632]

175. Some industry members suggest that the transmission of caller ID information may not be technically possible in all circumstances. [633] They also maintain that a caller ID requirement could be costly for telemarketers. [634] One particular concern raised by parties opposed to a caller ID mandate is the technical feasibility of transmitting caller ID information when using private branch exchanges (PBX). WorldCom maintains that, in situations where telemarketers use a PBX that connects to their telephone company through typical T-1 trunks, Calling Party Number (CPN) cannot be transmitted. [635] WorldCom contends that Integrated Services Digital Network (ISDN) T-1 trunks *may* be capable of transmitting CPN, but that typical T-1 trunks do not have this capability. [636] DialAmerica notes that it has been delivering CPN for over two years using regular T-1 trunk groups provisioned by AT&T. [637] DialAmerica transmits an outgoing number which is captured by caller ID equipment. If a consumer chooses to call that number, the local exchange carrier (LEC) forwards the call to DialAmerica's **14120** customer service center. [638] DialAmerica asserts that ISDN T-1 trunks are available from all carriers and enable a user to control whether CPN is delivered and what telephone number is displayed. [639] WorldCom notes that even if we accept DialAmerica's assertion that ISDN trunks are universally available, carriers would have to upgrade network switches to accommodate additional digital switch ports necessitated by telemarketers' shift to ISDN-PRI trunks. [640]

Add. 98

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 159 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*61**  176. Telemarketers also raised technical concerns that the ability to transmit caller ID information is dependent on the deployment of Signaling System 7 (SS7). [641] They argue that SS7 is not nationally deployed and thus the capability to transmit caller ID is not available throughout the country. [642] Moreover, they maintain that Commission rules exempt PBX and Centrex systems from existing caller ID requirements because some of them cannot transmit CPN, [643] and not all carriers are able or permitted to transmit CPN, if they lack blocking capability. [644] The DMA and WorldCom expressed concern that regardless of whether the telemarketer is able to transmit CPN, consumers will expect it, and may incorrectly believe a company has violated the rules. [645]

177. Several parties argue that even if a telemarketer can transmit CPN information, how to transmit a number that is useful to consumers remains a challenge. [646] Comments were mixed on what information actually needed to be transmitted for purposes of caller ID. Several parties opined that the name of the telemarketing operator would be adequate identification. [647] Others asserted that the name of the company on whose behalf the call was being made should be provided. [648] Emergency Communications Network argued that a company's website information should be a permitted as a substitute for the name and phone number. [649]

178. The FTC's amended TSR mandates transmission of caller ID information and **\*14121** prohibits any seller or telemarketer from "failing to transmit or cause to be transmitted the telephone number, and when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service in use by a recipient of a telemarketing call." [650] Under the FTC's rule, telemarketers may transmit any number associated with the telemarketer that allows the called consumer to identify the caller. [651] The FTC concluded that transmission of caller ID would provide increased accountability and was technically feasible at minimal costs to telemarketers. The DMA stated that it was concerned that technical issues were not adequately taken into account during the FTC's proceeding. The DMA requested that the FCC initiate a comprehensive review of the technical feasibility of caller ID. [652]

### B. Discussion

179. The Commission has determined to require all sellers and telemarketers to transmit caller ID information, regardless of their calling systems. In addition, any person or entity engaging in telemarketing is prohibited from blocking the transmission of caller ID information. Caller ID information must include either ANI or CPN and, when available by the telemarketer's carrier, the name of the telemarketer. If the information required is not passed through to the consumer, through no fault of the telemarketer originating the call, then the telemarketer will not be held liable for failure to comply with the rules. [653] In such a circumstance, the telemarketer must provide clear and convincing evidence that the caller ID information could not be transmitted. However, the Commission concurs with the FTC that caller ID information can be transmitted cost effectively for the vast majority of calls made by telemarketers. [654] Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and "dead air" calls. [655] We disagree with those commenters who argue that caller ID information only benefits those consumers who subscribe to caller ID services. [656] Consumers can also use the *69 feature to **\*14122** obtain caller ID information transmitted by a telemarketer. [657] Caller ID also should increase accountability and provide an important resource for the FCC and FTC in pursuing enforcement actions against TCPA and TSR violators. [658]

**\*\*62**  180. We conclude that while SS7 capability is not universally available, the vast majority of the United States has access to SS7 infrastructure. The SS7 network contains functionality to transmit both the CPN and the charge number. [659] Under the Commission's rules, with certain limited exceptions, common carriers using SS7 and offering or subscribing to any service based

Add. 99

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 160 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

on SS7 functionality are required to transmit the CPN associated with an interstate call to connecting carriers.[660] Regardless of whether SS7 is available, a LEC at the originating end of a call must receive and be able to transmit the Automated Number Identification (ANI) to the connecting carrier,[661] as the ANI is the number transmitted through the network that identifies the calling party for billing purposes. Thus, we determine that telemarketers must ensure that either CPN or ANI is made available for all telemarketing calls in order to satisfy their caller ID requirements. Whenever possible, CPN is the preferred number and should be transmitted.[662] Consistent with the FTC's rules, CPN can include any number associated with the telemarketer or party on whose behalf the call is made, that allows the consumer to identify the caller.[663] This includes a number assigned to the telemarketer by its carrier, the specific number from which a sales representative placed a call, the number for the party on whose behalf the telemarketer is making the call, or the seller's customer service number. Any number supplied must permit an individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.[664]

 **\*14123** 181. As discussed above, some commenters state that it is not technically feasible for telemarketers to transmit caller ID information when using a PBX and typical T-1 trunks.[665] As noted by NASUCA, the Commission's rules exempt from the current caller ID rules, PBX and Centrex systems which lack the capability to pass CPN information. Regardless of whether a call is made using a typical T-1 trunk or an ISDN trunk, ANI is transmitted to the Local Exchange Carrier for billing purposes.[666] With both PBX and Centrex systems, the carrier can determine the billing number from the physical line being used to make a call, even if the billing number is not transmitted along that line to the carrier. We are cognizant of the fact that with PBX and Centrex systems, the billing number could be associated with multiple outgoing lines. Nevertheless, telemarketers using PBX or Centrex systems are required under the new rules not to block ANI, at a minimum, for caller ID purposes.

182. We recognize that ISDN technology is preferred, as it presents the opportunity to transmit both CPN and ANI. However, in situations where existing technology permits only the transmission of the ANI or charge number, then the ANI or charge number will satisfy the Commission's rules, provided it allows a consumer to make a do-not-call request during regular business hours.[667] By allowing transmission of ANI or charge number to satisfy the caller ID requirement, we believe that carriers need not incur significant costs to upgrade T-1 and ISDN switches.[668] For these same reasons, we also believe that mandating caller ID will not create a competitive advantage towards particular carriers.[669] As typical T-1 technology is upgraded to ISDN technology, we expect that telemarketers will increasingly be able to transmit the preferred CPN instead of ANI or charge number.

 **\*\*63** 183. Finally, the record strongly supports a prohibition on blocking caller ID information.[670] Both NCL and NASUCA state that there is no valid reason why a telemarketer should be allowed to intentionally block the transmission of caller ID.[671] We conclude that the **\*14124** caller ID requirements for commercial telephone solicitation calls do not implicate the privacy concerns associated with blocking capability for individuals.[672] We recognize that absent a prohibition on blocking, a party could transmit CPN in accordance with the new rules and simultaneously transmit a request to block transmission of caller ID information. Thus, the Commission has determined to prohibit any request by a telemarketer to block caller ID information or ANI.

184. As explained above, the TCPA seeks primarily to protect subscribers from unrestricted commercial telemarketing calls. Therefore, the Commission has determined not to extend the caller ID requirements to tax-exempt nonprofit organizations. However, the caller ID rules will apply to all other companies engaged in telemarketing, and the existence of an established business relationship between the telemarketer and the consumer shall not be an exception to these rules. For all covered entities, the effective date of the caller ID requirements will be January 29, 2004.[673] This will provide telemarketers a reasonable period of time to obtain or update any equipment or systems to enable them to transmit caller ID information. We decline to extend the effective date beyond January 29, 2004, which is consistent with the date on which telemarketers are required to comply with the FTC's caller ID provision.[674]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 161 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

## XIII. UNSOLICITED FACSIMILE ADVERTISEMENTS

### A. Background

185. The TCPA prohibits the use of any telephone facsimile machine, computer or other device to send an "unsolicited advertisement" to a telephone facsimile machine. [675] An unsolicited advertisement is defined as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." [676] The TCPA also requires those sending any messages via telephone facsimile machines to identify themselves to message recipients. [677] In **\*14125** the *1992 TCPA Order*, the Commission stated that "the TCPA leaves the Commission without discretion to create exemptions from or limit the effects of the prohibition." [678] It noted, however, that facsimile transmission from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. [679] The Commission sought comment on the effectiveness of these regulations and on any developing technologies, such as computerized fax servers, that might warrant revisiting the rules on unsolicited faxes. [680] We specifically asked about the need to clarify what constitutes prior express invitation or permission for purposes of sending an unsolicited fax. [681]

**\*\*64** 186. The record indicates that some consumers feel "besieged" by unsolicited faxes; [682] others explain that advertisers continue to send faxes despite asking to be removed from senders' fax lists. [683] Consumers emphasize that the burden of receiving unsolicited faxes is not just limited to the cost of paper and toner, but includes the time spent reading and disposing of faxes, the time the machine is printing an advertisement and is not operational for other purposes, and the intrusiveness of faxes transmitted at inconvenient times, including in the middle of the night. [684] Some of the consumer advocates maintain that the current rules are ineffective [685] and urge the Commission to take tougher measures to stop unwanted faxes by stricter enforcement measures, [686] including higher penalties. A few home-based businesses and other companies maintain that facsimile advertisements interfere with receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs. [687] **\*14126** Industry members maintain that faxing is a cost-effective way to reach customers, [688] and that the current exemption for established business relationships works well, [689] particularly for small businesses for whom faxing is a cheaper way to advertise. [690]

### B. Discussion

#### 1. Prior Express Invitation or Permission

187. The Commission has determined that the TCPA requires a person or entity to obtain the prior express invitation or permission of the recipient before transmitting an unsolicited fax advertisement. This *express* invitation or permission must be in writing and include the recipient's signature. [691] The recipient must clearly indicate that he or she consents to receiving such faxed advertisements from the company to which permission is given, and provide the individual or business's fax number to which faxes may be sent.

188. *Established Business Relationship.* The TCPA does not act as a total ban on fax advertising. Persons and businesses that wish to advertise using faxes may, under the TCPA, do so with the express permission of the recipients. In the *2002 Notice*, we sought comment on whether an established business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisements. [692] The majority of industry commenters support the finding that

Add. 101

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 162 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

facsimile transmissions from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient. [693] These commenters maintain that eliminating the EBR exemption for facsimile **\*14127** advertisements would interfere with ongoing business relationships, raise business costs, and limit the flow of valuable information to consumers. [694] They urge the Commission to amend the rules to expressly provide for the EBR exemption. [695] Conversely, the majority of consumer advocates argue that the TCPA requires companies to obtain express permission from consumers–even their existing customers–before transmitting a fax to a consumer. [696] Some consumer advocates maintain that the Commission erred in its 1992 determination that a consumer, by virtue of an established business relationship, has given his or her express invitation or permission to receive faxes from that company. [697] They urge the Commission to eliminate the EBR exemption, noting that Congress initially included in the TCPA an EBR exemption for faxes, but removed it from the final version of the statute. [698]

**\*\*65** 189. We now reverse our prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers. As of the effective date of these rules, the EBR will no longer be sufficient to show that an individual or business has given their express permission to receive unsolicited facsimile advertisements. [699] The record in this proceeding reveals consumers and businesses receive faxes they believe they have neither solicited nor given their permission to receive. Recipients of these **\*14128** faxed advertisements assume the cost of the paper used, the cost associated with the use of the facsimile machine, and the costs associated with the time spent receiving a facsimile advertisement during which the machine cannot be used by its owner to send or receive other facsimile transmissions. [700]

190. The legislative history indicates that one of Congress' primary concerns was to protect the public from bearing the costs of unwanted advertising. Certain practices were treated differently because they impose costs on consumers. For example, under the TCPA, calls to wireless phones and numbers for which the called party is charged are prohibited in the absence of an emergency or without the prior express consent of the called party. [701] Because of the cost shifting involved with fax advertising, Congress similarly prohibited unsolicited faxes without the prior express permission of the recipient. [702] Unlike the do-not-call list for telemarketing calls, Congress provided no mechanism for opting out of unwanted facsimile advertisements. Such an opt-out list would require the recipient to possibly bear the cost of the initial facsimile and inappropriately place the burden on the recipient to contact the sender and request inclusion on a "do-not-fax" list. [703]

191. Instead, Congress determined that companies that wish to fax unsolicited advertisements to customers must obtain their express permission to do so before transmitting any faxes to them. [704] Advertisers may obtain consent for their faxes through such means as direct mail, websites, and interaction with customers in their stores. Under the new rules, the permission to send fax advertisements must be provided in writing, include the recipient's signature and facsimile number, and cannot be in the form of a "negative option." [705] For example, a company that requests a fax number on an application form could include a clear statement indicating that, by providing such fax number, the individual or business agrees to receive facsimile advertisements from that company. Such statement, if accompanied by the recipient's signature, will constitute the necessary prior express permission to send facsimile advertisements to that individual or business. We believe that even small businesses may easily obtain permission from existing customers who agree to receive faxed advertising, when customers patronize their stores or provide their contact information. The Commission believes **\*14129** that given the cost shifting and interference caused by unsolicited faxes, the interest in protecting those who would otherwise be forced to bear the burdens of unwanted faxes outweighs the interests of companies that wish to advertise via fax.

**\*\*66** 192. _Membership in a Trade Association_. In its _1995 Reconsideration Order_, the Commission determined that mere distribution or publication of a telephone facsimile number is not the equivalent of prior express permission to receive faxed advertisements. [706] The Commission also found that given the variety of circumstances in which such numbers may be distributed (business cards, advertisements, directory listings, trade journals, or by membership in an association), it was appropriate to treat the issue of consent in any complaint regarding unsolicited facsimile advertisements on a case-by-case

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 163 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

basis. [707] In the *2002 Notice*, we sought comment specifically on the issue of membership in a trade association or similar group and asked whether publication of one's fax number in an organization's directory constitutes an invitation or permission to receive an unsolicited fax. [708] The American Business Media argued that those willing to make fax numbers available in directories released to the public do so with an expectation that such fax numbers will be used for advertising. [709] Consumer advocates, however, contend that publicly listing a fax number is not a broad invitation to send commercial faxes. [710] TOPUC asserted that businesses often publish their fax numbers for the convenience of their customers, clients and other trade association members, not for the benefit of telemarketers. [711]

193. The Commission agrees that fax numbers are published and distributed for a variety of reasons, all of which are usually connected to the fax machine owner's business or other personal and private interests. The record shows that they are not distributed for other companies' advertising purposes. Thus, a company wishing to fax ads to consumers whose numbers are listed in a trade publication or directory must first obtain the express permission of those consumers. Express permission to receive a faxed ad requires that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed advertisements. We believe the burden on companies to obtain express permission is warranted when balanced **\*14130** against the need to protect consumers and businesses from bearing the advertising costs of those companies. Finally, the Commission affirms that facsimile requests for permission to transmit faxed ads, including toll-free opt-out numbers, impose unacceptable costs on the recipients. This kind of "negative option" is contrary to the statutory requirement for prior express permission or invitation. [712]

### 2. Fax Broadcasters

194. The Commission explained in the *2002 Notice* that some fax broadcasters, who transmit other entities' advertisements to a large number of telephone facsimile machines for a fee, maintain lists of facsimile numbers that they use to direct their clients' advertisements. [713] We noted that this practice, among others, indicates a fax broadcaster's close involvement in sending unlawful fax advertisements and may subject such entities to enforcement action under the TCPA and our existing rules. We then sought comment on whether the Commission should address specifically in the rules the activities of fax broadcasters. [714] Companies and organizations whose members hire fax broadcasters to transmit their messages argue that the fax broadcaster should be liable for violations of the TCPA's faxing prohibition. [715] AIADA maintains this should be the case, even if the fax broadcaster uses the list of fax numbers provided by the company doing the advertising. [716] Nextel argues that liability ought to lie with the party controlling the destination of the fax; that fax broadcasters who actively compile and market databases of fax numbers are the major perpetrators of TCPA fax violations. [717] Nextel specifically urges the Commission to find that companies whose products are advertised by independent retailers should not be liable for TCPA violations when they have no knowledge of such activities. [718] Fax broadcasters disagree that they should be liable for unlawful faxes, maintaining that many of them do not exercise any editorial control or discretion over the content of the messages, [719] and do not provide the list of fax numbers to which the ads are transmitted. [720] **\*14131** Many industry as well as consumer commenters agree that only those fax broadcasters who are closely involved in the transmission of the fax should be subject to liability. [721] Reed asserts that liability should rest with the entity on whose behalf a fax is sent; that fax broadcasters are not in a position to know firsthand whether, for example, an established business relationship exists between the company and consumer. [722]

**\*\*67** 195. The Commission's rulings clearly indicate that a fax broadcaster's exemption from liability is based on the type of activities it undertakes, and only exists "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions.'" [723] The Commission believes that, based on the record and our own enforcement experience, addressing the activities of fax broadcasters will better inform both consumers and businesses about the prohibition on unsolicited fax advertising. The Commission has determined to amend the rules to explicitly state that a

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 164 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

fax broadcaster will be liable for an unsolicited fax if there is a high degree of involvement or actual notice on the part of the broadcaster. The new rules provide that if the fax broadcaster supplies the fax numbers used to transmit the advertisement, the fax broadcaster will be liable for any unsolicited advertisement faxed to consumers and businesses without their prior express invitation or permission. We agree, however, that if the company whose products are advertised has supplied the list of fax numbers, that company is in the best position to ensure that recipients have consented to receive the faxes and should be liable for violations of the prohibition. Therefore, the fax broadcaster will not be responsible for the ads, in the absence of any other close involvement, such as determining the content of the faxed message. [724] In such circumstances where both the fax broadcaster and advertiser demonstrate a high degree of involvement, they may be held jointly and severally liable for violations of the unsolicited facsimile provisions. In adopting this rule, the Commission focuses on the nature of an entity's activity rather than on any label that the entity may claim. We believe the rule will better inform the business community about the prohibition on unsolicited fax advertising and the liability that attaches to such faxing. And, it will better serve consumers who are often confused about which party is responsible for unlawful fax advertising. For the same reasons, the new rules define "facsimile broadcaster" to mean a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee. [725]

**\*14132** 196. Some commenters ask the Commission to clarify the extent of common carriers' liability for the transmission of unsolicited faxes. [726] Cox specifically urges the Commission to distinguish the obligations of fax broadcasters from "traditional common carriers." [727] As noted above, the Commission has stated that "[i]n the absence of 'a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmissions,' common carriers will not be held liable for the transmission of a prohibited facsimile message." [728] We reiterate here that if a common carrier is merely providing the network over which a subscriber (a fax broadcaster or other individual, business, or entity) sends an unsolicited facsimile message, that common carrier will not be liable for the facsimile.

**\*\*68** 197. Nextel urges the Commission to clarify that section 217 of the Communications Act does not impose a higher level of liability on common carriers than on other entities for violations of the TCPA. [729] Section 217 provides that "[i]n construing and enforcing the provisions of this Act, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person." [730] The Commission declines to address the scope of section 217 in this rulemaking, which was not raised in the *2002 Notice* or in subsequent notices in this proceeding.

### 3. Fax Servers

198. The TCPA makes it unlawful for any person to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine. [731] The TCPA defines the term "telephone facsimile machine" to mean "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." [732] The Commission sought comment on any developing technologies, such as computerized fax servers, that might warrant revisiting these rules. [733]

199. Commenters who addressed this issue were divided on whether fax servers should **\*14133** be subject to the unsolicited facsimile provisions. Some industry representatives urged the Commission to clarify that the TCPA does not prohibit the transmission of unsolicited fax advertisements to fax servers and personal computers because these transmissions are not sent to a "telephone facsimile machine," as defined in the statute. [734] Nextel maintains that such faxes do not implicate the harms Congress sought to redress in the TCPA, as they are not reduced to paper and can be deleted from one's inbox without being opened or examined. [735] Other commenters disagree, noting that there are other costs associated with faxes sent to computers

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 165 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

and fax servers. [736] They note that the TPCA only requires that the equipment have the *capacity* to transcribe text or messages onto paper, [737] and that computer fax servers and personal computers have that capacity.

200. We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes. However, we clarify that the prohibition does not extend to facsimile messages sent as email over the Internet. The record confirms that a conventional stand-alone telephone facsimile machine is just one device used for this purpose; that developing technologies permit one to send and receive facsimile messages in a myriad of ways. Today, a modem attached to a personal computer allows one to transmit and receive electronic documents as faxes. "Fax servers" enable multiple desktops to send and receive faxes from the same or shared telephony lines. [738]

 **69** 201. The TCPA's definition of "telephone facsimile machine" broadly applies to any equipment that has the capacity to send or receive text or images. The purpose of the requirement that a "telephone facsimile machine" have the "capacity to transcribe text or images" is to ensure that the prohibition on unsolicited faxing not be circumvented. Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal computers and fax servers, rather than to traditional stand-alone facsimile machines. As the House Report accompanying the TCPA explained, "facsimile machines are designed to accept, process and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax  **14134**  numbers, knowing that it will be received and printed by the recipient's machine." [739] However, Congress also took account of the "interference, interruptions, and expense" resulting from junk faxes, emphasizing in the same Report that "[i]n addition to the costs associated with the fax advertisements, when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications." [740]

202. Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed. They may also tie up lines and printers so that the recipients' requested faxes are not timely received. [741] Such faxes may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business. Finally, because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.

### 4. Identification Requirements

203. The TCPA and Commission rules require that any message sent via a telephone facsimile machine contain the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. [742] In the *2002 Notice*, the Commission asked whether these rules have been effective at protecting consumers' rights to enforce the TCPA. [743] The Commission determined in its *1997 Reconsideration Order* that a facsimile broadcast service must ensure that the identifying information of the entity on whose behalf the provider sent messages appear on facsimile messages. In its discussion, the Commission clarified that the sender of a facsimile message is the creator of the content of the message, finding that Section 227(d)(1) of the TCPA mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message, and not the entity that transmits the message. [744] The Commission believes that if a fax broadcaster is responsible for the content of the message or for determining the destination of the message (*i.e.*, supplying the list of facsimile numbers to which the faxes are sent), it should be identified on the facsimile, along  **14135**  with the entity whose products are advertised. [745] Therefore, we amend the rules to require any fax broadcaster that demonstrates a high degree of involvement in the transmission of such facsimile message to be identified on the facsimile, along with the identification of the sender. [746] This will permit consumers to hold fax broadcasters accountable for unlawful fax advertisements when there is a high degree of involvement on the part of the fax broadcaster. [747] Commenters suggested the Commission clarify what constitutes an adequate identification header. [748]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 166 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

Consistent with our amended identification rules for telemarketing calls, senders of fax advertisements will be required under the new rules to use the name under which they are officially registered to conduct business. [749] Use of a "d/b/a" ("doing business as") or other more widely recognized name is permissible; however, the official identification of the business, as filed with state corporate registration offices or comparable regulatory entities, must be included, at a minimum.

## XIV. PRIVATE RIGHT OF ACTION

### A. Background

**70** 204. The TCPA is a unique statute in that it provides consumers with two private rights of action for violations of the TCPA rules. One provision permits a consumer to file suit immediately in state court if a caller violates the TCPA's prohibitions on the use of automatic dialing systems, artificial or prerecorded voice messages, and unsolicited facsimile advertisements. [750] A separate private right of action permits a consumer to file suit in state court if he or she has received more than one telephone call within any 12-month period by or on behalf of the same company in violation of the guidelines for making telephone solicitations. [751] Based on inquiries received about the private right of action, the Commission asked whether we should clarify whether a consumer may file suit after receiving one call from a telemarketer who, for example, fails to properly identify himself or makes a call outside the time of day **14136** restrictions. [752]

205. Industry commenters argue that the statutory language is clear; that only a person who has received more than one telephone call that violates the telephone solicitation rules within any 12-month period may file suit under the TCPA's private right of action. [753] Consumers and consumer advocates were split on the issue. Some maintained that a consumer should be permitted to pursue a private right of action for a telemarketer's first offense; [754] others acknowledged that the statute does not permit a cause of action for the first time a telemarketer violates the telephone solicitation rules. [755] Several industry commenters point out that they have been named as defendants in class action lawsuits under the TCPA in state courts. [756] They urge the Commission to determine that the TCPA's private right of action does not contemplate or permit class action lawsuits. [757] Some consumer commenters and plaintiffs' attorneys who have filed class action suits argue that foreclosing class actions would severely handicap the effectiveness of the TCPA and consumers' ability to enforce its provisions. They also contend that the FCC is not authorized to interfere with state courts' certification of class actions. [758]

### B. Discussion

206. The Commission declines to make any determination about the specific contours of the TCPA's private right of action. Congress provided consumers with a private right of action, "if otherwise permitted by the laws or rules of court of a State." [759] This language suggests that Congress contemplated that such legal action was a matter for consumers to pursue in appropriate state courts, subject to those courts' rules. The Commission believes it is for Congress, not the Commission, to either clarify or limit this right of action.

### *14137  XV. INFORMAL COMPLAINT RULES

207. In the *2002 Notice*, the Commission noted that it had released another Notice of Proposed Rulemaking in February of 2002, seeking comment on whether to extend the informal complaint rules to entities other than common carriers. [760] We sought comment in this proceeding on whether the Commission should amend these informal complaint rules to apply to telemarketers.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 167 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

We will review this issue as part of the Informal Complaints proceeding. All comments filed in this proceeding that address the applicability of the informal complaint rules to telemarketers will be incorporated into CI Docket No. 02-32.

## XVI. TIME OF DAY RESTRICTIONS

**71** 208. Commission rules restrict telephone solicitations between the hours of 8:00 a.m. and 9:00 p.m. local time at the called party's location. [761] As part of our review of the TCPA rules, we sought comment on how effective these time restrictions have been at limiting objectionable solicitation calls. [762] The Commission also asked whether more restrictive calling times could work in conjunction with a national registry to better protect consumers from telephone solicitations to which they object.

209. Industry members that commented on the calling time restrictions unanimously asserted that the current calling times should be retained. [763] Some explained that any restrictions on calls made during the early evening hours, in particular, would interfere with telemarketers' ability to reach their customers. [764] Consumers, on the other hand, urged the Commission to adopt tighter restrictions on the times that telemarketers may call them. Some object to calls at the end of the day and during the dinner hour; [765] others prefer that telemarketers not be able to begin calling until later in the morning. [766] Some suggest the calling times should parallel local noise **14138** ordinances. [767] EPIC advocated allowing consumers to specify the hours they wish to receive calls. [768]

210. The Commission declines to revise the restrictions on calling times. Instead, we retain the current calling times, which are consistent with the FTC's rules. [769] We believe the current calling times strike the appropriate balance between protecting consumer privacy and not unduly burdening industry in their efforts to conduct legitimate telemarketing. We also believe that Commission rules that diverge from the FTC's calling restrictions will lead to confusion for consumers. Moreover, consumers who want to block unwanted calls during certain times will now have the option of placing their telephone numbers on the national do-not-call registry. They will have the additional option of giving express verifiable authorization to only those companies they wish to hear from. The Commission declines at this time to require companies to adhere to consumers' calling preferences, including "acceptable" calling times. [770] We believe that the costs of monitoring calling times for individual consumers could be substantial for many companies, particularly small businesses. The Commission may revisit this option in the future.

## XVII. ENFORCEMENT PRIORITIES

211. TCPA enforcement has been a Commission priority over the past several years, [771] and we intend that it remain so. In guiding our future enforcement plans, we recognize that the FTC's recent rule changes expand that agency's regulation of telemarketing activities and require coordination to ensure consistent and non-redundant federal enforcement in this area. Most notably, the FTC's adoption of a nationwide do-not-call registry, the related Do-Not-Call Act, and finally our adoption here of requirements that maximize consistency with those adopted by the FTC create an overlap in federal regulations governing major telemarketing activities. [772] We hereby direct Commission staff to negotiate with FTC staff a Memorandum of Understanding between the respective staffs to achieve an efficient and effective enforcement strategy that will promote compliance with federal telemarketing regulations, consistent with the guidelines set forth below.

**72** 212. The FCC's jurisdiction over telemarketing is significantly broader than the FTC's. First, as noted above, the FTC does not have authority over telemarketing calls made by in-house employees of common carriers, banks, credit unions, savings and loans, insurance companies, **14139** and airlines. In addition, the FTC's telemarketing rules pertain only to interstate transmissions. In contrast, the FCC's telemarketing rules apply without exception to any entity engaged in any of the telemarketing activities targeted by the TCPA and the Commission's related rules, including those that involve purely intrastate

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 168 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

activities. [773] Given the substantial gaps in the FTC's authority over the full range of telemarketing activities, we contemplate that our enforcement staff will focus particularly on those activities and entities that fall outside the FTC's reach - airlines, banks, credit unions, savings and loans, insurance companies, and common carriers, as well as intrastate transmissions by any entity.

213. Nevertheless, we do not contemplate Commission enforcement that targets only those activities, entities, or transmissions that are outside the FTC's jurisdiction. The TCPA creates a statutory expectation for FCC enforcement in the telemarketing area. [774] Moreover, the TCPA's detailed standards pertaining to do-not-call matters evince Congressional intent that the FCC assume a prominent role in federal regulation of this aspect of telemarketing, a mandate that is not altered by the Do-Not-Call Act. Accordingly, even with the FTC's new do-not-call regulations, including its administration of a national do-not-call registry, we emphasize that the Commission must stand ready to enforce each of our telemarketing rules in appropriate cases. For reasons of efficiency and fairness, our staff will work closely with the FTC to avoid unnecessarily duplicative enforcement actions.

214. In determining enforcement priorities under the new telemarketing rules, we contemplate that the Enforcement Bureau will continue its policy of reviewing FCC and FTC consumer complaint data and conferring with appropriate state and federal agencies to detect both egregious violations and patterns of violations, and will act accordingly. [775] The Enforcement Bureau has in place effective procedures to review aggregate complaint information to determine the general areas that merit enforcement actions, and to identify both particular violators and the individual consumers who may be able to assist the staff in pursuing enforcement actions against such violators. [776] Enforcement action could include, for example, forfeiture proceedings under section 503(b), [777] cease and desist proceedings under section 312(c), injunctions under section 401, and revocation of common carrier section 214 operating authority.

## *14140 XVIII. OTHER ISSUES

### A. Access to TCPA Inquiries and Complaints

215. The Commission stated that the *2002 Notice* was "prompted, in part, by the increasing number and variety of inquiries and complaints involving our rules on telemarketing and unsolicited fax advertisements." [778] A few commenters maintain that the Commission should not consider final rules until parties have had an opportunity to analyze the consumer complaints referenced in the *2002 Notice*. [779] Other commenters contend that the number of complaints received by the Commission does not necessarily demonstrate a problem that demands government intervention. [780] The ATA filed a Freedom of Information Act (FOIA) request with the Commission on October 16, 2002, seeking access to the TCPA-related informal complaints. [781] The FOIA generally provides that any person has a right to obtain access to federal agency records, subject to enumerated exemptions from disclosure. [782] The FOIA requirements do not apply to records that contain "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." [783] Many of the complaints sought by the ATA contain personal private information. In addition, the complaints are part of a system of records subject to the Privacy Act. [784] For these reasons, the Commission agreed to release the complaints on a rolling basis only after personal information was redacted. [785] In response to ATA's FOIA request, the Commission has thus far provided ***14141** approximately 2,420 redacted complaints. [786]

**\*\*73** 216. We agree with commenters that the increasing number of inquiries and complaints about telemarketing practices should not form the basis upon which we revise or adopt new rules under the TCPA. [787] Rather, such information can be considered in determining whether to seek comment on the effectiveness of any of its rules. [788] We note that, even in the absence of any such complaints, the Commission is required by the Do-Not-Call Act to complete the TCPA rulemaking commenced last year. We disagree with commenters who suggest that parties must have access to all of the complaints referenced in the

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 169 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

NPRM in order to be able to have a meaningful opportunity to participate in this proceeding. [789] It is not the existence of the complaints, or the number of complaints, that led the Commission to institute this proceeding to consider revision of its TCPA rules. Rather, our TCPA rules have been in place for more than ten years. We opened this proceeding to determine "whether the Commission's rules need to be revised in order to more effectively carry out Congress's directives in the TCPA." [790] In any event, since September 2002, consumers, industry, and state governments have filed over 6,000 comments in this proceeding, during which time the Commission extended the comment periods twice and released a *Further Notice* in order to ensure that parties had ample opportunity to comment on possible FCC action. The substantial record compiled in this proceeding, along **\*14142** with the Commission's own enforcement experience, provides the basis for the actions we take here today.

### B. Reports to Congress

217. The Do-Not-Call Act requires the Commission to transmit reports to Congress within 45 days after the promulgation of final rules in this proceeding, and annually thereafter. [791] By this Order, the Commission delegates its authority to the Chief, Consumer & Governmental Affairs Bureau, to issue all such reports.

### XIX. PROCEDURAL ISSUES

#### A. Regulatory Flexibility Act Analysis

218. Pursuant to the Regulatory Flexibility Act of 1980, as amended, [792] the Commission's Final Regulatory Flexibility Analysis in this Order is attached as Appendix B.

#### B. Paperwork Reduction Act Analysis

219. This Order contains modified information collections subject to the Paperwork Reduction Act of 1995 (PRA), Public Law 104-13. It will be submitted to the Office of Management and Budget (OMB) for review under § 3507(d) of the PRA. OMB, the general public, and other Federal agencies are invited to comment on the modified information collections contained in this proceeding.

#### C. Late-Filed Comments

220. We note that there were comments filed late in this proceeding. In the interest of having as complete and accurate a record as possible, we will accept late-filed comments and waive the requirements of 47 C.F.R. § 1.46(b).

#### D. Materials in Accessible Formats

**\*\*74** 221. To request materials in accessible formats for people with disabilities (braille, large print, electronic files, audio format), send an email to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at (202) 418-0531 (voice), (202) 418-7365 (TTY). This *Report and Order* can also be downloaded in Text and ASCII formats at: http:// www.fcc.gov/ cgb/policy/telemarketing.html.

### XX. ORDERING CLAUSES

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 170 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

222. Accordingly, IT IS ORDERED that, pursuant to the authority contained in Sections 1-4, 222, 227, and 303(r) of the Communications Act of 1934, as amended; 47 U.S.C. §§ 151-154, 222 and 227; and 47 C.F.R. § 64.1200 of the Commission's rules, and the Do-Not- **14143** Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557, the Report and Order in CG Docket No. 02-278 IS ADOPTED, and Parts 64 and 68 of the Commission's rules, 47 C.F.R. Parts 64.1200, 64.1601, and 68.318, are amended as set forth in Appendix A. The requirements of this Report and Order shall become effective 30 days after publication of a summary thereof in the Federal Register, with the following exceptions. As discussed herein, the national do-not-call rules at 47 C.F.R. § 64.1200(c)(2) will go into effect on October 1, 2003; the call abandonment rules at 47 C.F.R. §§ 64.1200(a)(5) and (6) will become effective on October 1, 2003; and the caller ID requirements at 47 C.F.R. § 64.1601(e) will go into effect on January 29, 2004. The amendments to the rules in § 64.1200 that contain information collection requirements under the PRA are not effective until approved by OMB. The Commission will publish a document in the Federal Register announcing the effective date of these rules.

223. IT IS FURTHER ORDERED that the comments addressing the applicability of the informal complaint rules to telemarketers ARE INCORPORATED into CI Docket 02-32.

224. IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau shall have authority to issue any reports to Congress as required by the Do-Not-Call Implementation Act.

225. IT IS FURTHER ORDERED that the Commission's Consumer & Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of this Report and Order, including the Final Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

**FEDERAL COMMUNICATIONS COMMISSION**

**75** Marlene H. Dortch
Secretary

**14144** **Appendix A**

**Final Rules**

Part 64 of the Code of Federal Regulations is amended as follows:

**PART 64** - **MISCELLANEOUS RULES RELATING TO COMMON CARRIERS**

1. Authority: 47 U.S.C. § 227.

* * * * *

2. Subpart L is amended by revising the Subpart Heading to read as follows:

**Subpart L** - **Restrictions on Telemarketing and Telephone Solicitation**

* * * * *

3. Section 64.1200 is revised to read as follows:

§ 64.1200 Delivery restrictions.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 171 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

(a) No person or entity may:

(1) Initiate any telephone call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice,

(i) To any emergency telephone line, including any 911 line and any emergency line of a hospital, medical physician or service office, health care facility, poison control center, or fire protection or law enforcement agency;

(ii) To the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

(2) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call:

(i) Is made for emergency purposes,

(ii) Is not made for a commercial purpose,

(iii) Is made for a commercial purpose but does not include or introduce an unsolicited advertisement or constitute a telephone solicitation,

 **\*14145**  (iv) Is made to any person with whom the caller has an established business relationship at the time the call is made, or

(v) Is made by or on behalf of a tax-exempt nonprofit organization.

(3) Use a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine.

(i) For purposes of paragraph (a)(3) of this section, a facsimile advertisement is not "unsolicited" if the recipient has granted the sender prior express invitation or permission to deliver the advertisement, as evidenced by a signed, written statement that includes the facsimile number to which any advertisements may be sent and clearly indicates the recipient's consent to receive such facsimile advertisements from the sender.

(ii) A facsimile broadcaster will be liable for violations of paragraph (a)(3) of this section if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.

(4) Use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are engaged simultaneously.

 **\*\*76**  (5) Disconnect an unanswered telemarketing call prior to at least 15 seconds or four (4) rings.

(6) Abandon more than three percent of all telemarketing calls that are answered live by a person, measured over a 30-day period. A call is "abandoned" if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting. Whenever a sales representative is not available to speak with the person answering the call, that person must receive, within two (2) seconds after the called person's completed greeting, a prerecorded identification message that states only the name and telephone number of the business, entity, or individual on whose behalf the call was placed, and that

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 172 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

the call was for "telemarketing purposes." The telephone number so provided must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign. The telephone number may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. The seller or telemarketer must maintain records establishing compliance with paragraph (a)(6) of this section.

(i) A call for telemarketing purposes that delivers an artificial or prerecorded voice message to a residential telephone line that is assigned to a person who either has granted prior express consent for the call to be made or has an established business relationship with the caller shall not be considered an abandoned call if the message begins within two (2) seconds of the called person's completed greeting.

(ii) Calls made by or on behalf of tax-exempt nonprofit organizations are not covered by paragraph (a)(6) of this section.

 **\*14146**  (7) Use any technology to dial any telephone number for the purpose of determining whether the line is a facsimile or voice line.

(b) All artificial or prerecorded telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated, and

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign.

(c) No person or entity shall initiate any telephone solicitation, as defined in paragraph (f)(9) of this section, to:

 **\*\*77**  (1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location), or

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government. Such do-not-call registrations must be honored for a period of 5 years. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) it can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

(B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the

Add. 112

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 173 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

administrator of the registry no more than three months prior to the date any call is made, and maintains records documenting this process; and

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone **\*14147** solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

(d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

**\*\*78** (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

**\*14148** (5) Affiliated persons or entities. In the absence of a specific request by the subscriber to the contrary, a residential subscriber's do-not-call request shall apply to the particular business entity making the call (or on whose behalf a call is made), and will not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised.

Add. 113

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 174 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

(6) <u>Maintenance of do-not-call lists</u>. A person or entity making calls for telemarketing purposes must maintain a record of a caller's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made.

(7) Tax-exempt nonprofit organizations are not required to comply with 64.1200(d).

(e) The rules set forth in sections 64.1200(c) and 64.1200(d) are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

**79** (f) As used in this section:

(1) The terms <u>automatic telephone dialing system</u> and <u>autodialer</u> mean equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers.

(2) The term <u>emergency purposes</u> means calls made necessary in any situation affecting the health and safety of consumers.

(3) The term <u>established business relationship</u> means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

(i) The subscriber's seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.

(ii) The subscriber's established business relationship with a particular business entity does not extend to affiliated entities unless the subscriber would reasonably expect them to be included given the nature and type of goods or services offered by the affiliate and the identity of the affiliate.

(4) The term <u>facsimile broadcaster</u> means a person or entity that transmits messages to telephone facsimile machines on behalf of another person or entity for a fee.

*14149 (5) The term <u>seller</u> means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(6) The term <u>telemarketer</u> means the person or entity that initiates a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(7) The term <u>telemarketing</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person.

(8) The term <u>telephone facsimile machine</u> means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 175 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

(9) The term <u>telephone solicitation</u> means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message:

**80** (i) To any person with that person's prior express invitation or permission.

(ii) To any person with whom the caller has an established business relationship; or

(iii) By or on behalf of a tax-exempt nonprofit organization.

(10) The term <u>unsolicited advertisement</u> means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

(11) The term <u>personal relationship</u> means any family member, friend, or acquaintance of the telemarketer making the call.

(g) Beginning January 1, 2004, common carriers shall:

(1) When providing local exchange service, provide an annual notice, via an insert in the subscriber's bill, of the right to give or revoke a notification of an objection to receiving telephone solicitations pursuant to the national do-not-call database maintained by the federal government and the methods by which such rights may be exercised by the subscriber. The notice must be clear and conspicuous and include, at a minimum, the Internet address and toll-free number that residential telephone subscribers may use to register on the national database.

(2) When providing service to any person or entity for the purpose of making telephone solicitations, make a one-time notification to such person or entity of the national do-not-call requirements, including, at a minimum, citation to 47 C.F.R. § 64.1200 and 16 C.F.R. Part 310. **14150** Failure to receive such notification will not serve as a defense to any person or entity making telephone solicitations from violations of this section.

(h) The administrator of the national do-not-call registry that is maintained by the federal government shall make the telephone numbers in the database available to the States so that a State may use the telephone numbers that relate to such State as part of any database, list or listing system maintained by such State for the regulation of telephone solicitations.

§ 64.1601 Delivery requirements and privacy restrictions.

4. Section 64.1601 is amended by adding paragraph (e) to read as follows:

* * * * *

(e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(7) must transmit caller identification information.

(i) For purposes of this paragraph, caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.

**81** (ii) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 176 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

(iii) Tax-exempt nonprofit organizations are not required to comply with this paragraph.

§ 68.318 Additional limitations.

5. Section 68.318 is amended by revising (d) to read as follows:

* * * * *

(d) Telephone facsimile machines; Identification of the sender of the message. It shall be unlawful for person within the United States to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual. If a facsimile broadcaster demonstrates a high degree of involvement in the sender's facsimile messages, such as supplying the numbers to which a message is sent, that broadcaster's name, under which it is registered to conduct business with the State Corporation Commission (or comparable regulatory authority), must be identified on the facsimile, along with **\*14151** the sender's name. Telephone facsimile machines manufactured on and after December 20, 1992, must clearly mark such identifying information on each transmitted page.

* * * * *

### **\*14152 Appendix B**

### **FINAL REGULATORY FLEXIBILITY ANALYSIS**

1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[793] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the Notice of Proposed Rulemaking and Memorandum Opinion and Order[794] (*2002 Notice*) released by the Federal Communications Commission (Commission) on September 18, 2002. The Commission sought written public comments on the proposals contained in the *2002 Notice*, including comments on the IRFA. On March 25, 2003, the Commission released a Further Notice of Proposed Rulemaking (Further Notice), seeking comments on the requirements contained in the Do-Not-Call Implementation Act (Do-Not-Call Act),[795] which was signed into law on March 11, 2003.[796] None of the comments filed in this proceeding were specifically identified as comments addressing the IRFA; however, comments that address the impact of the proposed rules and policies on small entities are discussed below. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[797]

### **A. Need for, and Objectives of, the Order**

2. Since 1992, when the Commission adopted rules pursuant to the Telephone Consumer Protection Act (TCPA),[798] telemarketing practices have changed significantly. New technologies have emerged that allow telemarketers to better target potential customers and make marketing using telephones and facsimile machines more cost-effective. At the same time, these new telemarketing techniques have heightened public concern about the effect telemarketing has on consumer privacy. A growing number of states have passed, or are considering, legislation to establish statewide do-not-call lists, and the Federal Trade Commission (FTC) has decided to establish a national do-not-call registry.[799] Congress provided in the TCPA that "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing **\*14153** practices."[800]

**\*\*82** 3. The *2002 Notice* sought comments on whether to revise or clarify Commission rules governing unwanted telephone solicitations, the use of automatic telephone dialing systems, prerecorded or artificial voice messages, telephone facsimile

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 177 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

machines, the effectiveness of company-specific do-not-call lists, and the appropriateness of establishing a national do-not-call list. In addition, in the IRFA, the Commission sought comments on the effect the proposed policies and rules would have on small business entities. [801]

4. In this Report and Order (Order) the Commission revises the current TCPA rules and adopts new rules to provide consumers with additional options for avoiding unwanted telephone solicitations. We establish a national do-not-call registry for consumers who wish to avoid most unwanted telemarketing calls. This national do-not-call registry will supplement the current company-specific do-not-call rules, which will continue to permit consumers to request that particular companies not call them. The Commission also adopts a new provision to permit consumers registered with the national do-not-call list to provide permission to call to specific companies by an express written agreement. The TCPA rules exempt from the "do-not-call" requirements nonprofit organizations and companies with whom consumers have an established business relationship. The definition of "established business relationship" has been amended so that it is limited to 18 months from any purchase or financial transaction with the company and to three months from any inquiry or application from the consumer. Any company that is asked by a consumer, including an existing customer, not to call again must honor that request for five years. We retain the current calling time restrictions of 8:00 a.m. until 9:00 p.m.

5. To address the use of predictive dialers, we have determined that a telemarketer must abandon no more than three percent of calls answered by a person, must deliver a prerecorded identification message when abandoning a call, and must allow the telephone to ring for 15 seconds or four rings before disconnecting an unanswered call. The new rules also require all companies conducting telemarketing to transmit caller identification information when available, and they prohibit companies from blocking such information. The Commission has revised its earlier determination that an established business relationship constitutes express invitation or permission to receive an unsolicited facsimile advertisement. We find that the permission to send fax ads must be in writing, include the recipient's signature, and clearly indicate the recipient's consent to receive such ads. In addition, we have clarified when fax broadcasters are liable for the transmission of unlawful fax advertisements.

6. We believe the rules the Commission adopts in the Order strike an appropriate balance between maximizing consumer privacy protections and avoiding imposing undue burdens on telemarketers. In addition, the Commission must comply with the Do-Not-Call Act, which requires the Commission to file an annual report to the House Committee on Energy and Commerce and the Senate Committee on Commerce, Science and Transportation. This report is to include: (1) an analysis of the effectiveness of the registry; (2) the number of consumers **14154** included on the registry; (3) the number of persons accessing the registry and the fees collected for such access; (4) a description of coordination with state do-not-call registries; and, lastly, (5) a description of coordination of the registry with the Commission's enforcement efforts. [802]

### B. Summary of Significant Issues Raised by Public Comments in Response to the IRFA

**83** 7. There were no comments filed in direct response to the IRFA. Some commenters, however, raised issues and questions about the impact the proposed rules and policies would have on small entities. Telemarketers maintained that "telemarketing is used to introduce consumers to novel and competitive products and services," [803] often offered by small businesses. [804] Some commenters insisted that business-to-business telemarketing is essential for small businesses. [805] They indicated that they rely on fax broadcasting as a cost-effective form of advertising. [806] On the other hand, other small businesses have requested that the Commission allow their telephone numbers to be included on any national do-not-call list [807] and urged the Commission to adopt rules protecting them from unsolicited faxes. [808] The rules adopted herein reflect not only the difficult balancing of individuals' privacy rights against the protections afforded commercial speech, but the difficult balancing of the interests of small businesses that rely on telemarketing against those that are harmed by unwanted telephone calls and facsimile transmissions. The amended rules should reduce burdens on both consumers and businesses, including small businesses.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 178 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

8. _National Do-Not-Call List._ As discussed more extensively in the Order, [809] some commenters opposed the adoption of a national do-not-call registry, stating that company-specific do-not-call lists adequately protect consumer privacy. [810] Other commenters supported the establishment of a national do-not-call registry, arguing that "further regulation is needed because the current system does little or nothing to protect privacy in the home." [811] NFIB "believes that significant burdens are being placed upon businesses of all sizes in order to comply **\*14155** with the regulations..., but that small businesses bear the brunt of those burdens." [812] NFIB suggested that women, minorities and small businesses will be affected disproportionately by any new restrictions. [813] And, some commenters maintained that businesses, including small businesses, will suffer a reduction in telemarketing sales as a result of the establishment of a national do-not-call list. [814] SBSC, while opposed to a national do-not-call list, nevertheless offered a recommendation that would make such a list less onerous for small businesses. SBSC suggested exempting local calls that might result in a face-to-face transaction from the do-not-call list requirements. [815] NAIFA also encouraged exempting calls which result in face-to-face meetings and recommended an exemption for those businesses that make a _de minimus_ number of calls. [816]

9. The Commission received comments arguing that a national do-not-call list "would be cumbersome" [817] and too expensive for small businesses to use. [818] DSA specifically indicated that a national do-not-call list would increase businesses' start-up costs if they were required to purchase the list. [819] In addition, MBA maintained that many small lenders use referrals from existing customers, not large lists, to attract new business. Such referrals, MBA suggested, will be difficult to scrub against a national do-not-call list. [820] Some commenters suggested that an option to help reduce the cost of a national do-not-call list for small businesses would be to offer smaller pieces of the list to small businesses. [821]

**\*\*84** 10. Yellow Pages urged the Commission to continue to exempt business-to-business calls from a national do-not-call list, because small businesses benefit tremendously by advertising in yellow pages and on-line. [822] However, other commenters requested that small businesses be allowed to include their telephone numbers on the national do-not-call list. [823] One **\*14156** small business commenter stated that "... telemarketing ... interferes with business operations, especially small business operations ...." [824] Another commenter argued that "people that work from home ... should not have to be bothered with telemarketing calls that would impact their job performance and potentially their ability to make a living." [825] Finally, some have assured the Commission that a national do-not-call list would be manageable and feasible to maintain. [826] NCS, for example, maintained that even extremely small telemarketers could gain access to the do-not-call list at a reasonable cost using the Internet. [827]

11. _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests_. The Commission sought comment on whether to consider any modifications that would allow consumers greater flexibility to register on company-specific do-not-call lists. [828] We specifically asked whether companies should be required to provide a toll-free number and/or website that consumers can access to register their names on do-not-call lists. [829] Some commenters argued that it would be costly if small, local businesses were required to design and maintain websites or provide toll-free numbers for consumers to make do-not-call requests. [830] In addition, they maintained that businesses should not be required to confirm registration of a consumer's name on a company's do-not-call list. [831] Confirmations by mail, they stated, would be expensive for a business and probably perceived by the consumer as "junk mail." [832]

12. _Established Business Relationship_. One issue raised by commenters as particularly burdensome for small business was monitoring existing business relationships and do-not-call requests. NFIB stated that members have found requests by existing customers to cease contacting them "unwieldy and difficult ... to translate as a business practice." [833] "An individual who continues to interact with a [sic] these small businesses following a 'do not contact' request does not sever the business

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 179 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

relationship *de facto...*"[834]  According to NFIB, it should be the right of the business to continue to call that customer. They argued that it should be the responsibility of the customer to terminate the relationship with that business  **\*14157** affirmatively.[835]

13. NADA indicated that there has been no significant change that would warrant a revision of the established business relationship exemption.[836]  In fact, NADA stated that "narrowing the exemption would unnecessarily deprive small businesses of a cost-effective marketing opportunity."[837] According to NADA, small businesses must maximize their marketing resources and the best way to do so is to direct their marketing efforts toward their existing customers.[838]

 **\*\*85** 14. While no commenter specifically addressed the effect of time limits on small businesses, several entities discussed time limits for the established business relationship rule in general.[839]  DMA indicated the difficulty in establishing a "clock" that "will apply across all the industries that use the phone to relate to their customers."[840]  DMA continued by stating "[d]ifferent business models require different periods of time."[841]  This concept was supported by Nextel, "the FTC's eighteen-month limit on its EBR rule would be inappropriate for the telecommunications industry" and would "dramatically increase administrative burdens and costs for all businesses as they would be forced to monitor and record every customer inquiry and purchasing pattern to ensure compliance with the FCC's rules."[842]

15. *Unsolicited Facsimile Advertising and "War Dialing"*. Privacy Rights commented that the practice of dialing large blocks of numbers to identify facsimile lines, *i.e.*, "war dialing," should be prohibited, especially because such calls cannot be characterized as telemarketing.[843]  It argued that "this practice is particularly troubling for small business owners who often work out of home offices" because it deprives the small business owner of the use of the equipment, creates an annoyance and interrupts business calls.[844]

16. NFIB advocated on behalf of its small business members that "the ability to fax information to their established customers is an essential commercial tool."[845]  Any customer  **\*14158**  who provides contact information when patronizing a business is providing express permission to be contacted by that business, including via facsimile advertising.[846]  In addition, NFIB indicated that businesses engaged in facsimile advertising should not be required to identify themselves, and that customers should be required to notify the business that they do not wish to receive such faxes.[847]  NADA agreed that the Commission should "preserve its determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive fax advertisements."[848]  According to NADA, changing these rules would deprive small businesses of a marketing tool upon which they have come to rely.[849]

17. Other commenters disagreed, explaining that numerous small businesses are burdened by the intrusion of ringing telephones and fax machines,[850] the receipt of advertisements in which they are not interested,[851] the depletion of toner and paper,[852] and the time spent dealing with these unwanted faxes.[853]  A few home-based businesses and other companies maintain that facsimile advertisements interfere with the receipt of faxes connected to their own business, and that the time spent collecting and sorting these faxes increases their labor costs.[854]  In fact, NFIB has received complaints from its own members "who ... failed to realize that their membership entitles them to the receipt of such information via fax."[855]

 **\*\*86** 18. *Caller ID Requirements*. In response to the Commission's proposal to require telemarketers to transmit caller ID or prohibit the blocking of such information, NYSCPB favored prohibiting the intentional blocking of caller ID information, but acknowledged that  **\*14159**  requiring the transmission of caller ID may be inappropriate for smaller firms.[856]  NYSCPB stated that " [w]hile mandatory transmission of caller ID information would undoubtedly facilitate do-not-call enforcement ... we would not want to impose onerous burdens on smaller, less technically sophisticated firms ...."[857]  In addition, NYSCPB

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 180 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

suggested that smaller businesses that lack the capability to transmit caller ID be exempt from providing caller ID information until the business installs new equipment with caller ID capabilities. [858]

### C. Description and Estimate of the Number of Small Entities to Which the Rules Will Apply

19. The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rules adopted herein. [859] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction." [860] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act. [861] Under the Small Business Act, a "small business concern" is one that: 1) is independently owned and operated; 2) is not dominant in its field of operation; and 3) satisfies any additional criteria established by the Small Business Administration (SBA). [862]

20. The Commission's rules on telephone solicitation and the use of autodialers, artificial or prerecorded messages and telephone facsimile machines apply to a wide range of entities, including all entities that use the telephone or facsimile machine to advertise. [863] That is, our action affects the myriad of businesses throughout the nation that use telemarketing to advertise. For instance, funeral homes, mortgage brokers, automobile dealers, newspapers and telecommunications companies could all be affected. Thus, we expect that the rules adopted in this proceeding could have a significant economic impact on a substantial number of small entities.

**\*14160** 21. Nationwide, there are a total of 22.4 million small businesses, according to SBA data. [864] And, as of 1992, nationwide there were approximately 275,801 small organizations [not-for-profit]. [865]

22. Again, we note that our action affects an exhaustive list of business types and varieties. We will mention with particularity the intermediary groups that engage in this activity. SBA has determined that "telemarketing bureaus" with $6 million or less in annual receipts qualify as small businesses. [866] For 1997, there were 1,727 firms in the "telemarketing bureau" category, total, which operated for the entire year. [867] Of this total, 1,536 reported annual receipts of less than $5 million, and an additional 77 reported receipts of $5 million to $9,999,999. Therefore, the majority of such firms can be considered to be small businesses.

### D. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities

**\*\*87** 23. The rules contained herein require significant recordkeeping requirements on the part of businesses, including small business entities. First, while the national do-not-call list will be developed and maintained by the FTC, all businesses that engage in telemarketing will be responsible for obtaining the list of telephone numbers on the national do-not-call list and scrubbing their calling lists to avoid calling those numbers. [868] They must also continue to be responsible for maintaining their own company-specific do-not-call lists; however, this is not a new requirement, but a continuation of the Commission's existing rules. The Commission has reduced the period of time that businesses must retain company-specific do-not-call requests from 10 years to five years. In addition, for those businesses, including small businesses, that wish to call consumers under the "established business relationship" exemption, they must continue to maintain customer lists in the normal course of business. Because of the time limits associated with this rule, businesses will need to monitor and record consumer contacts to assure that they are complying with the 18-month and three-month provisions in the rule. Businesses that want to call consumers with whom they have no relationship, but who are listed on the national do-not-call list, must obtain a consumer's express permission to call. This permission must be evidenced by a signed, written agreement.

24. Second, all businesses that use autodialers, including predictive dialers, to sell goods or services, will be required to maintain records documenting compliance with the call **\*14161** abandonment rules. [869] Such records should demonstrate the telemarketers' compliance with a call abandonment rate of no less than three percent measured over a 30-day period, with the two-second-transfer rule, and with the ring duration requirement.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 181 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

25. Third, with the exception of tax-exempt nonprofit organizations, all businesses that engage in telemarketing will be required to transmit caller ID information. [870]

26. Fourth, businesses that advertise by fax will be required to maintain records demonstrating that recipients have provided express permission to send fax advertisements. Such permission must be given in writing, and businesses must document that they have obtained the required permission. [871]

### E. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered

27. The RFA requires an agency to describe any significant alternatives that it has considered in developing its approach, which may include the following four alternatives (among others): "(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for such small entities; (3) the use of performance rather than design standards; and (4) an exemption from coverage of the rule, or any part thereof, for such small entities." [872]

**\*\*88** 28. There were five specific areas in which the Commission considered alternatives for small businesses. These areas were: (1) establishing a National Do-Not-Call List ((a) providing a portion of the national do-not-call list (five area codes) for free, (b) providing businesses with 30 days to process do-not-call requests, and (c) reducing the do-not-call record retention rate from 10 years to five years); (2) maintaining the current established business rule exemption and adopting the FTC's time limits of 18 months and three months; (3) establishing a call abandonment rate of three percent, rather than zero percent, and measuring the rate over a 30-day period, rather than on a per day basis; (4) continuing to prohibit facsimile advertising to residential and business numbers; and (5) declining to require businesses to maintain a website or toll-free number for do-not-call requests or confirmation of such requests by consumers. As mentioned, *supra*, in Section B of the FRFA, small businesses presented arguments on both sides of each of these issues.

29. *National Do-Not-Call List*. This Order establishes a national do-not-call list for those residential telephone subscribers who wish to avoid most unwanted telephone **\*14162** solicitations. [873] Although many businesses, including small businesses, objected to a national do-not-call registry, [874] the Commission determined that a national do-not-call list was necessary to carry out the directives in the TCPA. We agreed with those commenters who maintained that the company-specific approach to concerns about unwanted telephone solicitations does not alone adequately protect individuals' privacy interests. [875] We declined to exempt local solicitations and small businesses from the national do-not-call list. [876] Given the numerous entities that solicit by telephone, and the technological tools that allow even small entities to make a significant number of solicitation calls, we believe that to do so would undermine the effectiveness of the national do-not-call rules in protecting consumer privacy. In addition, we declined to permit businesses to register their numbers on the national do-not-call registry, despite the requests of numerous small business owners to do so. [877] The TCPA expressly contemplates that a national do-not-call database includes residential telephone subscribers' numbers. Although business numbers will not be included in the national do-not-call database, a business could nevertheless *request* that its number be added to a company's do-not-call list.

30. The Commission considered the costs to small businesses of purchasing the national do-not-call list. In an attempt to minimize the cost for small businesses, we have considered an alternative and determined that businesses will be allowed to obtain up to five area codes free of charge. [878] Since many small businesses telemarket within a local area, providing five area codes at no cost should help to reduce or eliminate the costs of purchasing the national registry for small businesses. [879] Furthermore, as suggested by NCS, small businesses should be able to gain access to the national list in an efficient, cost-effective manner via the Internet. [880]

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 182 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

**\*\*89** 31. As discussed extensively in the Order, many businesses, including small business entities, requested specific exemptions from the requirements of a national do-not-call list. [881] In order to minimize potential confusion for both consumers and businesses alike, we declined to create specific exemptions for small businesses. [882] We believe the exemptions adopted for calls **\*14163** made to consumers with whom a seller has an established business relationship and those that have provided express agreement to be called provide businesses with a reasonable opportunity to conduct their business while protecting consumer privacy interests.

32. The Commission also considered modifying for small businesses the time frames for (1) processing consumers' do-not-call requests; (2) retaining consumer do-not-call records; and (3) scrubbing calling lists against the national do-not-call registry. In doing so, we recognized the limitations on small businesses of processing requests in a timely manner. [883] Therefore, we determined to require that both large and small businesses must honor do-not-call requests within 30 days from the date such a request is made, instead of requiring that businesses honor requests in less time. [884] Although some commenters suggested periods of up to 60 to 90 days to process do-not-call requests, we determined that such an inconsistency in the rules would lead to confusion for consumers. Consumers might not easily recognize that the telemarketer calling represented a small business and that they must then allow a longer period of time for their do-not-call requests to be processed.

33. The Commission also determined to reduce the retention period of do-not-call records from 10 years to five years. [885] This modification should benefit businesses that are concerned about telephone numbers that change hands over time. They argue that a shorter retention requirement will result in do-not-call lists that more accurately reflect those consumers who have requested not to be called. Finally, we considered allowing small businesses additional time to scrub their customer call lists against the national do-not-call database. The FTC's rules require telemarketers to scrub their lists every 90 days. For the sake of consistency, and to avoid confusion on the part of consumers and businesses, the Commission determined to require all businesses to access the national registry and scrub their calling lists of numbers in the registry every 90 days.

34. _Established Business Relationship._ We have modified the current definition of "established business relationship" [886] so that it is limited in duration to 18 months from any purchase or transaction and three months from any inquiry or application. The revised definition is consistent with the definition adopted by the FTC. [887] We concluded that regulating the duration of an established business relationship is necessary to minimize confusion and frustration for consumers who receive calls from companies they have not contacted or patronized for many years. There was little consensus among industry members about how long an established business relationship should last following a transaction between the consumer **\*14164** and seller. [888] We believe the 18-month timeframe strikes an appropriate balance between industry practices and consumer privacy interests. Although businesses, including small businesses must monitor the length of relationships with their customers to determine whether they can lawfully call a customer, we believe that a rule consistent with the FTC's will benefit businesses by creating one uniform standard with which businesses must comply.

**\*\*90** 35. _Call Abandonment._ In the _2002 Notice_, the Commission requested information on the use of predictive dialers and the harms that result when predictive dialers abandon calls. [889] In response, some small businesses urged the Commission to adopt a maximum rate of zero on abandoned calls. They described their frustration over hang-up calls that interrupt their work and with answering the phone "only to find complete silence on the other end." [890] Most industry members encouraged the Commission to adopt an abandonment rate of no less than five percent, claiming that this rate "minimizes abandoned calls, while still allowing for the substantial benefits achieved by predictive dialers." [891] The Commission has determined that a three percent maximum rate on abandoned calls balances the interests of businesses that derive economic benefits from predictive dialers and consumers who find intrusive those calls delivered by predictive dialers. [892] We believe that this alternative, a rate of three percent, will also benefit small businesses that are affected by interruptions from hang-ups and "dead air" calls.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 183 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

36. The three percent rate will be measured over a 30-day period, rather than on a per day basis. Industry members maintained that a per day measurement would not account for short-term fluctuations in marketing campaigns [893] and may be overly burdensome to smaller telemarketers. We believe that measuring the three percent rate over a longer period of time will still reduce the overall number of abandoned calls, yet permit telemarketers to manage individual calling campaigns effectively. It will also permit telemarketers to more easily comply with the recordkeeping requirements associated with the use of predictive dialers.

37. _Unsolicited Facsimile Advertising_. The record reveals that facsimile advertising can both benefit and harm small businesses with limited resources. The small businesses and organizations that rely upon faxing as a cost-effective way to advertise insist that the Commission allow facsimile advertising to continue. [894] Other small businesses contend that facsimile advertising interferes with their daily operations, increases labor costs, and wastes **\*14165** resources such as paper and toner. [895] The Commission has reversed its prior conclusion that an established business relationship provides companies with the necessary express permission to send faxes to their customers. [896] Under the amended rules, a business may advertise by fax with the prior express permission of the fax recipient, which must be in writing. [897] Businesses may obtain such written permission through direct mail, websites, or during interaction with customers in their stores. This alternative will benefit those small businesses, which are inundated with unwanted fax advertisements.

38. _Website or Toll-Free Number to Access Company-Specific Lists and to Confirm Requests_. Lastly, the Commission has determined not to require businesses to provide a website or toll-free number for consumers to request placement on company-specific do-not-call lists or to respond affirmatively to do-not-call requests or otherwise provide some means of confirmation that consumers have been added to a company's do-not-call list. [898] Several commenters indicated that such requirements would be costly to small businesses. [899] Although we believe these measures would improve the ability of consumers to register do-not-call requests, we agree that such requirements would be potentially costly to businesses, particularly small businesses. Instead, we believe that the national do-not-call registry will provide consumers with a viable alternative if they are concerned that their company-specific do-not-call requests are not being honored. In addition, consumers may pursue a private right of action if there is a violation of the do-not-call rules. This alternative should reduce, for small businesses who engage in telemarketing, both the potential cost and resource burdens of maintaining company-specific lists.

**\*\*91** 39. **REPORT TO CONGRESS:** The Commission will send a copy of the Order, including this FRFA, in a report to be sent to Congress pursuant to the Congressional Review Act. [900] In addition, the Commission will send a copy of the Order, including this FRFA, to the Chief Counsel for Advocacy of the SBA. A copy of the Order and FRFA (or summaries thereof) will also be published in the Federal Register. [901]

**\*14166  Appendix C**

**Comments Filed**

**\*\*92** _Due to the significant number of comments filed by individual consumers in this proceeding, we have listed below only those comments received from industry, consumer advocacy groups and governmental entities. All individual consumer comments, including those cited in the Report and Order, are available for inspection on the Commission's Electronic Comment Filing System (ECFS)._

| | |
|---|---|
| ACI Telecentrics Incorporated (5-2-03) | ACI |
| Allstate Life Insurance Company (Lisa Behzad; 12-9-02) | Allstate |
| Americall Group, Inc. (11-26-02) | Americall |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 184 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| American Association of Blood Banks (Marlene H. Dortch; 12-6-02) | AABB |
| American Association of Retired Persons (AARP; 1-31-03) | AARP |
| American Bankers Association (12-9-02) | ABA |
| American Business Media (11-22-02) | ABM |
| American Express Company (12-5-02) | American Express |
| American General Finance, Inc. (12-10-02) | AGF |
| American Insurance Association (11-21-02) | AIA |
| American International Automobile Dealers Association (12-9-02) | AIADA |
| American Red Cross (12-9-02) | Red Cross |
| American Resort Development Association (11-15-02) | ARDA |
| American Teleservices Association (12-9-02) (12-23-02) | ATA |
| America's Blood Centers (Jeanne Dariotis; 12-5-02) | ABC |
| Ameriquest Mortgage Company (12-9-02) | Ameriquest |
| Association for Communications Technology Professionals in | |
| Higher Education (ACUTA, Inc.) and Association of College | |
| and University Housing Officers-International (ACUHO-I) | |
| (ACUTA and ACUHO-I; 12-9-02) | ACUTA |
| Association for Competitive Technology (12-9-02) | ACT |
| Association of Fundraising Professionals (11-27-02) | AFP |
| AT&T Wireless Services, Inc. (12-9-02) | AT&T Wireless |
| Autoflex Leasing (11-18-02) | Autoflex |
| Avinta Communications, Inc. (Abraham Y. Chen; 11-18-02) | Avinta |
| Bank of America (12-3-02) | Bank of America |
| BellSouth Corporation (12-9-02) | BellSouth |
| Blocklist.com (12-9-02) | Blocklist.com |
| BMO Financial Group (12-9-02) | BMO Financial |
| The Broadcast Team (12-6-02) | TBT |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 185 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| Brunswick Corporation (12-9-02) | Brunswick |
| Californians Against Telephone Solicitation (Robert Arkow; 12-9-02) | CATS |
| Call Compliance, Inc. (12-9-02) | Call Compliance |
| Castel, Inc. (2-28-03) | Castel |
| Cellular Telecommunications & Internet Association (12-9-02) | CTIA |
| Cendant Corporation (11-22-02) | Cendant |
| Center for Democracy & Technology (12-9-02) | CDT |
| Cherry Communications (11-21-02) | Cherry |
| Cingular Wireless LLC (12-9-02) | Cingular |
| Citigroup, Inc. (12-12-02) | Citigroup |
| City of Chicago (11-22-02) | City of Chicago |
| CMOR (12-9-02) | CMOR |
| CNN.com (4-22-03) | CNN |
| Colorado Public Utilities Commission (12-3-02) | CO PUC |
| Comcast Cable Communications, Inc. (12-9-02) | Comcast |
| Concerned Telephone Companies (12-9-02) | CTC |
| Consumer Bankers Association (12-9-02) | CBA |
| Consumer Choice Coalition (12-2-02) | Coalition |
| Consumer Disability Telecommunications | |
| Advisory Committee (12-24-02) | CDTAC |
| Consumer Mortgage Coalition (12-19-02) | CMC |
| Convergys Corporation (12-9-02) | Convergys |
| Copilevitz and Canter, LLC (William E. Raney; 12-9-02) | Copilevitz & Canter |
| Cox Enterprises, Inc. (12-9-02) | Cox |
| DialAmerica Marketing, Inc. (12-10-02) | DialAmerica |
| Direct Marketing Association (12-9-02) | DMA |
| Direct Selling Association (12-9-02) | DSA |
| DIRECTV, Inc. (12-9-02) | DIRECTV |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 186 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| Discover Bank (12-9-02) | Discover |
| Electronic Privacy Information Center; Consumer Task Force for | |
| Automotive Issues; Remar Sutton; Consumer Action; Privacy | |
| Rights Clearinghouse; Consumer Federation of America; | |
| International Union, UAW; Free Congress Foundation; Junkbusters | |
| Corp.; Consumer Project on Technology; Computer Professionals | |
| for Social Responsibility; and Private Citizens, Inc. (12-9-02) | EPIC |
| Electronic Retailing Association (12-9-02) | ERA |
| Emergency Communications Network, Inc. (12-6-02) | ECN |
| Farmers Insurance Group (11-22-02) | Farmers |
| Financial Services Roundtable (12-12-02) | FSR |
| Florida Department of Agriculture and Consumer Services (1-8-03) | FL DACS |
| Fund for Public Interest Research, Inc. (Jon Scarlett; 12-6-02) | Fund for Public Interest |
| Globecomm Systems, Inc. (12-9-02) | Globecomm |
| Hilton Head Hospitality Resort Services (1-31-03) | Hilton Head |
| Household Automotive Finance Corporation; OFL-A Receivables | |
| Corp.; and Household Automotive Credit Corporation (12-9-02) | Household Automotive |
| Household Bank (SB), N.A. (12-9-02) | Household Bank |
| Household Finance Corp. (House Hold Finance Corporation; 12-12-02) | Household Finance |
| Household Financial Services, Inc. (12-10-02) | HFS |
| Hunton & Williams (11-22-02) | Hunton & Williams |
| IBM Corporate Market Intelligence (2-4-03) | IBM |
| Intellidyn Corporation (Kathie Fleischer; 12-4-02) | Intellidyn |
| Interactive Teleservices Corporation (Barbara Bricker; 4-10-03) | |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 187 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| (Duane L. Billingslea; 4-11-03) | ITC |
| Intrado Inc. (11-22-02) | Intrado |
| Intuit, Inc. (12-9-02) | Intuit |
| Katz & Korin (Robert J. Schuckit; 10-5-02) | Katz & Korin |
| Kauffman Group Inc. (11-25-02) | Kauffman |
| Kondos & Kondos Law Offices (11-14-02) | Kondos & Kondos |
| LCC International, Inc. (12-9-02) | LCC |
| The Leukemia & Lymphoma Society (George Dahlman; | |
| 1-31-03 and 5-2-03) | L&LS |
| LSSi Corp. (12-9-02) | LSSi |
| Magazine Publishers of America (12-9-02) | MPA |
| March of Dimes (11-22-02) | March of Dimes |
| MasterCard International Incorporated (12-9-02) | Mastercard |
| Mathemaesthetics, Inc. (11-22-02) (*see also* Douglas M. McKenna) | Mathemaesthetics |
| MBNA America Bank, N.A. (12-9-02) (Revised 12-10-02) | MBNA |
| Metris Companies, Inc. (12-6-02) | Metris |
| Meyer Associates, Inc. ([Thoams] Caprio; 4-24-03) | Meyer |
| MidFirst Bank (1-9-03) | MidFirst |
| Mortgage Bankers Association of America (12-9-02) | MBA |
| Mortgage Investors Corporation, Inc. (12-9-02) | Mortgage Investors |
| Mothers Against Drunk Driving (1-30-03) (Wendy J. Hamilton; 5-1-03) | MADD |
| Moultrie Independent Telephone Company (12-9-02) | Moultrie |
| National Association of Attorneys General (12-9-02) | NAAG |
| National Association of Broadcasters (12-9-02) | NAB |
| National Association of Consumer Agency Administrators | |
| (Kathleen Thuner, President; 11-22-02) | NACAA |
| National Association of Independent Insurers (12-10-02) | NAII |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 188 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| National Association of Insurance & Financial Advisors (11-22-02) | NAIFA |
| National Association of Mortgage Brokers (12-9-02) | |
| (*see also* Armand Cosenza) | NAMB |
| National Association of Regulatory Utility Commissioners (11-22-02) | NARUC |
| National Association of State Utility Consumer Advocates | |
| (NASUCA; 12-9-02) | NASUCA |
| National Automobile Dealers Association (12-10-02) | NADA |
| National Cable & Telecommunications Association (12-9-02) | NCTA |
| National Consumers League (12-6-02) | NCL |
| National Energy Marketers Association (11-22-02) | NEM |
| National Federation of Independent Business (1-9-03) | NFIB |
| National Public Radio, Inc. (12-9-02) | NPR |
| National Retail Federation (12-9-02) | NRF |
| National Telecommunications Cooperative Association (11-22-02) | NTCA |
| NCS Pearson, Inc. (12-9-02) | NCS |
| NeuStar, Inc. (12-9-02) | NeuStar |
| New Orleans, Utility, Cable & Telecommunications Committee | |
| of the City Council (11-18-02) | City of New Orleans |
| Newsletter & Electronic Publishers Association (12-9-02) | NEPA |
| Newspaper Association of America (12-9-02) | NAA |
| New York State Consumer Protection Board (11-22-02) (3 comments) | NYSCPB |
| Nextel Communications, Inc. (12-9-02) | Nextel |
| Nielsen Media Research, Inc. (1-31-03) | Nielsen |
| North Dakota Public Service Commission (12-2-02) | ND PSC |
| Not-For-Profit and Charitable Coalition (11-22-02) | NPCC |
| Office of the People's Counsel for the District of Columbia | |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 189 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| (Elizabeth A. Noel; 12-9-02) | OPC-DC |
| Ohio, Public Utilities Commission (12-9-02) | PUC of Ohio |
| Oregon Telecommunications Association (12-3-02) | OTA |
| Pacesetter Corporation (11-20-02) | Pacesetter |
| Personal Legal Plans, Inc. (12-16-02) | PLP |
| Progressive Casualty Insurance Company (11-18-02) | Progressive Casualty |
| Privacilla.org (12-9-02) | Privacilla.org |
| Privacy Rights Clearinghouse (Beth Givens; 12-5-02) | PRC |
| Private Citizen, Inc. (12-9-02) | Private Citizen |
| Process Handler et al. For Hire, Inc. (5-14-03) | Process Handler |
| Progressive Business Publications (Edward M. Satell; 4-28-03) | Progressive Business |
| Qwest Services Corporation (12-9-02) | Qwest |
| R & D Lawn & Tree Services (11-18-02) | R & D |
| Reed Elsevier, Inc. (12-9-02) | Reed |
| Reese Brothers, Inc. (12-9-02) | Reese |
| Response Catalyst (Doug Hibbeler; 12-9-02) | Response Catalyst |
| Royal Sonesta Hotel (4-7-03) | Royal Sonesta |
| SBC Communications, Inc. (12-9-02) | SBC |
| Scholastic, Inc. (12-9-02) | Scholastic |
| The Seattle Times Company (12-9-02) | Seattle Times |
| SER Solutions, Inc. (11-19-02) | SER |
| Small Business Survival Committee (1-31-03) | SBSC |
| Special Olympics Florida (Laurie Moyson; 5-8-03) | Special Olympics FL |
| Special Olympics Hawaii (Nancy Bottelo; 1-30-03) | Special Olympics HI |
| Special Olympics Kansas (5-1-03) | Special Olympics KS |
| Special Olympics New Jersey (Suzanne Schwanda; 1-31-03) | Special Olympics NJ |
| Special Olympics New Mexico (Randy Mascorella; 4-30-03) | Special Olympics NM |
| Special Olympics New York (5-2-03) | Special Olympics NY |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 190 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| Special Olympics Ohio (Federal Communications Commission; 1-31-03) | Special Olympics OH |
| Special Olympics Virginia (5-2-03) | Special Olympics VA |
| Special Olympics Wisconsin (Dennis H. Alldridge; 1-30-03) | Special Olympics WI |
| Sprint (12-9-02) | Sprint |
| Student Parent Support Services Corp. (3-19-03) | Student Support |
| Suggs & Associates, P.C. (James [M.Suggs]; 12-4-02) | Suggs |
| Sytel Limited (12-9-02) | Sytel |
| Technion Communications Corp. (11-19-02) | Technion |
| Telatron Marketing Group, Inc. (12-9-02) | Telatron |
| Telecommunications for the Deaf (11-15-02) | TDI |
| Teleperformance USA (Julie Loppe-Peyrin; 12-6-02) | |
| (Timothy J. Casey; 12-6-02) | Teleperformance |
| Telestar Marketing, L.P. (11-19-02) | Telestar |
| Tennessee Regulatory Authority and the | |
| Tennesse Attorney General (12-9-02) | TN AG |
| Texas, Office of Public Utility Counsel (12-9-02) | TOPUC |
| Texas, Public Utility Commission (12-3-02) | Texas PUC |
| TSI Telecommunications Services, Inc. (11-7-02) | TSI |
| U. S. Chamber of Commerce (12-26-02) | Chamber of Commerce |
| Vector Marketing Corporation (12-9-02) | Vector |
| Ver-A-Fast (12-10-02) (*see also* Bob Bensman; 11-19-02) | Ver-A-Fast |
| VeriSign, Inc. (f/n/a Illuminet, Inc.) (3-31-03) | VeriSign |
| Verizon (12-10-02) | Verizon |
| Verizon Wireless (12-9-02) | Verizon Wireless |
| Visa U.S.A. Inc. (12-9-02) | Visa |
| Wells Fargo & Company (11-5-02) | Wells Fargo |
| Winnebago Cooperative Telephone Association (1-30-03) | Winnebago |
| Worldcom, Inc. (12-9-02) | Worldcom |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 191 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| Xpedite Systems, Inc. (12-9-02) | Xpedite |
| Yellow Pages Integrated Media Association (12-9-02) | Yellow Pages |

### Reply Comments Filed

| Adval Communications, Inc. (1-31-03) | ADVAL |
| American Teleservices Association (1-31-03) (3-5-03, correction) | ATA |
| Ameriquest Mortgage Company (1-31-03) | Ameriquest |
| AT&T Wireless Services, Inc. (1-31-03) | AT&T Wireless |
| BellSouth Corporation (1-31-03) | BellSouth |
| Cablevision Systems Corporation (1-31-03) | Cablevision |
| Cavalier Telephone, LLC (1-31-03) | Cavalier |
| CMOR (1-31-03) | CMOR |
| Coontz, J. Greg (1-8-03) | |
| DialAmerica Marketing, Inc. (1-31-03) | DialAmerica |
| Direct Marketing Association (1-31-03) | DMA |
| DIRECTV, Inc. (1-31-03) | DIRECTV |
| Hershovitz, Marc B., Michael Jablonski, Ned Blumenthal and C. Ronald Ellington (1-8-03) (3 comments) | Hershovitz |
| The International Softswitch Consortium (1-31-03) | ISC |
| Intuit, Inc. (1-31-03) | Intuit |
| LSSi Corp. (Lissi Corp; 1-31-03) | LSSi |
| Mathemaesthetics, Inc. (1-8-03) (*see also* Douglas McKenna; 1-6-03) | Mathemaesthetics |
| MBNA America Bank, N.A. (1-31-03) | MBNA |
| Mortgage Bankers Association of America (Stephen A. O'Conner; 1-31-03) | MBA |
| National Association of Broadcasters (1-31-03) | NAB |
| National Association of State Utility Consumer Advocates (NASUCA; 1-31-03) | NASUCA |
| National Public Radio, Inc. (1-31-03) | NPR |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 192 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| NCS Pearson, Inc. (1-31-03) | NCS |
| The Newspaper Association of America (1-21-03) | NAA |
| Nextel Communications, Inc. (1-31-03) | Nextel |
| Office of the People's Counsel for the District of Columbia | |
| (Elizabeth A. Noël, People's Counsel; 1-31-03) | OPC-DC |
| Private Citizen, Inc. (1-9-03) | Private Citizen |
| RoperASW (1-30-03) | RoperASW |
| SBC Communications, Inc. (1-31-03) | SBC |
| Sytel Limited (2-3-03) | Sytel |
| Teleperformance USA (4-30-03) | Teleperformance |
| Vector Marketing Corporation (1-31-03) | Vector |
| Verizon (1-31-03) | Verizon |
| Verizon Wireless (1-31-03) | Verizon Wireless |
| Visa (1-31-03) | Visa |
| VoltDelta (Brad Schorer; 12-9-02) | VoltDelta |
| Worldcom, Inc. (1-31-03) | Worldcom |
| Xpedite Systems, Inc. (1-31-03) | Xpedite |
| Yellow Pages Integrated Media Association (1-31-03) | Yellow Pages |

**Further Comments Filed**

| | |
|---|---|
| Active Periodicals, Inc. (5-5-03) | Active Periodicals |
| Allstate Life Insurance Company (5-5-03) | Allstate |
| American Association of Retired Persons (AARP; 5-19-03) | AARP |
| American Council of Life Insurers (5-5-03) | ACLI |
| American Teleservices Association (5-5-03) | ATA |
| America's Community Bankers (5-8-03) | ACB |
| Ameriquest Mortgage Company (5-5-03) | Ameriquest |
| Bank of America Corporation (Kathryn D. Kohler; 5-2-03) | Bank of America |
| Bank One Corporation (5-5-03) | Bank One |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 193 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| Cendant Corporation (5-5-03) | Cendant |
| Citigroup Inc. (5-19-03) | Citigroup |
| City of Chicago (5-1-03) | City of Chicago |
| Chrusch, Michael J., Esq. (5-5-03) | |
| Consumer Council of America (5-5-03) | CCA |
| Direct Marketing Association (5-5-03) | DMA |
| DIRECTV, Inc. (5-5-03) | DIRECTV |
| Electronic Retailing Association (5-5-03) | ERA |
| Federal Trade Commission (5-12-03) | FTC |
| Household Bank (SB), N.A. (5-2-03) | Household |
| InfoCision Management Corporation (5-5-03) | InfoCision |
| Interactive Teleservices Corporation | ITC |
| Intuit Inc. (5-5-03) | Intuit |
| Lorman Education Services (5-5-03) | Lorman |
| MBNA America Bank, N.A. (5-5-03) | MBNA |
| Metris Companies Inc. (5-5-03) | Metris |
| Miller Isar, Inc. (5-2-03) | Miller Isar |
| Mortgage Bankers Association of America (Kurt Pfotenhauer; 5-5-03) | MBA |
| National Association of Independent Insurers | |
| (National Association of Independent Insures [sic]; 5-5-03) | NAII |
| National Association of Realtors | |
| (National Association of Realtor; 5-5-03) | NAR |
| National Association of State Utility Consumer Advocates | |
| (NASUCA; 5-5-03) | NASUCA |
| National Association of Insurance and Financial Advisors (5-2-03) | NAIFA |
| National Telecommunications Cooperative Association (NTCA; 5-5-03) | NTCA |
| Newspaper Association of America (5-5-03) | NAA |

Add. 133

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 194 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| | |
|---|---|
| New Jersey State Division of the Ratepayer Advocate (5-5-03) | New Jersey Ratepayer |
| Nextel Communications, Inc. (5-5-03) | Nextel |
| Scholastic Inc. (5-5-03) | Scholastic |
| Securities Industry Association (James Y. Chin; 5-5-03) | SIA |
| Software & Information Industry Association (5-5-03) | SIIA |
| Sprint Corporation (5-5-03) | Sprint |
| Stonebridge Life Insurance Companies (5-5-03) | Stonebridge |
| Teleperformance USA (4-29-03) | Teleperformance |
| Tennessee Regulatory Authority (5-5-03) | TN RA |
| Vector Marketing Corporation | |
| (Vector – Marketing Corporation; 4-29-03) | Vector |
| Verizon (5-5-03) | Verizon |
| Winstar Communications, LLC (5-5-03) | Winstar |
| Worldcom, Inc. (5-5-03) | Worldcom |
| Yellow Pages Integrated Media Association (5-5-03) | Yellow Pages |

### Further Reply Comments Filed

| | |
|---|---|
| American Council of Life Insurers (5-19-03) | ACLI |
| American Teleservices Association (5-19-03) | ATA |
| America's Community Bankers (5-8-03) | ACB |
| Ameriquest Mortgage Company (5-5-03) | Ameriquest |
| Competitive Telecommunications Association (5-19-03) | Competitive Telecom |
| DialAmerica Marketing, Inc. (5-19-03) | DMA |
| Indiana Attorney General Steve Carter (5-19-03) | Indiana AG |
| National Association of State Utility Consumer Advocates | |
| (NASUCA; 5-19-03) | NASUCA |
| New Jersey State Division of the Ratepayer Advocate (5-19-03) | New Jersey Ratepayer |
| Primerica Financial Services, Inc. (5-19-03) | Primerica |

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 195 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

| SBC Communications, Inc. (SBC Communications Inc.; 5-19-03) | SBC |
| Verizon (5-5-03) | Verizon |

### *14174  SEPARATE STATEMENT OF CHAIRMAN MICHAEL K. POWELL

*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; CG Docket No. 02-278*

Our decision today is the most sweeping consumer protection measure ever adopted by the FCC. No longer will consumers be forced to endure unwanted telephone calls and faxes. Under the Telephone Consumer Protection Act (TCPA) and our revised rules, consumers are empowered to choose.

The TCPA is about tools. It gives consumers the tools they need to build a high and strong fence around their homes to protect them from unsolicited telephone calls and faxes. It also allows other consumers to have a lower fence or no fence at all, if they wish to take advantage of these commercial messages. Our decision makes the American consumer's toolbox more complete by creating a national do not call list and strengthening and modifying our other longstanding protections under the TCPA. Our goal: to maximize consumers' ability to control the messages they receive on their personal phones and faxes.

Since the enactment of the TCPA a decade ago, the rapid growth of technology has led to a five-fold increase in marketing contacts via telephone. An increased number of telemarketing calls, the proliferation of predictive dialers, and the incomplete protections of less-comprehensive do not call lists have combined to necessitate the Commission's new approach. Consumers want more control over their telephones - today we give it to them.

In addition to the national do not call list, our decision contains a number of other important provisions. First, although telemarketing calls made pursuant to an existing business relationship are exempt under the TCPA, the Commission today significantly narrows the scope of that exemption to better protect consumers. Consumers may eliminate even these commercial calls upon request. Second, we tighten the limitations on our existing do not call rules and impose additional requirements on predictive dialers, pre-recorded messages, and calls to wireless phones. We also require telephone solicitations to provide caller identification. Finally we adopt stricter rules to control unsolicited fax advertising. Taken together and combined with vigilant enforcement, our rules provide consumers with the tools they need to craft the commercial relationships they want.

Consistent with the instructions in the recently enacted Do Not Call Implementation Act, our order maximizes consistency and complements the FTC's recently amended rules. I look forward to working with the FTC, under the fine leadership of Chairman Muris, to harmonize our rules and move forward with nation-wide implementation of the federal Do-Not-Call Registry.

### *14175  SEPARATE STATEMENT OF COMMISSIONER KATHLEEN Q. ABERNATHY

*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order*

Today's decision to establish a national do-not-call list is directly responsive to consumer frustration with telemarketing overload. Consumers are fed up with the barrage of telemarketing calls that intrude on their privacy, and they crave the ability to just say no. Congress also has made clear the importance of giving consumers a more effective means of blocking unwanted calls. Congress authorized establishment of a national do-not-call registry in the Telephone Consumer Protection Act of 1991, and earlier this year, it enacted the Do-Not-Call Implementation Act. This legislation authorizes funding for the Federal Trade Commission's national registry and directs this Commission to "maximize consistency" with the FTC's Telemarketing Sales Rule. Today's action responds to this congressional direction by providing a convenient, one-stop solution that will enable consumers to place their phone numbers on a unified national do-not-call list at no charge.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 196 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

At the same time, I remain mindful that telemarketing can serve a valuable function by providing information to consumers about goods and services. Many consumers appreciate learning about ways to save money, obtain better service, or otherwise take advantage of commercial opportunities. Moreover, telemarketers enjoy protection under the First Amendment, which requires that any restrictions on commercial speech advance a substantial governmental interest and be no more extensive than necessary. Accordingly, I am pleased that we have crafted rules that balance the competing interests at stake.

In particular, we have preserved and in some cases modified the exemptions for calls to consumers with whom the marketer has an established business relationship, calls to consumers who have expressly consented to being called, and calls by tax-exempt nonprofit organizations (or by independent telemarketers calling on their behalf). Consumers should understand that, as a result of these statutory exemptions, placing a phone number on the national do-not-call list will not necessarily mean that you will receive *no* telemarketing calls. But the small number of calls received should be more consistent with consumers' expectations of privacy, and consumers can prohibit any further contact through company-specific do-not-call lists.

I am also pleased that the Commission has established a narrow exemption from the national do-not-call list to permit marketers to contact people with whom they have a personal relationship. I believe the record shows that Congress was concerned about anonymous calls using autodialers; it did not intend to put the Avon Lady out of business. Consumers generally expect and welcome calls from family, friends, and acquaintances who want to promote products and services. Restricting such calls therefore would impose a more extensive burden on speech than is necessary to achieve Congress's goals.

 **\*14176**  In addition, the Order appropriately clarifies the interplay between federal and state telemarketing restrictions. While I support empowering consumers to block unwanted calls, telemarketers should not have to comply with multiple, inconsistent rules. Indeed, Congress clearly called on this Commission and the FTC to establish a uniform federal regime. Thus, the Order appropriately clarifies that, while states may enforce the federal rules and may adopt more restrictive rules for intrastate calls, states generally may not regulate interstate calls.

In sum, I am pleased to support this Order, because it provides effective mechanisms for consumers to restrict unwanted telemarketing calls, while balancing the legitimate interests that companies and individuals have in communicating with customers and potential customers. I expect companies to comply with our new rules, and I look forward to working together with the FTC and state attorneys general to ensure that consumers receive the privacy protection they want and deserve.

### **\*14177  SEPARATE STATEMENT OF COMMISSIONER MICHAEL J. COPPS**

Re: *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket No. 02-278), Report and Order*

Few rights are so fundamental as the right to privacy in our daily lives, yet few are under such frontal assault. Our dinners are disrupted by unwanted phone calls. Our computer accounts are besieged with bothersome spam. Our mailboxes are swollen with advertisements for products, goods and services. We conduct our whole lives against the white noise of commercial solicitation. These intrusions exhaust us, irritate us and threaten our cherished right to be left alone.

Today we have an opportunity to do something about it. We have an opportunity to reinforce our homes against the constant invasion of commercialism and the endless nuisance of unwanted telemarketing calls. At the direction of Congress and through coordinated action with the Federal Trade Commission, we now return a measure of privacy control to citizens. We establish a national Do-Not-Call registry that permits each of us to choose limits on the telemarketing calls we receive. We do this in a way that balances the First Amendment rights of marketers with the right of each individual and every household to determine the scope of permissible intrusion. This decision represents a positive step for all of us, not only as consumers, but as citizens. I am pleased to support it.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 197 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

I am especially pleased that the rules we adopt are in harmony with those put in place by our allies in this exercise at the Federal Trade Commission. This is consistent with Congress' direction that we "maximize consistency" with the rules adopted by our fellow agency. This makes for a user-friendly registry.

To ensure that the Do-Not-Call list achieves the protective power and prominence that Congress intended, both agencies must now work together–and with our partners in the states–to enforce the national program we establish here today. When the Do-Not-Call list is open for business, we will share the duty of vigilant enforcement. We worked hard here to balance the rights and privileges of personal contacts and relationships with the right to be left alone. I think we achieve good balance, but I never underestimate the inventiveness of some in skirting or abusing rules, and these individuals and enterprises should understand that such actions will not go unnoticed or unpunished.

We all owe a debt of gratitude to the many people at our Consumer and Governmental Affairs Bureau who worked hard to draft and coordinate and bring this item before the Commission and who will continue to labor on behalf of the American people to implement the rules and make the national registry a success. I also want to commend my colleagues for the productive discussions we have had on this item in recent days. The result is a little more privacy in our not-so-private society.

### *14178  SEPARATE STATEMENT OF COMMISSIONER JONATHAN S. ADELSTEIN
*Re: Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (CG Docket 02-278).*

I am pleased to support this item. By adopting a National Do-Not-Call List, we arm American consumers with a powerful tool to protect their privacy. This is one of the most significant things that the FCC has ever done for American families. It will benefit consumers on a daily basis and in a very personal way. It's certainly the thing that people will notice as much as anything else we have done. We're restoring peace and quiet around the dinner table for everyone who asks for it, and plenty will ask, myself included. The public has sent a resounding directive telling us that uninvited telephone solicitations are not merely a distraction but are driving customers away from their phones. Consumers have also made clear that our prior rules - without a national Do-Not-Call List - do not work to their satisfaction. And Congress has made its wishes clear by adopting the Do-Not-Call Act which authorized the establishment of the national list. My hope is that our actions here will allow the American public to once again view their phones as a useful connection to the world rather than a source of nightly harassment.

At the same time, we balance the interests of consumer privacy alongside the commercial speech interests of those businesses who use the telephone to offer goods and services and the interests of those consumers willing to receive such offers. The record bears out that many consumers find telephone solicitations valuable. According to industry estimates, outbound telemarketing generates between 300 and 600 billion dollars in annual revenues. So, I am sensitive to the potential impact of these rules on the businesses that rely on telephones to reach their customers. I have particular concern about the local telephone industry, where the practical effect of our established business relationship exemption may have an uneven impact on competitors. Nonetheless, Congress has captured the will of the people - certainly, as reflected in our record - when it directed us to "maximize the consistency" of our rules with the newly-adopted FTC national list. Congress did not explicitly provide for particular treatment of the local telephone industry in the Do-Not-Call Act, but I believe that this area warrants our special attention and monitoring.

So that our rules are no more extensive than necessary and because American consumers each hold different views about the value of telephone solicitations, we adopt a suite of options from which customers can choose the approach that best serves their needs. Under our rules, customers may sign up for the new national Do-Not-Call List or, alternatively, may continue to receive telemarketing calls and sign up for the company-specific lists when they no longer wish to hear from a particular company. When customers sign up for the national list, they still have the ability to grant express permission to receive calls from particular companies. So our rules are flexible enough to allow consumers to choose the best option for them.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 198 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

We have a special obligation to remain vigilant in our implementation of these rules. Congress has asked us to report to it annually. I look forward to those reports with the optimism that we have adopted measures that will put American consumers back in control of their phones.

## Footnotes

1    Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227. The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. § 201 *et seq.*

2    The Direct Marketing Association (DMA) is a trade association of businesses that advertise their products and services directly to consumers by mail, telephone, magazine, internet, radio or television. *See also infra*, note 47.

3    Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 6101 *(Do-Not-Call Act).*

4    *See TCPA*, Section 2(5), *reprinted in* 7 FCC Rcd 2736 at 2744.

5    47 U.S.C. § 227(b)(1).

6    47 U.S.C. §§ 227(d)(1)(B) and (d)(3)(A). *See also Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Order on Further Reconsideration, 12 FCC Rcd 4609, 4613, para. 6 (1997) (*1997 TCPA Reconsideration Order*), in which the Commission found that "[s]ection 227(d)(1) of the statute mandates that a facsimile include the identification of the business, other entity, or individual creating or originating a facsimile message and not the entity that transmits the message." (footnotes omitted).

7    The TCPA permits consumers to file suit in state court if an entity violates the TCPA prohibitions on the use of facsimile machines, automatic telephone dialing systems, and artificial or prerecorded voice messages and telephone solicitation. 47 U.S.C. §§ 227(b)(3) and (c)(5). Consumers may recover actual damages or receive up to $500 in damages for each violation, whichever is greater. If the court finds that the entity willfully or knowingly violated the TCPA, consumers may recover an amount equal to not more than three times this amount. 47 U.S.C. § 227(b)(3). Consumers may also bring their complaints regarding TCPA violations to the attention of the state attorney general or an official designated by the state. This state entity may bring a civil action on behalf of its residents to enjoin a person or entity engaged in a pattern of telephone calls or other transmissions in violation of the TCPA. 47 U.S.C. § 227(f)(1). Additionally, a consumer may request that the Commission take enforcement actions regarding violations of the TCPA and the regulations adopted to enforce it. *See* 47 C.F.R. § 1.41 on informal requests for Commission action and 47 C.F.R. § 1.716 on the Commission's process for complaints filed against common carriers.

8    47 U.S.C. § 227(b)(2).

9    47 U.S.C. § 227(c)(1)-(4).

10    47 U.S.C. § 227(c)(1)(A).

11    47 U.S.C. § 227(c)(3).

12    *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Report and Order, 7 FCC Rcd 8752 (1992) (*1992 TCPA Order*); *see also* 47 C.F.R. § 64.1200.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 199 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

13    Initially telemarketers were required to honor a do-not-call request indefinitely. The Commission later modified its rules to require that the request be honored for a ten-year period. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397-98, para. 14 (1995) (*1995 TCPA Reconsideration Order*); 47 C.F.R. § 64.1200(e)(2)(vi).

14    47 C.F.R. § 64.1200(e)(2)(i).

15    47 C.F.R. § 64.1200(e)(2)(ii).

16    47 C.F.R. § 64.1200(e)(1).

17    47 C.F.R. § 64.1200(e)(2)(iv).

18    47 C.F.R. § 64.1200(a)(1)(i)-(iii).

19    47 C.F.R. § 64.1200(a)(2).

20    47 C.F.R. §§ 64.1200(a)(4) and 68.318(c).

21    47 C.F.R. § 64.1200(a)(3).

22    47 C.F.R. §§ 64.1200(d)(1) and (2); 47 C.F.R. § 68.318(d).

23    *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397-401, paras. 12-19.

24    *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12404-06, paras. 27-31.

25    *1997 TCPA Reconsideration Order*, 12 FCC Rcd at 4612-13, para. 6. The Commission also "[did] not find anything in the TCPA that would prohibit a facsimile broadcast provider from supplying identification of itself and the entity originating a message if it arranges with the message sender to do so." *Id*. at 4613, para. 6.

26    *See TCPA*, Section 2(3), *reprinted in* 7 FCC Rcd 2736 at 2744.

27    *See TCPA*, Section 2(4), *reprinted in* 7 FCC Rcd 2736 at 2744.

28    In attempting to estimate the number of outbound marketing calls made each day in the United States, representatives of the Direct Marketing Association (DMA) have stated that, with as many as 1 million telemarketing representatives making 13 calls an hour, working 8 hours a day, it is possible that 104 million outbound calls are made to businesses and consumers every day. They noted that, of these calls, as many as 41% of them may be abandoned (because they get busy signals, no answer, hang-ups, or answering machines). *See* transcript from FTC Do-Not-Call Forum, Testimony of Jerry Cerasale, DMA, June 6, 2002 at 68. Another study presented to the FTC during its proceeding, estimates that the annual number of outbound calls that are answered by a consumer is 16,129,411,765 (*i.e.*, 16 billion calls). This figure does not include those calls that are abandoned. James C. Miller, III, Jonathan S. Bowater, Richard S. Higgins, and Robert Budd, "An Economic Assessment of Proposed Amendments to the Telemarketing Sales Rule," June 5, 2002 at 28, Att. 1 (prepared for the Consumer Choice Coalition and its members, ACI Telecentrics, Coverdell & Company, Discount Development Services, HSN LP d/b/a HSN and Home Shopping Network, Household Credit Services, MBNA America Bank, Member Works Incorporated, Mortgage Investors Corporation, Optima Direct, TCIM Inc., Trilegiant Corporation and West Corporation). *See Telemarketing Sales Rule, Final Rule,* Federal Trade Commission, 68 Fed. Reg. 4580 at 4629-30, n.591 (Jan. 29, 2003) (*FTC Order)*.

29    This figure represents telemarketing sales to consumers and businesses. *See* Seth Stern, "Will feds tackle telemarketers?" (April 15, 2002) <http:// www.csmonitor.com/2002/0415/p16s01-wmcn.html> (citing Direct Marketing Association statistics).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 200 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

30    *See* "The Economic Impact of Direct Marketing by Telephone," a study presented by Direct Marketing Association Telephone Marketing Council, <http:// www.third-wave.net/economics.htm> (visited July 3, 2002).

31    A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call. *See Telemarketing Sales Rule, Notice of Proposed Rulemaking*, Federal Trade Commission, 67 Fed. Reg. 4492 at 4522 (January 30, 2002) (*FTC Notice*).

32    Each telemarketing company can set its predictive dialer software for a predetermined abandonment rate (*i.e.*, the percentage of hang-up calls the system will allow). The higher the abandonment rate, the higher the number of hang-up calls. High abandonment rates increase the probability that a customer will be on the line when the telemarketer finishes each call. It also, however, increases the likelihood that the telemarketer will still be on a previously placed call and not be available when the consumer answers the phone, resulting in "dead air" or a hang-up. *See FTC Notice*, 67 Fed. Reg. at 4523.

33    47 U.S.C. § 227(b)(1)(C) and 47 C.F.R. § 64.1200(a)(3).

34    The Commission or the Commission's Enforcement Bureau have issued forfeiture orders totaling $1.56 million for violations of the TCPA's prohibition on unsolicited fax advertisements. The Commission has also proposed a $5,379,000 forfeiture against a fax broadcaster. *See Fax.com, Inc. Apparent Liability for Forfeiture*, Notice of Apparent Liability for Forfeiture, 17 FCC Rcd 15927 (2002) *(Fax.com NAL), stayed Missouri v. American Blast Fax*, No. 4:00CV933SNL (E.D. Mo. Aug. 29, 2002). The Enforcement Bureau has also issued 189 citations for such prohibited faxes. For a description of the Commission's enforcements actions involving the TCPA, *see* <http:// www.fcc.gov/eb/tcd/ working.html>. Under section 503 of the Act, the Commission is required in an enforcement action to issue a warning citation to any violator that does not hold a Commission authorization. Only if the non-licensee violator subsequently engages in conduct described in the citation may the Commission propose a forfeiture, and the forfeiture may only be issued as to the subsequent violations. *See* 47 U.S.C. §§ 503(b)(5), (b)(2)(C).

35    *See, e.g., Fax.com NAL*, 17 FCC Rcd at 15932-33, para. 9, which describes a medical doctor's complaint about unsolicited fax advertisements he received on a line that is reserved for the receipt of patient medical data.

36    *See FTC Order*, 68 Fed. Reg. at 4580. The FTC adopted its Telemarketing Sales Rule, 16 C.F.R. Part 310, on August 16, 1995, pursuant to the Telemarketing Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101-6108. The Telemarketing Act, which was signed into law on August 16, 1994, directed the FTC to issue a rule prohibiting deceptive and abusive telemarketing acts or practices. *FTC Notice*, 67 Fed. Reg. at 4492-93.

37    "Scrubbing" refers to comparing a do-not-call list to a company's call list and eliminating from the call list the telephone numbers of consumers who have registered a desire not to be called.

38    Despite these jurisdictional limitations, the FTC stated that it can reach telemarketing activity conducted by non-exempt entities. Therefore, it maintains that when an exempt financial institution, telephone company, insurance company, airline, or nonprofit entity conducts its telemarketing campaign using a third-party telemarketer not exempt from the amended TSR, then that campaign is subject to the provisions of the TSR. *See FTC Order*, 68 Fed. Reg. 4580 at 4587.

39    The FTC's national do-not-call registry and other amendments to the TSR have been challenged on grounds that a national do-not-call registry violates the First Amendment and that the FTC exceeded its statutory authority under the Telemarketing Consumer Fraud and Abuse Prevention Act. *See Mainstream Marketing Services, Inc. v. FTC*, No. 03-N-0184 (D. Colo. filed Jan. 29, 2003). *See also U.S. Security et al v. FTC*, Civ. No. 03-122-W (W.D. Okla. filed Jan. 29, 2003). On March 26, 2003, the U.S. District Court for the Western District of Oklahoma denied plaintiffs' Motion for Preliminary Injunction of the FTC's abandoned call rules, stating that plaintiffs "have failed to show a substantial

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 201 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

likelihood that they will prevail on the merits of their challenges to the Final Rule." *See U.S. Security et al. vs. FTC*, No. Case CIV-03-122-W (W. D. Okla. March 26, 2003).

40    *See FTC Order*, 68 Fed. Reg. 4580 at 4641.

41    *See* FTC press materials at <http:// www.ftc.gov/opa/2003/06/dncaccelerated.htm> (accessed June 3, 2003).

42    *See FTC Order*, 68 Fed. Reg. 4580 at 4641-45; 16 C.F.R. §§ 310.4(b)(1)(iv) and 310.4(b)(4).

43    *See FTC Order*, 68 Fed. Reg. 4580 at 4623-28; 16 C.F.R. § 310.4(a)(7).

44    Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Vermont, Wisconsin and Wyoming have no-call laws. Of these states, Connecticut, Maine, Michigan, Pennsylvania, Vermont, and Wyoming require telemarketers to use the DMA's Telephone Preference Service (TPS) list. *See infra* note 47. Alaska's statute requires telephone companies to place a black dot in the telephone directory by the names of consumers who do not wish to receive telemarketing calls.

45    States that are considering laws to create state-run do-not-call lists are Delaware, District of Columbia, Hawaii, Iowa, Maryland, Michigan, Nebraska, Nevada, North Carolina, Ohio, Rhode Island, South Carolina, Washington, and West Virginia.

46    In Indiana, more than 1,000,000 residential telephone numbers have been submitted to the State's do-not-call list. In Missouri, more than 1,000,000 residential telephone numbers are now enrolled in the State's do-not-call database, placing approximately 40% of the State's households on that State's do-not-call list. In Tennessee, 762,000 telephone numbers have been registered, representing an estimated 33% of all households. In New York, the number of residential telephone numbers enrolled on that State's do-not-call list is nearly 2 million. Connecticut's do-not-call list contains nearly 400,000 telephone numbers, and Georgia's is nearing 360,000. Colorado has 977,000 registered phone numbers, almost half of the number of residential phone lines in the state. Texas has more than 782,000 registered phone lines. Kentucky has 740,000 registered phone lines, representing 46% of Kentucky residents. The Kansas list contains more than 367,000 phone lines. Approximately 1,600,000 residents enrolled in Pennsylvania's registry in less than six weeks. *See* NAAG Comments at 6, n.5.

47    *See, e.g.*, Wyoming (Wyo. Stat. Ann. § 40-12-301) and Maine (Me. Rev. Stat. Ann. tit. 32, § 14716 (2003). Established in 1985, the DMA's Telephone Preference Service (TPS) is a list of residential telephone numbers for consumers who do not wish to receive telemarketing calls. The DMA requires its members to adhere to the list. Telemarketers who are not members of DMA are not required to use the list, but may purchase the TPS for a fee. *See* <http:// www.dmaconsumers.org/offtelephonelist.html> (accessed April 8, 2003).

48    *See, e.g.*, Connecticut (Conn. Gen. Stat. Ann. § 42-288a); Indiana (H. B. 1222, to be codified at Ind. Code Ann. § 24.4.7); Missouri (Mo. Rev. Stat. § 407.1098); and Tennessee (Tenn. Code Ann. § 65-4-404 (2002)); *see also* rules at Tenn. Comp. R & Regs. Chap. 1220-4-11).

49    *See* Ga. Code Ann. § 46-5-27 (2002); *see also* rules at Ga. Comp. R & Regs. R. 515-14-1.

50    *See* H.B. 472, to be codified at Tex. Bus. & Com. Code Ann. § 43.001.

51    *See* Or. Rev. Stat. § 646.574.

52    *See* Mo. Rev. Stat. § 407.1098.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 202 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

53    *See* Illinois H.B. 3407.

54    *See* <http://nocall.doj.state.ca.us/> (accessed April 8, 2003).

55    *See FTC Order*, 68 Fed. Reg. 4580 at 4641.

56    *See* FTC Order, 68 Fed. Reg. 4580 at 4641.

57    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90 (2002) (*2002 Notice*). In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

58    *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

59    *2002 Notice*, 17 FCC Rcd at 17473-76, paras. 23-27.

60    *2002 Notice*, 17 FCC Rcd at 17477-81, paras. 30-35.

61    *2002 Notice*, 17 FCC Rcd at 17482-84, paras. 37-40.

62    *2002 Notice*, 17 FCC Rcd at 17468-71, paras. 13-17.

63    *2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

64    *See FTC Notice*, 67 Fed. Reg. 4492 and *FTC Order*, 68 Fed. Reg. 4580.

65    *2002 Notice*, 17 FCC Rcd at 17497-501, paras. 70-80.

66    On December 20, 2002, the Commission extended its reply comment period until January 31, 2003. *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

67    *See* H.R. REP. No. 108-8 at 4 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 671.

68    *Id.*

69    The Do-Not-Call Act provides that the FTC and FCC shall each transmit a report to Congress which shall include: "(1) an analysis of the telemarketing rules promulgated by both the Federal Trade Commission and the Federal Communications Commission; (2) any inconsistencies between the rules promulgated by each such Commission and the effect of any such inconsistencies on consumers, and persons paying for access to the registry; and (3) proposals to remedy any such inconsistencies." *See* Do-Not-Call Act, Sec. 4(a).

70    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Docket No. 02-278, Further Notice of Proposed Rulemaking, FCC 03-62 (rel. March 25, 2003) (*Further Notice*).

71    *See* Comments filed by the FTC in response to the Commission's *Further Notice. See also* NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs; Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*).

72    47 U.S.C. § 227(c)(1).

73    47 U.S.C. § 227(c)(1)(A).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 203 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

74    47 U.S.C. § 227(c)(3).

75    *See* 47 U.S.C. § 227(c)(3)(A)-(L).

76    47 U.S.C. § 227(c)(4).

77    47 U.S.C. § 152(b). *See also Texas v. American Blast Fax*, 121 F. Supp. 2d 1085 at 1087-89 (W.D. Tex. 2000), *Minnesota v. Sunbelt Communications and Marketing*, Civil No. 02-CV-770 (D. Minn. Sept. 4, 2002).

78    *1992 TCPA Order*, 7 FCC Rcd at 8760, para. 14. At that time commenters estimated the start-up and operational costs for a national database in the first year could be as high as $80 million. *Id.* at 8758, para. 11.

79    *See infra* paras. 86-96 for a discussion of the company-specific do-not-call requirements.

80    *2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66. On December 20, 2002, the Commission extended its reply comment period to allow parties an opportunity to comment on the FTC's order establishing a national do-not-call database for those entities over which it has jurisdiction. *See Consumer & Governmental Affairs Bureau Announces An Extension of Time To File Reply Comments on the Telephone Consumer Protection Act (TCPA) Rules*, Public Notice, DA 02-3554 (rel. Dec. 20, 2002).

81    *2002 Notice*, 17 FCC Rcd at 17487-88, para. 49 (also noting that the FTC had received over 40,000 comments in response to its Notice on telemarketing).

82    *2002 Notice*, 17 FCC Rcd at 17464, para. 7, n.34 (citing estimate that as many as 104 million outbound calls are made every day).

83    *See 2002 Notice*, 17 FCC Rcd at 17487-96, paras. 49-66.

84    *See, e.g.*, Maureen Matthews Comments; Gloria Toso Comments; Shirley A. Weaver Comments. *See also* ACUTA Comments at 2; NACAA Comments at 2; Telecommunications for the Deaf Comments at 4; NJ Ratepayer Further Comments at 2.

85    *See, e.g.*, EPIC Comments at 2-5; Private Citizens, Inc. Comments at 3; Teresa Wilkie Comments; Benjamin Philip Johnson Comments.

86    *See, e.g.,* Terry L. Krodel Comments (disabled individual has difficulty answering phone); Brian Lawless (contends that consumers should not be forced to pay additional charges to stop telemarketing calls); J. Raymond de Varona Comments (telemarketers hang up when he requests to be added to do-not call list); Mandy Burkart Comments (elderly grandmother targeted by telemarketers). *See also* AARP Comments at 1 (noting that elderly consumers are often the subject of telemarketing fraud).

87    *See, e.g.*, Emily Malek Comments; Lester D. McCurrie Comments; Andrea Sattler Comments; Sandra S. West Comments (receives as many as 20 telemarketing calls per day).

88    Edwin Bailey Hathaway Comments; Cynthia Stichnoth Comments.

89    *See, e.g.,* Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides quiet for terminally ill family member).

90    *See, e.g.*, Verizon Comments at 2; Bank of America Further Comments at 2.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 204 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

91    *See, e.g.*, NAAG Comments at 8-13; New York State Consumer Protection Board Comments at 7; Ohio PUC Comments at 3-7; Texas PUC Comments at 10.

92    *See, e.g.*, Bank of America Comments at 2-4 (endorse national list provided it establishes a uniform national standard and retains established business relationship); Cox Enterprises Comments at 4-9 (would not oppose national list if established business relationship exemption is retained); Sprint Comments at 11-12 (state lists should be preempted); Verizon Wireless Comments at 4-6 (support national list if state lists preempted and established business relationship retained). *See also* DMA Further Comments at 3 (should preempt states); DirectTV Further Comments at 3 (preempt); Nextel Further Comments at 8.

93    *See, e.g.*, MBA Comments at 2; NAII Comments at 2; SBC Comments at 6; WorldCom Comments at 17.

94    *See, e.g.*, ABA Comments at 7; BellSouth Reply Comments at 5.

95    *See, e.g.*, Dial America Comments at 15-18; Technion Comments at 3-4; Vector Comments at 14-15.

96    *See, e.g.*, MPA Comments at 13-14; NAA Comments at 12-14; Seattle Times Comments at 2; Vector Comments at 14-15.

97    *See, e.g.*, MPA Comments at 4, 13-14; NAA Comments at 13; PLP Comments at 1.

98    *See, e.g.*, March of Dimes Comments at 2; Leukemia and Lymphoma Society Comments; Special Olympics Hawaii Comments at 2.

99    *See, e.g.*, ATA Comments at 58-91; SBC Comments at 6, 16-17; WorldCom Comments at 19-30.

100    *See FTC Order*, 68 Fed. Reg. at 4628-33.

101    The FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry of consumers who do not want to be contacted by telemarketers.

102    The FTC indicates that calls will be answered by an Interactive Voice Response (IVR) system. Consumers will be directed to enter their telephone numbers. That number will then be checked against an automatic number information (ANI) that is transmitted with the call. Consumers will also be able to verify or cancel their registration in the same way. *See FTC Order*, 68 Fed. Reg. at 4638-39.

103    As discussed herein, the terms "seller" and "telemarketer" may refer to the same entity or separate entities. The "telemarketer" is the entity that actually initiates the telephone call. The "seller" is the entity on whose behalf the telephone call is being made. *See* amended 47 C.F.R. § 64.1200(f)(5) and (6). Sellers may often hire telemarketing entities to contact consumers on their behalf. *See* amended 47 C.F.R. § 64.1200(f)(7) for the definition of "telemarketing." Pursuant to the FTC's do-not-call program, each seller must pay for access to the do-not-call database. Thus, telemarketing entities cannot share do-not-call data among various client sellers.

104    *See* 16 C.F.R. § 310.4(b)(2).

105    The FTC has concluded, however, that calls on behalf of charitable organizations will be subject to the company specific do-not-call provisions. *See FTC Order*, 68 Fed. Reg. at 4629.

106    The FTC defines an "established business relationship" as a relationship between a seller and consumer based on: (1) the consumer's purchase, rental, or lease of the seller's goods or services or a financial transaction between the consumer and seller, within the *eighteen* months immediately preceding the date of a telemarketing call; or (2) the consumer's inquiry or application regarding a product or service offered by the seller, within the *three* months immediately preceding the date of a telemarketing call. 16 C.F.R. § 310.2(n). Regarding the interplay between the established business relationship and do-not-call rules, the FTC concluded that if the consumer continues to do business with the seller after asking not

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 205 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

to be called, the consumer cannot be deemed to have waived their company-specific do-not-call request. *FTC Order*, 68 Fed. Reg. at 4634.

107    *See* 16 C.F.R. § 310.4(b)(3).

108    *FTC Order*, 68 Fed. Reg. at 4638-41.

109    *See also* H.R. REP. No. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

110    *See, e.g.*, Joseph A. Durle Comments (forced to turn phone off due to constant telemarketing calls and missed call that family member had a stroke); John D. Milhous Comments; Gregory Reichenbach Comments; Christopher C. Parks Comments (receives numerous calls every day).

111    *See* 47 U.S.C. § 227(c)(1)(A).

112    *See TCPA*, Section 2(9), *reprinted in* 7 FCC Rcd at 2744.

113    In the *FTC Order*, the FTC outlines in detail how the national registry will be administered, including how consumers may register and how sellers may purchase the list. *See also infra*, Enforcement Priorities section, paras. 211-214.

114    We decline to extend the effective date for the national do-not-call rules beyond October 1, 2003. *See Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for national do-not-call list requirements).

115    *See* H.R. J. Res. 2, 108th Congress at 96 (2003) (*Consolidated Appropriations Resolution*). *See also* H.R. REP. No. 108-8 at 3 (2003), reprinted in 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

116    *See* Do-Not-Call Act, Sec. 3.

117    *See, e.g.*, Sean Herriott Comments (receives numerous telemarketing calls each day); Lester D. McCurrie (receives between 8-12 call per day); David K. McClain Comments; Greg Rademacher Comments (receives so many calls that he now refuses to answer the phone); John Rinderle Comments; Steven D. Thorton Comments; Sandra West Comments (receives 20 calls per day).

118    *See supra* para. 8.

119    *See, e.g.*, Karen M. Meyer Comments (86 year-old receives as many as 10 solicitation calls per day); Vivian Sinclair Comments (85 year old with cane receives numerous telephone solicitations); Mr. and Mrs. Joseph Stephanik Comments (works at night and telemarketing calls interfere with sleep); Mavis Selway Comments (husband who works at night must answer telemarketing calls during day).

120    *See* Telecommunications for the Deaf Comments at 2-3 (noting that telemarketers often lack TTY or telecommunications relay service).

121    *See* H.R. REP. No. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities.").

122    *See, e.g.*, LSSi Comments at 5-6; NCS Comments at 2-4.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 206 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

123  As noted above, the FTC has awarded a contract to AT&T Government Solutions for $3.5 million to create the national registry. The Congressional Budget Office estimates that the FTC will collect and spend a total of about $73 million in fees over 2003-2008 to implement the national database. *See* H.R. REP. NO.108-8 at 6 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 673.

124  *FTC Order*, 68 Fed. Reg. at 4640.

125  *See FTC Order*, 68 Fed. Reg. at 4640. Our rules previously required a company-specific do-not-call request to be honored for ten years. *See* 47 C.F.R. § 64.1200(e)(2)(vi).

126  The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery of such number to end users. 47 C.F.R. § 64.1600(b).

127  *FTC Order*, 68 Fed. Reg. at 4640.

128  As noted above, the "seller" and "telemarketer" may be the same entity or separate entities. Each entity on whose behalf the telephone call is being made must purchase access to the do-not-call database.

129  *See* 47 U.S.C. § 227(c)(3)(K). *See also* 16 C.F.R. § 310.4(b)(2). We also note that telemarketers will be prohibited from selling the list to others or dividing the costs of accessing the list among various client sellers. Such action would threaten the financial support for maintaining the database.

130  *See, e.g.*, AT&T Wireless Reply Comments at 22; Charles Ferguson Comments; City of New Orleans Comments at 12; Texas Office of Public Utility Counsel Comments at 7. *See also* NAAG Comments at 35-36 contending that public safety implications may arise if wireless consumers receive unsolicited marketing calls while operating automobiles.

131  47 U.S.C. § 227(b)(1)(iii).

132  Nextel Comments at 19. We note that section 227(c)(1) uses the phrase "residential telephone subscribers" and that section 227(c)(3), which more specifically discusses the do-not-call database, uses the phrase "residential subscribers." Neither of these terms is defined in the TCPA. Thus, we see no basis in the legislative language or history for considering them to be materially different. Nor do we see a basis for distinction in common usage. Therefore, we will interpret them to be synonymous and will refer to both by using the term "residential subscribers."

133  Nextel Comments at 19.

134  Nextel Comments at 21.

135  Nextel Comments at 20.

136  For example, the Commission recently relied on wireless broadband PCS substitution to support "Track A" findings in two section 271 proceedings where residential customers in New Mexico and Nevada had replaced their landline service with wireless service. *See Application by SBC Communications Inc., Nevada Bell Telephone Company, and Southwestern Bell Communications Services, Inc., for Authorization to Provide In-Region, InterLATA Services in Nevada*, WC Docket No. 03-10, Memorandum Opinion and Order, FCC 03-80 at paras. 16 - 26 (rel. April 14, 2003); *see also* Federal Communications Commission, Seventh Annual Report and Analysis of Competitive Market Conditions With Respect to Commercial Mobile Services at 32-36 (*Seventh Annual CMRS Competition Report*).

137  47 U.S.C. § 227(b)(1)(A)(iii).

138  S. REP. NO. 102-178 at 1 (noting that telephone solicitations are both a nuisance and an invasion of privacy).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 207 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

139    This presumption is only for the purposes of section 227 and is not in any way indicative of any attempt to classify or regulate wireless carriers for purposes of other parts of Title II.

140    We also note that numerous alternative marketing outlets remain available to sellers, such as newspapers, television, radio, and direct mail.

141    Such calls may be prohibited if they serve as a pretext to an otherwise prohibited advertisement or a means of establishing a business relationship. Moreover, responding to such a "survey" does not constitute express permission or establish a business relationship exemption for purposes of a subsequent telephone solicitation. *See* H.R. REP. NO. 102-317 at 13 ("[T]he Committee does not intend the term 'telephone solicitation' to include public opinion polling, consumer or market surveys, or other survey research conducted by telephone. A call encouraging a purchase, rental, or investment would fall within the definition, however, even though the caller purports to be taking a poll or conducting a survey.").

142    *See* FTC Order, 68 Fed. Reg. at 4645-46.

143    *See* 16 C.F.R. § 310.4(b)(3).

144    *See* 47 U.S.C. § 227(c)(1)(A).

145    *See* "New telemarketer tool trumps TeleZapper," CNN.com (February 26, 2003) <http://edition.cnn.com/2003/TECH/ ptech/02/26/telemarket.tool.ap/> (noting development of software that allows telemarketers to circumvent the telezapper and other blocking devices).

146    *See, e.g.*, Leslie Price Comments (telezapper ineffective); Josephine Presley Comments (call blocking ineffective).

147    For example, section 227(c) prohibits consumers from being charged to place their number on a national do-not-call list. *See* 47 U.S.C. § 227(c)(3)(E).

148    *See* 1992 TCPA Order, 7 FCC Rcd at 8761-62, paras. 16-17.

149    *See* 47 U.S.C. § 227(c)(4)(C) (requiring the Commission to consider "whether the needs of telemarketers operating on a local basis could be met through special markings of area white page directories"). This conclusion is consistent with the Commission's conclusion in 1992.

150    *See* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated march 18, 2003.

151    *See infra* para. 54.

152    This finding is dependent, in large part, on conclusions that we have reached elsewhere in this order. For example, our conclusion that the McCarran-Ferguson Act does not necessarily prohibit the application of the national registry to insurance companies; rather, the implications of the McCarran-Ferguson Act will need to be evaluated on a case-by-case basis. The Commission may seek further clarification or authority from Congress as necessary to support these conclusions.

153    *See supra* note 39.

154    *See, e.g.*, NCTA Comments at 6; NAA Comments at 14; MBA Further Comments at 4.

155    47 U.S.C. § 227(a)(3).

156    *See* amended 47 C.F.R. § 64.1200(f)(3).

157    47 U.S.C. § 227(a)(3). *See also* H.R. REP. No. 102-317 at 13 (1991) (suggesting that Congress did not believe such prior express permission need be in writing) We believe that in discussing the form in which *prior express permission* must

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 208 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

be given, Congress was addressing an exemption to the definition of telephone solicitation. Here, we are addressing the type of prior express permission that would allow calls to consumers who already have indicated that they do not wish to receive telemarketing calls (by registering on the do-not-call list).

158 For purposes of this exemption, the term "signed" shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal or state contract law.

159 *See, e.g.*, Association of Fundraising Professionals Comments at 3-4; Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Special Olympics of Hawaii Comments.

160 47 U.S.C. § 227(a)(3).

161 *See* H.R. REP. No. 102-317 at 16 (1991).

162 *See, e.g.*, Fund for Public Interest Comments at 2; March of Dimes Comments at 2; Non-for-Profit Coalition Comments at 11-13; Special Olympics Hawaii Comments. *But see* Wayne G. Strang Comments at 7-8; Michael C. Worsham Comments at 10. Commenters also argue that restrictions imposed on tax-exempt nonprofit organizations or organizations acting on their behalf are subject to more stringent scrutiny under the First Amendment as noncommercial speech. *See* NPCC Comments at 15-18.

163 *See, e.g.*, American Red Cross Comments at 2; America's Blood Centers Comments at 1.

164 *See, e.g.*, Newspaper Association of America Comments at 12-14 (noting that newspapers are holders of second-class mail permits); Personal Legal Plans Comments at 5 (contending that small businesses should be exempt); Seattle Times Comments at 2 (proposing exemption for newspapers); Vector Comments at 7 (proposing exemption for entities that make a *de minimis* number of calls); Ameriquest Further Comments at 2 ("face-to-face" exemption).

165 In determining whether a telemarketer is considered a 'friend' or 'acquaintance' of a consumer, we will look at, among other things, whether a reasonable consumer would expect calls from such a person because they have a close or, at least, firsthand relationship. If a complaining consumer were to indicate that a relationship is not sufficiently personal for the consumer to have expected a call from the marketer, we would be much less likely to find that the personal relationship exemption is applicable. While we do not adopt a specific cap on the number of calls that a marketer may make under this exemption, we underscore that the limited nature of the exemption creates a strong presumption against those marketers who make more than a limited number of calls per day.

166 We note that this conclusion is consistent with Congress' rationale in exempting tax-exempt nonprofit organizations and established business relationships from the definition of telephone solicitation. *See* H.R. Rep. No. 102-317 at 14 and 16 (1991).

167 47 U.S.C. § 227(c)(1)(E).

168 *See* Vector Further Comments at Att. 2. Vector makes approximately 4 million calls per year. Vector Comments at 6.

169 *See, e.g.*, Ameriquest Comments at 14; Vector Comments at 6-7. Such calls may, however, be permissible when they fall within exemptions for personal or established business relationships as discussed herein.

170 *FTC Order*, 68 Fed. Reg. 4655-56.

171 For example, Vector suggests that the Commission exempt individual direct sellers who make no more than 20 calls per day. Vector Comments at 8-10.

172 Vector Further Comments at 4. Vector makes approximately 4 million calls per year. Vector Comments at 6.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 209 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

173    *See* ACLI Further Comments at 1-3; Stonebridge Further Comments at 5-7; Cendant Further Comments at 3-4; NAII Further Comments at 3. We note that many other commenters representing insurance interests did not raise this issue before or during the Further Notice comment period.

174    15 U.S.C. § 1012(a).

175    15 U.S.C. § 1012(b).

176    *See* ACLI Further Comments at 1-2.

177    *See* 15 U.S.C. § 1012(b); *see also The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995), *vacated for lack of subject matter jurisdiction* 131 F.3d 507 (5th Cir. 1997).

178    *The Chair King, Inc. v. Houston Cellular Corp.*, 1995 WL 1760037 (S.D. Tex. 1995).

179    *See Chair King*, 1995 WL 1760037 at 3 (*citing SEC v. National Securities Inc.*, 393 U.S. 453, 460 (1960) and *FTC v. National Casualty Co.*, 357 U.S. 560 (1958)).

180    *See Chair King*, 1995 WL 1760037 at 4.

181    We note that the TCPA's prohibition does not specifically reference insurance advertising. The TCPA also permits facsimile advertising to persons who have given their prior express invitation or permission. See 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

182    NAII explains that "[s]tate insurance codes prohibit a variety of unfair trade practices, such as rebating, deceptive advertising, inequitable claim settlement and unfair discrimination." *See* NAII Further Comments at 2.

183    *See, e.g., Merchant Home Delivery Serv. Inc. v. Frank B. Hall & Co. Inc.*, 50 F.3d 1486, 1492 (9th Cir. 1995) (holding federal statute prohibiting acts also prohibited under state law not to "invalidate, impair, or supersede" state law under McCarran-Ferguson); *United Farm Bureau Mut. Ins. Co. v. Metropolitan Human Relations Comm'n*, 24 F.3d 1008, 1016 (7th Cir. 1994) (holding duplicate prohibition of redlining under Indiana law not to preempt Fair Housing Act under McCarran-Ferguson Act).

184    *See, e.g., Mackey v. Nationwide Ins. Companies*, 724 F.2d 419, 421 (4th Cir. 1984).

185    *See U.S. v. Calvin*, 39 F.3d 1299, 1305 (5th Cir. 1994) (noting that government charges of fraud not barred by McCarran-Ferguson Act where interest in fraud protection is completely compatible with state's regulatory interests).

186    *See* 47 U.S.C. § 227(f)(1).

187    47 U.S.C. § 227(c)(4)(A)-(B) (emphasis added).

188    *See* 47 U.S.C. § 227(c)(4)(B)(iii).

189    *See also* Letter from Michael Del Casino, AT&T, to Marlene Dortch, FCC, dated March 18, 2003.

190    *FTC Order*, 68 Fed. Reg. at 4638-39.

191    *FTC Order*, 68 Fed. Reg. at 4639.

192    *See also* 16 C.F.R. § 310.4(b)(1)(iii)(B).

193    *FTC Order*, 68 Fed. Reg. at 4640.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 210 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

194  *FTC Order*, 68 Fed. Reg. at 4640.

195  *Telemarketing Sales Rule Fees*, 68 Fed. Reg. 16238 (April 3, 2003) (*FTC Fees Notice*). The FTC has proposed that sellers be charged $29 per area code with a maximum annual fee of $7,250 for access to the entire national database. Sellers may request access to five or less areas codes for free.

196  *FTC Order*, 68 Fed. Reg. at 4640.

197  *FTC Order*, 68 Fed. Reg. at 4647.

198  Appropriate state and federal regulators will be capable of verifying when the telemarketer last accessed the list. *FTC Order*, 68 Fed. Reg. at 4641.

199  *FTC Order*, 68 Fed. Reg. at 4640.

200  In fact, section 227(e)(2) prohibits states from using any database that does not include the part of the national database that relates to such state. *See* 47 U.S.C. § 227(e)(2).

201  *See FTC Order*, 68 Fed. Reg. at 4641.

202  *See supra* para. 32.

203  *Central Hudson Gas & Elec. v. Pub. Serv. Comm. of N.Y.*, 447 U.S. 557 (1980). NAAG argues that *Central Hudson* may not even be the appropriate analytical framework to determine the constitutionality of regulations implementing the national do-not-call registry, since "[f]ar from being an impermissible regulation of speech, the registry merely works to prevent 'a form of trespass.'" NAAG Comments at 34. We would note, however, that the Supreme Court has analyzed other measures that protected residential privacy as restrictions on commercial speech. *See Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) (applied *Central Hudson* analysis to Florida Bar rules that prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of accident.) *See also State of Missouri v. American Blast Fax*, 323 F.3d 649 (8th Cir. 2003) (*American Blast Fax*), *pet. for rehearing pending* and *Destination Ventures v. Federal Communications Commission*, 46 F.3d 54 (9th Cir.1995) (*Destination Ventures*), where both the Eighth and Ninth Circuits applied the *Central Hudson* analysis to the TCPA provisions banning unsolicited fax advertising.

204  *See Kathryn Moser v. Federal Communications Commission*, 46 F.3d 970 (9th Cir. 1995) (*Moser*) *cert. denied*, 515 U.S. 1161 (1995) (upholding ban on prerecorded telephone calls); *American Blast Fax* (upholding ban on unsolicited fax advertising) and *Destination Ventures* (upholding ban on unsolicited fax advertising).

205  *Central Hudson*, 447 U.S. at 566. Specifically, the Court found that "[f]or commercial speech to come within the First Amendment, it at least must concern lawful activity and not be misleading. Next, it must be determined whether the asserted governmental interest to be served by the restriction on commercial speech is substantial. If both inquiries yield positive answers, it must then be decided whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.* at 557.

206  *Frisby v. Schultz*, 487 U.S. 474, 485. *See also Federal Communications Commission v. Pacifica Foundation*, 438 U.S. 726, 748 (1978) ( "[I]n the privacy of the home, ... the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder.").

207  *Rowan v. United States Post Office*, 397 U.S. 728 at 737-738 (1970); *see also Martin v. City of Struthers*, 319 U.S. 141 (1943), in which the Court struck down a ban on door-to-door solicitation because it "substituted the judgment of the community for the judgment of the individual householder," *id.* at 144, but noted in *dicta* that a regulation "which would

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 211 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

make it an offense for any person to ring a bell of a householder who has appropriately indicated that he is unwilling to be disturbed" would be constitutional. *Id.* at 148.

208    H.R. REP. NO. 102-317 at 2 (1991).

209    *See supra* para. 8.

210    *See supra* para. 19.

211    *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995) (citations omitted).

212    *Id.* at 628 (citation omitted).

213    *See, e.g.*, Brenda J. Donat Comments; Alice and Bill Frazee Comments; Tammy Packett Comments.

214    *See e.g.*, H.R. REP. NO. 108-8 at 3 (2003), *reprinted in* 2003 U.S.C.C.A.N. 688, 670 ("[i]t is the strongly held view of the Committee that a national do-not-call list is in the best interest of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses.").

215    *See, e.g.*, ATA Comments at 85-88 and WorldCom Comments at 27-33.

216    *United States v. Edge Broadcasting Company*, 509 U.S. 418, 434 (1993). *See also Moser v. FCC*, 46 F.3d at 975 ("Congress may reduce the volume of telemarketing calls without completely eliminating the calls.").

217    H.R. REP. NO. 102-317 at 16 (1991).

218    *See American Blast Fax* and *Destination Ventures*.

219    We reject Vector's argument that because its direct sellers and others make a *de minimis* number of calls relative to the high-volume of calls that telemarketers make, that the national do-not-call registry, as applied to companies like Vector's, "would not directly or materially advance the government's interest." Vector Comments at 12-13. The Supreme Court has held, in applying *Central Hudson's* second prong, that the state does not have to demonstrate that the government's interest is advanced as applied to every case. *See Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) ("[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interest in an individual case."); *Edge Broadcasting*, 509 U.S. 418, *discussing Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978) ( "[T]he State was entitled to protect its interest by applying a prophylactic rule to those circumstances generally; we declined to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in ... [the] particular case.").

220    *Florida Bar*, 515 U.S. 618, 632.

221    *Id.*

222    *Id.* at 624.

223    *Moser*, 46 F.3d at 975; *see also American Blast Fax*, 323 F.3d at 658-60 (TCPA's ban on unsolicited faxes was not more extensive than necessary to "prevent ... unwanted fax advertising from shifting advertising costs to unwilling consumers and interfering with their fax machines."); *Destination Ventures* (FCC sustained its burden of demonstrating reasonable fit between interest in preventing shift of advertising costs to consumers and banning unsolicited commercial faxes.).

224    *See Florida Bar*, 515 U.S. at 633-34.

225    *See supra* para. 19.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 212 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

226    *See supra* para. 39.

227    *See supra* paras. 30-32. We also reject Vector's argument that the failure in our rules to provide an exemption for direct sellers and others who make a *de minimis* number of calls means that our regulations do not meet the requirement of *Central Hudson's* third prong of being "narrowly tailored to ensure that ... [they are] ... no more extensive than necessary to serve the governmental interest." Vector Comments at 10, quoting *Central Hudson*, 447 U.S. at 565-66. As stated above, the Supreme Court requires a "not necessarily perfect but, reasonable" fit, *Florida Bar*, 515 U.S. at 632. In upholding a ban which prohibited lawyers from using direct mail to solicit personal injury or wrongful death clients within 30 days of an accident, even in cases where the injuries or grief was relatively minor, the Court held that, "We find little deficiency in the ban's failure to distinguish among injured Floridians by the severity of their pain or the intensity of their grief.... The Bar's rule is reasonably well tailored to its stated objective." *Id.* at 633. Similarly, we find our regulations implementing the national do-not-call registry do not need to provide for an exemption for direct sellers and others who make a *de minimis* number of calls in order to be a "reasonable fit" between the governmental ends and means.

228    *See* ATA Comments at 64-79 and WorldCom Comments at 36-38.

229    *City of Cincinnati v. Discovery Network Inc. et al*, 507 U.S. 410 at 430 (1993).

230    *Id.* at 428 (citation omitted).

231    *Id.* at 429.

232    *Id.* at 429-30.

233    H.R. REP. No. 102-317, at 16 (1991). ATA asserts that we cannot give weight to Congress' findings to support our decision to exclude non-profit organizations from our regulations implementing the do-not-call registry. ATA Comments at 60-61. ATA argues that we may only consider the record compiled in this proceeding and that its market survey of consumer attitudes regarding telemarketing commissioned in November 2002 calls into question the validity of the Congressional findings distinguishing between non-profit and commercial calls. ATA Comments at 73-74. We disagree. As a preliminary matter, it is not clear to us that ATA's data support its assertion that consumers make no distinction between commercial and charitable calls. For example, while ATA does not provide exact data, it appears from the bar graph illustrating the data that approximately twice as many consumers find charitable calls "more acceptable" than other types of unsolicited calls than find commercial calls "more acceptable" than other types of unsolicited calls (approximately 18% v. 9%). The Congressional findings were supported by a poll undertaken by the National Association of Consumer Agency Administrators of its state level members for statistical data describing the extent to which consumer complaints about unsolicited telemarketing calls involved commercial, charitable, or political calls. The evidence showed that the overwhelming majority of consumer complaints were about commercial calls. H.R. REP. No. 102-137 at 16. Both the Eighth and Ninth Circuits have credited Congress' findings relating to the TCPA. *See American Blast Fax*, 323 F.3d at 655-656 (citing Congress' evidence in upholding the distinction between commercial and non-commercial faxes in the TCPA) and *Moser v. FCC*, 46 F.3d at 974 (finding that "[t]here was significant evidence before Congress of consumer concerns about telephone solicitation" before the passage of the TCPA). "When Congress makes findings on essentially factual issues ... those findings are entitled to a great deal of deference, inasmuch as Congress as an institution is better equipped to amass and evaluate the vast amounts of data." *Walters v. National Ass'n of Radiation Survivors*, 473 U.S. 305, 331 n.12 (1985). We also note that in its *1992 TCPA Order*, the Commission stated that no evidence had been presented to show that non-commercial calls represented as serious a concern for telephone subscribers as unsolicited commercial calls and unsolicited commercial calls and concluded, based on the comments and the legislative history of the TCPA, that it would not seek additional authority to curb calls by tax-exempt organizations. TCPA Order, 7 FCC Rcd at 8773-8774, para. 40. Congress recently reaffirmed this judgment by

Add. 152

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 213 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

requiring us "to maximize consistency" with the rule promulgated by the Federal Trade Commission, which contains an exemption for non-profit organizations.

234     *Id*. at 14.

235     *Missouri ex rel. v. American Blast Fax*, 323 F.3d at 656 n.4 (*citing United States v. Edge Broad. Co.*, 509 U.S. 418 at 434).

236     *FTC Order*, 68 Fed. Reg. at 4636, n. 675, *quoting from Metromedia v. San Diego*, 453 U.S. 490, 513 (1981) ("[I]nsofar as it regulates commercial speech, the San Diego ordinance meets the constitutional requirements of *Central Hudson* .... It does not follow, however, that San Diego's ban on signs carrying noncommercial advertising is also valid ..." Commercial speech cases have consistently accorded noncommercial speech a greater a greater degree of protection than commercial speech.") and *citing Watchtower Bible and Tract Soc'y v. Village of Stratton*, 122 S.Ct. 2080 (summarized by the FTC Order as "the Court invalidated an ordinance that required anyone who wanted to engage in door-to-door canvassing or soliciting to obtain a permit before doing so, the Court went out of its way to suggest that the ordinance may have been constitutional if it were limited to commercial speech.").

237     *FTC Order*, 68 Fed. Reg. at 4636.

238     Thirty-six states have adopted no-call laws.

239     *See* Do-Not-Call Act, Sec. 3.

240     *See* 47 U.S.C. § 227(e) and (f).

241     *See* Letter from James Bradford Ramsay, NARUC General Counsel, to FCC filed March 14, 2003 (NARUC *ex parte*); NARUC Winter Committee Meetings, February 23-26, 2003, at which FCC and FTC staff discussed the national do-not-call registry and ways to harmonize federal and state programs. *See also* FTC Further Comments.

242     *See, e.g.*, AARP Comments at 3; Visa Comments at 1-3.

243     *See* 47 U.S.C. § 227(e)(2).

244     *See* new rule at 47 C.F.R. § 64.1200(h).

245     *FTC Order*, 68 Fed. Reg. at 4641. Approximately 19.2 million consumers have registered on state do-not-call lists.

246     The FTC estimates that many states will be able to transfer their do-not-call registrations to the national database prior to its implementation on October 1, 2003. For other states it may take from 12 to 18 months to achieve this result. *FTC Order*, 68 Feg. Reg. at 4641.

247     *See* 47 U.S.C. § 227(e)(2).

248     *See 2002 Notice*, 17 FCC Rcd at 17493-96, paras. 60-66.

249     *See, e.g.*, DMA Reply Comments at 5. *See also* Nextel Comments at 4-6; Visa Comments at 3-4; Wells Fargo Comments at 1-2; Xpedite Comments at 14-16 (arguing that the Commission should preempt to create more uniform rules). We note that, although Bank One raises its preemption arguments, in part, by referencing the Commerce Clause, its analysis clearly focuses on the Commission's authority under the Communications Act to preempt. ("Congress' general power to regulate interstate commerce *and* its delegation of that authority to the FCC in the Communications Act of 1934." Bank One Further Comments at 5.) Moreover, to the extent Bank One suggests that, in the absence of federal statutory preemption, the Commerce Clause operates to preempt states from unduly burdening interstate commerce, such a finding would require a more particularized showing with regard to the specific statute at issue and the burden on interstate

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 214 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

commerce. *See e.g., Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978) (considering whether state statute that prohibited oil producers and refiners from operating retail gas stations impermissibly burdened interstate commerce.).

250   *See, e.g.*, WorldCom Reply Comments at 27-30 (arguing that state do-not-call lists are preempted by operation of law to the extent they purport to regulate interstate calls).

251   *See, e.g.*, NAAG Comments at 12; Attorney General of Indiana Further Reply Comments.

252   *See, e.g.*, American Express Comments at 2-3; Nextel Comments at 4-5; Visa Reply Comments 8-9.

253   *See, e.g.*, NAAG Comments at 12; NARUC Comments at 3-4; North Dakota PSC Comments at 2; Attorney General of Indiana Further Reply Comments.

254   *See, e.g.* NARUC Comments at 3-4; North Dakota PSC Comments at 2; OPCDC Comments at 3; Texas PUC Comments. In addition, a large number of consumers filed comments in this proceeding indicating that state do-not-call regulations have improved their privacy rights. *See, e.g.*, Brenda J. Donat Comments (cancer patient appreciates reduction in calls due to Indiana Telephone Privacy Act); Alice and Bill Frazee Comments; Tammy Puckett Comments (Indiana law provides for quiet for terminally ill family member).

255   *See* NAAG Comments at 2. NAAG estimates that approximately 150 state enforcement actions have been taken against telemarketing companies call across state lines.

256   47 U.S.C. § 227(f)(6)("Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.").

257   *Van Bergen v. Minnesota*, 59 F.3d 1541, 1547-48 (8th Cir. 1995).

258   Ala. Code 1975 § 8-19A-4; Ark. Code Ann. § 4-99-103; Fla. Stat. Ann. § 501.604.

259   Ind. Code § 24-4.7-1-1 (no EBR exception); Idaho Code § 48-1003A (nonprofit exception for minors only).

260   Alaska Stat. § 45.50.475; Vt. Stat. Ann. tit. 9 § 2464a; Kan. Stat. Ann. § 50-670 and § 50-671.

261   Section 2(b) provides the Commission with the authority to apply the TCPA to intrastate communications. *See* 47 U.S.C. § 152(b).

262   47 U.S.C. § 227(f)(1).

263   *See, e.g., Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (where state law frustrates the purposes and objectives of Congress, conflicting state law is "spatified" by the Supremacy Clause); *City of New York v. FCC*, 486 U.S. 57, 64 (1988) ("The statutorily authorized regulations of an agency will preempt any state or local law that conflicts with such regulations or frustrates the purposes thereof.").

264   47 U.S.C. § 227(e)(1).

265   Section 227(e)(1) provides that:

(e) Effect on State Law. -

(1) State Law Not Preempted. - Except for the standards prescribed under subsection (d) and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits–

(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 215 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

(B) the use of automatic telephone dialing systems;

(C) the use of artificial or prerecorded voice messages; or

(D) the making of telephone solicitations.

266    *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986); *Smith v. Illinois Bell Telephone Co.*, 282 U.S. 133 (1930).

267    S. REP. NO. 102-178, at 3; *see also id.* at 5 ("Federal action is necessary because States do not have jurisdiction to protect their citizens against those who ... place interstate telephone calls."); Cong. Rec. S16205 (Nov. 7, 1991) (remarks of Sen. Hollings) ("State law does not, and cannot, regulate interstate calls."); TCPA § 2(7) (finding that "[o]ver half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation.").

268    *See, e.g.,* 137 Cong. Rec. S18317-01, at 1 (1991) (remarks of Sen. Pressler) ("The Federal Government needs to act now on uniform legislation to protect consumers.").

269    *See, e.g.,* AWS Further Comments at 7 (separate state requirements will confuse customers and increase costs and burdens for telemarketers); Intuit Further Comments at 2-4 (Congress intended that more restrictive state laws be preempted); Visa Further Comments at 8 (contending that state lists that are inconsistent with federal requirements should be preempted).

270    NAAG Comments at 12.

271    47 U.S.C. § 227(f)(6).

272    *1992 TCPA Order*, 7 FCC Rcd at 8765-66, para. 23. Specifically, the Commission's rules require that persons or entities engaged in telephone solicitations must have a written policy available upon demand for maintaining a do-not-call list, must inform and train any personnel engaged in telephone solicitations in the existence and use of the list, and must record the request and place the subscriber's name and telephone number on the do-not-call list at the time the request is made. 47 C.F.R. § 64.1200(e)(2)(i)-(iii). In addition, the Commission's rules require that a do-not-call request be honored for a period of ten years from the date of the request. 47 C.F.R. § 64.1200(e)(2)(vi). In the absence of a specific request by the subscriber to the contrary, a do-not-call request applies to the particular business entity making the call or on whose behalf the call is made, and does not apply to affiliated entities unless the consumer reasonably would expect them to be included given the identification of the caller and the product being advertised. 47 C.F.R. § 64.1200(e)(2)(v).

273    *2002 Notice*, 17 FCC Rcd at 17468-72, paras. 13-20.

274    *2002 Notice*, 17 FCC Rcd at 17469-70, paras. 14-15.

275    *2002 Notice*, 17 FCC Rcd at 17470, para. 17.

276    Lyle Bickley Comments; Pete Nico, Jr. Comments.

277    *See, e.g.,* James D. Gagnon Comments; Norman C. Hamer Comments; Rosanna Santiago Comments; Elizabeth J. Yocam Comments.

278    *See, e.g.,* Harley H. Cudney Comments (telemarketers fail to identify themselves); Timothy Walton Comments (telemarketers failure to send do-not-call policy when requested).

279    Gregory S. Reichenbach Comments.

280    Thomas M. Pechnik Comments at 2; Wayne Strang Comments at 4.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 216 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

281    *See* Telecommunications for the Deaf Comments at 2.

282    *See, e.g.*, ATA Comments at 97-100; DMA Comments at 16-18; SBC Reply Comments at 6.

283    *See, e.g.*, Household Financial Comments at 3; MBA Comments at 6-7; Nextel Comments at 7-9; Qwest Comments at 6-7. *But see* MBNA Comments at 7.

284    *FTC Order*, 68 Fed. Reg. at 4629.

285    *FTC Order*, 67 Fed. Reg. at 4629.

286    *See, e.g.,* Nancy J. Barginear Comments; David K. McClain Comments; John A. Rinderle Comments; Ryan Tobin Comments.

287    *But see* Nextel Comments at 7 (contending that adoption of a national do-not-call list may render unnecessary any detailed company-specific requirements).

288    *See, e.g.*, DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17.

289    *See, e.g.*, ABA Comments at 8; AGF Comments at 3; Call Compliance Comments at 7.

290    *See, e.g.*, DMA Comments at 16; Electronic Retailing Association Comments at 5-6; Ohio PUC Comments at 17-18.

291    *See* amended rule at 47 C.F.R. § 64.1200(d)(6).

292    *See, e.g.*, MBA Comments at 6; Nextel Comments at 7-9; Qwest Comments at 6-7.

293    *See, e.g.*, Household Financial Services Comments at 3-4 (contending that it takes 90 days to process requests); Verizon Comments at 6 (45 days to process request).

294    *See, e.g.,* WorldCom Comments at 40.

295    Consistent with our existing rules, such request applies to all telemarketing campaigns of the seller and any affiliated entities that the consumer reasonably would expect to be included given the identification of the caller and the product being advertised. 47 C.F.R. § 64.1200(e)(2)(v). *See also* AGF Comments at 4 (indicating that a reasonable time to process requests is 30 days); MBNA Comments at 7 (reasonable time to process requests is a minimum of 30 days).

296    47 C.F.R. § 64.1200(e)(2)(iii).

297    As noted above, the safe harbor period for compliance with the national do-not-call list is three-months. However, given that the national list will contain many more registrants than the individual company-specific lists, we believe that it is reasonable to allow some additional time for telemarketers to comply with the national do-not-call requests.

298    *See* 47 U.S.C. § 227(a)(3)(C).

299    *1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

300    *2002 Notice*, 17 FCC Rcd at 17479, para. 33.

301    *See* amended rule at 47 C.F.R. § 64.1200(d).

302    *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

303    *2002 Notice*, 17 FCC Rcd at 17471-72, paras. 18-19.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 217 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

304    The Act defines CPNI as "(A) information that relates to the quantity, technical configuration, type, destination, location, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier." 47 U.S.C. § 222(h)(1)(A) and (B) (the 911 Act amended the definition of CPNI in section 222(h) to include "location" among a customer's information that carriers are required to protect under the privacy provisions of section 222). CPNI includes personal information such as the phone numbers called by a consumer, the length of phone calls, and services purchased by a consumer, such as call waiting. *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information; Implementation of the Non-Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended, 2000 Biennial Regulatory Review - Review of Policies and Rules Concerning Unauthorized Changes of Consumers' Long Distance Carriers,* CC Docket Nos. 96-115, 96-149, and 00-257, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860 at 14864, para. 7 (2002) (*CPNI Third Report and Order*).

305    Opt-out approval and opt-in approval refer to methods of obtaining customer consent to use, disclose, or permit access to customers' CPNI. The opt-in approval method "requires that the carrier obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request consistent with the requirements" adopted by the Commission. 47 C.F.R. § 64.2003(h). Under the opt-out approval method "a customer is deemed to have consented to the use, disclosure, or access to the customer's CPNI if the customer has failed to object thereto within the waiting period [adopted by the Commission in 47 C.F.R. § 64.2009(d)(1)] after the customer is provided appropriate notification of the carrier's request for consent consistent with the rules" adopted by the Commission. 47 C.F.R. § 64.2003(i).

306    Such marketing is not limited to telemarketing and may include direct mail or other marketing.

307    *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19. The Commission noted that the carrier would still be able to market to that consumer in other ways (e.g., direct mail, e-mail, etc.). *Id.*

308    *2002 Notice,* 17 FCC Rcd at 17471-72, para. 19.

309    BellSouth Comments at 6; Verizon Comments at 16; Michael C. Worsham Comments at 3; Yellow Pages Comments at 6.

310    Cingular Comments at 10; Sprint Comments at 15.

311    AT&T Wireless Comments at 20-21.

312    Concerned Telephone Companies Comments at 1-8; NTCA Comments at 2 ("Offering opt-out consent to the consumer's telecommunications carrier under section 222 indicates an interest in receiving information on new services that may be available either now or in the future from the carrier.").

313    NYSCPB Comments at 5.

314    *See* 47 C.F.R. § 64.1200(f)(4). *See also infra* Section VI.

315    *See supra* para. 42.

316    BellSouth Comments at 6; Michael C. Worsham Comments at 3; Verizon Comments at 16; Yellow Pages Comments at 6.

317    As one commenter stated "under the Commission's CPNI rules ... a customer's CPNI consent does not equate to customer consent to receive telemarketing by that carrier." AT&T Wireless Comments at 19.

318    *See infra* para. 112.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 218 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

319    We disagree with the Concerned Telephone Companies' assertion that a customer's CPNI consent equates to a "prior express invitation or permission" to be contacted. *See* Concerned Telephone Companies Comments at 2. As we discuss herein, a customer's CPNI consent indicates her willingness to have her telephone company use her CPNI in order to, among other things, tailor marketing proposals to her. CPNI approval, however, is not a blanket approval for any and all marketing a carrier may decide to pursue. A customer's affirmative decision to enroll on a do-not-call list is a much more direct and reliable indicator of a customer's willingness to receive marketing advances via the telephone. Accordingly, we disagree with the Concerned Telephone Companies' assertion that "consent given by a customer under the CPNI rules renders Section 227 constraints inapplicable." Concerned Telephone Companies Comments at 2.

320    Some commenters equated obtaining customers' consent to use the customers' CPNI with having an established business relationship. *See* Nextel Comments at 16, section entitled "The Commission Should Interpret the Established Business Relationship Rules in a Manner Consistent With the Consent Requirements of the CPNI Rules." We concur with those commenters who argue that the carrier's established business relationship allows the carrier to contact those customers via telemarketing who have requested to be on the national do-not-call list. However, as we determine herein, the CPNI consent does not overcome or trump a customer's request to be included on the national do-not-call list. *See* Cingular Comments at 10; Nextel Comments at 17; Sprint Comments at 16 ("The view that telecommunications service providers should be allowed to contact their existing customers, even if such customers have asked to be placed on a general (non-company specific) DNC list, is consistent with the Commission's view of the importance of 'established business relationships.'").

321    Concerned Telephone Companies Comments at 2; AT&T Wireless Reply Comments at 26.

322    Concerned Telephone Companies Comments at 2 (emphasis added).

323    AT&T Wireless Reply Comments at 26-27.

324    Yellow Pages Comments at 7 ("Consumers who do not want to receive solicitations via telephone are going to request to be placed on the do-not-call list, regardless of whether the consumer has consented to the use of their CPNI").

325    AT&T Wireless Reply Comments at 27.

326    AT&T Wireless Comments at 18-19 (contending that under circumstances where "the express opt-in CPNI consent includes customer consent to be contacted by telephone, AWS believes the carrier has the permission to contact the customer even if that customer has placed her name on either the carrier's or a national do-not-call list."). *See also* NYSCPB Comments at 5.

327    AT&T Wireless Reply Comments at 27.

328    NYSCPB Comments at 5.

329    NYSCPB Comments at 5.

330    AT&T Wireless Reply Comments at 26; Verizon Comments at 16; Yellow Pages Comments at 6.

331    Concerned Telephone Companies Comments at 3.

332    47 U.S.C. § 227(a)(3)(B).

333    *1992 TCPA Order*, 7 FCC Rcd at 8770, para. 34; *see also* 47 C.F.R. § 64.1200(c)(3).

334    *2002 Notice*, 17 FCC Rcd at 17480, para. 34.

335    47 C.F.R. § 64.1200(f)(4).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 219 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

336    *See, e.g.,* MPA Comments at 5, 13; MBNA Comments at 7; NAII Comments at 3; SBC Comments at 10; Nextel Comments at 11-13.

337    *See, e.g.*, ATA Comments at 101-105; NADA Comments at 2.

338    *See, e.g.,* SBC Comments at 12-13; Intuit Comments at 6; DMA Comments at 20-21; ATA Comments at 105. *But see, e.g.,* ERA Comments at 11 (definition should cover 24 month period prior to call); AT&T Wireless Reply Comments at 18-19 (favoring the FTC's 18-month duration on the established business relationship); Scholastic Comments at 8 (3 years following payment for goods and 6 months following an inquiry); MidFirst Bank Comments at 2-3 (suggesting the existing business relationship be terminated no earlier than a period of 12 months following the last purchase and no earlier than 60 days following the closure of all accounts with a company).

339    *See, e.g.*, HFS Comments at 6; WorldCom Comments at 14-16; Comcast Comments at 5-7; American Express Comments at 3-4.

340    *See, e.g.* NASUCA Comments at 17; John A. Shaw Comments at 4; TOPUC Comments at 5; NYSCPB Comments at 7-8 (should not extend to related business entities); Michael C. Worsham Comments at 10 (should delete "inquiry, application" from definition, as they do not constitute permission to receive prerecorded messages); PUC of Ohio Comments at 15 (should be limited to contact about changes or updates to current product or service); NYSCPB–Other Than DNC List Comments at 7-8, 14-17 (should not extend to related business entities or include a mere inquiry); NCL Comments at 5 (explaining that under the current definition of established business relationship, consumers have to remember the name of every company with whom they have ever had any contact in order to determine which can call legally and which cannot).

341    Thomas M. Pechnik Comments at 3 (no authority in section 227 for an EBR exemption for artificial or prerecorded message calls); Wayne G. Strang Comments at 12 (should revoke EBR exemption for prerecorded messages).

342    *See* AARP Comments at 6; *see also* NCL Comments at 5 (urging the Commission to require telemarketers to disclose to their customers that they plan to make telemarketing calls and to provide the opportunity for them to opt-out).

343    *See, e.g.*, AARP Comments at 5; NASUCA Comments at 17-18.

344    AARP Comments at 5.

345    AARP Comments at 5.

346    Some suggest 24 months (MPA Comments at 12-13 and NASUCA Comments at 17); others advocate a 36-month period (Scholastic Comments at 8 and Bank of America Comments at 4); some commenters maintain that a 12-month period would be sufficient (Sprint Comments at 18); other commenters advocated a definition comparable to the FTC's (DIRECTV Further Comments at 2; NTCA Further Comments at 2-3). *See also* TOPUC Comments at 6 (stating that Commission rules should require that the relationship be ongoing. To qualify as "ongoing," the customers must have completed a purchase or transaction with a specific company within 24 months prior to the call).

347    *FTC Order*, 68 Fed. Reg. at 4634; 16 C.F.R. § 310.2(n).

348    *FTC Order*, 68 Fed. Reg. at 4634.

349    *FTC Order*, 68 Fed Reg. at 4592.

350    *FTC Order*, 68 Fed. Reg. at 4593-94.

351    The "established business relationship" permits telemarketers to call consumers registered on the national do-not-call list and to deliver prerecorded messages to consumers. The "established business relationship," however, is not an exception

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 220 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

to the company-specific do-not-call rules. Companies that call their EBR customers must maintain company-specific do-not-call lists and record any do-not-call requests as required by amended 47 C.F.R. § 64.1200(d). *See infra* discussion in para. 124. The Commission has also reversed its prior conclusion that an "established business relationship" provides the necessary permission to deliver unsolicited facsimile advertisements. *See infra* discussion in para. 188-191.

352     *See, e.g.*, ATA Comments at 105; Verizon Comments at 13-14.

353     American Express Comments at 4.

354     *See, e.g.*, Bank of America Comments at 3; ATA Comments at 101.

355     *See infra* discussion on unsolicited facsimile messages, paras. 185-193.

356     *See* H.R. REP. NO. 102-317 at 14 (1991) ("In the Committee's view, an 'established business relationship' ... could be based upon any prior transaction, negotiation, or inquiry between the called party and the business entity that has occurred during a reasonable period of time... The Committee recognized this relationship so as not to foreclose the capacity of businesses to place calls that build upon, follow up, or renew, within a reasonable period of time, what had once been [an] 'existing customer relationship.'") The House Report also states that "... the Committee believes the test to be applied must be grounded in the consumer's expectation of receiving the call. Consequently, the test shall consist of a determination of whether the new solicitation occurs within a reasonable period of time and the new product or service being promoted is related substantially to the prior relationship." *Id.* at 14-15.

357     *See* amended 47 C.F.R. § 64.1200(f)(3).

358     We also note that the act of "terminating" an established business relationship will not hinder or thwart creditors' attempts to reach debtors by telephone, to the extent that debt collection calls constitute neither telephone solicitations nor include unsolicited advertisements. *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12400, para. 17.

359     *See* amended 47 C.F.R. § 64.1200(f)(3).

360     *See infra* discussion on the interplay between the established business relationship and a do-not-call request, para. 124.

361     NASUCA Comments at 17; TOPUC Comments at 5-6; NCL Comments at 5 (EBR should be narrowed to require a consumer to actually set up an account with a company for the purpose of making recurring or repeated purchases); Michael C. Worsham Comments at 10; Stewart Abramson-December 9, 2002 Comments at 4-5; NYSCPB-Other Than DNC List Comments at 15.

362     Verizon Comments at 15; FSR Comments at 3-4.

363     *See* H.R. REP. NO. 102-317 at 14-15 (1991) (noting that if an investor had written to a mutual fund or responded to an ad requesting additional information, the fund's manager could make follow-up calls. The Report also explains that a loan officer or financial consultant may call a telephone subscriber who had requested a loan.).

364     H.R. REP. NO. 102-317 at 14, 15 (1991).

365     *See, e.g.*, TOPUC Comments at 5-6, 11 ("there is no reason for a customer who merely inquires about a product or service, or answers a survey, to be subject to future telemarketing calls"); NCL Comments at 5 (definition should be narrowed to include situations in which the consumer has set up an account with a company for purposes of making recurring or repeated purchases).

366     Verizon Comments at 15; ATA Comments at 104; ABA Comments at 5.

367     Most commenters who suggested a time limit on the EBR did not specify that it would apply to inquiries. *But see* Scholastic Comments at 8 (for requests of information, the reasonable amount of time should be at least 6 months);

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 221 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

DIRECTV Reply Comments at 5 (FCC should adopt the same timeframes adopted by the FTC–18 months for a purchase and 3 months for an inquiry); Intuit Reply Comments at 7 (3-month rule is not practical from the perspective of an online service provider and software company; customers may be interested in upgrading software or in new products and services several years after the initial purchase).

368   *2002 Notice*, 17 FCC Rcd at 17472, para. 20.

369   NCTA Comments at 2-5 ("[I]t is precisely because cable operators now compete with a range of other wireline and wireless entities in providing packages of *different* services and products that it is more important than ever– to cable operators *and* their customers–that operators be able to keep their customers informed of the full range of offerings and promotions available to them."); Comcast Comments at 7-8; Cox Comments at 6-8; Yellow Pages Comments at 8; American Express Comments at 3; DMA Comments at 28.

370   John A. Shaw Comments at 4; PUC of Ohio Comments at 15 (should limit the contact about changes or updates to the current product or service. For example, a lawn care service cannot call to offer vinyl siding); Joe Shields Further Comments at 3 (any product or service offered through telemarketing must be substantially related to the product that created the relationship).

371   *See* WorldCom Comments at 9 (describing its "Neighborhood" product, which combines a special feature package and unlimited local and long distance calling for one price); Cablevision Reply Comments at 3 (noting that in addition to telephone and telecom products, the company owns an array of entertainment and retail venues. It also faces strong competition from other providers of video programming, and needs to be able to let customers for one line of service know about other services).

372   As required by the amended rules we adopt today, "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." *See* 47 C.F.R. § 64.1200(d)(4). The amended rules also require that all artificial or prerecorded telephone messages shall, "[a]t the beginning of the message, state clearly the identify of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated, and [d]uring or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player which placed the call) of such business, other entity, or individual..." *See* 47 C.F.R. § 64.1200(b).

373   *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

374   NCL Comments at 5-6; NYSCPB-Other Than DNC List Comments at 7.

375   *See, e.g.*, SBC Comments at 11 (This is consistent with sec. 272(g), which allows Bell Operating Companies to jointly market services of their long distance affiliates); Visa Comments at 6 (should also apply to co-brand and affinity partners); FSR Comments at 4 (Commission should make clear that any member of a corporate family, including subsidiaries and affiliates, should be permitted to call as long as customer has EBR with any member).

376   Given the numerous types of business relationships, the Commission believes it appropriate to treat the issue of a consumer's "reasonable expectations" in any complaint on a case-by-case basis. *See also* H.R. REP. NO. 102-317 at 15 (noting that contact by an affiliate of the company with whom a consumer has an established business relationship may be permissible if the solicitation by the affiliate related to a transaction in progress with the consumer or was substantially related to the product or service forming the basis of the business relationship.).

377   *See, e.g.*, American Express Comments at 4.

378   *See* 47 C.F.R. § 64.1200(e)(2)(v).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 222 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

379   *See* New Jersey Ratepayer Further Reply Comments at 3 (providing an exemption for referrals by existing customers would provide an open door and the element of consent would still be missing). *But see* NAIFA Comments at 3.

380   *See* AT&T Wireless Comments at 25 (arguing that an established business relationship is formed in such a situation).

381   *See* Verizon Comments at 14-15.

382   *See* Nextel Reply Comments at 15-17. However, if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption.

383   *See* Notice of *Ex Parte Presentation* from WorldCom to FCC at 8, filed June 16, 2003.

384   WorldCom Comments at 7.

385   WorldCom Comments at 9 ("telemarketing is the most cost-effective way to introduce new products and services to the public, especially local and long distance telecommunications services that customers customize for their specific needs" (footnote omitted)).

386   WorldCom Comments at 13; *see also* ATA Reply Comments at 30-32; Winstar Further Comments at 3-4 (maintaining that the FCC should either exempt telecommunications service providers from the do-not-call rules or implement rules that prevent incumbents from using the EBR to preserve their monopoly); CompTel Further Reply Comments at 2 (should follow WorldCom's suggestion and determine that all consumers have an EBR with all providers of local service). *But see* Wayne G. Strang Reply Comments at 16 (suggesting that WorldCom's arguments are exaggerated as even those entities that have an established business relationship with a subscriber may not take advantage of the exemption once the subscriber makes a do-not-call request).

387   *See 2002 Notice*, 17 FCC Rcd at 17472, para. 20; *see also* Shaw Further Reply Comments at 13 (if there is any competition problem, the EBR for ILECS should not allow them to sell the customer additional services or products).

388   WorldCom Comments at 15. *See also* WorldCom Comments at 15-16 (arguing that limiting calls to those related to the customer's current service does not make sense in a market where products are increasingly integrated).

389   WorldCom Reply Comments at 11. *But see* Verizon Further Reply Comments at 2-3 (it would be at odds with the plain meaning of EBR to adopt WorldCom's suggestion that all consumers would have an EBR with WorldCom).

390   WorldCom Reply Comments at 11.

391   *See* 47 U.S.C. § 227(c)(1).

392   We note that of the TCPA-related complaints filed by consumers with the Commission, a substantial number have been against common carriers. *See* Caroline E. Mayer, "Do Not Call' List Operator AT&T Leads in Complaints," Washingtonpost.com (April 23, 2003) <http://washingtonpost.com/wp-dyn/articles/A17683-2003Apr22.html> (describing the number of complaints filed against AT&T and other common carriers for do-not-call violations); *see also* ATA Comments, Appendix 16.

393   *See supra* para. 113 for a discussion regarding termination of the established business relationship for purposes of telemarketing calls.

394   *2002 Notice*, 17 FCC Rcd at 17480-81, para. 35.

395   *See* H.R. REP. NO. 102-317 at 15-16 (1991) ("If a subscriber asks a company with whom it has an established relationship not to call again, that company has an obligation to honor the request and avoid further contacts. Despite the fact that objecting subscribers can be called based on an 'established business relationship,' it is the strongly held

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 223 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

view of the Committee that once a subscriber objects to a business that calls based on an established relationship, such business must honor this second objection and implement procedures not to call that twice-objecting subscriber again.").

396    *See, e.g.*, Thomas M. Pechnik Comments at 3; Joe W. McDaniel-Fifth December 5, 2002 Comments; City of Chicago Comments at 11-12; Philip J. Charvat Comments at 8; Mark A. Hiner Comments; Barbara Crouse Comments (receives calls from a newspaper because she is a subscriber, even when she asks to be placed on a do-not-call list); Wayne G. Strang Comments at 13; TOPUC Comments at 6.

397    Owen O'Neill Comments at 2; City of New Orleans Comments at 10.

398    *See, e.g.*, DialAmerica Comments at 14; AT&T Wireless Comments at 26-27; Verizon Comments at 15; HFS Comments at 9; NCTA Comments at 5. *But see* Bank of America Comments at 6 (a do-not-call request should not terminate the relationship, and businesses should be able to continue calling those customers).

399    *See, e.g.*, Philip J. Charvat Comments at 8 (If product exceptions to do-not-call requests were allowed, the TCPA's effectiveness would be eviscerated. "A 'credit card' offer declined by a consumer with a [do-not-call] demand, will be followed by a 'shopping convenience card' offer from the same entity"); Stewart Abramson-December 9, 2002 Comments at 1 (a do-not-call request should apply to the business generally, not just by product or service. Otherwise, it would be very time-consuming for the consumer).

400    In some instances, however, a consumer may grant explicit consent to be called during the course of a subsequent purchase or transaction.

401    *See* amended rule at 47 C.F.R. § 64.1200(d). *See also supra* para. 96.

402    *See* amended rule at 47 C.F.R. § 64.1200(f)(3)(i).

403    47 U.S.C. § 227(a)(3). In its initial rulemaking in 1992, the Commission concluded that, in the same vein, calls by tax-exempt nonprofit organizations also should be exempt from the prohibition on prerecorded messages to residences as non-commercial calls. *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40; *see also* 47 U.S.C. § 227(a)(3)(C) and 47 C.F.R. § 64.1200(c)(4).

404    *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

405    *See 1995 TCPA Reconsideration Order*, 10 FCC Rcd at 12397, para. 13.

406    *2002 Notice*, 17 FCC Rcd at 17479, para. 33.

407    NPCC Comments at 12-13; March of Dimes Comments at 2; Special Olympics-Hawaii Comments; NPCC Comments at 4 ("An estimated 60 percent to 70 percent of nonprofit and charitable organizations use professional fundraisers to deliver their messages to consumers and solicit donations." (cites omitted)).

408    NPCC Comments at 10; Donald R. Davis Comments; Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

409    NPCC Comments at 10. *See also* Private Citizen Comments at 4; Gregory S. Reichenbach Comments.

410    NAAG Comments at 39 (describing an example of a for-profit sending prerecorded messages "to residential phone numbers, promising to reduce interest rates and save consumers money repaying their credit card debt. The prerecorded message did not disclose how the savings would be achieved and did not identify any nonprofit organization. If a caller responded to the 1-800 number on the message, the caller reached the for-profit call center. In the sales pitch that followed, the telemarketer described credit counseling services offered by a nonprofit organization. However, the telemarketer solicited "enrollment fees" (between $199-499), payable entirely to the for-profit company... Consumers

interested in nonprofit credit counseling would be referred to a nonprofit credit counselor, but only after they paid hundreds of dollars to the for-profit marketing company."); *see also* Wayne G. Strang Comments at 7; City of New Orleans Comments at 9-10; Donald R. Davis Comments.

411    AFP Comments at 3.

412    Reese Comments at 10.

413    DialAmerica Comments at 13-14. *See also* DialAmerica Reply Comments at 13 (DialAmerica's Sponsor Magazine Program donates 12.5% of the proceeds to the charity.).

414    We again reiterate that calls that do not fall within the definition of "telephone solicitation" as defined in section 227(a)(3) will not be precluded by the national do-not-call list. These may include calls regarding surveys, market research, and calls involving political and religious discourse. *See supra* para. 37.

415    *See* H.R. REP. NO. 102-317 at 16-17 (1991).

416    *See* NPCC Comments at 13 ("Nonprofit and charitable organizations rely on the expertise and operational efficiencies of professional fundraisers to conduct their fundraising campaigns and disseminate their message.... *Such trained professionals offer significant resources, expertise and operational efficiencies that cannot be duplicated by nonprofit and charitable organizations.*" (emphasis added; cites omitted))

417    These restrictions are found in amended 47 C.F.R. §§ 64.1200(c) and (d).

418    *See* 47 U.S.C. § 227(a)(3) and amended 47 C.F.R. § 64.1200(f)(9).

419    Similarly, an affiliate of a tax-exempt nonprofit organization that is itself not a tax-exempt nonprofit is not exempt from the TCPA rules when it makes telephone solicitations.

420    *See* NPCC Comments at 10; AFP Comments at 3.

421    Unlike debt collection calls, a consumer may "terminate" an established business relationship with a company offering debt consolidation services by requesting placement on a company-specific do-not-call list. *See supra* note 358.

422    47 U.S.C. § 227(b)(1)(A)(i)-(iii); 47 C.F.R. § 64.1200(a)(1)(i)-(iii).

423    47 U.S.C. § 227(a)(1); *see also*, 47 C.F.R. § 64.1200(f)(1).

424    *2002 Notice*, 17 FCC Rcd at 17473-74, paras. 23-24.

425    *See, e.g.*, Mastercard Comments at 6; Verizon Comments at 23; HFS Comments at 7; Discover Comments at 8; CBA Comments at 7-8; Bank of America Comments at 5; ATA Comments at 113-114. *But see* American General Finance Comments at 1 (urging the Commission to clarify the definitions of "automatic telephone dialing system" and "autodialer," which focus on equipment that *has the capacity* to generate random number and sequential dialing patterns, rather than on whether the equipment is actually used in that fashion).

426    *See, e.g.*, Mastercard Comments at 6; HFS Comments at 7; Verizon Comments at 23; Discover Comments at 8.

427    *See, e.g.*, EPIC Comments at 12; City of Chicago Comments at 9-11; Stewart Abramson Comments at 1-2; Michael C. Worsham Comments at 6.

Add. 164

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 225 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

428    *See, e.g.*, Thomas M. Pechnik Comments at 4; Stewart Abramson Comments at 2 (FCC should not have to identify specific technologies covered by definition as technologies are always changing). *But see* Wayne G. Strang Comments at 6 (should ask Congress to change the definition to cover all devices capable of automatically dialing calls).

429    *See* Thomas M. Pechnik Comments at 5; Michael C. Worsham Comments at 5.

430    *See* LCC Comments at 7. LCC explains that, on behalf of certain clients, it installs terrestrial repeaters across the country, which receive satellite signals and retransmit the signals into areas that the signals would not otherwise reach. The repeaters contain an on-board modem, which may be programmed to call the client's number in the event a malfunction occurs. If the modem is programmed incorrectly, it may dial a number other than the number of the client. *See* LCC Comments at 2-3.

431    *See, e.g.*, HFS Comments at 7; ATA Comments at 110; ABA Comments at 3.

432    *See* ATA Comments at 113, n. 108; DMA Comments at 21 ("Some dialers are capable of being programmed for sequential or random dialing; some are not.").

433    Mastercard Comments at 6.

434    HFS Comments at 7.

435    47 U.S.C. § 227(a)(1).

436    *See* 137 Cong. Rec. S18784 (1991) (statement of Sen. Hollings) ("The FCC is given the flexibility to consider what rules should apply to future technologies as well as existing technologies."). *See also Southern Co. v. FCC*, 293 F.3d 1338, 1346 (11th Cir. 2002) ("While the FCC is correct that the principle of nondiscrimination is the primary purpose of the 1996 Telecommunications Act, we must construe statutes in such a way to 'give effect, if possible, to every clause and word of a statute'.") (*quoting Williams v. Taylor*, 529 U.S. 362, 404 (2000) (internal quotation marks omitted)).

437    ATA Comments at 113.

438    NASUCA Comments at 4-5.

439    One commenter suggests that databases of emergency and cellular numbers are commercially available which can be used to exclude emergency numbers, health care facilities and wireless numbers from an automated dialer's calling list. *See* ECN Comments at 3. The Commission is not persuaded that any such databases would include all numbers covered by the prohibition at 47 U.S.C. § 227(b)(1)(A), or that such databases are sufficiently accurate. Assuming, though, that predictive dialers can be programmed to avoid calling such numbers, there would be no reason to then exclude the dialing equipment from the TCPA's prohibition.

440    *See* S. REP. No. 102-178 at 5 *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972-73 (1991) ("The Committee believes that Federal legislation is necessary to protect the public from automated telephone calls. These calls can be an invasion of privacy, an impediment to interstate commerce, and a disruption to essential public safety services.").

441    *See* 47 U.S.C. § 227(a)(1).

442    Because the statutory definition does not turn on whether the call is made for marketing purposes, we also conclude that it applies to modems that have the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See* 47 U.S.C. § 227(a)(1).

443    Customer Premises Equipment is defined in the Communications Act as "equipment employed on the premises of a person (other than a carrier) to originate, route, or terminate telecommunications." *See* 47 U.S.C. § 153(14).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 226 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

444    *See* ATA Comments at 120; ATA Further Comments at 11-12; DMA Reply Comments at 17; WorldCom Comments at 41 (asserting that predictive dialers are customer premises equipment).

445    *See* ATA Comments at 120-122 (noting that the Commission also has authority to forebear from adopting a specific rule governing predictive dialers to promote marketplace flexibility). *See also* DMA Comments at 17 ("Predictive dialers are customer premises equipment ("CPE"), and thus beyond the states' power to regulate pursuant to the Communications Act of 1934 and longstanding Commission rules and orders. These policies apply because predictive dialers are used interchangeably and inseparably for both inter- and intrastate communications, and are not susceptible to a segregated regulatory framework that would govern inter- and intrastate uses separately."); DMA Further Comments at 4.

446    *See Amendment of Section 64.702 of the Commission's Rules and Regulations (Second Computer Inquiry)*, Docket No. 20828, 77 FCC2d 384, Final Decision (1980) (*Computer II*). In the *Computer II* Order, the Commission explained that "In conferring jurisdiction upon this agency over 'all instrumentalities ... incidental to ... transmission,' the intent was '... to give the FCC ability to regulate any charge or practice associated with a common carrier service in order to insure that the carrier operated for the public benefit."' *See Computer II*, 77 FCC2d at 450, para. 170.

447    *Computer II*, 77 FCC2d at 442-43, para. 149; *see also In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace*, Report and Order, CC Docket Nos. 96-91 and 98-183, 16 FCC Rcd 7418, 7422, para. 5 (March 30, 2001).

448    *Computer II*, 77 FCC2d at 451, para. 172. The Commission explained that "[e]quipment manufacturers, distributors, and even regulated carriers routinely offer terminal equipment for sale or lease on an untariffed basis."

449    *See Computer II*, 77 FCC2d at 451-52, paras. 172-173. ("[S]uch activities are not necessarily beyond the jurisdiction of the Commission to the extent they are encompassed within the definition of wire or radio communications in Section 3(a) of the Act. The definitions of wire and radio communications in Section 3(a) and (b) are far-reaching and include 'all instrumentalities, facilities, apparatus, and services incidental to such transmission."' Indeed we explicitly find that all terminal equipment used with interstate communications services are within the Act's definition of wire and radio communications. However, the fact that the provision of incidental 'instrumentalities,' etc. is within the subject matter jurisdiction of the Act does not mandate regulation of the 'instrumentalities."') (footnotes omitted).

450    *Computer II*, 77 FCC2d at 451-452, para. 173.

451    The Commission earlier stated that "[a]ny regulation by tariff or otherwise of terminal equipment must be demonstrated to be reasonably ancillary to the effective performance of the Commission's responsibilities under Title II or 'imperative for the achievement of an agency's ultimate purposes."' *Computer II*, 77 FCC Rcd at 451-52, para. 173.

452    *See* Private Citizen Comments at 7 ("California will be implementing a 1% abandonment rate soon."); HFS at 7 ("California adopted legislation requiring a maximum for abandoned calls, but the regulatory body charged with setting the maximum has, to our knowledge, been unable to establish a maximum yet."). Oklahoma bans the use of automatic or predictive dialing devices that abandon more than 5% of calls answered per day per telemarketing campaign. *See* Okla. Stat. tit. 15, §755.1 (2002). Virginia failed to pass legislation proposing to regulate the use of predictive dialers. *See* S.B. 918, 2003 Gen. Assem. (Va. 2003).

453    In this context, war dialing uses automated equipment to dial telephone numbers, generally sequentially, and software to determine whether each number is associated with a fax line or voice line.

454    *See* Thomas M. Pechnik Comments at 6; PRC Comments at 4-5; Michael C. Worsham Comments at 5; Carl Paulson Comments; Wayne G. Strang Reply Comments at 21.

455    *See, e.g.,* Thomas M. Pechnik Comments at 5; Wayne G. Strang Reply Comments at 21.

456    *See* amended rule at 47 C.F.R. § 64.1200(a)(7).

457    47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(2).

458    47 U.S.C. § 227(b)(2)(B).

459    *See 1992 NPRM*, 7 FCC Rcd at 2737, para. 11. Among the examples of calls that do not include the transmission of any unsolicited advertisement, the Commission cited calls from a business that wishes to advise its employees of a late opening time due to weather; or calls from a nationwide organization that wishes to remind members of an upcoming meeting or change in schedule; or calls from a catalogue or delivery company to confirm the arrival, shipment, or delivery date of a product to a customer. We reiterate that such calls also would typically be covered by the exemption for an established business relationship. *See* amended 47 C.F.R. § 64.1200(f)(3).

460    *1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

461    *1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

462    NAAG Comments at 33 ("The telephone records subpoenaed for one autodialing telemarketer revealed the business was using 47 lines to leave messages that lasted less than 30 seconds. Considering that calls could be placed over at least a 14-hour period, the equipment could leave more than half a million calls per week."); Wayne G. Strang Comments at 5; Mathemaesthetics Comments at 7; Philip J. Charvat Comments at 5.

463    Michael Sprinker Comments; Dale Carson Comments; Judith Hanes Comments; Jean Armstrong Comments; NACAA Comments at 2-3.

464    *See, e.g.,* NACAA Comments at 2-3; Tom Burch Comments; James D. Gagnon Comments; Neil J. Nitzberg Comments at 1; John Cox Comments; NYSCPB - Other Than DNC List Comments at 2.

465    Debra Denson-Royal Oak Comments.

466    Dennis C. Brown December 6, 2002 Comments at 4; David Purk Comments.

467    *See, e.g.*, NCL Comments at 5.

468    NCL Comments at 5; Thomas Pechnik Comments at 8; TOPUC Comments at 4-5; Michael C. Worsham Comments at 9; City of New Orleans Comments at 8; J. Melville Capps Comments at 6-7; NAAG Comments at 37; NYSCPB Comments at 12; S. Abramson Comments at 4; NACAA Comments at 4; Wayne G. Strang Comments at 16; Philip J. Charvat Comments at 7; EPIC Comments at 13.

469    *See, e.g.,* NAAG Comments at 36-37; TOPUC Comments at 5; J. Melville Capps Comments at 6; NYSCPB Comments at 12. *See also* NAAG at 33, n. 108 (describing a prerecorded message received by many state attorneys general offices which invited the called party to call an 800 number to participate in Disney's 100th Anniversary celebration by visiting south Florida for a cost of $99 per person for three days); NAAG at 37 (describing another message that advertised a "revolutionary new product" and asked consumers to attend a local meeting to learn how to make a six-figure income. At the meeting, consumers are encouraged to purchase new products for resale.)

470    Wells Fargo Comments at 2; HFS Comments at 8; AT&T Wireless Comments at 27-28.

471    Wells Fargo Comments at 2; *see also* AT&T Wireless Comments at 27-28.

472    Joe Shields Reply Comments at 6-7.

473    *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744.

474   *TCPA*, Section 2(12), *reprinted in* 7 FCC Rcd at 2744-45.

475   47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(f)(5).

476   *See* 47 U.S.C. § 227(a)(4).

477   Therefore, a prerecorded message that contains language describing a new product, a vacation destination, or a company that will be in "your area" to perform home repairs, and asks the consumer to call a toll-free number to "learn more," is an "unsolicited advertisement" under the TCPA if sent without the called party's express invitation or permission. *See* 47 U.S.C. § 227(a)(4). However, as long as the message is limited to identification information only, such as name and telephone number, it will not be considered an "unsolicited advertisement" under our rules. *See* FTC Further Comments at 32. *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

478   The current rule exempts from the prohibition any call that is made for a commercial purpose but does not include the transmission of any unsolicited advertisement. *See* 47 C.F.R. § 64.1200(c)(2). We amend the rule to exempt a call that is made for a commercial purpose but does not include or introduce an unsolicited advertisement or *constitute a telephone solicitation. See* amended rule at 47 C.F.R. § 64.1200(a)(2)(iii).

479   *See, e.g.*, NAAG Comments at 43.

480   *See TCPA*, Section 2(12) and (13), *reprinted in* 7 FCC Rcd at 2744-45.

481   *See, e.g.*, Michael Worsham Comments at 9; Stewart Abramson Comments; City of New Orleans Comments at 8; J. Melville Capps Comments at 6.

482   *See 2002 Notice*, 17 FCC Rcd at 17478, para. 31.

483   Wayne G. Strang Reply Comments at 6-7.

484   *See* 47 C.F.R. § 64.1200(d).

485   47 C.F.R. § 64.1200(e)(2)(iv).

486   47 C.F.R. § 64.1200(f)(3).

487   *2002 Notice*, 17 FCC Rcd at 17476-77, para. 28.

488   AT&T Wireless Comments at 23; ARDA Comments at 9; ABA Comments at 4; Stewart Abramson Comments at 3; NCL Comments at 4; Carl Paulson Comments.

489   City of New Orleans Comments at 8; NCL Comments at 4; PRC Comments at 5-6.

490   *See, e.g.*, Carl Paulson Comments; City of New Orleans Comments at 7-8; Joe Shields Reply Comments at 6-7.

491   *See* amended 47 C.F.R. § 64.1200(b).

492   This would be 9 a.m. - 5 p.m., Monday through Friday, during the particular telemarketing campaign. A seller or telemarketer's telephone number must permit consumers to make their do-not-call requests in a timely manner. Therefore, the seller or telemarketer must staff the "do-not-call number" sufficiently or use an automated system for processing requests in such a way that consumers are not placed on hold or forced to wait for an agent to answer the connection for an unreasonable length of time. We also reiterate the Commission's determination in its *1995 Reconsideration Order* that any number provided for identification purposes may not be a number that requires the recipient of a solicitation to incur more than nominal costs for making a do-not-call request (*i.e.,* for which charges exceed costs for transmission of

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 229 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

local or ordinary station-to-station long distance calls). *See 1995 Reconsideration Order*, 10 FCC Rcd at 12409, para. 38. *See also* amended 47 C.F.R. § 64.1200(b)(2).

493    *See* amended 47 C.F.R. § 64.1200(d)(3).

494    47 U.S.C. § 227(b)(1)(B).

495    47 C.F.R. § 64.1200(c)(2).

496    *2002 Notice*, 17 FCC Rcd at 17478-79, para. 32.

497    NYSCPB states that they have not received complaints on these types of messages by radio and television stations. *See* NYSCPB Comments at 13.

498    Thomas Pechnik Comments at 9 (prerecorded messages sent by radio stations are commercial ads covered by the TCPA); Hershovitz Comments at 3-4 (such messages clearly prohibited under the TCPA); NAB Comments at 3 (broadcaster audience invitation calls do not promote the commercial availability or quality of property, goods or services and are therefore exempted under TCPA rules); TBT Comments at 1 (invitation to listen to a radio station is not a solicitation as defined by FCC); Michael C. Worsham Comments at 9 (true purpose of call is not charitable or political); Wayne G. Strang Reply Comments at 13-14 (calls made to increase listener/viewer shares are commercial in nature, even though no sale was made or was intended to be made); Shaw Further Comments at 4 (calls to invite a consumer to listen to a radio station are regulated by the TCPA and may not be made to numbers on the do-not-call list).

499    *See* amended 47 C.F.R. § 64.1200(a)(2)(iii). However, messages that encourage consumers to listen to or watch programming, including programming that is retransmitted broadcast programming for which consumers must pay (e.g., cable, digital satellite, etc.), would be considered advertisements for purposes of our rules.

500    *2002 Notice*, 17 FCC Rcd at 17473-74, para. 24.

501    *See supra* note 31 for a description of a "predictive dialer."

502    "Dead air" may also be the result of Answering Machine Detection (AMD) software which is used to determine whether the call has reached a live person or an answering machine. AMD may be programmed to have a certain amount of time in which to determine whether an answering machine or live person has answered the call. During this time, the consumer may experience "dead air" until either the dialer transfers the called party to a sales agent or disconnects the call. *See* ECN Comments at 3-4; Alek Szlam Comments at 4.

503    *See 2002 Notice*, 17 FCC Rcd at 17465, para. 7, n.38.

504    *See 2002 Notice*, 17 FCC Rcd at 17475, para. 26.

505    *2002 Notice*, 17 FCC Rcd at 17475-76, para. 26.

506    *See, e.g.*, NACAA Comments at 3; Pacesetter Comments at 5; WorldCom Comments at 41. We note that the vast majority of commenters that engage in telemarketing described their use of predictive dialers.

507    *See, e.g.*, F. Jenny Holder Comments at 1; Caroline Henriques Comments.

508    *See, e.g.,* NCL Comments at 4 ("It is the equivalent of sending 3 door-to-door salespeople to a neighborhood with twenty homes, using a remote technology to knock on all the doors at once, and leaving seventeen homeowners standing at their doors wondering who was there."); NACAA Comments at 3-4; TOPUC Comments at 3; NAAG Comments at 34; Edwin Bailey Hathaway Comments at 1; Stewart Abramson Comments at 1; Kent Rausch Comments (worries that when his children answer the phone, there is a predator on the other end of the line).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 230 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

509   *See, e.g.,* Thomas Callahan Comments; Vivian Sinclair Comments; Carmen Brown Comments (caretaker of husband with MS); Henry Jackson Comments.

510   *See, e.g.,* Edwin Bailey Hathaway Comments; Karen M. Meyer Comments; AARP Comments at 2.

511   *See, e.g.,* NACAA Comments at 3; Thomas Pechnik Comments at 2; Stewart Abramson Comments at 1; Katherine S. Raulston Comments at 1.

512   TOPUC Comments at 3.

513   *See, e.g.,* NAAG Comments at 34-35 (a 0% abandonment rate is the appropriate standard); NASUCA Comments at 3; TOPUC Comments at 3; AARP Comments at 2; Michael C. Worsham Comments at 6.

514   *See, e.g.,* Mathemaesthetics Comments at 6; NCL Comments at 4; Private Citizen Comments at 7.

515   ATA Comments at 109.

516   Pacesetter Comments at 5; Teleperformance Comments at 2; ATA Comments at 109; MBNA Comments at 7; NAA Comments at 15-16; Allstate Comments at 2.

517   ATA Comments at 109.

518   SER Comments at 2; MPA Comments at 21.

519   SBC Reply Comments at 4; Sytel Reply Comments at 4; DMA Reply Comments at 19.

520   Cendant Comments at 3; CBA Comments at 8; Bank of America Comments at 5; ABA Comments at 3; DialAmerica Comments at 10; ITC Further Comments at 4.

521   Sytel Comments at 7; DMA Comments at 31; Nextel Further Comments at 11 (stating that any Commission regulation of call abandonment rates should be no more restrictive than the maximum three percent rate established by the FTC).

522   Sytel Reply Comments at 2, 4.

523   *See FTC Order*, 68 Fed. Reg. at 4642. The FTC found that a three (3) percent abandonment rate was "feasible, realistic" and "fully capable" of being achieved. *Id.* at 4643. *See also* FTC Further Comments at 33-38.

524   Section 310.4(b)(1)(iv) of the amended TSR defines a prohibited abandoned outbound call as one in which the recipient of the call answers the call, and the telemarketer does not connect the call to a sales representative within two seconds of the person's completed greeting. *FTC Order*, 68 Fed. Reg. at 4642. The FTC notes that this definition of abandoned call covers "dead air" and "hang-up" calls, in which the telemarketer hangs up on a called consumer without connecting that consumer to a sales representative. *Id.*

525   Under FTC Rule 310.4(b)(4), a seller or telemarketer will not be liable for violating 310.4(b)(1)(iv) if: (i) the seller or telemarketer employs technology that ensures abandonment of no more than three (3) percent of all calls answered by a person, measured per day per calling campaign; (ii) the seller or telemarketer, for each telemarketing call placed, allows the telephone to ring for at least fifteen (15) seconds or four (4) rings before disconnecting an unanswered call; (iii) whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed greeting, the seller or telemarketer promptly plays a recorded message that states the name and telephone number of the seller on whose behalf the call was placed; and (iv) the seller or telemarketer, in accordance with 310.5(b)-(d), retains records establishing compliance with 310.4(b)(4)(i)-(iii). *FTC Order*, 68 Fed. Reg. at 4643-45.

The FTC's rules on call abandonment were to go into effect on March 31, 2003. In response to petitions filed by the DMA and ATA, the FTC determined to stay the date by which it would require compliance with the abandoned call rules until

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 231 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

October 1, 2003. The FTC concluded that "staying these provisions will provide ample time for all telemarketers who use predictive dialers to obtain, install, and test the necessary hardware or software, and should alleviate concerns that predictive dialer manufacturers might not have adequate supplies of the necessary products" by the March 31 deadline. *See* Letter from Donald S. Clark, Secretary, FTC, to Robert Corn-Revere, Ronald G. London and Paul A. Werner III, Counsel for the ATA, March 14, 2003 (available at <http:// www.ftc.gov/os/2003/03/030314ataletter.htm>). *See also Telemarketing Sales Rule* (Federal Trade Comm'n, Stay of Compliance Date), 68 Fed. Reg. 16414 (April. 4, 2003).

526    *See 2002 Notice*, 17 FCC Rcd at 17475-76, para. 26 (seeking comment on what approaches we might take to minimize any harm that results from the use of predictive dialers and on alternative approaches to the problems associated with abandoned calls).

527    However, some industry commenters indicate that a 3 percent rate still obtains productivity benefits. *See, e.g,* WorldCom Comments at 44.

528    *See* <http://www.the-dma.org/guidelines/dotherightthing.pdf.>

529    *See, e.g.,* Sprint Comments at 6 (uses 5%); CMOR Comments at 6 (uses a 1% rate); WorldCom Comments at 44 (uses 3-5%); *see also* ATA Reply Comments at 70 (many telemarketers from all industries use a 5% limit on abandoned calls); Technion Comments at 5 (uses 5% abandonment rate).

530    *See, e.g.,* Edwin Bailey Hathaway Comments; Stewart Abramson Comments at 1; Kent Rausch Comments.

531    Reese Comments at 7; ERA Comments at 16; MPA Comments at 20; DMA Reply Comments at 19-20; DialAmerica Reply Comments at 3-4 (noting that California allows compliance with its abandoned call rules over a 30-day period); DialAmerica Further Reply Comments at 5 (stating that it can achieve an average abandonment rate of 5% or less when the measuring period spans a month).

532    WorldCom Reply Comments at 20; WorldCom Further Comments at 8 (advocating that the abandonment rate be measured over a six-month period); Teleperformance Further Comments at 4; *see also* MPA Comments at 21.

533    *See, e.g.,* Reese Comments at 7; WorldCom Reply Comments at 20.

534    *See* ERA Comments at 16; Stonebridge Further Comments at 6 (three percent abandonment rate imposes an unnecessary burden on telemarketers, which should be alleviated by eliminating any reference to a per-day measure); Teleperformance Further Comments at 3.

535    *See* WorldCom Reply Comments at 19-20; Reese Comments at 7.

536    *See, e.g.,* Katherine S. Raulston Comments; Edwin Bailey Hathaway Comments; NAAG Comments at 34.

537    *See supra* discussion on the use of prerecorded messages, paras. 136-144.

538    Calls that reach voicemail or an answering machine will not be considered "answered" by the called party. Therefore, a call that is disconnected upon reaching an answering machine will not be considered an abandoned call.

539    *See* 16 C.F.R. § 310.4(b)(1)(iv).

540    *See, e.g.,* MBNA Comments at 7-8; ATA at 112. *But see* Reese Comments at 6 ("Abandons should not be defined so as to include any measure of 'time to transfer,' as these timings are not available in currently installed dialers.").

541    Technion Comments at 5.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 232 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

542    ATA Comments at 117 (suggesting a 4-second transfer requirement); DMA Reply Comments at 19 ("AMD serves perfectly legitimate business purposes causing negligible harm to consumers, but current technology simply will not ensure that 'dead air' lasts less than five seconds.").

543    *But see* Alek Szlam Comments at 5 (stating that "[o]ne possible solution is to require the threshold in the AMD to be set to err on the side of connecting vs. disconnecting. If the dialer cannot determine within the first second whether it is a live call or answering machine, it will assume that it is a live call and connect it to an agent. On the agent side, when they are passed a call that turns out to be an answering machine, they should have the ability to quickly terminate the call or to push a button to play a message. This approach will reduce the amount of dead air, while not significantly impacting the productivity of the call center agent."). *See also* Sytel Comments at 5 ("We believe that the loss of productivity (measured in terms of talk time per agent hour) that results when answering machines are connected to agents in call centers is not significant when set against the improvement in call quality that results from having live calls connected to consumers immediately i.e. not exposing consumers to 'dead air' whilst detection is done by the switch.").

544    *See* DialAmerica Comments at 10; ABA Comments at 4; Hershovitz Comments at 9. We reiterate that under the TCPA, it is unlawful to initiate any telephone call to any residential line using a prerecorded message without the prior express of the called party, absent an emergency or an exemption by Commission rule or order. Delivery of a message to an answering machine does not render the call lawful. *See* 47 U.S.C. § 227(b)(1)(B).

545    Reese Comments at 9; *see also* Convergys Comments at 7. ("Elimination of the use of AMD would cause Convergys to re-revaluate its participation in the industry.")

546    Sytel Comments at 3-4; Alek Szlam Comments at 4.

547    DialAmerica Comments at 10.

548    *See* Sytel Comments at 3-5. The Commission notes that in addition to requiring the delivery of a prerecorded identification message when a call is abandoned. Commission rules also permit prerecorded messages in limited circumstances, including when a company has an established business relationship with a consumer. *See* 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(2).

549    *See* FTC's amended TSR at 16 C.F.R. § 310.4(b)(4)(iii); *see also FTC Order*, 68 Fed. Reg. at 4644.

550    By requiring such notice, we believe consumers will be less likely to return the call simply to learn the purpose of the call and possibly incur unnecessary charges.

551    *See supra* para. 137. *See also* Wayne G. Strang Further Comments at 5-6.

552    *See, e.g.*, NASUCA Further Reply Comments at 8-9 (because the FTC's identification requirements mitigate the nuisance aspects of abandoned calls, the FCC should make an exception for prerecorded messages that are used to comply with the FTC's safe harbor provision).

553    As long as the message is limited to identification information only, it will not be considered an "unsolicited advertisement" under our rules. *See* FTC Further Comments at 32. *But see* Joe Shields Further Comments at 4-5 (arguing that all prerecorded messages that introduce a business are by definition an advertisement).

554    *See supra* discussion on prerecorded messages, paras. 136-144. Contrary to the claims of some parties, even an incidental reference to a product or service could transform the identification message into a prohibited unsolicited advertisement. *See* Nextel Further Comments at 14-15.

555    *See 1992 TCPA Order*, 7 FCC Rcd at 8770-71, para. 34.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 233 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

556    *But see* FTC Further Comments at 40-41 ("The FCC may need to eliminate the established business relationship exemption with respect to prerecorded message calls, especially if, as the FTC urges, it includes in its revised TCPA regulations provisions addressing the practice of call abandonment and creating a safe harbor.")

557    *See, e.g.*, NAAG Comments at 39; Joe Shields Reply Comments at 6-7.

558    *See* amended 47 C.F.R. § 64.1200(a)(6)(i).

559    *See* FTC Further Comments at 40-41 (under the FTC's amended rules, such prerecorded messages would be prohibited as abandoned calls).

560    DMA Comments, Exhibit 1 (Guidelines for Ethical Business Practice) at 23.

561    WorldCom Reply Comments at 20-21.

562    Sytel Comments at 3.

563    WorldCom indicated that such recommendation should not be implemented, yet stated that its dialers are programmed to disconnect the call if there is no answer after 4 ring cycles, which provides sufficient time for a consumer to reach the phone. *See* WorldCom Reply Comments at 20-21.

564    *See 1992 TCPA Order*, 7 FCC Rcd at 8773-74, para. 40.

565    Because this will result in an inconsistency with the FTC's rules, we will discuss the call abandonment rules in the report due to Congress within 45 days after the promulgation of final rules. *See* Do-Not-Call Act, Section 4.

566    *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 9.5-month implementation period for the call abandonment rules).

567    *2002 Notice*, 17 FCC Rcd at 17485, para. 45 (footnote omitted); *see also* 47 U.S.C. § 227(b)(2)(C).

568    *1992 TCPA Order*, 7 FCC Rcd at 8775, para. 45.

569    *2002 Notice*, 17 FCC Rcd at 17485, para. 43.

570    *2002 Notice*, 17 FCC Rcd at 17485, para. 45

571    Wireless carriers will begin providing local number portability (LNP) on November 24, 2003. LNP "means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. § 153(30). *See also* 47 C.F.R. § 52.21(k).

572    Wireless carriers began participating in thousands-block number pooling (pooling) on November 24, 2002. Thousands-block number pooling is a process by which the 10,000 numbers in a central office code (NXX) are separated into sequential blocks of 1,000 numbers each (thousands-blocks), and allocated separately within a rate center. *See* 47 C.F.R. § 52.20(a).

573    *2002 Notice*, 17 FCC Rcd at 17485-86, para. 46.

574    *Telephone Number Portability*, CC Docket No. 95-116, First Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 8352, 8393, para. 77 (1996) (*Number Portability First Report and Order*).

575    *Telephone Number Portability*, CC Docket No. 95-116, First Memorandum Opinion and Order on Reconsideration, 12 FCC Rcd 7236, 7272-3, paras. 59-60 (1997) (*Number Portability First Order on Reconsideration*).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 234 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

576   *Verizon Wireless's Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation*, WT Docket No. 01-184, and *Telephone Number Portability*, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, 14981, para. 23 *affirmed CTIA v. FCC*, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

577   *Id.* at 14985-86.

578   *Numbering Resource Optimization*, CC Docket No. 99-200, First Report and Order and Further Notice of Proposed Rulemaking, 15 FCC Rcd 7574 (2000) (*Numbering Resource Optimization First Report and Order*).

579   *Numbering Resource Optimization*, CC Docket No. 99-200, Third Order on Reconsideration in CC Docket No. 99-200, Third Further Notice of Proposed Rulemaking in CC Docket No. 99-200, and Second Further Notice of Proposed Rulemaking in CC Docket No. 95-116. 17 FCC Rcd 4784 at 4787, para. 9 (2002).

580   *Numbering Resource Optimization Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, Telephone Number Portability*, CC Docket Nos. 99-200, 96-98, and 95-116, Fourth Report and Order and Fourth Further Notice of Proposed Rulemaking, FCC 03-126 (rel. June 18, 2003), para. 11 (*Numbering Resource Optimization Fourth Report and Order*).

581   *Numbering Resource Optimization Fourth Report and Order. See also Numbering Resource Optimization*, CC Docket No. 99-200, Order, 17 FCC Rcd 7347 (2002) (*Pooling Rollout Schedule*).

582   *See Verizon Wireless Petition for Partial Forbearance from the Commercial Mobile Radio Services Number Portability Obligation*, WT Docket No. 01-184, and Telephone Number Portability, CC Docket No. 95-116, Memorandum Opinion and Order, 17 FCC Rcd 14972, *affirmed CTIA v. FCC*, No. 02-1264, 2003 WL 21293569 (D.C. Cir. June 6, 2003).

583   *But see* April Jordan Comments at 1; Mark A. Hiner Comments at 2; Rhett Riviere Comments (all three of whom received marketing calls on their cell phones); AT&T Wireless Comments at 29 ("little telemarketing is directed to wireless subscribers ... [although] such activity likely will increase.").

584   *See, e.g.*, CTIA Comments at 5 ("having built it, [they] will come"); AT&T Wireless Comments at 29 (reported receiving some complaints from customers regarding calls to wireless phones).

585   ARDA Comments at 12; BellSouth Comments at 6-7. *But see* Nextel Comments at 21-22 (whose report indicates that only 3 percent of wireless service subscribers have used their mobile phones to displace traditional residential landline service).

586   AT&T Wireless Reply Comments at 21.

587   Cingular Wireless Comments at 5; DMA Comments at 35; NeuStar Comments at 2.

588   *See* <http://www.dmaconsumers.org/cgi/offtelephonedave> (accessed June 2, 2003).

589   Cingular Wireless Comments at 5. This service provides a list of 280 million phone numbers that are currently used or have been set aside for CMRS carriers. *Id.*

590   American Bankers Association Comments at 5; AT&T Wireless Comments at 29; American Teleservices Association Reply at 78; Cingular Wireless Comments at 4; AT&T Wireless Reply at 21. One commenter, however, state that calls to wireless phones are an existing and growing problem. CTIA Comments at 5. *See also* AT&T Wireless Reply at 21 ("...it is likely that telemarketing to wireless phones will increase...").

591   Cingular Wireless Comments at 4-5.

592    *See, e.g.*, NASUCA Comments at 19 (suggesting that telemarketing calls to wireless phones be prohibited unless expressly authorized by the subscriber); NCL Comments at 6-7; TOPUC Comments at 7; NAAG Comments at 35-36.

593    *See, e.g.*, J. Melville Capps Comments; City of New Orleans Comments at 12.

594    *See* J. Melville Capps Comments; J. Shaw Comments at 5; NCL Comments at 6-7; City of Chicago Comments at 13; NAAG Comments at 35-36; EPIC Comments at 13 (arguing that many consider their wireless phone more personal than their wireline phone).

595    *See* NAAG Comments at 35; CTIA Comments at 4-5 (arguing that the depletion of one's minutes by unwanted telemarketing calls is a cost. Telemarketers have no way of knowing what rate plan a consumer has.).

596    *See* Sprint Comments at 10; Verizon Wireless Reply Comments at 7 (noting that statutory prohibition on autodialing and artificial messages to wireless service is absolute).

597    ATA Comments at 126-128; ATA Reply Comments at 77-80; CBA Comments at 9 (arguing that premature amendments to the rules could stifle the evolution of mobile commerce).

598    AGF Comments at 2.

599    *See, e.g.*, AGF Comments at 1.

600    CMOR Comments at 7 (if calls to cell phones are not permitted, the quality of survey research will be harmed). *But see* John Shaw Reply Comments at 13 (if survey calls are exempted from the TCPA, many sham surveys could result as telemarketers try to circumvent the regulations).

601    HFS Comments at 10; BellSouth Comments at 6-7; Bank of America Comments at 6; AGF Comments at 1.

602    ATA Comments at 130-134. *See also* HFS Comments at 10 (urging the Commission to permit even those calls to wireless numbers made by autodialers and prerecorded messages).

603    *See* 47 U.S.C. § 227(b)(1), which provides that it is "unlawful for any person within the United States to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

604    47 C.F.R. § 64.1200(a)(1)(iii).

605    47 U.S.C. § 227(b)(1)(A)(iii).

606    SMS, for example, "provides the ability for users to send and receive text messages to and from mobile handsets with maximum message length ranging from 120 to 500 characters." *Section 6002(B) of the Omnibus Budget Reconciliation Act of 1993*, 17 FCC Rcd 12985, 13051 (2002).

607    *TCPA*, Section 2(10), *reprinted in* 7 FCC Rcd at 2744. The TCPA prohibits the initiation of any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is for emergency purposes or is exempted by Commission rule or order. See 47 U.S.C. § 227(b)(1)(B).

608    *See, e.g.*, Verizon Wireless Comments at 11; J. Shaw Comments at 5; NAAG Comments at 40-41.

609    *See, e.g.*, AT&T Wireless Comments at 24.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 236 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

610    Consistent with our determination in 1992, calls made by cellular carriers to their subscribers, for which subscribers are not charged in any way for the call (either on a per minute, per call, or as a reduction in their "bucket" of minutes) are not prohibited under the TCPA. *See* Verizon Wireless Comments at 11 (noting that for "bucket" plans, exceeding the bucket allowance is not unusual).

611    We note, however, that the TCPA already prohibits live solicitation calls to wireless numbers using an autodialer. *See* 47 U.S.C. § 227(b)(1).

612    Registration on the do-not-call database will not prevent calls from entities that have an established business relationship with a wireless subscriber. Wireless subscribers who receive such live calls can easily make a company-specific do-not-call request. Moreover, we note that the record reveals that telemarketing to wireless numbers is not widespread at this time.

613    *See* Bell South Comments at 6-7; ARDA Comments at 12.

614    A USA Today/CNN/Gallop poll found that almost one in five mobile telephony users regard their wireless phone as their primary phone. *2002 CMRS Competition Report*, Section II.A.1.e, citing Michelle Kessler, *18% See Cellphones as Their Main Phone*, USA Today, Feb. 1, 2002.

615    *See* 47 C.F.R. § 64.1200(e).

616    *See supra* paras. 33-36. *See also* 47 U.S.C. § 227(b)(1)(A)(iii).

617    *See, e.g.*, Citigroup Comments at 6; Cingular Wireless Comments at 6-7; John Shaw Reply Comments at 14.

618    *See supra* paras. 160-163.

619    *See supra* para. 163.

620    Cingular Wireless Comments at 5; DMA Comments at 35; Letters from Neustar to FCC, filed January 23, 2003 and May 5, 2003.

621    *See* Letter from Neustar to FCC, filed June 4, 2003.

622    ABA Comments at 5; AT&T Wireless Comments at 29; Cingular Wireless Comments at 4; ATA Reply Comments at 78; AT&T Wireless Reply Comments at 21.

623    *See* ATA Comments at 134-36; BMO Financial Group Comments at 6; Sprint Comments at 21; ATA Reply Comments at 82. Commenters also suggest other exceptions, such as where a subscriber uses wireless as his sole telephone service, AGF Comments at 1, or where the subscriber provides his wireless number as a contact number to a business. *Id. See also* Bank of America Comments at 6; CBA Comments at 9; BellSouth Comments at 6-7.

624    *See 1992 TCPA Order*, 7 FCC Rcd at 8762, para. 17.

625    *2002 Notice*, 17 FCC Rcd at 17473, para 22.

626    Thomas Pechnik Comments at 4; TOPUC Comments at 3; Wayne G. Strang Comments at 15; Michael C. Worsham Comments at 4; Samuel E. Whitley Comments at 2; HFS Comments at 6; CTIA Comments at 7; Michael J. Blitch Comments at 5; AT&T Wireless Comments at 23; ARDA Comments at 9; Louis J Hoppman Jr. Comments; PUC of Ohio Comments at 19; TN AG Comments at 13; DialAmerica Comments at 11-12; Stewart Abramson Comments at 3; Thomas F. Kirby Comments; David Griffith Comments; Ghita & Stephan Strain Comments.

627    *See, e.g.,* Brad Totten Comments at 3; DC Hunter Comments; James D. Gagnon Comments; Brian Klug Comments; Thomas Pechnik Comments at 4; NCL Comments at 3; EPIC Comments at 12; Verizon Reply Comments at 12.

628    *See, e.g.,* F. Jenny Holder Comments at 1; Thomas Callahan Comments; Michael C. Worsham Comments at 2; NCL Comments at 4; Gregory S. Reichenbach Comments; TOPUC Comments at 6-7; EPIC Comments at 12; Stewart Abramson Comments at 3; Thomas Pechnik Comments at 4; AGF Comments at 4; Joe Shields Comments at 7.

629    OPC-DC Comments at 6; Janice G. Farkosh Comments; Leslie Price Comments; Josephine K. Presley Comments.

630    *See, e.g.,* Verizon Comments at 18; PRC Comments at 5; NYSCPB Comments at 9; PUC of Ohio Comments at 19.

631    OPC-DC Comments at 6; Owen O'Neill Comments at 1; TOPUC Comments at 3; Technion Comments at 6-7; Verizon Comments at 18; PUC of Ohio Comments at 19, NASUCA Comments at 3; Thomas Pechnik Comments at 4. *But see* NAA Comments at 17; Nextel Comments at 17-18; Comcast Comments at 14; Teleperformance Comments at 3; ABA Comments at 3 (should restrict caller ID blocking, but not require the transmission of caller ID).

632    Stewart Abramson Comments at 3.

633    Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Mastercard Comments at 7; Nextel Comments at 17-18; SER Comments at 2; Sprint Comments at 7; ECN Comments at 9 (asserting that telemarketers will provide caller ID when technologically feasible, and thus, the Commission need not adopt a caller ID requirement).

634    Teleperformance Comments at 3; WorldCom Comments at 45; DMA Reply Comments at 30; Nextel Comments at 18; SER Comments at 2; Sprint Comments at 7-8.

635    WorldCom Reply Comments at 23.

636    WorldCom Reply Comments at 23. We note that both typical T-1 and ISDN trunks contain 24 channels. ISDN trunks dedicate one channel specifically to data transmission, while typical T-1 lines dedicate all 24 channels to voice transmission.

637    DialAmerica Comments, Attachment A at 1.

638    DialAmerica Comments, Attachment A at 2.

639    DialAmerica Comments, Attachment A at 1.

640    WorldCom Reply Comments at 24.

641    "Signaling System 7" (SS7) refers to a carrier to carrier out-of-band signaling network used for call routing, billing and management. *See* 47 C.F.R. § 64.1600(f).

642    DMA Reply Comments at 30.

643    *See* 47 C.F.R. § 64.1601(d).

644    DMA Reply Comments at 29-30. *But see* NASUCA Comments at 9; Verizon Comments at 18 (indicating that caller ID is technically viable because CPN is transmitted to the LECs).

645    DMA Reply Comments at 30; WorldCom Reply Comments at 26.

646    *See, e.g.*, DMA Reply Comments at 30.

647    Jeff Mitchell Comments at 1; Martin C. Kaplan Comments at 2; City of New Orleans Comments at 8.

648    Jeff Mitchell Comments at 1; NCL Comments at 4; Xpedite Systems Comments at 12; PRC Comments at 5.

649    ECN Comments at 4.

650    *FTC Order*, 68 Fed. Reg. at 4623.

651    *FTC Order*, 68 Fed. Reg. at 4625.

652    DMA Reply Comments at 30. The DMA notes that the FCC has the requisite experience to evaluate technical feasibility and a more comprehensive view of the larger issues of how a caller ID requirement might fit into the regulation of the communications network as a whole. *See* DMA Reply Comments at 29.

653    *See* WorldCom Reply Comments at 26 (arguing that requiring caller ID could create an expectation in the minds of consumers that they should always receive the information and that such a regulation creates a situation where companies will be unfairly accused of breaking the law, and as a consequence, face undue litigation and harm to their reputations).

654    *See* Nextel Further Comments at 16 (stating that most telemarketers are currently capable of transmitting caller ID using their existing equipment, and that the FCC should adopt an approach similar to the FTC's, if it chooses to regulate the transmission of caller ID for telemarketing calls).

655    Cynthia Stichnoth Comments; Stewart Abramson Comments at 1.

656    *See, e.g.,* Sprint Comments at 7-8, CBA Comments at 8.

657    The *69 feature, available through many subscribers' telephone service providers, provides either: (1) information regarding the last incoming call, and the option to dial the caller back, or (2) the ability to return the last incoming call. Call information, however, would not be available for an incoming call, if the caller failed to transmit caller ID information or blocked such information.

658    *See FTC Order,* 68 Fed. Reg. at 4623-24.

659    "Charge number" is defined in 47 C.F.R. §64.1600(d) and refers to the delivery of the calling party's billing number by a local exchange carrier for billing or routing purposes, and to the subsequent delivery of such number to end users.

660    *See* 47 C.F.R. §§ 64.1600, 64.1601.

661    The term "ANI" refers to the delivery of the calling party's billing number by a local exchange carrier to any interconnecting carrier for billing or routing purposes, and to the subsequent delivery to end users. *See* 47 C.F.R. § 64.1600(b). ANI is generally inferred by the switch. Each line termination on the telco switch corresponds to a different phone number for ANI.

662    Provision of Caller ID information does not obviate the requirement for a caller to verbally supply identification information during a call. *See* 47 C.F.R. § 64.1200(e)(iv).

663    *See FTC Order*, 68 Fed. Reg. at 4623-28.

664    This would mean 9:00 a.m. - 5:00 p.m. Monday through Friday. A seller or telemarketer calling on behalf of a seller must be able to record do-not-call requests at the number transmitted to consumers as caller ID. Therefore, if the person answering the calls at this number is not the sales representative who made the call or an employee of the seller or telemarketer who made the call, or if the telemarketer is using an automated system to answer the calls, the seller is

Add. 178

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 239 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

nevertheless responsible for ensuring that any do-not-call request is recorded and the consumer's name, if provided, and telephone number are placed on the seller's do-not-call list at the time the request is made. *See also supra* note 492.

665    *See supra* para. 175.

666    *See* Telcordia Notes on the Networks - Notes Design and Configuration, Telcordia Technologies Special Report SR-2275, Issue 4, October 2000, pp. 4-30. *See also, Administration of the North American Numbering Plan, Carrier Identification Codes (CICs)*, CC Docket No. 92-237, Second Report and Order, 12 FCC Rcd 8024 (1997).

667    We note that a telemarketer using a service that prevents the transmission of the required caller ID information will be in violation of the Commission's caller ID rules.

668    *See* WorldCom Reply Comments at 26.

669    *See, e.g.*, Discover Comments at 7; DMA Reply Comments at 30.

670    *See, e.g.*, TOPUC Comments at 3; Verizon Comments at 18; Owen O'Neill Comments at 1; Rob McNeal Comments; Jeff Mitchell Comments at 1.

671    NASUCA Comments at 8-9; NCL Comments at 3.

672    *See* 47 C.F.R. § 64.1601(b).

673    *See* new rule at 47 C.F.R. § 64.1601(e). *See also* FTC Further Comments (explaining that the goals of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

674    *See* Notices of *Ex Parte Presentations* from WorldCom to FCC, filed May 23, 2003 and June 16, 2003 (advocating a 13-month implementation period for the caller ID rules). *See also* FTC Further Comments (explaining that the goals of regulatory consistency will be promoted if the FCC adopts caller ID requirements analogous to Amended TSR 16 C.F.R. § 310.4(a)(7)).

675    47 U.S.C. § 227(b)(1)(C). The United States Court of Appeals for the Eighth Circuit recently upheld the TCPA's provision on unsolicited faxes as satisfying the constitutional test for regulation of commercial speech. *See Missouri ex rel Nixon v. American Blast Fax, Inc.*, 323 F.3d 649 (8th Cir. 2003) (*petition for rehearing pending*).

676    47 C.F.R. § 64.1200(f)(5).

677    Specifically, the TCPA provides that the facsimile include "in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual." 47 U.S.C. § 227(d)(1)(B). The Commission determined that the sender of a facsimile message is the creator of the content of the message. *See 1997 Reconsideration Order*, 12 FCC Rcd at 4613, para. 6.

678    *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87.

679    *1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87.

680    *2002 Notice*, 17 FCC Rcd at 17482, para. 37

681    *2002 Notice*, 17 FCC Rcd at 17482-83, para. 38. The Commission sought comment specifically on the Commission's determination that a prior business relationship between a fax sender and recipient establishes the requisite consent to receive telephone facsimile advertisement transmissions. *See 2002 Notice*, 17 FCC Rcd at 17483, para. 39.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 240 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

682 Chris Hernandez Comments; Damien Blevins Comments; Peter LeCody Comments; Joe Shields Comments at 6; Mathemaesthetics Comments at 2.

683 Anthony Oppenheim Comments; W. Allen Wilkens, Jr. Comments.

684 J. Greg Coontz Comments at 15-17.

685 NCL Comments at 6.

686 Dennis C. Brown Comments at 13; City of New Orleans Comments at 11.

687 Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited [fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue. When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time..." (emphasis in original)).

688 ABM Comments at 4 (Members have found that targeted fax communication is cost-effective way to seek renewal "request" forms from existing subscribers, and to communicate with subscribers about industry trade shows.).

689 MPA Comments at 22; Nextel Comments at 25; NADA Comments at 2; Scholastic Comments at 13; Reed Comments at 2-3.

690 NADA Comments at 2; NFIB Comments at 3.

691 The term "signature" in the amended rule shall include an electronic or digital form of signature, to the extent that such form of signature is recognized as a valid signature under applicable federal law or state contract law. *See, e.g.*, Cendant Comments at 6.

692 *2002 Notice*, 17 FCC Rcd at 17483, para. 39.

693 ABM Comments at 9; DIRECTV Comments at 9-19; Hunton & Williams Comments at 5-6; Lorman Further Comments at 7 (noting that parties with an established business relationship expect to be in communications with companies with which they do business, and that any company that transmits ads by fax should be required to maintain a company-specific do-not-fax list).

694 Nextel Reply Comments at 6.

695 *See* Xpedite Reply Comments at 6; ABM Comments at 4-5; Nextel Comments at 25; DIRECTV Comments at 9-10; Lorman Further Comments at 8.

696 Biggerstaff Reply Comments at 22 (noting that express permission can easily be requested from existing customers, as paperwork is exchanged between merchants and their customers regularly); NAAG Comments at 31 (stating that treating express consent on a case-by-case basis can be costly and time-consuming, as consent is the main defense asserted by fax advertisers. NAAG suggests that the Commission adopt a concrete definition of "express," meaning definite, explicit or direct, and not left to inference).

697 NAAG Comments at 31-32 (arguing that creating an established business relationship exception runs contrary to the clear wording of the statute. "The TCPA defines 'unsolicited advertisement' as an advertisement sent to a person 'without that person's prior express invitation or permission.' A business relationship exemption would rely on *implied* invitation

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 241 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

or permission which is contrary to the clear wording of the statute." (emphasis in original; footnotes omitted)); Mark R. Lee Comments; Biggerstaff Comments at 3; John Holcomb Comments at 4; Kondos & Kondos Comments at 3-4; Marc A. Wites Comments; Wayne G. Strang Comments at 12; Michael C. Worsham Comments at 13; Wayne G. Strang Reply Comments at 16. *But see* NYSCPB Comments at 18 (recommends retaining the EBR as permission to receive faxes).

698     *See* Kondos & Kondos Comments at 1-2 and Exhibit A (noting that three versions of the House predecessor bill to the TCPA included an EBR exemption for unsolicited fax ads. "Not only is an EBR not a defense to unsolicited fax advertising under the TCPA, the U.S. Congress specifically included such a defense in numerous predecessor TCPA bills and then excluded it in the law which overwhelmingly passed in 1991." Kondos & Kondos Comments at 2); John Holcomb Comments at 4; Biggerstaff Comments at 3.

699     *See 1992 TCPA Order*, 7 FCC Rcd at 8779, para. 54, n. 87 (finding that facsimile transmissions from persons or entities that have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient). *See also* 47 C.F.R. 64.1200(f)(4) for the definition of an "established business relationship." We emphasize that, prior to the effectuation of rules contained herein, companies that transmitted facsimile advertisements to customers with whom they had established business relationships were in compliance with the Commission's existing rules.

700     NCL Comments at 6; Michael J. Blitch Comments at 7; Autoflex Comments at 1-2.

701     *See* 47 U.S.C. § 227(b)(1).

702     47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

703     *See, e.g.*, Blocklist.com Comments (operates a national do-not-fax list); Davide Di Labio Comments (should be a national fax list for those opposed to faxes); William B. Hayes Comments (no-fax lists are an alternative solution); Paul Aratow Comments (do-not-fax lists do not work); W. Allen Wilkins Comments (after responding to a "remove your fax number," receives more faxes).

704     *See* 47 U.S.C. §§ 227(b)(1)(C) and (a)(4).

705     A facsimile advertisement containing a telephone number and an instruction to call if the recipient no longer wishes to receive such faxes, would constitute a "negative option." This option (in which the sender presumes consent unless advised otherwise) would impose costs on facsimile recipients unless or until the recipient were able to ask that such transmissions be stopped.

706     *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37.

707     *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37.

708     *2002 Notice*, 17 FCC Rcd at 17482-83, para. 38.

709     ABM Comments at 8; *see also* Brunswick Comments at 8-10; DIRECTV Comments at 11 (generally, publication of a fax number should constitute permission, but consumers should be able to control the circumstances under which they will receive faxes. For example, a trade association could note in its directory that faxes are not to be used for advertising purposes).

710     *See, e.g.*, NCL Comments at 6; NAAG Comments at 31; TOPUC Comments at 6; John Holcomb Comments at 4.

711     TOPUC Comments at 6; *see also* Mathemaesthetics Reply Comments at 7 (operators of a trade show ignored request not to use fax number for advertising and began transmitting multi-page fax ads for services my business has no interest in). *But see* NADA Comments at 3 (in deciding to become a member of a trade association, the member voluntarily seeks the benefit of the association's services).

712   *1995 Reconsideration Order*, 10 FCC Rcd at 12408-09, para. 37; *see also* Hunton & Williams Comments at 7 (recommends at opt-out mechanism for unsolicited faxes).

713   *2002 Notice*, 17 FCC Rcd at 17483-84, para. 40.

714   *2002 Notice*, 17 FCC Rcd at 17483-84, para. 40.

715   AIADA Comments at 2; Nextel Comments at 40.

716   AIADA Comments at 2.

717   Nextel Comments at 38; *see also* NAAG Comments at 32 (stating that fax broadcasters that maintain their own databases of fax numbers are the subject of the vast majority of consumer complaints and state enforcement actions, and that fax broadcasters who determine the content of the advertisement or its destination should be held liable for unsolicited faxes).

718   Nextel Comments at 25, 38-40; *see also* DIRECTV Comments at 3, 9 (asking whether DIRECTV or its independent contractors have the established business relationship with a consumer).

719   Xpedite Comments at 5-7; Globecomm Comments at 4-5; ADVAL Reply Comments at 3 (fax broadcasters never see the list of recipients or the faxed document, which is often uploaded directly through the Internet); Xpedite Reply Comments at 3, 8.

720   ADVAL Reply Comments at 3; Xpedite Reply Comments at 3.

721   Xpedite Comments at 3-4; NAAG Comments at 32-33; NCL Comments at 6; ADVAL Comments at 3 ("Fax carriers should not be penalized for traffic sent by third parties.").

722   Reed Comments at 6.

723   *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

724   A high degree of involvement might be demonstrated by a fax broadcaster's role in reviewing and assessing the content of a facsimile message.

725   *See* 47 C.F.R. § 64.1200(f)(4).

726   Cox Comments at 12-19.

727   Cox Comments at 13.

728   *1992 TCPA Order*, 7 FCC Rcd at 8780, para. 54 (quoting *Use of Common Carriers*, 2 FCC Rcd 2819, 2820 (1987)).

729   Nextel Comments at 40-41.

730   47 U.S.C. § 217.

731   47 U.S.C. § 227(b)(1)(C).

732   47 U.S.C. § 227(a)(2); this definition was incorporated in § 64.1200(f)(2) of the Commission's rules.

733   *2002 Notice*, 17 FCC Rcd at 17482, para. 37.

734   *See* Nextel Comments at 31-32.

735   Nextel Reply Comments at 4-5.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 243 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

736    Michael C. Worsham Comments at 20; James Suggs Comments at 1. Commenters also note that some commercial facsimile services transmit faxes to the recipients as email attachments. We emphasize that any rules the Commission adopts with respect to unsolicited facsimile advertisements would not extend to facsimile messages transmitted as email over the Internet. *See* definition of telephone facsimile machine at 47 U.S.C. § 227(a)(2).

737    Autoflex Comments at 2; J. Greg Coontz Reply Comments at 11-15, 16-17.

738    *See* Kauffman Comments at 3. Although fax boards alone do not have the capability to transcribe text onto or from paper, the Commission nevertheless determined that fax modem boards, which enable personal computers to transmit messages to or receive messages from conventional facsimile machines or other computer fax boards, are the functional equivalent of telephone facsimile machines. *See 1995 Reconsideration Order*, 10 FCC Rcd at 12404-06, paras. 28-30.

739    H.R. REP. NO. 102-317 at 10 (1991).

740    H.R. REP. NO. 102-317 at 25 (1991).

741    *See Covington & Burling v. International Marketing & Research, Inc. et al.*, No. 01-0004360 (D.C. Sup. Ct. (April 16, 2003) (finding a fax broadcaster liable under the TCPA for transmitting unsolicited fax advertisements to a law firm's fax server).

742    47 U.S.C. § 227(d)(1)(B); 47 C.F.R. § 68.318(d).

743    *2002 Notice*, 17 FCC Rcd at 17483-84, paras. 37 and 40.

744    *1997 Reconsideration Order*, 12 FCC Rcd at 4612-13, para. 6.

745    *See* NAAG Comments at 32-33 (stating that only requiring the advertiser's identify has been a hindrance in enforcing the TCPA. It has been the states' experience that fax broadcasters, who maintain their own databases and send others' advertisements to these fax numbers, frequently omit their identifying information as the sender in order to avoid detection and enforcement action.).

746    *See* amended rule at 47 C.F.R. § 68.318(d).

747    *See supra* discussion, paras. 194-195.

748    Michael C. Worsham Comments at 11-12; NCL Comments at 6; Michael J. Blitch Comments at 7 (both seller and fax broadcaster should be identified); NAAG at 33 (should require identifying information of fax broadcaster). *But see* Xpedite Reply Comments at 8 (requiring a fax broadcaster's identifying information could confuse consumers as to who created the message. Uninvolved fax broadcasters should not be required to identify themselves on faxes.).

749    *See supra* discussion on identification requirements for telemarketers, para. 144.

750    47 U.S.C. § 227(b)(3).

751    47 U.S.C. § 227(c)(5).

752    *2002 Notice*, 17 FCC Rcd at 17486-87, para. 47.

753    Mastercard Comments at 7; BMO Financial Comments at 4; Bank of America Comments at 6; DialAmerica Comments at 14; AT&T Wireless Reply Comments at 27-28.

754    Martin C. Kaplan Comments at 2 (acknowledging that "[u]p to one call per year is permitted ... should be amended to total prohibition"); April Jordon Comments at 2; Wayne G. Strang Reply Comments at 16; NCL Comments at 7.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 244 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

755    NYSCPB Comments at 19; Michael C. Worsham Comments at 15 (Commission should clarify that once threshold of two calls received within one year is met all violations in any calls are actionable).

756    *See* DIRECTV Comments at 3-4; Nextel Comments at 39.

757    *See, e.g.,* AIA Comments at 2; AIADA Comments at 2; Kauffman Comments at 8; DIRECTV Reply Comments at 7; ABM Comments at 2.

758    *See* Hershovitz Reply Comments at 1, 8-9; Wayne G. Strang Reply Comments at 4; *see also* City of New Orleans Comments at 11; Joe Shields Reply Comments at 9.

759    47 U.S.C. § 227(c)(5).

760    *2002 Notice*, 17 FCC Rcd at 17486-87, para. 47. *See generally Establishment of Rules Governing Procedures to Be Followed When Informal Complaints Are Filed by Consumers Against Entities Regulated by the Commission; Amendment of Subpart E of Chapter I of the Commission's Rules Governing Procedures to Be Followed When Informal Complaints Are Filed Against Common Carriers; 2000 Biennial Review,* Memorandum Opinion and Order and Notice of Proposed Rulemaking, CI Docket No. 02-32, CC Docket Nos. 94-93, 00-175, 17 FCC Rcd 3919 (2002).

761    47 C.F.R. § 64.1200(e)(1).

762    *2002 Notice*, 17 FCC Rcd at 17481-82, para. 36.

763    *See, e.g.,* ATA Comments at 105; BMO Financial Comments at 5; HFS Comments at 9; Technion Comments at 7; AT&T Wireless Comments at 28.

764    Teleperformance Comments at 2; ATA Comments at 106.

765    *See, e.g.,* Melva L. Taylor Comments at 1; Michael C. Worsham Comments at 11; Robert Jaglowski Comments; Linda M. Deakl Comments; Richard M. Bryant Comments.

766    J. Melville Capps Comments; Mandy Burkart Comments; Jeff Bryson Comments; John Shaw Comments at 7 (due to the number of nighttime workers, time of day restrictions should begin at 9 am).

767    PUC of Ohio Comments at 22-23; James Wood Comments.

768    EPIC Comments at 13.

769    *See* 16 C.F.R. § 310.4(c); *see also* FTC Further Comments at 47-50 (stating that the FCC should retain its existing calling time restrictions and maintain the consistency that both agencies have sought on this issue).

770    The Commission encourages any seller or telemarketer to comply with consumers' requests not to be called during certain times of the day.

771    *See* <http://www.fcc.gov/eb/News_Releases/DOC-230145A1.html>.

772    There are other overlapping regulations such as provisions governing abandoned calls, transmission of caller ID, and time-of-day restrictions. *See supra* paras. 146-159, 173-184, 208-210.

773    47 U.S.C. § 152(b). *See supra* paras. 9 and 16.

774    *See* 47 U.S.C. § 227(f)(3), (7).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 245 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

775   Review of the FTC do-not-call database will be particularly important so that our enforcement staff can easily determine the date of any do-not-call request and the date that a company last downloaded information from the database.

776   In the course of its investigations, the Enforcement Bureau will follow up with individual complainants as appropriate. In light of the state court private right of action under the TCPA and the fact that many TCPA complaints are not against common carriers, consistent with existing practice, the staff will not necessarily contact each individual TCPA complainant. Compare 47 U.S.C. § 208.

777   Before initiating a forfeiture proceeding against most entities that do not hold an FCC authorization, the violator must have received a Commission citation and then engaged in an additional violation. 47 U.S.C. § 503(b)(5).

778   See 2002 Notice, 17 FCC Rcd at 17466, para. 8.

779   See, e.g., ATA Comments at 41-43 (stating that "[a]s a general matter, access to the [complaints] is necessary to ensure that 'interested parties have a meaningful opportunity to participate ... and that the Court has an adequate record from which to determine whether the agency properly performed its functions.'"); MBNA Comments at 10 (requesting "an opportunity to review the complaints to determine the nature of the specific practices complained of, and the extent to which such practices reasonably require new TCPA rules ...").

780   See, e.g., ABM Comments at 7; SBC Comments at 7-8, 17; BellSouth Comments at 4.

781   The ATA's FOIA request was for copies of the over 11,000 complaints about telemarketing practices received during the period January 2000 through December 2001. The request also asked for copies of all similar complaints about telemarketing practices the FCC has received since January 1, 2002; copies of the over 1,500 inquiries about predictive dialing received from June 2000 to December 2001; and any non-publicly released FCC responses to the above-referenced complaints. See Motion For Extension of Time filed by the ATA, CG Docket No. 02-278, Tab 1, Electronic FOIA Request from Ronnie London. On November 14, 2002, following a meeting with the ATA regarding its FOIA request, CGB confirmed in a letter to ATA counsel that it would take a number of months and considerable staff resources in order to provide the over 11,000 documents covered by the request. See Letter from K. Dane Snowden, FCC, to Ronnie London, Counsel to ATA, November 14, 2002.

782   See 5 U.S.C. § 552.

783   5 U.S.C. § 552(b)(6); see also 47 C.F.R. §§ 0.441 et seq.

784   5 U.S.C. § 552(a); 47 C.F.R. §§ 0.551 et seq.

785   We explained that informal complaints often contain personally identifiable information such as addresses, phone numbers, social security numbers, and personal financial information. The ATA subsequently filed an Application for Review of the Freedom of Information Action, requesting that the Commission "overturn the staff's classification of the telemarketing complaints and predictive dialing inquiries as 'not routinely available' documents" and immediately release them for public consideration. See Review of Freedom of Information Action filed by the ATA at 5, CG Docket No. 02-278, December 6, 2002. (In the alternative, ATA requested that "the Commission require the staff to significantly accelerate its release of the redacted documents in time for consideration of them in the notice and comment period, and to substantially reduce or waive the charge associated with producing the requested documents.") On December 23, 2002, the ATA filed a Motion for Expedited Review of its Application for Review of the Freedom of Information Act Action to "ensure that ATA and other parties participating in the ... proceeding are afforded timely access to critical documents central to the issues raised...by the [2002 Notice]." See Motion for Expedited Review at 1.

786   As directed by the ATA, the Commission stopped processing the FOIA on January 27, 2003. The comment period in this proceeding was subsequently extended following the release of a Further Notice, and the ATA wrote to the Commission asking that the FOIA processing continue. However, the ATA did not represent that it would pay the additional FOIA

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 246 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

fees that would accrue from the processing, and CGB wrote to the ATA for further directions. The ATA then paid for complaint records provided through January 27, 2003, and asked the Commission to continue processing the request. CGB has provided the ATA with a total of 2,420 redacted complaints thus far.

787     *See, e.g.,* ATA Comments at 36 (noting that "the Commission's tally of complaints, inquiries and website visits fails to demonstrate a significant problem ... the existence of a complaint does not amount to a violation of the rules.")

788     Other considerations included: the Commission's own enforcement experience; the amount of time that had passed since the Commission undertook a broad review of the TCPA rules, during which time telemarketing practices have changed significantly; and the actions by the FTC to consider changes to its telemarketing rules, including the establishment of a national do-not-call registry. *See 2002 Notice,* 17 FCC Rcd at 17464-68, para. 7-11.

789     *See, e.g.,* ATA Comments at 41.

790     *2002 Notice,* 17 FCC Rcd at 17461, para. 1.

791     *See* Do-Not-Call Act, Sec. 4.

792     *See* 5 U.S.C. § 604.

793     *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (*SBREFA*), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

794     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Notice of Proposed Rulemaking (NPRM) and Memorandum Opinion and Order (MO&O), 17 FCC Rcd 17459, CG Docket No. 02-278 and CC Docket No. 92-90. In the MO&O, the Commission closed and terminated CC Docket No. 92-90 and opened a new docket to address the issues raised in this proceeding.

795     Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat. 557 (2003), *to be codified at* 15 U.S.C. § 1601.

796     *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, Further Notice of Proposed Rulemaking, 68 Fed. Reg. 16250 (March 25, 2003).

797     *See* 5 U.S.C. § 604.

798     Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 (1991), *codified at* 47 U.S.C. § 227. The TCPA amended Title II of the Communications Act of 1934, 47 U.S.C. §§ 201 *et seq.*

799     *See Telemarketing Sales Rule,* 68 Fed. Reg. 4580 (Jan. 29, 2003).

800     *See TCPA,* Section 2(9), *reprinted in* 7 FCC Rcd 2736 at 2744.

801     *2002 Notice,* 17 FCC Rcd at 17497-501, paras. 70-80.

802     *See* Do-Not-Call Act, Sec. 4(b).

803     WorldCom Reply Comments at 2.

804     NEMA Comments at 8; PLP Comments at 1.

805     *See e.g.,* Yellow Pages Comments at 2.

806     NADA Comments at 2-3.

807    John Shaw Reply Comments at 10; Mathemaesthetics Comments at 6; Gail Berk Comments.

808    John Holcomb Comments at 1; Jim Carter Comments.

809    Order, paras. 21, 88.

810    *See e.g.*, MBNA Comments at 4.

811    *See e.g.*, Privacy Rights at 2.

812    NFIB Comments at 1. *See also*, PLP Comments at 4; NEMA Comments at 8.

813    MBNA Comments at 3; MBNA Reply at 7.

814    MBNA Comments at 3.

815    SBSC Comments at 2-3. *See also*, PLP Comments at 4-5; MBA Reply at 5-6; Farmers Comments at 1.

816    NAIFA Comments at 3-4. *See also*, DSA Comments at 6-7 and Vector Comments at 8-10.

817    NAMB Comments at 2; NRF Comments at 9-10.

818    MBA Comments at 3.

819    DSA Comments at 4-5. *See also*, NAA Comments at 10-11.

820    MBA Comments at 3. *See also*, MPA Comments at 10-11 ("small businesses will be daunted by or unable to afford the computer processing time and expense involved in 'scrubbing' their relatively small marketing lists against a [national list]"); *see also* NRF Comments at 9.

821    Strang Reply Comments at 12. *See also* Joe W. McDaniel-First Dec 4, 2002 Comments.

822    Yellow Pages Comments at 2-4.

823    Mathemaesthetics Comments at 6.

824    Mathemaesthetics Comments at 6.

825    David T. Piekarski Comments (Docket No. 03-62) at 1-2.

826    NCS Comments at 4-5. *See also*, Mathemaesthetics Comments at 7-8.

827    NCS Comments at 5.

828    *2002 Notice*, 17 FCC Rcd at 17470-71, para. 17.

829    *2002 Notice*, 17 FCC Rcd at 17470-71, para. 17.

830    MBA Comments at 6.

831    MBA Comments at 6-7.

832    MBA Comments at 6-7.

833    NFIB Comments at 2.

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 248 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

834    NFIB Comments at 2.

835    NFIB Comments at 2.

836    NADA Comments at 2.

837    NADA Comments at 2.

838    NADA Comments at 2.

839    *See, e.g.*, NASUCA Comments at 17-18; DMA Comments at 20-21; Nextel Reply Comments at 11-13.

840    DMA Comments at 20.

841    DMA Comments at 20.

842    Nextel Reply Comments 12-13.

843    Privacy Rights Comments at 4-5.

844    Privacy Rights Comments at 4-5.

845    NFIB Comments at 3-4. *See also*, NADA Comments at 2-3.

846    NFIB Comments at 3-4.

847    NFIB Comments at 3-4. *But see,* Mathemaesthetics Comments at 2-5.

848    NADA Comments at 2.

849    NADA Comments at 2.

850    Mathemaesthetics Comments at 2.

851    Jeff Bryson Comments; Carolyn Capps Comments at 2.

852    Michael C. Addison Comments.

853    John Holcomb Comments at 1.

854    Jim Carter Comments; JC Homola Comments; Autoflex Comments at 1-2; Rob McNeal Comments (unsolicited faxes costs company tens of thousands of dollars each year in materials and employee time); *see also* NCL Comments at 6 ("[P]eople who work out of their homes are especially harmed by unsolicited faxes, which use up their paper and toner and tie up their machines."); Mathemaesthetics Reply Comments at 7 ("[U]nsolicited [fax] ads caused my business fax machine to become prematurely empty, which rendered *wholly useless* the equipment my small business crucially depends on for its revenue. When a customer of mine a short time later attempted to fax a purchase order for over $3,000 worth of my company's product, my empty fax machine was not able to capture this transaction for a significant period of time ... ." (emphasis in original)).

855    NFIB Comments at 2 (emphasis added).

856    NYSCPB-Other Than National DNC List Comments at 9-10.

857    NYSCPB-Other Than National DNC List Comments at 9.

858     NYSCPB-Other Than National DNC List Comments at 10.

859     5 U.S.C. § 604(a)(3).

860     5 U.S.C. § 601(6).

861     5 U.S.C. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632). Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comments, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

862     15 U.S.C. § 632.

863     47 C.F.R. § 64.1200.

864     *See* SBA, Programs and Services, SBA Pamphlet No. CO-0028, at page 40 (July 2002).

865     1992 Economic Census, U.S. Bureau of the Census, Table 6 (special tabulation of data under contract to Office of Advocacy of the U.S. Small Business Administration).

866     *See* 13 C.F.R. § 121.201, NAICS code 561422.

867     U.S. Census Bureau, 1997 Economic Census, Subject Series: "Administrative and Support and Waste Management and Remediation Services, Receipts Size of Firms Subject to Federal Income Tax: 1997," Table 4, NAICS code 561422 (issued Oct. 2000).

868     Order, paras 16-85.

869     Order, paras. 129-134, 146-159.

870     Order, paras. 173-184.

871     Order, paras. 185-203.

872     5 U.S.C. § 603(c)(1)-(c)(4).

873     Order, paras. 25-41.

874     *See e.g.*, MBNA Comments at 4.

875     *See e.g.*, Privacy Rights Comments at 2.

876     Order, paras. 46-49, 54.

877     *See e.g.*, Mathemaesthetics Comments at 6.

878     Order, para. 54.

879     *See e.g.*, MBA Reply at 3; NAA Comments at 3; SBSC Comments at 2; PLP Comments at 5.

880     NCS Comments at 4-5.

881     *See e.g.*, NAA Comments at 12-14 (exempt newspapers); NAIFA Comments at 3 (exempt referral calls); SBSC Comments at 2 (exempt local calls); MBA Comments at 5 (exempt calls to set up face-to-face meetings).

Case: 25-4066, 10/10/2025, DktEntry: 17.1, Page 250 of 258

In re Rules and Regulations Implementing the Telephone..., 18 FCC Rcd. 14014...

882     Order, paras. 46-54.

883     Order, para. 94.

884     Order, para. 94.

885     Order, para. 92.

886     Order, para. 113.

887     See *FTC Order*, 68 Fed. Reg. 4580 at 4591-94.

888     *See, e.g.*, Bank of America Comments at 4 (36 months); MPA Comments at 12-13 (24 months); Sprint Comments at 18 (12 months).

889     *2002 Notice*, 17 FCC Rcd at 17475-76, para. 26.

890     Mathemaesthetics Comments at 6.

891     WorldCom Reply at 18-19.

892     Order, paras. 150-152.

893     *See, e.g.*, WorldCom Further Comments at 8; Teleperformance Further Comments at 4.

894     NFIB Comments at 3-4.

895     John Holcomb Comments at 1; Mathemaesthetics Comments at 2-3.

896     Order, para. 189.

897     Order, para. 191.

898     Order, para. 93.

899     MBA Comments at 6-7.

900     *See* 5 U.S.C. § 801(a)(1)(A).

901     *See* 5 U.S.C. § 604(b).

**18 FCC Rcd. 14014 (F.C.C.), 18 F.C.C.R. 14014, 29 Communications Reg. (P&F) 830, 2003 WL 21517853**

---

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 190

H.R. REP. 108-8, H.R. Rep. No. 8, 108TH Cong., 1ST Sess. 2003, 2003 WL 294707, 2003 U.S.C.C.A.N. 668 (Leg.Hist.)

P.L. 108-10, **\*1** **\*\*668** DO-NOT-CALL IMPLEMENTATION ACT

HOUSE REPORT NO. 108–8

February 11, 2003

Mr. Tauzin, from the Committee on Energy and Commerce, submitted the following

REPORT

[To accompany H.R. 395]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 395) to authorize the Federal Trade Commission to collect fees for the implementation and enforcement of a "do-not-call" registry, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## CONTENTS

| | Page |
|---|---|
| Purpose and Summary | 1 |
| Background and Need for Legislation | 2 |
| Hearings | 5 |
| Committee Consideration | 5 |
| Committee Votes | 5 |
| Committee Oversight Findings | 5 |
| Statement of General Performance Goals and Objectives | 5 |
| New Budget Authority, Entitlement Authority, and Tax Expenditures | 5 |
| Committee Cost Estimate | 6 |
| Congressional Budget Office Estimate | 6 |
| Federal Mandates Statement | 8 |
| Advisory Committee Statement | 8 |
| Constitutional Authority Statement | 8 |
| Applicability to Legislative Branch | 8 |
| Section-by-Section Analysis of the Legislation | 8 |
| Changes in Existing Law Made by the Bill, as Reported | 10 |

PURPOSE AND SUMMARY

The purpose of H.R. 395 is to authorize the Federal Trade Commission (FTC or Commission) to collect fees from telemarkers to **\*2** fund the implementation and enforcement of the Commission's national do-not-call registry, and for other purposes.

BACKGROUND AND NEED FOR LEGISLATION

Telemarketing has been, and continues to be, a controversial marketing practice. Telemarketing can provide many benefits for consumers, such as introducing them to new opportunities or products. According to a DRI–WEFA Group study, [1] Economic Impact, U.S. Direct and Interactive Marketing Today, 2002 Forecast, in 2001, consumer **\*\*669** outbound telephone marketing generated $274.2 billion in sales, accounting for 27.3 percent of all consumer direct marketing sales. In fact, outbound telemarketing alone generated almost four percent of all U.S. consumer sales in 2001. In 2001, the telemarketing industry that markets to consumers was estimated to employ 4.1 million workers.

Unfortunately, certain telemarketing practices can be an intrusive nuisance for consumers, an invasion of privacy, and a source of consumer confusion. In some instances, unscrupulous telemarketers have taken advantage of this confusion and committed fraud against consumers. Indeed, the FTC receives thousands of complaints annually regarding a variety of telemarketing practices. According to the FTC, consumer complaints regarding unwanted telemarketing calls increased over one-thousand percent between 1998 and 2002.

In order to assist consumers in dealing with telemarketing, Congress provided authority to the FTC and the Federal Communications Commission (FCC) to limit these intrusions into their homes. Under the Telemarketing and Consumer Fraud and Abuse Prevention Act (15 U.S.C. S S 6101–08) enacted by Congress in 1994, the FTC implemented the Telemarketing Sales Rule (TSR). The TSR requires telemarketers to make certain disclosures and prohibits certain misrepresentations. These rules required company-specific do-not-call lists, required callers to identify the seller, their purpose and the nature of what is being sold, limited commercial telephone solicitations to between 8:00 a.m. and 9:00 p.m., and gave state law enforcement officers the authority to prosecute fraudulent telemarketers who operate across state lines.

Congress also enacted the Telephone Consumer Protection Act (TCPA) of 1991 (47 U.S.C. S –227). Regulated by the FCC, the TCPA, among other things, requires telemarketers to abide by do-not-call requests from consumers, restricts telemarketing calling hours to 8:00 a.m.–9:00 p.m., mandates that telemarketers provide the name of the solicitor, name of the entity calling, and the telephone number or address where that person may be contacted, and includes a private right of action. Exemptions exist for established business relationships and tax-exempt non-profit organizations, such as those of a charitable or political nature.

In addition to the FTC and FCC regulations, many states also maintain some form of a do-not-call list, and the Direct Marketing Association also maintains a self-regulated do-not-call list, called the Telephone Preference Service, used by its members. [2] Despite **\*3** these restrictions, telemarketing complaints continue to rise and there is an increasing need to provide consumers with the ability to opt-out of telemarketing calls.

To address the consumer demand, pursuant to its authority under the Telemarketing and Consumer Fraud and Abuse Prevention Act, the FTC initiated a rulemaking in January 2002 to create a national do-not-call registry and announced the adoption of its do-not-call amendments on December 18, 2002. The Commission's do-not-call registry allows consumers who prefer not to receive telemarketing calls to contact the FTC to be **\*\*670** placed on its do-not-call list. Telemarketers would be required to subscribe to the national do-not-call registry and to refrain from calling consumers who have placed their telephone numbers on this registry.

The FTC provided telemarketing exemptions in the TSR for companies with an "established business relationship" with a consumer lasting up to 18 months after the last purchase or delivery, or the last payment, unless the company is asked not to

call again. The TSR also exempts telemarketers calling to solicit charitable contributions, although calls made by for-profits on behalf of non-profits are required to maintain an organization-specific do-not-call list.

In order to implement the do-not-call registry, the Commission needs Congressional authorization to collect fees from the telemarketing industry. It is anticipated that fees collected will offset the appropriation that, in FY 2003, is estimated at $16 million. On May 29, 2002, the FTC issued a Request for Public Comment asking for guidance on the collection of fees. Under the new authority provided by H.R. 395, the Commission intends to initiate a notice of proposed rulemaking on how the fee collection process will operate once authorization and funding are acquired.

It is the strongly held view of the Committee that a national do-not-call list is in the best interests of consumers, businesses and consumer protection authorities. This legislation is an important step toward a one-stop solution to reducing telemarketing abuses. The FTC's rule, however, is only one piece of a multi-jurisdictional puzzle. Of primary concern to the Committee is the possibility for conflicting regulations. In addition to the FTC's national do-not-call registry, twenty-seven states[3] maintain some form of a do-not-call program, and the FCC requires businesses to maintain company-specific do-not-call lists. How these different regulatory regimes can compliment each other and work as one national program is still unclear.

The Commission's do-not-call registry, standing alone, will not stop all telemarketing calls. Due to the limited jurisdiction of the FTC, there are telemarketing calls that cannot be covered by the FTC's do-not-call rule. The Commission does not have jurisdiction over common carriers (such as telephone companies and airlines), insurance companies, banks, credit unions, political solicitations, or intrastate telemarketing calls. Under the Commission's do-not-call rule, if one of these non-covered entities contracts with a third-party telemarketing company to place a call, that call would be covered **\*4** by the FTC's rule. However, if one of these non-covered entities makes the same telemarketing call in-house, that call would not be covered by the FTC's do-not-call rule.

The FCC's do-not-call rules were created under the TCPA. That statute explicitly gives the FCC the authority to set up a national do-not-call database. In 1992, the FCC undertook a rulemaking, and after reviewing comments, determined that a national do-not-call list was too costly and burdensome at that time. The FCC instead opted to require telemarketers to maintain company-specific do-not-call lists. On September 12, 2002, the **\*\*671** FCC issued a notice of proposed rulemaking to review and possibly revise its do-not-call rules. The comment period closed on January 31, 2003, and the FCC's Chief of Consumer and Governmental Affairs Bureau announced that the FCC's goal is to avoid regulatory duplication by working closely with the FTC and fashioning rules that benefit consumers and the telemarketing industry.

As the FCC undertakes the process of revising its do-not-call regulations, there is the potential for inconsistencies between the FTC and FCC do-not-call rules. To address this issue, H.R. 395 directs the FCC to complete its rulemaking within 180 days of enactment and further requires the FCC to consult and coordinate with the FTC to maximize consistency between the two regulations. However, because the FCC is bound by the TCPA, it is impossible for the FCC to adopt rules identical to the FTC's TSR.

There are areas in which the FTC do-not-call rule is in conflict with the TCPA, such as the FTC's rule providing for a safe harbor from the call "abandonment" requirements if a telemarketer, among other things, leaves a recorded message. Under the TCPA, however, Congress by statute prohibited telemarketers from leaving recorded messages. In order to remedy these types of inconsistencies, either the FTC or FCC must address them administratively, or Congress must address them legislatively. We encourage the FTC and the FCC to take the necessary steps to make their rules as consistent and compatible as possible.

Similarly, some members of the Committee raised concerns about how the FTC do-not-call rule will work in conjunction with the existing twenty-seven state do-not-call laws. The Commission's do-not-call rules do not preempt the state lists, although the FTC has committed to "harmonizing" the Commission's rule with the state laws. We are encouraged with the FTC's commitment and efforts to work with the states to ensure a harmonized approach, although some remain concerned that consumers and businesses could continue to face conflicting and confusing regulatory approaches. In light of the fact that many states have

Add. 193

unique laws with protections for local industries or exemptions for certain products, for example, at least 12 states have developed specific provisions for local newspapers, we encourage the FTC to work diligently to persuade states to adopt the FTC's rule. The Committee cannot understate the importance of the FTC working aggressively to seek such harmonization, and we will continue to follow the FTC's progress on this issue. The Committee takes no position on the issue of state preemption in H.R. 395.

While this bill focuses on the necessary authority to establish the do-not-call registry, the Committee maintains a great deal of interest in the entire TSR produced by the FTC. Taken as a whole, the **\*5** amended TSR is a positive development that will help consumers. The Committee is interested in working with the FTC to better understand some of the implementation details of the rule that could raise some practical problems that could affect employment and small business. As the registry becomes available, we encourage the FTC to implement aggressive education efforts, including national awareness campaigns and a toll-free number with strong consumer recall.

The Committee is committed to holding hearings during the 108th Congress to better understand how these different do-not-call regulatory regimes can best be coordinated to protect consumers in a manner that is fair and balanced to industry participants.

## **\*\*672** HEARINGS

The Committee on Energy and Commerce did not hold hearings on H.R. 395. The Full Committee did hold a briefing on January 8, 2003 where FTC Chairman Muris testified.

## COMMITTEE CONSIDERATION

On Wednesday, January 29, 2002, the Full Committee on Energy and Commerce met in open markup session and ordered H.R. 395, favorably reported to the House, without amendment, by a voice vote, a quorum being present.

## COMMITTEE VOTES

Clause 3(b) of rule XIII of the Rules of the House of Representatives requires the Committee to list the record votes on the motion to report legislation and amendments thereto. There were no record votes taken in connection with ordering H.R. 395 reported. A motion by Mr. Tauzin to order H.R. 395 reported to the House was agreed to by a voice vote.

## COMMITTEE OVERSIGHT FINDINGS

Pursuant to clause 3(c)(1) of rule XIII of the Rules of the House of Representatives, the Committee has not held oversight or legislative hearings on this legislation.

## STATEMENT OF GENERAL PERFORMANCE GOALS AND OBJECTIVES

The goal of this legislation is to authorize the FTC to collect fees from the telemarketing industry to fund the operation and enforcement of the do-not-call registry.

## NEW BUDGET AUTHORITY, ENTITLEMENT AUTHORITY, AND TAX EXPENDITURES

In compliance with clause 3(c)(2) of rule XIII of the Rules of the House of Representatives, the Committee finds that H.R. 395, the "Do-Not-Call Implementation Act," would result in no new or increased budget authority, entitlement authority, or tax expenditures or revenues.

Add. 194

**\*6**  COMMITTEE COST ESTIMATE

The Committee adopts as its own the cost estimate prepared by the Director of the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974.

**\*\*673**  CONGRESSIONAL BUDGET OFFICE ESTIMATE

**\*\*0**  Pursuant to clause 3(c)(3) of rule XIII of the Rules of the House of Representatives, the following is the cost estimate provided by the Congressional Budget Office pursuant to section 402 of the Congressional Budget Act of 1974:

> U.S. Congress,
> Congressional Budget Office,
> Washington, DC, February 4, 2003.

Hon. W.J. "Billy" Tauzin,
Chairman, Committee on Energy and Commerce,
House of Representatives, Washington, DC.

Dera Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 395, the Do-Not-Call Implementation Act.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Ken Johnson (for federal costs), Victoria Heid Hall (for the state and local impact), and Jean Talarico (for the private-sector impact).

Sincerely,

> Barry B. Anderson,
> Acting Director.

Enclosure.

H.R. 395–Do-Not-Call Implementation Act

Summary: H.R. 395 would authorize the Federal Trade Commission (FTC) to collect and spend new fees during the 2003–2007 period for the purpose of creating a national "do-not-call" registry. The "do-not-call" registry is a list of consumers whom telemarketers would be prohibited from calling because the consumers do not wish to receive such calls.

Based on information from the FTC, CBO estimates that the agency would collect and spend a total of about $73 million in fees over the 2003–2008 period to implement H.R. 395, assuming appropriation of the necessary amounts. Over the six-year period, the total net effect on the federal budget would be insignificant. Enacting H.R. 395 would not affect direct spending or revenues.

H.R. 395 contains no intergovernmental mandates as defined in the Unfunded Mandates Reform Act (UMRA) and would impose no costs on state, local, or tribal governments. By authorizing the FTC to collect fees from telemarketing firms, H.R. 395 would impose a private-sector mandate as defined by UMRA. CBO expects that the cost of that mandate would fall well below the annual threshold for the private sector established by UMRA ($117 million in 2003, adjusted annually for inflation).

Estimated cost to the Federal Government: The estimated budgetary impact of H.R. 395 is shown in the following table. The costs of this legislation fall within budget function 370 (commerce and housing credit).

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Add. 195

**\*7** Basis of estimate: H.R. 395 would authorize the FTC to collect fees sufficient to create and operate a "do-not-call" registry, contingent upon the approval of the fees in appropriation acts. For this estimate, CBO assumes that H.R. 395 and the necessary appropriation provisions will be enacted by the middle of this fiscal year. Based on information from the FTC, CBO expects that the agency would start collecting fees from telemarketers in 2003, in amounts equal to the full estimated cost of the registry.

The costs of operating the "do-not-call" registry would have four main components: purchasing new computer systems, designing and maintaining those systems, hiring personnel to manage the registry and investigate violations, and advertising the new system to consumers. Based on information from the FTC, CBO estimates that the initial costs of purchasing the computer system would amount to about $1 million in 2003, $8 million in 2004, and $4 million in 2005. We expect that these costs would decline to between $1 million and $2 million a year during the 2006–2008 period. CBO estimates that designing and maintaining these computer systems would cost about $45 million over the 2003–2008 period. Finally, staff salaries and advertising expenses would together amount to an estimated $2 million each year.

In sum, CBO estimates that the FTC would implement H.R. 395 by collecting and spending a total of about $73 million in fees over the 2003–2008 period, assuming the **\*\*674** necessary appropriations action. Over this six-year old period, CBO estimates that the total net effect of the bill on the federal budget would be insignificant.

If the FTC continued to operate the "do-not-call" registry beyond 2007, CBO estimates annual operating costs would be about $13 million a year, assuming appropriation of the necessary amounts. H.R. 395 would authorize the collection of fees to offset those costs through 2007.

Estimated impacts on direct spending and revenues: None.

Estimated impact on state, local, and tribal governments: H.R. 395 contains no intergovernmental mandates as defined in UMRA and would impose no costs on state, local, or tribal governments.

Estimated impact on the private sector: The final rule that provides for a national "do-not-call" registry was published on January 29, 2003, in the Federal Register. Under that rule, telemarketing firms will be required to search the national registry at least four times a year and drop from their call lists the telephone numbers of consumers who have registered. The FTC anticipates that full **\*8** compliance with the "do-not-call" provision will be required within a few months after funding has been approved.

In order to implement the national "do-not-call" registry, and subject to approval in appropriation acts, H.R. 395 would authorize the FTC to collect fees from telemarketing firms and certain businesses associated with those firms that sell goods and services. The duty to pay those fees would be considered a private-sector mandate under UMRA. Assuming the necessary appropriation action, CBO estimates that the fees would amount to no more than $18 million annually over the next five years. Consequently, the cost of the mandate would fall well below the annual threshold for private-sector mandates established by UMRA ($117 million in 2003, adjusted annually for inflation).

## FEDERAL MANDATES STATEMENT

The Committee adopts as its own the estimate of Federal mandates prepared by the Director of the Congressional Budget Office pursuant to section 423 of the Unfunded Mandates Reform Act.

## ADVISORY COMMITTEE STATEMENT

Add. 196

No advisory committees within the meaning of section 5(b) of the Federal Advisory Committee Act were created by this legislation.

## CONSTITUTIONAL AUTHORITY STATEMENT

Pursuant to clause 3(d)(1) of rule XIII of the Rules of the House of Representatives, the Committee finds that the Constitutional authority for this legislation is provided in Article I, section 8, clause 3, which grants Congress the power to regulate commerce with foreign nations, among the several States, and with the Indian tribes.

## **675 APPLICABILITY TO LEGISLATIVE BRANCH

The Committee finds that the legislation does not relate to the terms and conditions of employment or access to public services or accommodations within the meaning of section 102(b)(3) of the Congressional Accountability Act.

## SECTION-BY-SECTION ANALYSIS OF THE LEGISLATION

Section 1. Short title

Section 1 establishes the short title as the "Do-Not-Call Implementation Act."

Section 2. Telemarketing Sales Rule; do-not-call registry fees

Section 2 authorizes the FTC to promulgate regulations to collect offsetting fees sufficient to implement and enforce the national do-not-call registry. The authorization is effective between fiscal years 2003–2007. The FTC may only collect the amounts as provided for in advance in appropriations Acts. The funds collected shall only be used to offset the costs of activities and services related to the implementation and enforcement of the Telemarketing Sales Rule, and other activities resulting from such implementation and enforcement.

In its forthcoming rulemaking to establish fees, the FTC should ensure that the fees are commercially reasonable and do not exceed  **9  the amounts necessary to effectively establish, maintain, and enforce the do-not-call rules.

No section of this Act should be construed by the FTC to confer any additional authority to regulate common carriers, or any other industries, outside of the Commission's statutory jurisdiction under the Federal Trade Commission Act (15 U.S.C. S 1 et seq).

Section 3. Federal Communications Commission do-not-call regulations

Section 3 directs the FCC, within 180 days of enactment, to issue a final do-not-call rule pursuant to the rulemaking proceeding initiated on September 18, 2002, under the TCPA. The FCC is directed to consult and coordinate with the FTC to maximize consistency with the do-not-call rule promulgated by the FTC.

In enacting section 3, it is not the intent of the Committee to dictate the outcome of the FCC's pending rulemaking proceeding. At the same time, however, it does endeavor to prevent situations in which legitimate users of telephone marketing are subject to conflicting regulatory requirements. The purpose of the consultation and coordination requirements of section 3 and the reporting requirements of section 4 are intended to prevent this possibility from becoming reality. The Committee further recognizes that the TCPA requires the FCC to consider a variety of factors in structuring a national do-not-call list. It is not the Committee's intent to foreclose consideration of those factors by enacting this legislation.

Add. 197

**\*\*676**  Section 4. Reporting requirements

Section 4(a) requires the FTC and the FCC to each, within 45 days of the FCC completing a final do-not-call rule, to report to the Committee on Energy and Commerce in the House of Representatives and the Committee on Commerce, Science, and Transportation in the Senate on the following: (1) an analysis of the telemarketing rules created by the FTC and FCC; (2) any inconsistencies between the two rules and the effect of any such inconsistencies on consumers and purchasers of the do-not-call registry; and (3) proposals to remedy any inconsistencies.

Section 4(b) contains an annual reporting requirement that mandates the FTC and FCC to report to the Committee on Energy and Commerce in the House of Representatives and the Committee on Commerce, Science, and Transportation in the Senate on the following: (1) an analysis of the effectiveness of the do-not-call registry as a national registry; (2) number of consumers placed on the registry; (3) the number of persons paying for access to the registry; (4) an analysis of the progress of coordinating the operation and enforcement of the do-not-call registry with other similar state registries; (5) an analysis of the progress of coordinating the operation and enforcement of the do-not-call registry with the enforcement activities of the FCC; and (6) a review of the enforcement activities of the FTC under the Telemarketing Sales Rule and of the FCC under the TCPA. The annual reporting requirement is applicable to fiscal years 2003–2007.

**\*10**  CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

\* \* \* \* \* \* \*

1 This study was commissioned by the Direct Marketing Association.

2 While all members of the Direct Marketing Association are required to participate in the Telephone Preference Service, the Association may apply sanctions only against its members. The Direct Marketing Association has approximately 5,000 members. There are approximately 4 million consumers who have subscribed to the Telephone Preference Service.

3 Alabama, Alaska, Arkansas, California (effective April 1, 2003), Colorado, Connecticut, Florida, Georgia, Idaho, Illinois (effective July 1, 2003), Indiana, Kansas, Louisiana, Massachusetts (effective April 1, 2003), Maine, Minnesota, Missouri, New York, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Vermont, Wisconsin and Wyoming.

H.R. REP. 108-8, H.R. Rep. No. 8, 108TH Cong., 1ST Sess. 2003, 2003 WL 294707, 2003 U.S.C.C.A.N. 668 (Leg.Hist.)

**End of Document**          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 198